# EXHIBIT 14

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, DC**

**Before the Honorable Charles E. Bullock**
**Chief Administrative Law Judge**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | **Investigation No. 337-TA-1191** |

**COMMISSION INVESTIGATIVE STAFF'S**
**<u>INITIAL *MARKMAN* BRIEF</u>**

Margaret D. Macdonald, Director
Jeffrey T. Hsu, Supervisory Attorney
Cortney C. Hoecherl, Investigative Attorney
**OFFICE OF UNFAIR IMPORT INVESTIGATIONS**
U.S. International Trade Commission
500 E Street SW, Suite 401
Washington, D.C.  20436
(202) 205-2582
(202) 205-2158 (facsimile)

July 13, 2020

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   LEGAL STANDARDS .......................................................................................... 1

III.  LEVEL OF ORDINARY SKILL IN THE ART ................................................... 3

IV.   U.S. PATENT NO. 9,195,258 ................................................................................ 4

   A.   Background and Overview of the Patent ........................................................ 4

   B.   Agreed-Upon Constructions ............................................................................ 6

   C.   Discussion of the Disputed Claim Terms ....................................................... 6

     1.   "local area network (LAN)"..................................................................... 6

       a.   The Term Should Be Given Its Plain and Ordinary Meaning ................... 6

       b.   Sonos' Construction Is Not Supported by the Intrinsic Evidence ............. 7

       c.   Sonos' Construction Is Inconsistent with the Pertinent Extrinsic Evidence.............. 9

V.    U.S. PATENT NO. 10,209,953 ........................................................................... 10

   A.   Background and Overview of the Patent ...................................................... 10

   B.   Agreed-Upon Constructions .......................................................................... 12

   C.   Discussion of the Disputed Claim Terms ..................................................... 12

     1.   "local area network (LAN)"................................................................... 12

VI.   U.S. PATENT NO. 9,219,959 .............................................................................. 13

   A.   Background and Overview of the Patent ...................................................... 13

   B.   Agreed-Upon Constructions .......................................................................... 15

   C.   Discussion of the Disputed Claim Terms ..................................................... 15

     1.   "equalization [of the audio data]"......................................................... 15

       a.   The Staff's Construction Is Supported by the Intrinsic Evidence............ 16

       b.   The Staff's Construction Is Supported by the Pertinent Extrinsic Evidence ........... 18

       c.   The Staff Does Not Object to Replacing "Output Audio Data" In Its Proposed Construction With "Audio Data".................................................. 20

     2.   "[first/second] type of pairing" ............................................................. 20

a.    The Term Should Be Given Its Plain and Ordinary Meaning ................................. 21

b.    The Claim Language and the Specification Explicitly Disclose "No Pairing" As A "Type of Pairing" .............................................................................................................. 21

c.    Judicial Estoppel Does Not Apply ........................................................................ 22

**VII. U.S. PATENT NO. 8,588,949** ........................................................................... **23**

**A.    Background and Overview of the Patent** .......................................................... **23**

**B.    Agreed-Upon Constructions** .......................................................................... **24**

**C.    Discussion of the Disputed Claim Terms** ........................................................ **24**

1.    "local area network (LAN)" ................................................................................ 25

2.    "independent playback device" .......................................................................... 26

a.    The Staff's Construction Is Supported by the Claim Language and the Specification ............................................................................................................. 27

b.    The Staff's Construction Is Supported by the Prosecution History .................... 28

c.    Google Has Not Met Its Burden of Showing That the Claims Are Indefinite ......... 34

**VIII. U.S. PATENT NO. 10,439,896** ........................................................................ **35**

**A.    Background and Overview of the Patent** .......................................................... **35**

**B.    Agreed-Upon Constructions** .......................................................................... **37**

**C.    Discussion of the Disputed Claim Terms** ........................................................ **37**

1.    "wireless local area network (WLAN)" ................................................................ 37

2.    "security key" .................................................................................................... 38

a.    The Term Should Be Given Its Plain and Ordinary Meaning ................................. 39

b.    Google's Construction Is Not Supported by the Intrinsic Evidence ........................ 39

c.    Google's Construction Is Inconsistent with the Pertinent Extrinsic Evidence ......... 41

3.    Element 1F and Element 1G ................................................................................ 42

4.    Element 1E and Element 1F ................................................................................ 44

5.    "at least a second message…" ........................................................................... 47

a.    The Term Should Be Given Its Plain and Ordinary Meaning ................................. 48

b.    The Specification Supports the Staff's and Google's Understanding of the Claim Language ................................................................................................................. 49

**IX.  CONCLUSION** ................................................................................................................ **50**

# TABLE OF AUTHORITIES

## Cases

*Catalina Marketing Int'l., Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 807 (Fed. Cir. 2002)...... 2

*Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ................................................ 3

*CoStar Realty Info., Inc. v. CIVIX-DDI, LLC*, 2013 WL 5346440, at *6 (N.D. Ill. Sept. 23, 2013)
.................................................................................................................................. 48

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986).......... 4

*Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013)................. 2

*Finjan v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010) ........................................... 45

*Graham v. John Deere Co.,* 383 U.S. 1, 17-18 (1966) ................................................................. 3

*Imperium (IP) Holdings, Inc. v. Apple Inc.,* No. 4:11-cv-163, 2012 Markman 6949611, at *28
(E.D. Tex. July 2, 2012).......................................................................................................... 45

*In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) ................................................................ 3

*In re Katz Interactive Call Processing Patent Litig.,* 639 F.3d 1303, 1318 (Fed. Cir. 2011)........ 46

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)
.................................................................................................................................... 2

*IPXL Holdings L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1379-1384 (Fed.Cir.2005)............. 46

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517
U.S. 370 (1996).......................................................................................................................... 1

*MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1316 (Fed. Cir. 2017) ............... 47

*Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).................... 2

*Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1361 (Fed. Cir. 2005). .................. 3

*New Hampshire v. Maine,* 532 U.S. 742, 750 (2001)................................................................. 22

*On Demand Machine Corp. v. Ingram*, 442 F.3d 1331, 1338 (Fed. Cir. 2006) ............................ 2

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) ............................................ 2, 3

*Sandisk Corp. v. Memorex Prods, Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2006) ........................... 3

*Sonos, Inc. v. Denon Electronics et al.*, No. 1:14-cv-01330-RGA (Jan. 12, 2017) ...................... 18

*Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 966 (Fed. Cir. 2000)................. 8

*Varco, L.P. v. Pason Sys. Corp.*, 436 F.3d 1368, 1373 (Fed. Cir. 2006)....................................... 8

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ............................... 1

**Administrative Decisions**

*Certain Unmanned Aerial Vehicles & Components Thereof*, Inv. No. 337-TA-1133, Order No. 15

(June 21, 2019)....................................................................................................................... 45

**ABBREVIATIONS**

| Sonos | Complainant Sonos, Inc. |
|---|---|
| Google | Respondents Google LLC and Alphabet Inc. |
| Sonos Initial *Markman* Brief | EDIS Doc. ID 713881 |
| Google Initial *Markman* Brief | EDIS Doc. ID 713880 |
| Complaint | EDIS Doc. ID 698562 |
| POSITA | Person of Ordinary Skill in the Art |
| Reb. | Rebuttal |
| Decl. | Declaration |

**EXHIBIT LIST**

| Staff Exhibit No. | Description |
|---|---|
| 1 | List of Asserted Claims |
| 2 | List of Agreed-Upon Constructions |
| 3 | Excerpts of Exhibit 12 (*Wireless Home Networking for Dummies*) to Deposition of Dr. Jon B. Weissman |
| 4 | Excerpts from Deposition Transcript of Dr. Jon B. Weissman |

## I.       INTRODUCTION

Pursuant to Order No. 13 (June 11, 2020) and the Ground Rules in this Investigation, the

Commission Investigative Staff ("Staff") respectfully submits this Initial *Markman* Brief.

The evidentiary hearing, which is scheduled to commence on February 22, 2021, and to

conclude no later than February 26, 2021, will determine whether there is a violation of Section

337 by reason of the importation and sale of certain audio players and controllers, components

thereof, and products containing the same that infringe of one or more claims of:  (i) U.S. Patent

No. 9,195,258 ("the '258 patent"); (ii) U.S. Patent No. 10,209,953 ("the '953 patent"); (iii) U.S.

Patent No. 9,219,959 ("the '959 patent"); (iv) U.S. Patent No. 8,588,949 ("the '949 patent"); and

(v) U.S. Patent No. 10,439,896 ("the '896 patent")  (collectively "the Asserted Patents").

The parties dispute the proper meaning of several claim terms in the Asserted Patents.

On July 2, 2020, Complainant Sonos, Inc. ("Sonos") submitted its Opening Claim Construction

Brief.  *See* EDIS Doc. ID 713881 ("Sonos Initial *Markman* Brief").  On the same day,

Respondents Google LLC and Alphabet Inc. (collectively, "Google") submitted their Initial

*Markman* Brief.  *See* EDIS Doc. ID 713880 ("Google Initial *Markman* Brief).

 For the reasons discussed below, the Staff submits that its proposed constructions for

these disputed claim terms are most consistent with the intrinsic evidence (and pertinent extrinsic

evidence) and, therefore, should be adopted by the Chief Administrative Law Judge ("CALJ").

## II.      LEGAL STANDARDS

Claim construction is a question of law.  *See, e.g., Markman v. Westview Instruments, Inc.*,

52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  Claim construction begins

with the language of the claims.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.

Cir. 1996); *Catalina Marketing Int'l., Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 807 (Fed. Cir.

2002); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). Proper construction of the claims is done from the perspective of a person of ordinary skill in the field of the invention, who is deemed to read the words in the patent with an understanding of their meaning in the field, and to have knowledge of any special usage of the words in the field. *See, e.g., On Demand Machine Corp. v. Ingram*, 442 F.3d 1331, 1338 (Fed. Cir. 2006). There is a heavy presumption that claim language carries its plain and ordinary meaning. *See*, *e.g.*, *Phillips*, 415 F.3d at 1316 ("The plain meaning of claim language ordinarily controls unless the patentee acts as his own lexicographer and provides a special definition for a particular claim term or the patentee disavows the ordinary scope of a claim term either in the specification or during prosecution.").

In other cases, claim terms have a specialized meaning and it is necessary to determine what a person of ordinary skill in the art would have understood the disputed claim language to mean by analyzing "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, as well as the meaning of technical terms, and the state of the art." *Id*. (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)); *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013). The specification is the "single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1321. But "[w]hile claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1323); *Varco, L.P. v. Pason Sys. USA Corp.*, 436 F.3d 1368, 1372-73 (Fed. Cir. 2006).

The prosecution history may also explain the meaning of claim language, although "it often lacks the clarity of the specification and thus is less useful for claim construction

purposes." *Phillips*, 415 F.3d at 1317; *see also Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution."). A prosecution disclaimer only occurs if there has been a disavowal that is both "clear and unmistakable." *Sandisk Corp. v. Memorex Prods, Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2006).

Extrinsic evidence may also be considered, if needed, to assist in determining the meaning or scope of technical terms in the claims. *Phillips*, 415 F.3d at 1317–18; *Vitronics*, 90 F.3d at 1582–83; *Markman*, 52 F.3d at 979. Expert testimony may be useful to "provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. However, expert testimony that is at odds with the intrinsic evidence must be disregarded. *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1361 (Fed. Cir. 2005).

## III.    LEVEL OF ORDINARY SKILL IN THE ART

To determine what a patent reveals to "one of ordinary skill" in the relevant art, one must first determine the appropriate level of skill that such a person would possess. *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc); *see also Graham v. John Deere Co.,* 383 U.S. 1, 17-18 (1966). Factors to consider include the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (*citing Custom Accessories, Inc. v. Jeffrey-Allan*

*Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986)).  Not all factors need be present, and one or more factors may predominate in a given case.  *Id.*

The private parties have offered slightly different views on the proper level of ordinary skill in the art of the Asserted Patents:

| Sonos' Proposal: | A POSITA would have had "the equivalent of a four-year degree from an accredited institution (typically denoted as a B.S. degree) in computer science, computer engineering, electrical engineering, or an equivalent thereof, and approximately 2-4 years of professional experience in the fields of networking and network-based systems or applications, such as consumer audio systems, or an equivalent level of skill, knowledge, and experience." |
|---|---|
| Google's Proposal: | A POSITA would have had "the equivalent of a four year degree from an accredited institution (typically denoted as a B.S. degree) in computer science, computer engineering, electrical engineering, or an equivalent thereof, and approximately 4 years of professional experience in the fields of networking and network-based systems or applications, such as consumer audio systems, or an equivalent level of skill, knowledge, and experience.  A person with slightly less technical education but slightly more practical experience, or more technical education (*e.g.,* a Master degree in the same fields) but less practical experience (*e.g.,* 2 years), could have met that standard." |

*See, e.g.,* Sonos Initial *Markman* Brief at 8, fn. 4; *see also* Google Initial *Markman* Brief, Ex. 9 (Reb. Shoemake Decl.) at ¶ 15.

The Staff agrees with Sonos' proposed level of ordinary skill in the art because it requires slightly less experience.  The parties appear to agree, however, that the differences in their proposed level of ordinary skill in the art are not material to claim construction.  *See, e.g.,* Sonos Initial *Markman* Brief at 8, fn. 4; *see also* Google Initial *Markman* Brief, Ex. 9 (Reb. Shoemake Decl.) at ¶ 17; *id.,* Ex. 7 (Jeffay Decl.) at ¶ 51; *id.,* Ex. 8 (Rinard Decl.) at ¶ 36.

## IV.    U.S. PATENT NO. 9,195,258

### A.    Background and Overview of the Patent

The '258 Patent, entitled "System and Method for Synchronizing Operations Among A

Plurality of Independently Clocked Digital Data Processing Devices," issued on November 24, 2015. *See* Complaint, Ex. 1. The '258 Patent issued from U.S. Application No. 14/184,935, filed on February 20, 2014. *Id.* The '258 patent claims priority to Provisional App. No. 60/490,768, filed July 28, 2003. *Id.* The named inventor is Nicholas A.J. Millington. *Id.* The '258 Patent was assigned to Sonos. *Id.*; *see also* Complaint, Ex. 9. A certificate of correction for the '258 Patent issued on November 24, 2015. *See* Complaint, Ex. 2. According to Sonos, the '258 Patent will expire on April 1, 2024. *See* Complaint, ¶ 52. The '258 Patent has a total of 26 claims, of which independent claim 17 and dependent claims 21-24 and 26 are asserted.

Independent claim 17 of the '258 Patent, with the first instance of each disputed claim term highlighted in **bold**, reads as follows:

| Claim 17 | |
|---|---|
| ***Claim Element*** | ***Claim Language*** |
| Preamble | 17. A first zone player comprising: |
| Element 17A | a network interface configured to interface the first zone player with at least a **local area network (LAN)**; |
| Element 17B | a device clock configured to generate clock time information for the first zone player; |
| Element 17C | one or more processors; and |
| Element 17D | a tangible, non-transitory computer-readable memory having instructions stored thereon that, when executed by the one or more processors, cause the first zone player to: |
| Element 17E | receive control information from any one of a plurality of controllers over the LAN via the network interface, wherein the received control information comprises a direction for the first zone player to enter into a synchrony group with at least a second zone player; |
| Element 17F | in response to the direction, enter into the synchrony group with the second zone player, |
| Element 17G | wherein in the synchrony group, the first and second zone players arc configured to playback audio in synchrony based at least in part on (i) audio content, (ii) playback timing information associated with the |

| | audio content, wherein the playback timing information is generated by one of the first or second zone players, and (iii) clock time information for the one of the first or second zone players, and wherein the generated playback timing information and the clock time information are transmitted from the one of the first or second zone players to the other of the first or second zone players, wherein the first and second zone players remain independently clocked while playing back audio in synchrony; and |
|---|---|
| Element 17H | transmit status information to at least one of the plurality of controllers over the LAN via the network interface, wherein the status information comprises an indication of a status of the synchrony group. |

*See also* Staff Ex. 1 at 1-3 (listing each of the asserted claims of the '258 Patent).

**B.      Agreed-Upon Constructions**

The parties agree on the meaning of several terms in the asserted claims of the '258

Patent.  These terms are listed in the attached Staff's Exhibit 2.

**C.      Discussion of the Disputed Claim Terms**

The parties dispute the meaning of the term "local area network (LAN)" in the '258

Patent.  *See* Sonos Initial *Markman* Brief at 13-22; *see also* Google Initial *Markman* Brief at 3-8.

**1.      "local area network (LAN)"**

The parties offer the following claim constructions for the above-identified term:

| *"local area network (LAN)"* | | |
|---|---|---|
| Complainant's Proposed Construction | Respondents' Proposed Construction | Staff's Proposed Construction |
| "data network that links devices within a limited area, such as a home or office" | Plain and ordinary meaning; no construction necessary | Plain and ordinary meaning; no construction necessary |

**a.      The Term Should Be Given Its Plain and Ordinary Meaning**

The parties appear to agree that the term "local area network (LAN)" should be given its

plain and ordinary meaning.  *See* Sonos Initial *Markman* Brief at 14; *see also* Google Initial

*Markman* Brief at 4.  This term would have had a well understood meaning to one of ordinary

skill in the art.  *See, e.g.,* Google Initial *Markman* Brief, Ex. 9 (Reb. Shoemake Decl.) at ¶ 18 (describing the plain and ordinary meaning of LAN as "a network that allows for communication amongst two or more devices in a geographically limited area (generally one building or a group of buildings).").  Moreover, as discussed in Section IV.C.1.b below, the specification is consistent with the plain and ordinary meaning.

Yet, Sonos than proceeds to argue that "in the context of the Assert[ed] Patents" the meaning of the term "local area network (LAN)" should be limited to a "data network…for transferring digital data packets between networked devices."[1]  *See* Sonos Initial *Markman* Brief at 13-14.  Sonos' overly narrow construction is inconsistent with the intrinsic evidence (and pertinent extrinsic evidence) and, therefore, should be rejected by the CALJ.  *See, e.g., Phillips*, 415 F.3d at 1316.

### b. Sonos' Construction Is Not Supported by the Intrinsic Evidence

The asserted claims of the '258 Patent require, in relevant part, "a network interface configured to interface the first zone player with at least a local area network (LAN)."  *See* Complaint, Ex. 1 at Claim 17.  The claims further require:  (i) "receiv[ing] control information from any one of a plurality of controllers over the LAN via the network interface;" and (ii)

---

[1] Sonos incorrectly states that Google and the Staff dispute whether the plain and ordinary meaning of "local area network" can constitute a "data network."  *See, e.g.,* Sonos Initial *Markman* Brief at 14.  The Staff (and Google) would not object to describing the LAN as a "data network" if it was understood to be simply a network that communicates data.  *See* Google Initial *Markman* Brief at 5 ("While Respondents do not object to Sonos' addition of the term 'data' in front of 'network' (because 'data networks' are simply networks that communicate data), the narrower specialized meaning that Sonos attempts to further insert—via its experts Drs. Almeroth and Weissman—to 'data network' is both improper (because it attempts to construe Sonos' own construction) and incorrect (because it injects restrictions into 'LAN' far past its plain and ordinary meaning).").  Thus, the key dispute amongst the parties is whether "data network" is limited to a network for transferring "digital data packets" between networked devices.

"transmit[ting] status information to at least one of the plurality of controllers over the LAN via the network interface." *Id.* Notably, the claims of the '258 Patent do not contain the terms "digital" or "packet[s]." *See* Complaint, Ex. 1. Thus, irrespective of whether the "local area network (LAN)" is a "data network," the plain language of the claims does not support limiting the term "local area network (LAN)" to a "data network…for transferring digital data packets between networked devices."

Instead, Sonos argues that the specification of the '258 Patent "repeatedly and consistently describe[es] that the 'local network' transfers 'digital' data 'packets.'" *See* Sonos Initial *Markman* Brief at 18-21. As an initial matter, Sonos' improper attempts to read particular examples and embodiments discussed in the specification into the claims as limitations should be rejected by the CALJ. *See, e.g., Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 966 (Fed. Cir. 2000) ("Although claims must be read in light of the specification of which they are a part, it is improper to read limitations from the written description into a claim.") (internal citations omitted)); *Varco, L.P. v. Pason Sys. Corp.*, 436 F.3d 1368, 1373 (Fed. Cir. 2006).

Furthermore, the specification of the '258 Patent does not restrict the scope of the term "local area network (LAN)" to a "data network…for transferring digital data packets between networked devices," as Sonos contends. For example, Figure 1 depicts an illustrative network audio system 10 constructed in accordance with the invention of the '258 Patent. *See* Complaint, Ex. 1 at 3:49-50, Fig. 1. The network audio system in Figure 1 includes "a plurality of zone players 11(1) through 11(N)" that are "interconnected by a local network 12." *Id.* at 3:50-56. The "zone players 11(*n*) may also be connected to one or more audio information sources" identified by the "reference numeral 14(*n*)(*s*)." *Id.* at 3:56-61. In addition, the "network audio system 10 may include one or more audio information sources 16(1) through 16(M) connected

through appropriate network interface devices…to the local network 12." *Id.* at 4:10-14.

The "audio information sources 14(*n*)(*s*) and 16(*m*) may be any of a number of types of conventional sources of audio information, including, for example, compact disc ("CD") players, AM and/or FM radio receivers, ***analog*** or digital tape cassette players, ***analog*** record turntables and the like." *Id.* at 4:51-55 (emphasis added). The specification further explains that "the audio information sources 14(*n*)(*s*) and 16(*m*) provide audio information associated with audio programs to the zone players for playback," and that "[a] zone player that receives audio information from an audio information source 14(*n*)(*s*)…can provide playback and/or forward the audio information…over the local network 12 to other zone players for playback." *Id.* at 5:10-17. Similarly, the specification teaches that "each audio information source 16(*m*) that is not directly connected to a zone player can transmit audio information over the network 12 to any zone player 11(*n*) for playback." *Id.* at 5:17-20.

These references in the specification to analog sources of audio information—and to the transmission of audio information from those sources over the "local network 12"—contradicts Sonos' contention that the term "local area network (LAN)" in the '258 Patent is limited to a "data network…for transferring digital data packets between networked devices."

Accordingly, Sonos' proposed construction is inconsistent with the intrinsic evidence, improperly limits the claim language, and should be rejected by the CALJ.

### c.   Sonos' Construction Is Inconsistent with the Pertinent Extrinsic Evidence

The extrinsic evidence cited by both Sonos and Google consistently indicates that the plain and ordinary meaning of "local area network (LAN)" refers to a network that spans a limited geographical area. *See* Sonos Initial *Markman* Brief at 21-22 (*"Modern Dictionary of Electronics* (Appendix B to Weissman and Almeroth Decls.) defining 'local area network' as '[a]

data communications network *spanning a limited geographical area*, such as an office, an entire building, or industrial park.'"); *id.* ("*The Telecommunications Illustrated* (Appendix C to Weissman and Almeroth Decls.) defining 'local area network' as "[a] computer network *within a specified geographical space*, such as a building or region, or within an institutional entity such as a classroom or department.'"); *id.* ("*Webster's New World Telecom Dictionary* (Appendix E to Weissman and Almeroth Decls.) defining 'local area network' as "a packet network designed to interconnect host computers, peripherals, storage devices, and other computing resources *within a local area, i.e., limited distance*.""); *id.* ("*Packet Broadband Network Handbook* (Appendix F to Weissman Decl. and Appendix D to Almeroth Decl.) defining 'local area network' as 'a highspeed data network *that covers a relatively small geographic area*.'") (emphasis changed from original); *id.* at Ex. 9 (Weissman Decl.); *id.* at Ex. 10 (Almeroth Decl.); *see also* Google Initial *Markman* Brief at 4-5 ("*Webster's New World Computer Dictionary*, *10th Edition* (2003) (defining LAN as "[a] computer network that uses cables or radio signals to link two or more computers *in a geographically limited area* (generally one building or a group of buildings).");*id.* at Ex. 9 (Shoemake Reb. Decl.).

None of the technical dictionary definitions cited by Sonos and Google explicitly limit the local area network to a "data network…for transferring digital data packets between networked devices."  *Id.*  Accordingly, Sonos' proposed construction is also inconsistent with the pertinent extrinsic evidence and should be rejected by the CALJ.

## V.     U.S. PATENT NO. 10,209,953

### A.     Background and Overview of the Patent

The '953 Patent, entitled "Playback Device," issued on February 19, 2019.  *See* Complaint, Ex. 3.  The '953 Patent issued from U.S. Application No. 16/119,638, filed on

August 31, 2018.  *Id.*  The '953 Patent claims priority to Provisional App. No. 60/490,768, filed

July 28, 2003.  *Id.*  The named inventor is Nicholas A.J. Millington.  *Id.*  The '953 Patent was

assigned to Sonos.  *Id.*; *see also* Complaint, Exs. 13-14.  A certificate of correction for the '953

Patent issued on December 31, 2019.  *See* Sonos Initial *Markman* Brief, Ex. 4.  According to

Sonos, the '953 Patent will expire on April 1, 2024.  *See* Complaint, ¶ 62.  The '953 Patent has a

total of 30 claims, of which independent claim 7 and dependent claims 12-14 and 22-24 are

asserted.

Independent claim 7 of the '953 Patent, with the first instance of each disputed claim

term highlighted in **bold**, read as follows:

| Claim 7 | |
|---|---|
| ***Claim Element*** | ***Claim Language*** |
| Preamble | 7. A first zone player comprising: |
| Element 7A | a network interface that is configured to provide an interconnection with at least one data network; |
| Element 7B | a clock that is configured to provide a clock time of the first zone player; |
| Element 7C | at least one processor; |
| Element 7D | a tangible, non-transitory computer-readable medium; and |
| Element 7E | program instructions stored on the tangible, non-transitory computer-readable medium that are executable by the at least one processor to cause the first zone player to perform functions comprising: |
| Element 7F | receiving a request to enter into a synchrony group with at least a second zone player that is communicatively coupled with the first zone player over a **local area network (LAN)**; |
| Element 7G | in response to receiving the request to enter into the synchrony group, entering into the synchrony group with the second zone player, wherein the first zone player is selected to begin operating as a slave of the synchrony group and the second zone player is selected to begin operating as a master of the synchrony group, and wherein the clock time of the first zone player differs from a clock time of the second zone player; |
| Element 7H | after beginning to operate as the slave of the synchrony group: |

| Element 7I | receiving, from the second zone player over the LAN, clock timing information that comprises at least one reading of the clock time of the second zone player; |
| --- | --- |
| Element 7J | based on the received clock timing information, determining a differential between the clock time of the first zone player and the clock time of the second zone player; |
| Element 7K | receiving, from the second zone player over the LAN, (a) audio information for at least a first audio track and (b) playback timing information associated with the audio information for the first audio track that comprises an indicator of a first future time, relative to the clock time of the second zone player, at which the first and second zone players are to initiate synchronous playback of the audio information for the first audio track; |
| Element 7L | updating the first future time to account for the determined differential between the clock time of the first zone player and the clock time of the second zone player; and |
| Element 7M | when the clock time of the first zone player reaches the updated first future time, initiating synchronous playback of the received audio information with the second zone player. |

*See also* Staff Ex. 1 at 4-6 (listing each of the asserted claims of the '953 Patent).

### B.    Agreed-Upon Constructions

The parties agree on the meaning of several terms in the asserted claims of the '258 Patent.  These terms are listed in the attached Staff's Exhibit 2.

### C.    Discussion of the Disputed Claim Terms

Like the '258 Patent, the parties dispute the meaning of the term "local area network (LAN)" in the '953 Patent.  *See* Sonos Initial *Markman* Brief at 13-22; *see also* Google Initial *Markman* Brief at 3-8.

### 1.    "local area network (LAN)"

Like the '258 Patent, the claims of the '953 Patent do not contain the terms "digital" or "packet."  *See* Complaint, Ex. 3.  Rather, the asserted claims of the '953 Patent require, in relevant part, "at least a second zone player that is communicatively coupled with the first zone player over a local area network (LAN)" and "receiving…over the LAN" such information as:

(i) "clock timing information;" (ii) "audio information for at least a first audio track and…playback timing information;" (iii) "a command to adjust an individual volume;" and (iv) "control information."  *See* Complaint, Ex. 3 at Claims 7, 22, 23.  Thus, irrespective of whether the "local area network (LAN)" is a "data network," the plain language of the claims does not support limiting the term "local area network (LAN)" to a "data network…for transferring digital data packets between networked devices."

Furthermore, the specification of the '953 Patent is the same as the specification for the '258 Patent.  *See* Complaint, Exs. 1 and 3.  Thus, for the same reasons set forth above in Section IV.C.1, the specification does not restrict the scope of the term "local area network (LAN)" to transferring only "digital data packets" between devices.

Accordingly, for the reason set forth above and in Section IV.C.1, the Staff submits that Sonos' improperly narrow construction should be rejected by the CALJ.  Instead, the Staff submits that the term "local area network (LAN)" in the '953 Patent should be given its plain and ordinary meaning.

## VI.    U.S. PATENT NO. 9,219,959

### A.    Background and Overview of the Patent

The '959 Patent, entitled "Multi-Channel Pairing In A Media System," issued on December 22, 2015.  *See* Complaint, Ex. 6.  The '959 Patent issued from U.S. Application No. 14/299,847, filed on June 9, 2014.  *Id.*  The '959 Patent is a continuation of U.S. Application No. 13/083,499, filed on April 8, 2011.  *Id.*  The named inventors are Christopher Kallai, Michael Darrell, Andrew Ericson, Robert A. Lambourne, Robert Reimann, and Mark Triplett.  *Id.* The '959 Patent was assigned to Sonos.  *Id.*; *see also* Complaint, Ex. 11.  An *Ex Parte* Reexamination Certificate for the '959 Patent issued on April 5, 2017, in response to

Reexamination Request No. 90/013,756 (filed May 25, 2016). *See* Complaint, Ex. 7. As a result

of reexamination: (i) original claims 1 and 14 were cancelled; (ii) claims 2-13 and 15-22 were

determined to be patentable as amended; and (iii) new claims 23-48 were added and determined

to be patentable. *Id.* According to Sonos, the '959 Patent will expire on September 11, 2027.

*See* Complaint, ¶ 77. The '959 Patent has a total of 48 claims, of which independent claims 5, 9,

10 and dependent claims 29 and 35 are asserted.

     Independent claim 10 of the '959 Patent, with the first instance of each disputed claim

term highlighted in **bold**, read as follows:

| Claim 10[2] | |
|---|---|
| ***Claim Element*** | ***Claim Language*** |
| Preamble | 10. **[**The playback device of claim 1, wherein the playback device is further configured to**]** *A playback device configured to output audio in a multi-channel listening environment, the playback device comprising:* |
| Element 10A | *a network interface configured to receive audio data over a network;* |
| Element 10B | *a plurality of speaker drivers configured to output audio based on the audio data;* |
| Element 10C | *one or more processors; and* |
| Element 10D | *tangible, non-transitory, computer readable memory comprising instructions encoded therein, wherein the instructions, when executed by the one or more processors, cause the playback device to (i)* receive a signal from a controller over the network, wherein the signal comprises an instruction for the playback device to pair with one or more playback devices, (ii) *process the audio data before the playback device outputs audio from the plurality of speaker drivers, (iii) determine that a **type of pairing** of the playback device comprises one of at least a **first type of pairing** or a **second type of pairing**. (iv) configure the playback device to perform a first **equalization of the audio data** before outputting audio* |

---

[2] The language of the asserted claims is reproduced as shown in the reexamination certificate for
the '959 Patent. *See* Complaint, Ex. 7. As such, matter enclosed in heavy brackets **[ ]** appeared
in the original patent, but has been deleted and is no longer a part of the patent. Whereas, matter
printed in italics indicates additions made to the patent during reexamination.

|  | *based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the first type of pairing, and (v) configure the playback device to perform a second equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the second type of pairing.* |
|---|---|

*See also* Staff Ex. 1 at 7-9 (listing each of the asserted claims of the '959 Patent).

### B.    Agreed-Upon Constructions

The parties agree on the meaning of several terms in the asserted claims of the '959 Patent.  These terms are listed in the attached Staff's Exhibit 2.

### C.    Discussion of the Disputed Claim Terms

The parties dispute the meaning of two terms in the '959 Patent: (i) "equalization [of the audio data];" and (ii) "type of pairing"/"first type of pairing"/"second type of pairing."  *See* Sonos Initial *Markman* Brief at 43-50; *see also* Google Initial *Markman* Brief at 10-21.  For the reasons set forth below, the Staff submits that its proposed constructions for these disputed claim terms are most consistent with the intrinsic evidence (and pertinent extrinsic evidence) and, therefore, should be adopted by the ALJ.

### 1.    "equalization [of the audio data]"

The parties offer the following claim constructions for the above-identified term:

| *"equalization [of the audio data]"* | | |
|---|---|---|
| Complainant's Proposed Construction | Respondents' Proposed Construction | Staff's Proposed Construction |
| "modifying the output audio data by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; | "alteration of the relative strength of certain frequency ranges in the audio data by performing one or more of the following:  adjusting one or more parameters related to speaker drivers, such as | "modifying the output audio data by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; |

| adjusting amplifier gain of the playback device; or using one or more filters" | gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters" | adjusting amplifier gain of the playback device; or using one or more filters"<br><br>*or alternatively*<br><br>"modifying the audio data by performing one or more of the following:  adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters" |

The parties' dispute centers on whether "equalization" in the '959 Patent requires alteration of the relative strength of certain frequency ranges in the audio data (as Google contends).  *See* Sonos Initial *Markman* Brief at 44-48; *see also* Google Initial *Markman* Brief at 10-18.

### a.    The Staff's Construction Is Supported by the Intrinsic Evidence

The Staff's construction is supported by both the claim language and the specification. Specifically, the asserted claims of the '959 Patent each require "playback device" with "computer readable memory" that causes the device to "configure [itself] to perform a [first/second] equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise [the first/second] type of pairing."  *See, e.g.,* Complaint, Ex. 7 at Claim 10.  In addition, non-asserted dependent claims 2, 26, and 34 recited that "performing the first equalization comprises using a first type of pass filter *to modify the audio data* before outputting audio based on the audio data" and "performing the second equalization comprises using a second type of pass filter *to modify*

*the audio data*." *Id.* at Claims 2, 26, and 34 (emphasis added). Thus, the plain language of the claims of the '959 Patent supports the Staff's proposed construction of "modifying the output audio data by performing one or more of the following…." and fails to support Google's construction.

The specification of the '959 Patent is also consistent with the Staff's proposed construction. The specification states:

> . Changing the equalization of the playback device might include any of: turning on or off (or effectively muting) one or more specific speaker drivers, changing the channel output of one or more speaker drivers, changing the frequency response of one or more specific speaker drivers, changing the amplifier gain of any particular speaker driver, changing the amplifier gain of the playback device as a whole.

*See* Complaint, Ex. 6 at 16:20-27 (emphasis added).

Similarly, the specification also describes additional adjustments that constitute equalization:

> In certain embodiments, changing the equalization of a playback device (e.g., changing the equalization of one or more speaker drivers of the playback device) may affect frequency dependent parameters. Examples might include the adjustment of the strength of frequencies within the audio data, a phase adjustment, and time-delay adjustment. In addition, a particular equalization may use a first type of pass filter, such as one that attenuates high, middle, or low frequencies, for example, while allowing other frequencies to pass unfiltered (or substantially unfiltered). Filters might also be different kinds or of a different order (e.g., first order filter, second order filter, third order filter, fourth order filter, and so on). For example, a first equalization of a playback device might include using a first type of pass filter to modify the output based on a first type of pairing and a second equalization of the playback device might include using a second type of pass filter to modify the output based on the second type of pairing. In this example, the first and second type of pass filters have one or different properties and/or behaviors, thus changing the equalization and sonic behavior of the device.

*Id.* at 16:28-47 (emphasis added). The specification's repeated use of "might" and "may" makes clear that "equalization" is not limited to altering the relative strength of certain frequency ranges, as Google contends. Rather, the intrinsic evidence supports the Staff's and Sonos' proposed construction.

    **b.**  **The Staff's Construction Is Supported by the Pertinent Extrinsic Evidence**

  The Staff and Sonos' proposed construction is the construction adopted by the district court in *Sonos, Inc. v. Denon Electronics et al.*, No. 1:14-cv-01330-RGA (Jan. 12, 2017) ("the *Denon* litigation"). *See* Google Initial *Markman* Brief, Ex. 17 (*Denon* Opinion) at 21-22.

  Like Google does here, the defendants in the *Denon* litigation argued that "equalization" should be construed based on a dictionary-driven construction that focused on frequency. *See* Google Initial *Markman* Brief, Ex. 18 (*Denon* Joint Claim Construction Brief) at 68-72. Specifically, the parties in the *Denon* litigation proposed the following constructions:

    3. **"Equalization"**

| Claim Term | Sonos Construction | D&M Construction |
|---|---|---|
| "equalization" ['959 Patent] | The phrase "performing a first [second] equalization" means "any of turning on or off (or effectively muting) one or more specific speaker drivers, *changing the channel output of one or more speaker drivers*, changing the frequency response of one or more specific speaker drivers, changing the amplifier gain of any particular speaker driver, and changing the amplifier gain of the playback device as a whole." | The term "equalization" means a set of frequency-dependent or speaker-driver dependent parameters that affect a range and/or power level of frequencies within a channel. |

*Id.* at 68. Sonos further argued, *inter alia*, in the parties' Joint Claim Construction Brief the following:

Notably, the '959 Patent provides an express disclosure of what it means for a zone

player to perform different equalizations of audio data, stating that:

> ***Changing the equalization of the playback device might include any of***: turning on
> or off (or effectively muting) one or more specific speaker drivers, changing the
> channel output of one or more speaker drivers, changing the frequency response of
> one or more specific speaker drivers, changing the amplifier gain of any particular
> speaker driver, changing the amplifier gain of the playback device as a whole.

*Id.* at 16:20-27 (emphasis added). Sonos's construction of the phase "performing an equalization

of audio data" is taken verbatim from this disclosure. On the other hand, D&M's construction is

narrower than this express disclosure and improperly excludes certain options for performing an

equalization, such as "changing the channel output of one or more speaker drivers."

*Id.* at 69. Whereas, respondents argued, *inter alia*, the following with respect to "equalization":

> On the other hand, Defendants' proposed construction is predicated on the intrinsic
> evidence and the plain and ordinary meaning of the term "equalization" in the context of
> equalizing audio data. "Equalization" of "data" relates generally to "frequency." In fact, the
> IEEE's definition of "equalization" of "data transmission" relates to altering and customizing
> frequencies of data to match the needs of a system. *See* Jackson Dec. at Ex. 1 at 388. Moreover,
> the '959 Patent states that "changing the equalization of a playback device (e.g., changing the
> equalization of one or more speaker drivers of the playback device) *may affect frequency
> dependent parameters*. Examples might include the *adjustment of the strength of frequencies
> within the audio data*, a phase adjustment, and time-delay adjustment." *Id.* at Col. 16:28-33.

*Id.* at 70 (emphasis added). The district court rejected both proposed constructions finding, in

relevant part, the following:

> constitutes lexicography. The specification provides that equalization "might include" the types
> of changes listed in Plaintiff's proposed construction. (*Id.* at 16:20-27). The specification also
> provides for additional adjustments that constitute equalization, including adjusting frequency
> strengths, phases, time delays, and the use of filters. (*Id.* at 16:28-47). For this reason, I will reject
> Defendants' proposed construction as too narrow. Plaintiff's proposed construction, however,
> simply parrots a portion of the specification and is also narrower than what is disclosed in the
> specification. Therefore, I will construe equalization to mean "modifying the output audio data by
> performing one or more of the following: adjusting one or more parameters related to speaker
> drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier
> gain of the playback device; or using one or more filters."

*See* Google Initial *Markman* Brief, Ex. 17 (*Denon* Opinion) at 21-22.

Google's proposed construction focused on frequency should be rejected for the same reasons. Instead, the CALJ should adopt the Staff's and Sonos' proposed construction (which is the same as the district court's construction).

        **c.      The Staff Does Not Object to Replacing "Output Audio Data" In Its Proposed Construction With "Audio Data"**

Google argues that the CALJ should reject the construction adopted by the *Denon* court because it uses the term "output audio data." *See* Google Initial *Markman* Brief at 18. Specifically, Google argues that the construction renders the claims ambiguous. *Id.* The Staff does not agree. However, to the extent the CALJ determines the construction creates ambiguity, the Staff believes an appropriate solution would be to construe "equalization [of the audio data]" as "modifying *the audio data* by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters."

        **2.      "[first/second] type of pairing"**

The parties offer the following claim constructions for the above-identified term:

| *"type of pairing" / "first type of pairing" / "second type of pairing"* | | |
|---|---|---|
| Complainant's Proposed Construction | Respondents' Proposed Construction | Staff's Proposed Construction |
| A "type of pairing" can be either a pairing configuration involving two or more playback devices that have different playback roles, such as a stereo pair or home theater configuration, or a 'no pairing' in which the playback device is not part of a pairing configuration involving two or more playback devices | The terms "type", "first type", and "second type" should have their plain an ordinary meaning | Plain and ordinary meaning; no construction necessary |

### a.    The Term Should Be Given Its Plain and Ordinary Meaning

The parties key dispute is whether a "no pairing" is a "type of pairing." *See Sonos Initial Markman* Brief at 48-50; *see also* Google Initial *Markman* Brief at 18-21.  There is no dispute that the claim language and specification of the '959 Patent explicitly discloses that a "no pairing" is a "type of pairing." *Id.*  Rather, Google argues that judicial estoppel bars Sonos from advancing its proposed construction.  For the reasons discussed below, Google's argument is without merit.  Because the meaning of the term is readily apparent from the claim language, the Staff submits that no construction is necessary.  However, the Staff would not object to adoption of Sonos' proposed construction.

### b.    The Claim Language and the Specification Explicitly Disclose "No Pairing" As A "Type of Pairing"

The claim language of the '959 Patent explicitly discloses that a "no pairing" is a "type of pairing."  For example, nonasserted dependent claim 3 (reproduced below), which depends from claim 10, recites "wherein the first *type of pairing comprises no pairing*….":

> **3**. The playback device of claim **[1]** *10*, wherein the first type of pairing comprises no pairing with another playback device and the second type of pairing comprises pairing with one or more additional playback devices.

*See* Complaint, Ex. 7 at Claim 3 (emphasis added); *see also id.* at Claim 16.

Similarly, the specification explicitly describes a "no pairing" as a "type of pairing":

> Further, it is understood that going from a configuration of no pairing (unpaired or non paired) to a configuration of pairing or from one kind of pairing (e.g., a pairing used in a type of stereo mode or theater mode) to a different kind of pairing (e.g., another pairing used in a type of stereo mode or theater mode) are all various types of "pairing" that can occur according to certain embodiments. In addition, disengaging a pairing between multiple playback devices might go from pairing to no pairing or from pairing of a first kind back to pairing of a previous kind, for example.

> In one example, a first type of pairing might include "no pairing" with another playback device and a second type of pairing might include pairing with one or more additional playback devices. In a second example, a first type of pairing

*See* Complaint, Ex. 6 at 15:48-61.

In light of the intrinsic evidence, the plain and ordinary meaning of the terms "type of pairing," "first type of pairing," and "second type of pairing" clearly include a "no pairing," and the Staff thus submits that no construction of these terms is necessary.

### c.     Judicial Estoppel Does Not Apply

Google does not dispute the explicit disclosures in the '959 Patent that a "no pairing" is a "type of pairing." *See* Google Initial *Markman* Brief at 18-21. Instead, Google argues that "judicial estoppel bars Sonos from advancing a construction of 'pairing' that is inconsistent with its position" in the *Denon* litigation. *Id.* at 21. Google's argument is without merit.

First, the term "pairing" in the '959 Patent is not the same as the term "type of pairing." Second, as shown in that attached Staff's Exhibit 2, the parties in this Investigation have agreed to construe the term "pairing" as a "configuration involving two or more playback devices that have different playback roles." *See* Staff Ex. 2 at 3. This construction for "pairing" is identical to the adopted construction in the *Denon* litigation. *See, e.g,* Google Initial *Markman* Brief at 19; *id.* at Ex. 18. Thus, contrary to Google's contention, Sonos has not "deviate[d] from the construction it advanced and won in the *Denon* litigation. *Id.* at 21. Accordingly, judicial estoppel does not apply. *See New Hampshire v. Maine,* 532 U.S. 742, 750 (2001) (listing the factors that inform the decision of whether judicial estoppel applies).[3]

---

[3] The Staff also agrees with Sonos' arguments as to why construing "type of pairing" to encompass a "no pairing" is consistent with the parties' agreed construction of the term "pairing" in the '959 Patent. *See* Sonos *Initial* Markman Brief at 50.

## VII.    U.S. PATENT NO. 8,588,949

### A.    Background and Overview of the Patent

The '949 Patent, entitled "Method And Apparatus For Adjusting Volume Levels In A

Multi-Zone System," issued on November 19, 2013.  *See* Complaint, Ex. 4.  The '949 Patent

issued from U.S. Application No. 13/619,237, filed on September 14, 2012.  *Id.*  The '949 Patent

claims priority to Provisional App. No. 60/490,768, filed July 28, 2003.  *Id.*  The named

inventors are Robert A. Lambourne and Nicholas A.J. Millington.  *Id.*  The '949 Patent was

assigned to Sonos.  *Id.*; *see also* Complaint, Ex. 10.  An *Ex Parte* Reexamination Certificate for

the '949 Patent issued on November 5, 2015, in response to Reexamination Request No.

90/013,423 (filed January 5, 2015).  *See* Complaint, Ex. 5.  As a result of reexamination: (i)

claims 1, 3, 4, 6, 7, 8, 10, 11, 13, 14, 15 and 17-20 were determined to be patentable as amended;

and (ii) claims 2, 5, 9, 12, and 16, dependent on an amended claim, were also determined to be

patentable.  *Id.*  According to Sonos, the '949 Patent will expire on April 1, 2024.  *See*

Complaint, ¶ 67.  The '949 Patent has a total of 20 claims, of which independent claim 1 and

dependent claims 2, 4, and 5 are asserted.

Independent claim 1 of the '949 Patent, with the first instance of each disputed claim

term highlighted in **bold**, read as follows:

| Claim 1[4] | |
|---|---|
| ***Claim Element*** | ***Claim Language*** |
| Preamble | 1. A multimedia controller including a processor, the controller configured to: |

---

[4]  The language of Claim 1 is reproduced as shown in the reexamination certificate for the '949 Patent.  *See* Complaint, Ex. 10.  As such, matter enclosed in heavy brackets **[ ]** appeared in the original patent, but has been deleted and is no longer a part of the patent.  Whereas, matter printed in italics indicates additions made to the patent during reexamination.

| Element 1A | provide a user interface for a player group, wherein the player group includes a plurality of players in a **local area network**, and wherein each player is an **independent playback device** configured to playback a multimedia output from a multimedia source; |
|---|---|
| Element 1B | accept via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group *for synchronized playback of a multimedia output from the same multimedia source*; |
| Element 1C | for [each of the plurality of players within] *any individual player in* the player group, accept via the user interface [an] *a player-specific* input to adjust a volume [associated with the] *of that individual* player, wherein the *player-specific* input to adjust the volume [associated with the] *of that individual* player causes [the corresponding independent playback device] *that individual player* to adjust its volume; and |
| Element 1D | accept via the user interface [an] *a group-level* input to adjust a volume associated with the player group, wherein the *group-level* input to adjust the volume associated with the *player* group causes [the corresponding independent playback devices] *each of the players* in the player group to adjust [their volumes] *its respective volume*. |

*See also* Staff Ex. 1 at 10-11 (listing each of the asserted claims of the '949 Patent).

## B.    Agreed-Upon Constructions

The parties agree on the meaning of several terms in the asserted claims of the '949 Patent.  These terms are listed in the attached Staff's Exhibit 2.

## C.    Discussion of the Disputed Claim Terms

Like the '258 and '953 Patents, the parties dispute the meaning of the term "local area network (LAN)" in the '949 Patent.  *See* Sonos Initial *Markman* Brief at 13-22; *see also* Google Initial *Markman* Brief at 3-8, 31-32.  In addition, the parties dispute whether the term "independent playback device" is indefinite.  *See* Sonos Initial *Markman* Brief at 36-43; *see also* Google Initial *Markman* Brief at 25-31.  For the reasons set forth below, the Staff submits that its proposed constructions for these disputed claim terms are most consistent with the intrinsic evidence (and pertinent extrinsic evidence) and, therefore, should be adopted by the CALJ.

1.    **"local area network (LAN)"**

The parties dispute with respect to the term "local area network (LAN)" in the '949

Patent is the same as the '258 and '953 Patents.  *See* Sonos Initial *Markman* Brief at 13-22; *see*

*also* Google Initial *Markman* Brief at 3-8, 31-32.

Like the '258 Patent and the '953 Patent, the claims of the '949 Patent do not contain the

terms "digital" or "packet."  *See* Complaint, Ex. 4.  Rather, the asserted claims of the '949 Patent

require, in relevant part, "a user interface for a player group, wherein the player group includes a

plurality of players in a local area network" and "accept[ing] via the user interface" various

inputs (*e.g.*, "an input to facilitate formation of the player group," "a player-specific input," "a

group-level input," or "an input to remove one of the plurality of players from the player

group.").  *See, e.g.,* Complaint, Ex. 4 at Claims 1 and 2.  Thus, irrespective of whether the "local

area network (LAN)" is a "data network," the plain language of the claims does not support

limiting the term "local area network (LAN)" to a "data network" that transfers only "digital data

packets" between devices.

Furthermore, the specification of the '949 Patent does not restrict the scope of the term

"local area network (LAN)" to a "data network" that transfers only "digital data packets"

between devices.  For example, Figure 1 depicts an exemplary configuration 100 in which the

invention of the '949 Patent may be practiced.  *See* Complaint, Ex. 4 at 4:56-58, Figure 1.  The

devices in Figure 1 "are coupled directly or indirectly to a data network 108."  *Id.* at 5:5-18.  The

specification describes that "device 112" (shown as a stereo system) "is configured to receive an

***analog*** audio source (e.g., from broadcasting) or retrieve a digital audio source (e.g., from a

compact disk)."  *Id.* at 5:25-31 (emphasis added).  The specification further teaches that the

"analog audio sources ***can be*** converted to digital audio sources," and that "the audio sources

may be shared among the devices on the network 108." *Id.* (emphasis added).

These references in the specification to analog audio sources—and to sharing the audio sources among devices on the network—contradict Sonos' contention that the term "local area network (LAN)" in the '949 Patent is limited to a "data network…for transferring digital data packets between networked devices."

Accordingly, for the reasons set forth above and in Section IV.C.1, the Staff submits that Sonos' improperly narrow construction should be rejected by the CALJ. Instead, the Staff submits that the term "local area network (LAN)" in the '949 Patent should be given its plain and ordinary meaning.

### 2.    "independent playback device"

The parties offer the following claim constructions for the above-identified term:

| *"independent playback device"* | | |
|---|---|---|
| Complainant's Proposed Construction | Respondents' Proposed Construction | Staff's Proposed Construction |
| "data network device configured to process and output audio that is capable of playing multimedia separately from other players" | Indefinite | "data network device configured to process and output audio that is capable of independent operation" |

The parties dispute whether this term is indefinite. *See* Sonos Initial *Markman* Brief at 36-43; *see also* Google Initial *Markman* Brief at 25-31. For at least the reasons discussed below, the Staff submits that its proposed construction most accurately encompasses the capabilities of the independent playback device described in the intrinsic evidence, and thus should be adopted by the CALJ.

### a.    The Staff's Construction Is Supported by the Claim Language and the Specification

The plain language of the claims supports the Staff's construction of "independent playback device" as a "data network device configured to process and output audio that is capable of independent operation."  For example, Elements 1A and 1B of claim 1 recite  "a player group…wherein each player is an independent playback device configured to playback a multimedia output from a multimedia source" and that "at least two of the…players…are to be included in the player group for synchronized playback of a multimedia output from the same multimedia source."  Thus, Elements 1A and 1B require that the independent playback device have the capability to:  (i) play back audio independently/separately from other players when ungrouped; and (ii) also have the capability to be dynamically grouped for synchronized audio playback with other players.  In addition, Elements 1C and 1D of claim 1 recite a "player-specific input" and "group-level input" that cause the independent playback devices to adjust their volume.  Thus, Elements 1C and 1D require that the independent playback device also has the capability of adjusting its volume based on individual and groupwise volume control.

Consistent with the Staff's construction, the specification of the '949 Patent describes "a need for dynamic control of…audio players as a group" where the audio players may be readily grouped "[w]ith a minimum manipulation," and "further a need for user interfaces that may be readily utilized to group and control the audio players."  *See* Complaint, Ex. 4 at 2:13-17.  The specification further describes that one aspect of the present invention provides "a configurable module…in the controlling device that provides interactive graphic user interface for ***forming, managing and controlling groups*** in the system, de-grouping a group ***or adjusting audio volume of individual players or a group of players***."  *Id.* at 2:65-3:3 (emphasis added); *see also* 3:40-45 ("One of the objects, features, and advantages of the present invention is to remotely

control a plurality of multimedia players in a multi-zone system, playing and controlling the audio source synchronously if the players are grouped together, or playing and controlling the audio source individually if the players are disassociated with each other.").

The independent playback device's capability of independent operation (*e.g.*, the capability to playback multimedia separately from other players and to adjust its volume based on individual and groupwise volume control) is also described elsewhere in the specification. For example, Figure 3C shows an exemplary user interface of individual zones in a house. *Id.* at 9:49-50, Fig. 3C. The specification explains that "[e]ach zone player can play a type of media (such as music, photographs and video) independently." *Id.* at 9:49-52. Whereas, Figure 3E illustrates a "group" of zone players wherein "the user…can switch the group of players to any other type of media or a different piece of music and all of the zone players in the group will play the selected media at the same time." *Id.* at 10:7-29; Fig. 3E. In addition, Figure 5C shows a user interface to allow a user to adjust a volume level of the zone players in a zone scene individually or collectively. *Id.* at 4:18-20, 11:1-10; *see also id.* at 5:37-6:40, 6:56-60, Fig. 2A.

### b. The Staff's Construction Is Supported by the Prosecution History

During both prosecution and subsequent reexamination of the '949 Patent, the independent playback device's capability of independent operation (*e.g.*, the capability to playback multimedia separately from other players and to adjust its volume based on individual and groupwise volume control) was important in distinguishing the prior art.

The application for the '949 Patent was filed on September 14, 2012 with original claims 1-20. *See* Sonos Initial *Markman* Brief, Ex. 16 (Reb. Weissman Decl.) at *34-84. On March 23, 2013, Sonos filed a preliminary amendment that, *inter alia*, cancelled the original claims and presented new claims 21-40. *Id*. at *85-96. Independent claim 21 eventually became

claim 1 of the '949 Patent.

On April 10, 2013, the Examiner issued a Non-Final Office Action rejecting the pending claims as anticipated and/or rendered obvious by U.S. Patent Pub. No. 2004/0131192 ("Metcalf") alone or in view of U.S. Patent Pub. No. 2004/0015252 ("Aiso").  *Id*. at *97-105. On May 29, 2013, a telephonic interview was conducted between Sonos and the Examiner, during which "[Sonos] discussed the Metcalf reference and the Aiso reference, and argued that those references did not disclose or suggest independent playback devices."  *Id*. at *107-108, 116.  On July 3, 2013, a second telephonic interview took place, during which Sonos proposed amendments to independent claim 21 to add the "independent playback device" limitation, which the Examiner deemed "sufficient to obviate the anticipation rejections over Metcalf and the obviousness rejection over Metcalf in view of Aiso."  *Id*. at *116, 121-123.

On July 8, 2013, Sonos filed a Response including, *inter alia*, the amendments to independent claim 21, which are shown below:

> 21.    (currently amended) A multimedia controller including a processor, the controller configured to:
>
>        provide a user interface for a player group, wherein the player group includes a plurality of players in a local area network, and wherein each player is an independent playback device configured to playback a multimedia output from a multimedia source;
>
>        accept via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group;
>
>        for each of the plurality of players within the player group, accept via the user interface an input to adjust a volume associated with the player, wherein the input to adjust the volume associated with the player causes the corresponding independent playback device player to adjust its volume; and
>
>        accept via the user interface an input to adjust a volume associated with the player group, wherein the input to adjust the volume associated with the group causes the corresponding independent playback devices players in the player group to adjust their volumes.

*Id*. at *110.  Sonos explained that it "amended the claims to clarify that each player in the plurality of players is an 'independent playback device'" and argued that "the prior art of record fails to show or render obvious the recited features of the pending claims including the grouping of independent playback devices."  *Id*. at *117.[5]

On August 28, 2013, Sonos and the Examiner participated in a third telephonic interview, during which the participants discussed, *inter alia*, claim 21 and U.S. Patent Pub. No. 2002/0124097 ("Isely").  *Id*. at *133, 136.  The Examiner's summary of the interview states as follows:

Identification of prior art discussed: *Isley (of record)*.

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

*Discussed support for the independent operation of the claimed individual player and Applicant distinguished the individual operation over the tethered or interdependent operation of Isley. Discussed corrections to the dependencies and language of claim 24* .

*Id*. at *133 (emphasis added).  Sonos's summary of the interview states that "[Sonos] discussed the Isely reference and reiterated that the reference did not disclose or suggest independent playback devices."  *Id*. at *136.

On September 6, 2013, the Examiner issued a Notice of Allowance in which the Examiner found the following:

3.    The following is an examiner's statement of reasons for allowance:

Applicant's amendments in concert with remarks filed 7/8/13 are persuasive. Particularly,

the prior art is enabling for an individually addressable  independent playback device,

such as that depicted in Figure 2A of the instant application, functionally grouped into ad

\*\*\*

---

[5] As explained by Sonos' expert, Dr. Jon Weissman, at minimum, the audio components disclosed in Metcalf are distinctly different from the claimed "independent playback devices" because they are "all hard-wired back to a centralized 'annunciator module'" and "work together to cooperatively reproduce 'a sound event,' such as a concert or a movie."  *See* Sonos *Initial Markman Brief*, Ex. 16 (Reb. Weissman Decl.) at ¶¶ 30-31.

hoc networks for designation, receipt and playback of particular audio streams in concert

with user directed characteristics such as volume (see at least Isley: 20020124097; ¶ 6,

60-64; Figure 2, 5, 6: zones are formed and volume control applied to a zone and thereby

selectively to individual zone players based on a user determined relationship). However

where Isley controls volume in an interdependent manner the instant application s teaches

the system functional to provide groupwise and individual control of each of the

groupwise addressable and independently addressable playback devices (see

Specification as filed ¶ 12 etc.) The prior art also abounds in individual and groupwise

volume control such as might be found on an audio mixer wherein individual channels

each comprise a volume adjustment such as by a fader etc. and wherein the individual

channels may be grouped onto a groupwise volume adjustment fader etc. to apply

individual and overall volume control. (see Metcalf, Aiso, ID3v2: master/group and

individual channel volume controls may be applied to streams, channels or collected

aggregates thereof). However the prior art does not reasonably link these functionalities

sufficient to operate multiple players in a room or other particular local area network

under direction of  a user interface operable to perform ad hoc groupings of individual

players, to save/recall/instantiate such groups and to perform individual and groupwise

volume control over such groups.

*Id*. at *124-132 (emphasis added).[6]  The '949 Patent issued on November 19, 2013.  *See*

Complaint, Ex. 4.

On January 5, 2015, a Request for *Ex Parte* Reexamination of the '949 Patent was filed,

and the Reexamination was initiated on January 29, 2015.  *See* Sonos Initial *Markman* Brief, Ex.

16 (Reb. Weissman Decl.) at *140-142.  On April 22, 2015, the Examiner issued a Non-Final

Office Action in the Reexamination, rejecting claims 1-20 as anticipated by U.S. Patent No.

---

[6] Cited paragraph [0012] states "According to yet another aspect of the present invention, a configurable module is implemented in the controlling device that provides interactive graphic user interface for ***forming, managing and controlling groups*** in the system, de-grouping a group ***or adjusting audio volume of individual players or a group of players***." *Id.* at *39 (emphasis added).

5,761,320 ("Farinelli").  *Id*. at *143-158.

On June 1, 2015, an interview was held during which Sonos's in-house counsel, Chris Butts, demonstrated Sonos devices and the Sonos App.  *Id*. at *161, 170-171.  Sonos' summary of the interview states in relevant part, the following:

> During the Interview, Mr. Butts conducted a demonstration involving multiple Sonos players[1] (i.e., independent playback devices), multiple audio sources, and a controller-provided user interface presented by Sonos's smartphone application. As described during the interview, the Sonos system includes a commercial embodiment of the claims. During the demonstration, Mr. Butts used the user interface to cause different respective players—which were ungrouped initially—to play back different audio content from different respective audio sources at the same time. Mr. Butts then used the user interface to dynamically form a player group that included multiple players, and then caused the players in the group to play back the same audio content from the same audio source in a synchronized fashion. After dynamically forming the player group that included multiple players, Mr. Butts first used the user interface to demonstrate inputs where each such input caused an individual player in the player group to adjust its volume. Mr. Butts then used the user interface to demonstrate a single input that caused all of the players in the player group to adjust their volume.

*Id*. at *170-171 (emphasis added) (footnote omitted).

On June 22, 2015, Sonos filed a Response to the Non-Final Office Action that put forth reasons as to why Farinelli does not anticipate the claims of the '949 Patent.  *Id*. at *163-182.  In relevant part, Sonos argued that the claimed system "is built on a network of independent playback devices (also called 'zone players')" and that "[c]ommerical examples of such independent playback devices…were demonstrated during the June 1 [i]interview…."  *Id*. at *172-173.  Referencing Figure 1 of the '949 Patent, Sonos further explained the following:

As shown, this system includes three independent playback devices 102, 104, and 106 that are each connected to data network 108, and any of independent playback devices 102, 104, and 106 can be controlled using a controller (such as control device 140 or 142) that is also connected to network 108. The independent playback devices can play back multimedia content from an audio source via the network 108 (e.g., from device 110 or device 112) or from an audio source on the Internet. Each of independent playback devices 102, 104, and 106 can play content from a different audio source or can be dynamically grouped together to play content from the same audio source in synchrony.

The claims of the '949 patent are directed to one of Sonos's many innovations in connection with its multi-room audio system. As recited in claim 1 of the '949 patent (which is representative), a controller is configured to provide a user interface for a player group. In the

\*\*\*

player group, "each *player* is an independent *playback device* configured to *play back* a multimedia output *from a multimedia source*." Claim 1 then recites that the controller is configured to accept the following two different types of volume-control inputs:

1.  an input to adjust a particular independent playback device's individual "player" volume, which in turn causes *that* particular independent playback device to adjust its individual "player" volume; and

2.  an input to adjust a "player group" volume, which in turn causes *each* independent playback device in the player group to adjust its individual "player" volume.

As is further explained below, Sonos respectfully submits that this combination of features is not taught by the cited Farinelli reference.

*Id*. at \*173-174 (emphasis added); *see also id.* at \*171 (arguing Farinelli does not anticipate the claims of the '949 Patent because, *inter alia*, "the Office Action 'double counted' a single volume control described in Farinelli with respect to the two different claimed inputs…[for individual and groupwise volume control].").

On August 5, 2015, the Examiner issued a Final Office Action again rejecting the claims as anticipated by Farinelli.  *Id*. at \*184-207.  On September 18, 2015, another interview was conducted during which proposed amendments were discussed that the Examiner indicated would overcome the prior art of record.  *Id*. at \*210-216, 224.  On October 6, 2015, Sonos filed a

Response to the Final Office Action including the proposed amendments to the claims. *Id*. at *217-226. The amendments made to claim 1 of the '949 Patent during reexamination are shown above in Section VII.A. *See also id*. at *218.

Accordingly, both the prosecution history and reexamination of the '949 Patent supports that Staff's construction of "independent playback device" as a "data network device configured to process and output audio that is capable of independent operation."[7]

### c. Google Has Not Met Its Burden of Showing That the Claims Are Indefinite

Google argues that the term "independent playback device" is indefinite because claim 1 of the '949 Patent "contradictorily requires the playback device to be in two distinct states at the same time: 'independent' and part of a 'group." *See* Google Initial *Markman* Brief at 25. Google's argument is based on an improper interpretation of claim 1 that its own expert (Dr. Martin Rinard) acknowledges renders the claims "internally inconsistent." *Id.*, Ex. 8 (Rinard Decl.) at ¶¶ 37-41.

Instead, as shown above in Sections VII.C.2.a-b, when the term "independent playback device" is properly interpreted in light of the claim language, specification and prosecution history, the claims of the '949 Patent "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910. Sonos' expert, Dr. Jon Weissman, confirms that one of ordinary skill in the art would have understood the term "independent playback device" in the context of the '949 Patent to refer to a playback device that is capable of independent operation. *See* Sonos Initial *Markman* Brief, Ex. Ex. 16 (Reb.

---

[7] Although the Staff's construction repeats the term "independent," the phrase "independent operation" is taken directly from the Examiner's summary of the interview discussing the "claimed individual players" as distinct from Isley. *See* Sonos *Initial* Markman Brief, Ex. 16 (Reb. Weissman Decl.) at *133.

Weissman Decl.) at ¶¶ 15-87; *see also* Staff Ex. 4 at 163:22-164:7 ("Q. Okay. And the capability of the independent playback devices to both play multimedia separately from other players and to play multimedia synchronously when grouped was important in overcoming the prior art during prosecution, correct?  A. My understanding is that was important to draw a distinction with at least Metcalf."); *id.* at 165:14-20 ("Q. And the independent playback device's ability to adjust its volume in response to individual and group-wise volume-control inputs was important to distinguishing the prior art during prosecution, correct?  A. Yes. It was important in the distinction over Isely.").  Similarly, during both prosecution and reexamination of the '949 Patent, neither Sonos, the party requesting reexamination, nor the Examiners expressed any concerns regarding the scope of the term "independent playback device."

For at least these reasons, Google has not met its burden of showing that the term independent playback device" renders claim 1 of the '949 Patent indefinite.

## VIII.   U.S. PATENT NO. 10,439,896

### A.    Background and Overview of the Patent

The '896 Patent, entitled "Playback Device Connection," issued on October 8, 2019.  *See* Complaint, Ex. 8.  The '896 Patent issued from U.S. Application No. 16/298,542, filed on March 11, 2019.  *Id.*  The '896 Patent claims priority to Provisional App. No. 60/577,284, filed June 5, 2004.  *Id.*  The named inventors are Nicholas A.J. Millington and Paul V. Hainsworth.  *Id.*  The '896 Patent was assigned to Sonos.  *Id.*; *see also* Complaint, Ex. 12.  According to Sonos, the '896 Patent will expire on June 6, 2025.  *See* Complaint, ¶ 87.  The '896 Patent has a total of 20 claims, of which independent claim 1 and dependent claims 3, 5, 6, and 12 are asserted.

Independent claim 1 of the '896 Patent, with the first instance of each disputed claim term highlighted in **bold**, reads as follows:

| Claim 1 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Preamble | 1. A computing device comprising: |
| Element 1A | a user interface; |
| Element 1B | a network interface; |
| Element 1C | at least one processor; |
| Element 1D | a non-transitory computer-readable medium; and |
| Element 1E | **program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising:** |
| Element 1F | **while operating on a secure wireless local area network (WLAN) that is defined by an access point, (a) receiving, via a graphical user interface (GUI) associated with an application for controlling one or more playback devices, user input indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b) receiving a first message indicating that a given playback device is available for setup;** |
| Element 1G | after receiving the user input and receiving the first message, transmitting a response to the first message that facilitates establishing an initial communication path with the given playback device, wherein the initial communication path with the given playback device does not traverse the access point; |
| Element 1H | transmitting, to the given playback device via the initial communication path, **at least a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN;** |
| Element 1I | after transmitting at least the second message containing the network configuration parameters, detecting an indication that the given playback device has successfully received the network configuration parameters; and |
| Element 1J | after detecting the indication, transitioning from communicating with the given playback device via the initial communication path to communicating with the given playback device via the secure WLAN that is defined by the access point. |

*See also* Staff Ex. 1 at 12-13 (listing each of the asserted claims of the '896 Patent).

B.      **Agreed-Upon Constructions**

The parties agree on the meaning of several terms in the asserted claims of the '896 Patent.  These terms are listed in the attached Staff's Exhibit 2.

C.      **Discussion of the Disputed Claim Terms**

The parties dispute five terms in the '896 Patent.  *See* Sonos Initial *Markman* Brief at 13-36; *see also* Google Initial *Markman* Brief at 32-50.  For the reasons set forth below, the Staff submits that its proposed constructions for these disputed claim terms are most consistent with the intrinsic evidence (and pertinent extrinsic evidence) and, therefore, should be adopted by the CALJ.

1.      **"wireless local area network (WLAN)"**

The parties dispute with respect to the term "wireless local area network (WLAN)" in the '896 Patent is the same as their dispute regarding the meaning of the term "local area network (LAN)" in the '258, '953, and '949 Patents.  *See* Sonos Initial *Markman* Brief at 13-22; *see also* Google Initial *Markman* Brief at 3-8, 49-50.

Like the '258, '953, and '949 Patents, the claims of the '896 Patent do not contain the terms "digital" or "packet."  *See* Complaint, Ex. 8.  Rather, the asserted claims of the '896 Patent require, in relevant part, "operating on a secure wireless local area network (WLAN) that is defined by an access point" and "communicating with the given playback device via the secure WLAN" to:  (i) "transmit[] a command to the given playback device related to playback of audio content;" or (ii) "transmit[] a command to the given playback device to form a group…."  *See* Complaint, Ex. 8 at Claims 1, 5, 12.  Thus, irrespective of whether the "wireless local area network (WLAN)" is a "data network," the plain language of the claims does not support limiting the term "wireless local area network (WLAN)" to a "data network…for transferring

digital data packets between networked devices."

Furthermore, the specification of the '896 Patent does not restrict the scope of the term "wireless local area network (WLAN)" to a "data network…for transferring digital data packets between networked devices."  For example, Figure 1 depicts an exemplary configuration 100 in which the invention of the '896 Patent may be practiced.  *See* Complaint, Ex. 8 at 5:42-44, Fig. 1.  Like in the '949 patent, the specification of the '896 patent describes that "device 112" (shown as a stereo system) "is configured to receive an ***analog*** audio source (e.g., from broadcasting) or retrieve a digital audio source (e.g., from a compact disk)."  *Id.* at 6:13-20 (emphasis added).  The specification further teaches that the "analog audio sources ***can be*** converted to digital audio sources," and that "all audio sources, regardless of where they are located or how they are received, may be shared among the devices on the network 108."  *Id.* (emphasis added).

These references in the specification to analog audio sources—and to sharing the audio sources among devices on the network—contradicts Sonos' contention that the term "wireless local area network (WLAN)" in the '896 Patent is limited to a "data network…for transferring digital data packets between networked devices."

Accordingly, for the reason set forth above and in Section IV.C.1, the Staff submits that Sonos' improperly narrow construction should be rejected by the CALJ.  Instead, the Staff submits that the term "wireless local area network (WLAN)" in the '896 Patent should be given its plain and ordinary meaning.

### 2.    "security key"

The parties offer the following claim constructions for the above-identified term:

| **"*security key*"** | | |
|---|---|---|
| Complainant's<br>Proposed Construction | Respondents'<br>Proposed Construction | Staff's<br>Proposed Construction |
| Plain and ordinary meaning; no construction necessary. | "a string of bits used in encryption to make data unreadable, or in decryption to render encrypted data readable" | Plain and ordinary meaning; no construction necessary |

### a.    The Term Should Be Given Its Plain and Ordinary Meaning

The key dispute amongst the parties is whether passwords and passphrases fall within the scope of the term "security key" in the '896 Patent.  *See* Sonos Initial *Markman* Brief at 22-27; *see also* Google Initial *Markman* Brief at 42-49.  Google's proposed construction excludes passwords and passphrases by limiting "security key" to binary format (*i.e.*, "a string of bits") and by limiting the use of the key to "encryption" and "decryption."  *Id.*  As discussed below, Google's proposed construction is inconsistent with the intrinsic evidence (and pertinent extrinsic evidence) and, therefore, should be rejected by the CALJ.  Instead, the Staff submits that the term should be given its plain and ordinary meaning (*e.g.*, information that allows access to a secure network).

### b.    Google's Construction Is Not Supported by the Intrinsic Evidence

Claim 1 of the '896 Patent requires "a security key for the secure WLAN."  *See* Complaint, Ex. 8 at Claim 1.  The claim language places no limitation on the format of the security key (*e.g.*, binary, hexadecimal format, a string of characters, or other possible formats).  *Id.*  Nor does the claim language explicitly limit the use of the "security key" to encryption or decryption.  *Id.*  Google's construction thus improperly imports limitations into the claims that are not required by the claim language.  *See, e.g., Phillips*, 415 F.3d at 1323.

Turning to the specification of the '896 Patent, it describes an "automatic configuration

process" that causes several messages to be exchanged between devices wherein "some of the messages carry information pertaining to a transmission channel, an identifier of the network and a ***security key for subsequent communication***, [and] at least some of the messages are encrypted." *See* Complaint, Ex. 8 at 3:11-4:24 (emphasis added); *see also id*. at 14:32-35. The specification further discloses that "[i]n one embodiment" the network "may be characterized by…a unique set of configuration variables or parameters, such as…WEP keys (wired equivalent privacy, or simply security keys). *Id.* at 9:28-41. Google's improper attempts to read this particular embodiment into the claims as a limitation should be rejected by the CALJ. *See, e.g.,* Google Initial *Markman* Brief at 44 (arguing that "the '896 patent specification describes the 'security key' of claim 1 as a WEP key…."); *see also Tate*, 222 F.3d at 966.

Furthermore, Google's proposed construction limiting the use of the "security key" to "encryption" and "decryption" is inconsistent with the teachings of the specification. When discussing encryption, the specification of the '896 Patent uses terms such as "public key" or "private key." *See* Complaint, Ex. 8 at 13:21-23, 13:31-32, 13:62-63, 15:26-27. Google's attempts to encompass all instances of the word "key" in the specification in its proposed construction of "security key" is thus inconsistent with the specification's use of different terms (*e.g.*, "security key," "WEP key," "public key" and "private key") to describe the teachings of the '896 Patent. *See* Google Initial *Markman* Brief at 45-46. For at least these reasons, the specification does not support limiting the term "security key" to use for "encryption" and "decryption," as Google proposes.

Similarly, contrary to Google's assertions otherwise, the specification does not reject the idea that "security key" includes other security settings like passphrases and passwords. *Id.* at 48. The specification of the '896 Patent does not specify the format (*e.g.*, binary or hexadecimal)

for the "WEP key" or "security key."  And neither Figure 5 of the '896 Patent nor related U.S. Patent No. 9,866,447 ("the '447 Patent) prohibit a password or passphrase from being a "security key," as Google contends.  *See* Google Initial *Markman* Brief at 48-49; *see also* Sonos Initial *Markman* Brief, Ex. 13 (Reb. Weissman Decl.) at ¶¶ 40-41 (describing why "the radio buttons" in Figure 5 show to a POSITA that the figure contemplates that both the WEP passphrase and WEP key are examples of a security key); *id*. at ¶ 42 (explaining that "were a POSITA to draw any conclusion from [the '447 Patent] it would be that a 'password' is a narrower example of a type of 'security key.'").  For at least these reasons, the specification also does not support limiting the term "security key" to binary format (*i.e.*, "a string of bits"), as Google proposes.

Accordingly, Google's proposed claim construction of the term "security key" is not supported by the intrinsic evidence and should be rejected by the CALJ.

### c.    Google's Construction Is Inconsistent with the Pertinent Extrinsic Evidence

Google relies on numerous technical dictionary definitions and other technical resources that define and explain "key[s]" to support its proposed narrow construction of the term "security key."  *See* Google Initial *Markman* Brief at 46; *id.* at Ex. 6 (Shoemake Decl.) ¶ 70.  Google's extrinsic evidence thus fails to address how a POSITA would have understood the term at issue.

Instead, various technical dictionary definitions of the term "security key" support Sonos' and the Staff's position that a POSITA would have understood the term to be broader than just keys in binary format used for encryption and decryption.  *See, e.g.,* Sonos Initial *Markman* Brief at 26-27; *id.* at Ex. 9 (Weissman Decl.) ¶¶ 22-24.

Furthermore, other extrinsic evidence clearly demonstrates that a POSITA would understand passwords and passphrases to fall within the scope of the term "security key."  For example, *Wireless Home Networking for Dummies* (4th ed.), clearly indicates that WEP or WPA

passwords or passphrases are examples of security keys:

> **3. If you're connecting to a secured (WEP or WPA) network, Windows prompts you to enter the password. <mark>Enter the WEP or WPA password in the Security Key box</mark>, as shown in Figure 7-7, and then click OK.**



**Figure 7-7:** Enter your <mark>security key (WPA or WEP passphrase)</mark> in this box.

> Your computer connects to the network, and you're all set. If you selected the Connect Automatically option in Step 2, your computer will always connect to this network whenever it's within range.

*See* Staff Ex. 3 (*Wireless Home Networking for Dummies*) at *17 (emphasis added); *see also* Staff Ex. 4 (Weissman Depo. Tr.) at 158:3-160:21; *see also id.* at 160:17-21 ("Q. Okay. I believe you also testified that a POSITA would have understood the definition of security key in the '896 patent to be materially the same from 2004 to today, correct? A. That's correct.")

Accordingly, for the reasons set forth above, the Staff submits that Google's improperly narrow construction should be rejected by the CALJ. Instead, the Staff submits that the term "security key" in the '896 Patent should be given its plain and ordinary meaning.

### 3. Element 1F and Element 1G

Google seeks construction of Elements 1F and 1G of claim 1 of the '896 Patent. *See* Google Initial *Markman* Brief at 34-37; *see also* Sonos Initial *Markman* Brief at 27-29.

The parties offer the following claim constructions:

| Element 1F and Element 1G | | |
|---|---|---|
| Complainant's Proposed Construction | Respondents' Proposed Construction | Staff's Proposed Construction |
| Plain and ordinary meaning; no construction necessary | Element 1F ***must happen before*** Element 1G | Plain and ordinary meaning; no construction necessary |

It is not clear to the Staff what dispute, if any, exists between the parties regarding the meaning of Elements 1F and 1G.  *See, e.g.,* Google Initial *Markman* Brief, Ex. 26 at 1 ("Google has failed to articulate how the language in Claim 1 is subject to different interpretations that require clarification.  If Google can explain how the language might be interpreted in more than one way, Sonos would be willing to consider a clarification.").

Elements 1F and 1G of claim 1 of the '896 Patent are as follows:

| Element 1F | while operating on a secure wireless local area network (WLAN) that is defined by an access point, (a) ***receiving***, via a graphical user interface (GUI) associated with an application for controlling one or more playback devices, ***user input*** indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b) ***receiving a first message*** indicating that a given playback device is available for setup; |
|---|---|
| Element 1G | ***after receiving the user input and receiving the first message, transmitting a response*** to the first message that facilitates establishing an initial communication path with the given playback device, wherein the initial communication path with the given playback device does not traverse the access point; |

*See* Complaint, Ex. 8 at Claim 1 (emphasis added).

The plain language of the claim requires: (i) "receiving…user input;" (ii) "receiving a first message;" and (iii) "after receiving the user input and receiving the first message, transmitting a response…."  *Id.*

Google's proposed construction seeks to add a limitation that the "receiving" in Element 1F ***must happen before*** the "transmitting" in Element 1G.  Google has not explained why its

construction is necessary, nor how its construction differs from the clear language of the claim (*e.g.*, the phrase "after receiving the user input and receiving the first message, transmitting a response…").

Because the claim language is clear on its face, and the specification of the '896 Patent does not deviate from the clear language of the claims, the Staff submits that Google's construction should be rejected by the CALJ.  Instead, Elements 1F and 1G in the '896 Patent should be given their plain and ordinary meaning.  *See*, *e.g.*, *Phillips*, 415 F.3d at 1316.

### 4.    Element 1E and Element 1F

The parties dispute whether Elements IE and IF of claim 1 of the '896 Patent improperly combine system claim limitations with a method claim limitation, thus rendering claim 1 (and its dependent claims) indefinite.  *See* Google Initial *Markman* Brief at 37-39; *see also* Sonos Initial *Markman* Brief at 29-32.

The parties' positions are as follows:

| Element 1E and Element 1F | | |
|---|---|---|
| Complainant's Proposed Construction | Respondents' Proposed Construction | Staff's Proposed Construction |
| Plain and ordinary meaning; no construction necessary | Indefinite | Plain and ordinary meaning; no construction necessary |

Element 1E and Element 1F of claim 1 of the '896 Patent are as follows:

| Element 1E | program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising: |
|---|---|
| Element 1F | while operating on a secure wireless local area network (WLAN) that is defined by an access point, (a) receiving, via a graphical user interface (GUI) associated with an application for controlling one or more playback devices, user input indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b) receiving a first message indicating that a given playback device is available for setup; |

*See* Complaint, Ex. 8 at Claim 1.

Google contends that the phrase "while operating on a secure wireless local area network (WLAN)" in claim 1 "describes the state of the 'computing device' during actual use, and not just its capabilities," thus rendering the claim indefinite. *See* Google Initial *Markman* Brief at 37-39. For the reasons discussed below, Google's argument is without merit.

Claim 1 of the '896 Patent claims a "computing device" with a "computer-readable medium" that "cause[s] the computing device to perform [certain] functions." *See* Complaint, Ex. 8 at Claim 1. Thus, like other computer-readable medium claims ("CRM claims" or "Beauregard claims"), claim 1 of the '896 Patent defines the "computer-readable medium" in terms of the functions it enables the "computing device" to perform (similar to a method claim). *See, e.g., In re Beauregard,* 53 F.3d 1583 (Fed. Cir. 1995) (confirming computer-readable medium claims recite a patent-eligible product under 35 U.S.C. § 101).[8]

The Federal Circuit, in *Finjan v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010), made clear that such CRM claims are infringed when one makes, uses, offers to sells, or sells the claimed apparatus, even if the claimed code is not executed. *Id.* at 1203-1205. In *Finjan*, the claim at issue recited a "computer-readable storage medium storing program code for causing a server that serves as a gateway to a client to perform the steps of: receiving ...; comparing ...; and preventing execution...." *Id.* at 1205. The Federal Circuit found that "[t]his language does not require that the program code be 'active,' only that it be written 'for causing' a server…or a computer…to perform certain steps." *Id.* Thus, the Federal Circuit affirmed that

---

[8] Google cites *Certain Unmanned Aerial Vehicles & Components Thereof*, Inv. No. 337-TA-1133, Order No. 15 (June 21, 2019) and *Imperium (IP) Holdings, Inc. v. Apple Inc.,* No. 4:11-cv-163, 2012 Markman 6949611, at *28 (E.D. Tex. July 2, 2012) in support of its arguments. *See* Google Initial *Markman* Brief at 38-39. These cases are distinguishable, at minimum, because they do not address computer-readable medium claims.

the defendant's devices infringed the asserted claim even though the defendant sold its devices with the relevant software disabled and the customer had to purchase a key to activate the software. *Id.* ("The fact that users needed to 'activate the functions programmed' by purchasing keys does not detract from or somehow nullify the existence of the claimed structure in the accused software."); *id.* at 1204 ("[T]o infringe a claim that recites capability and not actual operation, an accused device 'need only be capable of operating' in the described mode.").

Here, the phrase "while operating on a secure wireless local area network (WLAN)" in claim 1 of the '896 Patent is merely describing the functions the claimed "computer-readable medium" enables the "computing device" to perform. Because infringement of a CRM claim occurs without actual use of the device (*e.g.*, even if the claimed program code is not executed), the phrase does not require an activity to be performed by the user.

Thus, unlike in *IPXL Holdings* and similar cases, there is no confusion as to whether infringement occurs when one creates the claimed "computing device," or when the user actually uses the device. *See IPXL Holdings L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1379-1384 (Fed.Cir.2005) (finding indefiniteness where the claim language included "and the user uses the input means to either change ..."); *see also In re Katz Interactive Call Processing Patent Litig.,* 639 F.3d 1303, 1318 (Fed. Cir. 2011) (finding indefiniteness where the claim language included "said certain of said individual callers digitally enter data"); *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1336 (Fed.Cir.2014) (finding indefiniteness of "tangible computer readable medium" claims because the claim language included "wherein said user completes" and "where said user selects"). Rather, claim 1 of the '896 Patent merely uses permissible functional language to describe the capabilities of the claimed system, and is thus not indefinite. *See, e.g., MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1316 (Fed.

Cir. 2017) ("Because the claims merely use permissible functional language to describe the capabilities of the claimed system, it is clear that infringement occurs when one makes, uses, offers to sell, or sells the claimed system.").

Accordingly, the Staff submits that Elements 1E and 1F in the '896 Patent are not indefinite and should be given their plain and ordinary meaning.

### 5.    "at least a second message…"

The parties offer the following claim constructions for the above-identified term:

| *"at least a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN"* | | |
|---|---|---|
| Complainant's Proposed Construction | Respondents' Proposed Construction | Staff's Proposed Construction |
| "one or more additional messages that collectively contain an identifier of the secure WLAN and a security key for the secure WLAN" | "at least one second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN" | Plain and ordinary meaning; no construction necessary |

The parties' dispute with respect to this term centers on whether the "network configuration parameters" must be transmitted in each second message or can be divided between one or more second messages. *See* Sonos Initial *Markman* Brief at 32-36; *see also* Google Initial *Markman* Brief at 39-42. For the reasons discussed below, the Staff submits that the term should be given its plain and ordinary meaning. The Staff also would not object to the adoption of Google's construction. Sonos' proposed construction, however, is inconsistent with the plain meaning of the claim language and should be rejected by the CALJ.

###### a.    The Term Should Be Given Its Plain and Ordinary Meaning

The Staff contends that no construction is necessary because the meaning of the term is readily apparent from the claim language itself.  *See, e.g., Phillips*, 415 F.3d at 1316. Specifically, claim 1 of the '896 Patent requires "at least a second message ***containing*** network configuration parameters," and further explicitly states that "the network configuration parameters ***comprise*** an identifier of the secure WLAN ***and*** a security key for the secure WLAN."  *See* Complaint, Ex. 8 at Claim 1 (emphasis added).  Thus, the plain meaning of the limitation requires that each second message contain the network configuration parameters (*i.e.*, an identifier of the secure WLAN and a security key for the secure WLAN).  *See, e.g., CoStar Realty Info., Inc. v. CIVIX-DDI, LLC*, 2013 WL 5346440, at *6 (N.D. Ill. Sept. 23, 2013) (finding that the claim language "the request *containing*" both a category and geographic vicinity means that even if there could be multiple requests "each request must contain both the category and the geographic vicinity."); *TiVo, Inc. v. EchoStar Commc'ns Corp.*, 516 F.3d 1290, 1303 (Fed. Cir. 2008).

Furthermore, the plain language of the claims allows for the second message to contain additional information beyond the "network configuration parameters."  For example, unasserted dependent claim 10 of the '896 Patent (reproduced below) requires that, in addition to containing the network configuration parameters, the second message of claim 1 must "comprise[] a command for the given playback device to adopt the network configuration parameters":

> **10**. The computing device of claim **1**, wherein the second message comprises a command for the given playback device to adopt the network configuration parameters.

*See* Complaint, Ex. 8 at Claim 10.  Because the second message can contain additional information beyond the "network configuration parameters," the claim language "***at least*** a

second message containing network configuration parameters" is not rendered meaningless and superfluous, as Sonos contends.  *See* Sonos Initial *Markman* Brief at 33-34.

> **b.    The Specification Supports the Staff's and Google's Understanding of the Claim Language**

The specification of the '896 Patent further supports the Staff's construction.  For example, the specification describes an "automatic configuration process" that causes several messages to be exchanged between devices wherein "some of the messages carry information pertaining to a transmission channel, an identifier of the network and a security key for subsequent communication, [and] at least some of the messages are encrypted."  *See* Complaint, Ex. 8 at 3:11-4:24.

Figure 3B (reproduced below) shows an embodiment that involves a process of exchanging five messages between devices:



**FIG. 3B**

*Id.* at Fig. 3B, 13:4-42.  The specification explains that the "SetNetParams" message in Figure 3B is "a command message…indicating that the [playback device] should reconfigure its network parameters."  *Id.* at 13:29-37.  The specification explains that "[t]he command includes **at least** a zpUU/O, netConfig and tid," wherein "netConfig includes the new configuration parameters for the [playback device]…."  *Id.* (emphasis added).  The specification further

describes that when the playback device "receives a SetNetParams message, it reconfigures its own HHID [*i.e.*, an identifier] and WEP key [*i.e.*, a security key] to match those contained in the network packet." *Id.* at 14:15-17. The specification thus discloses a single message (the "SetNetParams" message) that contains both an identifier and a security key.

Accordingly, the specification supports the Staff's and Google's understanding of the term "at least a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN." Therefore, the Staff submits that Sonos' proposed construction should be rejected by the CALJ, and the term should be given its plain and ordinary meaning.

## IX.     CONCLUSION

For the reasons set forth above, the Staff submits that its proposed constructions for the disputed claim terms are most consistent with the intrinsic evidence (and pertinent extrinsic evidence) and, therefore, should be adopted by the CALJ.

Respectfully submitted,

 /s/ *Cortney C. Hoecherl*

Margaret D. Macdonald, Director
Jeffrey T. Hsu, Supervisory Attorney
Cortney C. Hoecherl, Investigative Attorney
**OFFICE OF UNFAIR IMPORT INVESTIGATIONS**
U.S. International Trade Commission
500 E Street SW, Suite 401
Washington, D.C. 20436
(202) 205-2582
(202) 205-2158 (facsimile)

July 13, 2020

**Certain Audio Players and Controllers,**                                    **Inv. No. 337-TA-1191**
**Components Thereof, and Products**
**Containing the Same**

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 13, 2020 the foregoing **COMMISSION INVESTIGATIVE STAFF'S INITIAL** *MARKMAN* **BRIEF**, was filed with the Commission, served upon Chief Administrative Law Judge Charles E. Bullock, and served upon the private parties in the manner indicated below:

| Counsel for Complainant Sonos, Inc. | |
|---|---|
| Clement S. Roberts, Esq.<br>ORRICK, HERRINGTON &SUTCLIFFE LLP<br>The Orrick Building<br>405 Howard Street<br>San Francisco, CA 94105-2669<br>Tel: (415) 773-5700<br>Fax: (415) 773-5759<br><br>Bas de Blank, Esq.<br>Lillian J. Mao, Esq.<br>ORRICK, HERRINGTON &SUTCLIFFE LLP<br>1000 Marsh Road<br>Menlo Park, CA 94025-1015<br>Tel: (650) 614-7400<br>Fax: (650) 614-7401<br><br>Jordan L. Coyle, Esq.<br>ORRICK, HERRINGTON &SUTCLIFFE LLP<br>Columbia Center<br>1152 15th Street, NW<br>Washington, DC 20005<br>Tel: (202) 339-8400<br>Fax: (202) 339-8500<br><br>Alyssa M. Caridis, Esq.<br>Shane D. Anderson, Esq.<br>Margaret Abernathy, Esq.<br>ORRICK, HERRINGTON &SUTCLIFFE LLP<br>777 South Figueroa Street, Suite 3200<br>Los Angeles, CA 90017-5855<br>Tel: (213) 629-2020<br>Fax: (213) 612-2499 | Via Electronic Transfer |

| | |
|---|---|
| George I. Lee, Esq.<br>Sean M. Sullivan, Esq.<br>Rory P. Shea, Esq.<br>J. Dan Smith, Esq.<br>Cole B. Richter, Esq.<br>Michael P. Boyea, Esq.<br>Jae Y. Pak, Esq.<br>LEE SULLIVAN SHEA &SMITH LLP<br>656 W Randolph St, Floor 5W<br>Chicago, IL 60661<br>Tel: (312) 754-0002<br>Fax: (312) 754-0003<br><br>*Sonos-1191-service@orrick.com* | |
| **Counsel for Respondents Google LLC and Alphabet Inc.** | |
| S. Alex Lasher<br>Marissa R. Ducca<br>Jared W. Newton<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>1300 I Street, NW, Suite 900<br>Washington, D.C. 20005<br>Tel.: (202) 538-8000<br><br>Charles K. Verhoeven<br>Sean S. Pak<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>50 California Street, 22nd Floor<br>San Francisco, CA 94111<br>Tel.: (415) 875-6600<br><br>Justin Griffin<br>Lance Yang<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>865 S Figueroa St, 10th Floor<br>Los Angeles, CA 90017<br>Tel.: (213) 443-3000<br><br>Patrick D. Curran<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>111 Huntington Ave, Suite 520<br>Boston, MA 02199<br>Tel.: (617) 712-7100<br><br>*qe-google-sonos-1191@quinnemanuel.com* | Via Electronic Transfer |

Shamita Etienne-Cummings
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
Telephone: 202-626-3600

*setienne@whitecase.com*

*/s/ Cortney C. Hoecherl*
Cortney C. Hoecherl
Investigative Attorney
**OFFICE OF UNFAIR IMPORT INVESTIGATIONS**
U.S. International Trade Commission
500 E. Street SW, Suite 401
Washington, DC 20436
(202) 205-2252
(202) 205-2158 (facsimile)

**<u>STAFF EXHIBIT 1</u>**

List of Asserted Claims

**COMMISSION INVESTIGATIVE STAFF'S INITIAL *MARKMAN* BRIEF**

Investigation No. 337-TA-1191

Staff Exhibit 1
List of Asserted Claims

## I.    U.S. PATENT NO. 9,195,258

| Claim 17 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Preamble | 17. A first zone player comprising: |
| Element 17A | a network interface configured to interface the first zone player with at least a **local area network (LAN)**; |
| Element 17B | a device clock configured to generate clock time information for the first zone player; |
| Element 17C | one or more processors; and |
| Element 17D | a tangible, non-transitory computer-readable memory having instructions stored thereon that, when executed by the one or more processors, cause the first zone player to: |
| Element 17E | receive control information from any one of a plurality of controllers over the LAN via the network interface, wherein the received control information comprises a direction for the first zone player to enter into a synchrony group with at least a second zone player; |
| Element 17F | in response to the direction, enter into the synchrony group with the second zone player, |
| Element 17G | wherein in the synchrony group, the first and second zone players arc configured to playback audio in synchrony based at least in part on (i) audio content, (ii) playback timing information associated with the audio content, wherein the playback timing information is generated by one of the first or second zone players, and (iii) clock time information for the one of the first or second zone players, and wherein the generated playback timing information and the clock time information are transmitted from the one of the first or second zone players to the other of the first or second zone players, wherein the first and second zone players remain independently clocked while playing back audio in synchrony; and |
| Element 17H | transmit status information to at least one of the plurality of controllers over the LAN via the network interface, wherein the status information comprises an indication of a status of the synchrony group. |

Staff Exhibit 1
List of Asserted Claims

| Claim 21 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Element 21A | 21. The first zone player of claim 17, wherein the status information further comprises one or both of (a) an identification of a zone player that is operating as a master device of the synchrony group and (b) an identification of at least one zone player that is operating as a slave device of the synchrony group. |

| Claim 22 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Element 22A | 22. The first zone player of claim 17, wherein the first zone player comprises a master device of the synchrony group. |

| Claim 23 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Element 23A | 23. The first zone player of claim 17, wherein the tangible computer-readable memory further has instructions stored thereon that, when executed by the one or more processors, cause the first zone player to determine whether the first zone player is operating as a master device of the synchrony group, and wherein the instructions that cause the first zone player to transmit status information to the at least one of the plurality of controllers comprise instructions that cause the first zone player to transmit status information to the at least one of the plurality of controllers only while the first zone player is operating as the master device of the synchrony group. |

| Claim 24 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Element 24A | 24. The first zone player of claim 23, wherein the tangible computer-readable memory further has instructions stored thereon that, when executed by the one or more processors, cause the first zone player to: |
| Element 24B | receive audio content via the network interface; and |
| Element 24C | while the first zone player is operating as the master device of the synchrony group, transmit the received audio content, via the network interface, to at least one zone player that is operating as a slave device of the synchrony group. |

2

Staff Exhibit 1
List of Asserted Claims

| Claim 26 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Element 26A | 26. The first zone player of claim 17, wherein the first zone player is a master zone player of the synchrony group, wherein the audio content comprises a plurality of frames, wherein the playback timing information associated with the audio content comprises a playback time for each frame of the audio content, and wherein the first zone player is configured to play back audio in synchrony with the second zone player based at least in part on (i) the audio content, (ii) playback timing information associated with the audio content, wherein the playback timing information is generated by the first zone player, and (iii) clock time information for the first zone player, and wherein the generated playback timing information and the clock time information are transmitted from the first zone player to the second zone player; and |
| Element 26B | wherein the first zone player playing back audio in synchrony comprises, for each frame of the audio content, the first zone player playing back the frame when the device clock of the first zone player is the same as the playback time for the frame. |

Staff Exhibit 1
List of Asserted Claims

## II.    U.S. PATENT NO. 10,209,953

| Claim 7 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Preamble | 7. A first zone player comprising: |
| Element 7A | a network interface that is configured to provide an interconnection with at least one data network; |
| Element 7B | a clock that is configured to provide a clock time of the first zone player; |
| Element 7C | at least one processor; |
| Element 7D | a tangible, non-transitory computer-readable medium; and |
| Element 7E | program instructions stored on the tangible, non-transitory computer-readable medium that are executable by the at least one processor to cause the first zone player to perform functions comprising: |
| Element 7F | receiving a request to enter into a synchrony group with at least a second zone player that is communicatively coupled with the first zone player over a **local area network (LAN)**; |
| Element 7G | in response to receiving the request to enter into the synchrony group, entering into the synchrony group with the second zone player, wherein the first zone player is selected to begin operating as a slave of the synchrony group and the second zone player is selected to begin operating as a master of the synchrony group, and wherein the clock time of the first zone player differs from a clock time of the second zone player; |
| Element 7H | after beginning to operate as the slave of the synchrony group: |
| Element 7I | receiving, from the second zone player over the LAN, clock timing information that comprises at least one reading of the clock time of the second zone player; |
| Element 7J | based on the received clock timing information, determining a differential between the clock time of the first zone player and the clock time of the second zone player; |
| Element 7K | receiving, from the second zone player over the LAN, (a) audio information for at least a first audio track and (b) playback timing information associated with the audio information for the first audio track that comprises an indicator of a first future time, relative to the clock time of the second zone player, at which the first and second zone players are to initiate synchronous playback of the audio information for the first audio track; |

Staff Exhibit 1
List of Asserted Claims

| Element 7L | updating the first future time to account for the determined differential between the clock time of the first zone player and the clock time of the second zone player; and |
|---|---|
| Element 7M | when the clock time of the first zone player reaches the updated first future time, initiating synchronous playback of the received audio information with the second zone player. |

| **Claim 12** ||
|---|---|
| *Claim Element* | *Claim Language* |
| Element 12A | 12. The first zone player of claim 7, wherein receiving the audio information for the first audio track from the second zone player over the LAN comprises: |
| Element 12B | receiving a series of frames that each include a respective portion of the received[1] audio information for the first audio track. |

| **Claim 13** ||
|---|---|
| *Claim Element* | *Claim Language* |
| Element 13A | 13. The first zone player of claim 12, wherein a first frame in the series of frames includes the indicator of the first future time. |

| **Claim 14** ||
|---|---|
| *Claim Element* | *Claim Language* |
| Element 14A | 14. The first zone player of claim 13, wherein the playback timing information further comprises, for each subsequent frame in the series of frames: |
| Element 14B | an indicator of a respective future time, relative to the clock time of the second zone player, at which the frame is to be synchronously played back by the first and second zone players. |

| **Claim 22** ||
|---|---|
| *Claim Element* | *Claim Language* |
| Element 22A | 22. The first zone player of claim 7, further comprising program instructions stored on the tangible, non-transitory computer-readable medium that are executable by the at least one processor to cause the first zone player to perform the following functions while operating as the slave |

---

[1] Element 12B contains changes made in the certificate of correction for the '953 Patent (issued on December 31, 2019). *See* Sonos Initial *Markman* Brief, Ex. 4.

5

Staff Exhibit 1
List of Asserted Claims

| | of the synchrony group: |
|---|---|
| Element 22B | receiving, from the second zone player over the LAN, a command to adjust an individual volume of the first zone player; and |
| Element 22C | in response to receiving the command, adjusting the individual volume of the first zone player. |

| Claim 23 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Element 23A | 23. The first zone player of claim 7, further comprising program instructions stored on the tangible, non-transitory computer-readable medium that are executable by the at least one processor to cause the first zone player to perform the following functions: |
| Element 23B | while operating as the slave of the synchrony group, receiving, from the second zone player over the LAN, control information that enables the first zone player to begin operating as the master of the synchrony group; and |
| Element 23C | in response to receiving the control information, transitioning from operating as the slave of the synchrony group to operating as the master of the synchrony group. |

| Claim 24 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Element 24A | 24. The first zone player of claim 7, further comprising program instructions stored on the tangible, non-transitory computer-readable medium that are executable by the at least one processor to cause the first zone player to perform the following functions: |
| Element 24B | while operating as the slave of the synchrony group, receiving a request to disengage from the synchrony group; |
| Element 24C | in response to receiving the request to disengage from the synchrony group, disengaging from the synchrony group and transitioning from operating as the slave of the synchrony group to operating as a standalone zone player. |

Staff Exhibit 1
List of Asserted Claims

## III.    U.S. PATENT NO. 9,219,959

| Claim 5[2] | |
|---|---|
| **Claim Element** | **Claim Language** |
| Preamble | 5. [The playback device of claim 1,] *A playback device configured to output audio in a multi-channel listening environment, the playback device comprising:* |
| Element 5A | *a network interface configured to receive audio data over a network;* |
| Element 5B | *a plurality of speaker drivers configured to output audio based on the audio data;* |
| Element 5C | *one or more processors; and* |
| Element 5D | *tangible, non-transitory, computer readable memory comprising instructions encoded therein, wherein the instructions, when executed by the one or more processors, cause the playback device to (i) process the audio data before the playback device outputs audio from the plurality of speaker drivers, (ii) determine that a **type of pairing** of the playback device comprises one of at least a **first type of pairing** or a **second type of pairing**, wherein in the first type of pairing, the playback device is configured to output audio comprising two channel sound via the plurality of speaker drivers, and wherein in the second type of pairing, the playback device is configured to output audio comprising no more than one channel of the two channel sound via the plurality of speaker drivers, (iii) configure the playback device to perform a first **equalization of the audio data** before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the first type of pairing, and (iv) configure the playback device to perform a second equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the second type of pairing.* |
| **Claim 9** | |
| **Claim Element** | **Claim Language** |

---

[2] The language of asserted claims is reproduced as shown in the reexamination certificate for the '959 Patent. *See* Complaint, Ex. 7. As such, matter enclosed in heavy brackets [ ] appeared in the original patent, but has been deleted and is no longer a part of the patent. Whereas, matter printed in italics indicates additions made to the patent during reexamination.

Staff Exhibit 1
List of Asserted Claims

| Preamble | 9. **[**The playback device of claim 1, wherein the playback device is further configured to (i)**]** *A playback device configured to output audio in a multi-channel listening environment, the playback device comprising:* |
|---|---|
| Element 9A | *a network interface configured to receive audio data over a network;* |
| Element 9B | *a plurality of speaker drivers configured to output audio based on the audio data;* |
| Element 9C | *one or more processors; and* |
| Element 9D | *tangible, non-transitory, computer readable memory comprising instructions encoded therein, wherein the instructions, when executed by the one or more processors cause the playback device to (i) process the audio data before the playback device outputs audio from the plurality of speaker drivers, (ii) determine that a type of pairing of the playback device comprises one of at least a first type of pairing or a second type of pairing, (iii) configure the playback device to perform a first equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the first type of pairing, (iv) configure the playback device to perform a second equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the second type of pairing, (v)* separate the audio data into separate audio channels, **[**(ii)**]** *(vi)* output audio based on audio data of at least one separate audio channel from the plurality of speaker drivers, and **[**(ii)**]** *(vii)* transmit at least one additional separate audio channel over the network. |

| **Claim 10** ||
|---|---|
| ***Claim Element*** | ***Claim Language*** |
| Preamble | 10. **[**The playback device of claim 1, wherein the playback device is further configured to**]** *A playback device configured to output audio in a multi-channel listening environment, the playback device comprising:* |
| Element 10A | *a network interface configured to receive audio data over a network;* |
| Element 10B | *a plurality of speaker drivers configured to output audio based on the audio data;* |
| Element 10C | *one or more processors; and* |
| Element 10D | *tangible, non-transitory, computer readable memory comprising instructions encoded therein, wherein the instructions, when executed by* |

Staff Exhibit 1
List of Asserted Claims

| | |
|---|---|
| | the one or more processors, cause the playback device to (i) receive a signal from a controller over the network, wherein the signal comprises an instruction for the playback device to pair with one or more playback devices, *(ii) process the audio data before the playback device outputs audio from the plurality of speaker drivers, (iii) determine that a type of pairing of the playback device comprises one of at least a first type of pairing or a second type of pairing. (iv) configure the playback device to perform a first equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the first type of pairing, and (v) configure the playback device to perform a second equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the second type of pairing.* |

| Claim 29 ||
|---|---|
| **Claim Element** | **Claim Language** |
| Element 29A | *29. The playback device of claim 5, wherein the playback device is further configured to receive a signal from a controller over the network, wherein the signal comprises an instruction for the playback device to pair with one or more playback devices.* |

| Claim 35 ||
|---|---|
| **Claim Element** | **Claim Language** |
| Element 35A | *35. The playback device of claim 9, wherein the playback device is further configured to receive a signal from a controller over the network, wherein the signal comprises an instruction for the playback device to pair with one or more playback devices.* |

Staff Exhibit 1
List of Asserted Claims

## IV.    U.S. PATENT NO. 8,588,949

| Claim 1[3] | |
|---|---|
| **Claim Element** | **Claim Language** |
| Preamble | 1. A multimedia controller including a processor, the controller configured to: |
| Element 1A | provide a user interface for a player group, wherein the player group includes a plurality of players in a **local area network**, and wherein each player is an **independent playback device** configured to playback a multimedia output from a multimedia source; |
| Element 1B | accept via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group *for synchronized playback of a multimedia output from the same multimedia source*; |
| Element 1C | for [each of the plurality of players within] *any individual player in* the player group, accept via the user interface [an] *a player-specific* input to adjust a volume [associated with the] *of that individual* player, wherein the *player-specific* input to adjust the volume [associated with the] *of that individual* player causes [the corresponding independent playback device] *that individual player* to adjust its volume; and |
| Element 1D | accept via the user interface [an] *a group-level* input to adjust a volume associated with the player group, wherein the *group-level* input to adjust the volume associated with the *player* group causes [the corresponding independent playback devices] *each of the players* in the player group to adjust [their volumes] *its respective volume*. |
| Claim 2 | |
| **Claim Element** | **Claim Language** |
| Element 2A | 2. The multimedia controller of claim 1, wherein the controller is further configured to accept via the user interface an input to remove one of the plurality of players from the player group. |

---

[3]  The language of Claims 1 and 4 is reproduced as shown in the reexamination certificate for the '949 Patent.  *See* Complaint, Ex. 10.  As such, matter enclosed in heavy brackets [ ] appeared in the original patent, but has been deleted and is no longer a part of the patent.  Whereas, matter printed in italics indicates additions made to the patent during reexamination.  Claims 2 and 5 (now dependent on an amended claim) appear in the original patent.

Staff Exhibit 1
List of Asserted Claims

| Claim 4 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Element 4A | 4. The multimedia controller of [claim 3] *claim 1*, wherein the *group-level* input to [mute] *adjust the volume associated with* the player group *further* causes [the players in the player group to adjust their volumes further comprises]: |
| Element 4B | the controller [sending] *to send* an instruction to one of the players in the player group, the instruction indicating that the volumes of each of the players in the player group should be adjusted in scale. |

| Claim 5 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Element 5A | 5. The multimedia controller of claim 1, wherein the controller is further configured to accept via the user interface an input to name the player group. |

Staff Exhibit 1
List of Asserted Claims

## V.    U.S. PATENT NO. 10,439,896

| Claim 1 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Preamble | 1. A computing device comprising: |
| Element 1A | a user interface; |
| Element 1B | a network interface; |
| Element 1C | at least one processor; |
| Element 1D | a non-transitory computer-readable medium; and |
| Element 1E | **program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising:** |
| Element 1F | **while operating on a secure wireless local area network (WLAN) that is defined by an access point, (a) receiving, via a graphical user interface (GUI) associated with an application for controlling one or more playback devices, user input indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b) receiving a first message indicating that a given playback device is available for setup;** |
| Element 1G | after receiving the user input and receiving the first message, transmitting a response to the first message that facilitates establishing an initial communication path with the given playback device, wherein the initial communication path with the given playback device does not traverse the access point; |
| Element 1H | transmitting, to the given playback device via the initial communication path, **at least a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN;** |
| Element 1I | after transmitting at least the second message containing the network configuration parameters, detecting an indication that the given playback device has successfully received the network configuration parameters; and |
| Element 1J | after detecting the indication, transitioning from communicating with the given playback device via the initial communication path to communicating with the given playback device via the secure WLAN that is defined by the access point. |

12

Staff Exhibit 1
List of Asserted Claims

| Claim 3 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Element 3A | 3. The computing device of claim 1, wherein the given playback device comprises a first playback device of a new networked audio system. |

| Claim 5 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Element 5A | 5. The computing device of claim 1, wherein communicating with the given playback device via the secure WLAN comprises transmitting a command to the given playback device related to playback of audio content. |

| Claim 6 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Element 6A | 6. The computing device of claim 5, wherein the command comprises a command to retrieve audio content for playback from an audio source that is accessible via a communication path that includes the secure WLAN. |

| Claim 12 | |
|---|---|
| **Claim Element** | **Claim Language** |
| Element 12A | 12. The computing device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising: |
| Element 12B | after transitioning to communicating with the given playback device via the secure WLAN, transmitting a command to the given playback device to form a group with at least a first playback device of a networked audio system such that the given playback device is configured to play back audio content in synchrony with at least the first playback device. |

**<u>STAFF EXHIBIT 2</u>**

List of Agreed-Upon Constructions

**COMMISSION INVESTIGATIVE STAFF'S INITIAL *MARKMAN* BRIEF**

Investigation No. 337-TA-1191

Staff Exhibit 2
List of Agreed-Upon Constructions

## I.    U.S. PATENT NO. 9,195,258

The parties agree on the meaning of several terms in the asserted claims of the '258

Patent.  The terms appear in **bold**, *italics*, and in the shaded rows, and the parties' agreed-upon

constructions of these terms appear immediately below, and are as follows:

| *"zone player" / "playback device" / "player"* |
|:---:|
| "data network device configured to process and output audio" |
| *"network interface"* |
| "physical component of a device that provides an interconnection with a data network" |
| *"independently clocked"* |
| "operating in accordance with their own respective clocks during synchronous playback" |
| *"clock time information" / "clock timing information"* |
| "information representing a time value indicated by a device's clock" |
| *"playback timing information"* |
| "information indicating when the audio information [content] is to be played back" |
| *"synchrony group"* |
| "a set of two or more zone players that are to play the same audio program synchronously" |

Staff Exhibit 2
List of Agreed-Upon Constructions

## II.    U.S. PATENT NO. 10,209,953

The parties agree on the meaning of several terms in the asserted claims of the '953 Patent.  The terms appear in **bold**, *italics*, and in the shaded rows, and the parties' agreed-upon constructions of these terms appear immediately below, and are as follows:

| ***"zone player" / "playback device" / "player"*** |
| :---: |
| "data network device configured to process and output audio" |
| ***"network interface"*** |
| "physical component of a device that provides an interconnection with a data network" |
| ***"clock time information" / "clock timing information"*** |
| "information representing a time value indicated by a device's clock" |
| ***"playback timing information"*** |
| "information indicating when the audio information [content] is to be played back" |
| ***"synchrony group"*** |
| "a set of two or more zone players that are to play the same audio program synchronously" |

Staff Exhibit 2
List of Agreed-Upon Constructions

### III.    U.S. PATENT NO. 9,219,959

The parties agree on the meaning of several terms in the asserted claims of the '959 Patent. The terms appear in **bold**, *italics*, and in the shaded rows, and the parties' agreed-upon constructions of these terms appear immediately below, and are as follows:

| ***"zone player" / "playback device" / "player"*** |
| :---: |
| "data network device configured to process and output audio" |
| ***"network interface"*** |
| "physical component of a device that provides an interconnection with a data network" |
| ***"pairing"*** |
| "configuration involving two or more playback devices that have different playback roles" |

Staff Exhibit 2
List of Agreed-Upon Constructions

## IV.    U.S. PATENT NO. 8,588,949

The parties agree on the meaning of several terms in the asserted claims of the '949

Patent.  The terms appear in **bold**, *italics*, and in the shaded rows, and the parties' agreed-upon

constructions of these terms appear immediately below, and are as follows:

| ***"zone player" / "playback device" / "player"*** |
|:---:|
| "data network device configured to process and output audio" |
| ***"multimedia"*** |
| "any type of media that comprises audio (including audio alone)" |

Staff Exhibit 2
List of Agreed-Upon Constructions

**V.      U.S. PATENT NO. 10,439,896**

The parties agree on the meaning of several terms in the asserted claims of the '896

Patent.  The terms appear in **bold**, *italics*, and in the shaded rows, and the parties' agreed-upon

constructions of these terms appear immediately below, and are as follows:

| ***"zone player" / "playback device" / "player"*** |
|---|
| "data network device configured to process and output audio" |
| ***"network interface"*** |
| "physical component of a device that provides an interconnection with a data network" |

5

**<u>STAFF EXHIBIT 3</u>**

Excerpts of Exhibit 12 (*Wireless Home Networking for Dummies*) to
Deposition of Dr. Jon B. Weissman

**COMMISSION INVESTIGATIVE STAFF'S INITIAL *MARKMAN* BRIEF**

Investigation No. 337-TA-1191

Making Everything Easier!™

4th Edition

# Wireless Home Networking

## FOR DUMMIES®

### Learn to:

- **Consider financial and logistical issues when planning a wireless network**

- **Design, install, and use a wireless LAN**

- **Keep your network security up to date**

- **Plan for the Wi-Fi capability of your mobile devices**

**Danny Briere**
**Pat Hurley**

*Coauthors of* Smart Homes
For Dummies, 3rd Edition



WEISSMAN EXH 12

# Get More and Do More at Dummies.com®



Start with **FREE** Cheat Sheets

Cheat Sheets include
- Checklists
- Charts
- Common Instructions
- And Other Good Stuff!

**To access the Cheat Sheet created specifically for this book, go to**
***www.dummies.com/cheatsheet/wirelesshomenetworking***



## Get Smart at Dummies.com

Dummies.com makes your life easier with 1,000s of answers on everything from removing wallpaper to using the latest version of Windows.

Check out our
- Videos
- Illustrated Articles
- Step-by-Step Instructions

Plus, each month you can win valuable prizes by entering our Dummies.com sweepstakes. *

Want a weekly dose of Dummies? Sign up for Newsletters on
- Digital Photography
- Microsoft Windows & Office
- Personal Finance & Investing
- Health & Wellness
- Computing, iPods & Cell Phones
- eBay
- Internet
- Food, Home & Garden

## Find out "HOW" at Dummies.com

*Sweepstakes not currently available in all countries; visit Dummies.com for official rules.*



# Wireless Home Networking

## FOR DUMMIES®

### 4TH EDITION

by Danny Briere and Pat Hurley



Wiley Publishing, Inc.

**Wireless Home Networking For Dummies®, 4th Edition**

Published by
**Wiley Publishing, Inc.**
111 River Street
Hoboken, NJ 07030-5774
www.wiley.com

Copyright © 2011 by Wiley Publishing, Inc., Indianapolis, Indiana

Published by Wiley Publishing, Inc., Indianapolis, Indiana

Published simultaneously in Canada

No part of this publication may be reproduced, stored in a retrieval system or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning or otherwise, except as permitted under Sections 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 646-8600. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, (201) 748-6011, fax (201) 748-6008, or online at http://www.wiley.com/go/permissions.

**Trademarks:** Wiley, the Wiley Publishing logo, For Dummies, the Dummies Man logo, A Reference for the Rest of Us!, The Dummies Way, Dummies Daily, The Fun and Easy Way, Dummies.com, Making Everything Easier, and related trade dress are trademarks or registered trademarks of John Wiley & Sons, Inc. and/or its affiliates in the United States and other countries, and may not be used without written permission. All other trademarks are the property of their respective owners. Wiley Publishing, Inc., is not associated with any product or vendor mentioned in this book.

LIMIT OF LIABILITY/DISCLAIMER OF WARRANTY: THE PUBLISHER AND THE AUTHOR MAKE NO REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE ACCURACY OR COMPLETENESS OF THE CONTENTS OF THIS WORK AND SPECIFICALLY DISCLAIM ALL WARRANTIES, INCLUDING WITHOUT LIMITATION WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE. NO WARRANTY MAY BE CREATED OR EXTENDED BY SALES OR PROMOTIONAL MATERIALS. THE ADVICE AND STRATEGIES CONTAINED HEREIN MAY NOT BE SUITABLE FOR EVERY SITUATION. THIS WORK IS SOLD WITH THE UNDERSTANDING THAT THE PUBLISHER IS NOT ENGAGED IN RENDERING LEGAL, ACCOUNTING, OR OTHER PROFESSIONAL SERVICES. IF PROFESSIONAL ASSISTANCE IS REQUIRED, THE SERVICES OF A COMPETENT PROFESSIONAL PERSON SHOULD BE SOUGHT. NEITHER THE PUBLISHER NOR THE AUTHOR SHALL BE LIABLE FOR DAMAGES ARISING HEREFROM. THE FACT THAT AN ORGANIZATION OR WEBSITE IS REFERRED TO IN THIS WORK AS A CITATION AND/OR A POTENTIAL SOURCE OF FURTHER INFORMATION DOES NOT MEAN THAT THE AUTHOR OR THE PUBLISHER ENDORSES THE INFORMATION THE ORGANIZATION OR WEBSITE MAY PROVIDE OR RECOMMENDATIONS IT MAY MAKE. FURTHER, READERS SHOULD BE AWARE THAT INTERNET WEBSITES LISTED IN THIS WORK MAY HAVE CHANGED OR DISAPPEARED BETWEEN WHEN THIS WORK WAS WRITTEN AND WHEN IT IS READ.

For general information on our other products and services, please contact our Customer Care Department within the U.S. at 877-762-2974, outside the U.S. at 317-572-3993, or fax 317-572-4002.

For technical support, please visit www.wiley.com/techsupport.

Wiley also publishes its books in a variety of electronic formats. Some content that appears in print may not be available in electronic books.

Library of Congress Control Number: 2010938828

ISBN: 978-0-470-87725-8

Manufactured in the United States of America

10 9 8 7 6 5 4 3 2 1



# About the Authors

**Danny Briere** founded TeleChoice, Inc., a telecommunications consulting company, in 1985 and now serves as CEO of the company. Widely known throughout the telecommunications and networking industry, Danny has written more than 1,000 articles about telecommunications topics and has authored or edited eight books, including *Smart Homes For Dummies,* 3rd Edition; *HDTV For Dummies,* 2nd Edition; *Windows XP Media Center Edition 2004 PC For Dummies; Wireless Network Hacks & Mods For Dummies;* and *Home Theater For Dummies,* 2nd Edition (all published by Wiley). He is frequently quoted by leading publications on telecommunications and technology topics and can often be seen on major TV networks providing analysis on the latest communications news and breakthroughs. Danny lives in Mansfield Center, Connecticut, with his wife and four children.

**Pat Hurley** is director of research with TeleChoice, Inc., specializing in emerging telecommunications technologies, including all the latest access and home technologies: wireless LANs, DSL, cable modems, satellite services, and home networking services. Pat frequently consults with the leading telecommunications carriers, equipment vendors, consumer goods manufacturers, and other players in the telecommunications and consumer electronics industries. Pat is the co-author of *Smart Homes For Dummies,* 3rd Edition; *HDTV For Dummies,* 2nd Edition; *Windows XP Media Center Edition 2004 PC For Dummies; Wireless Network Hacks & Mods For Dummies;* and *Home Theater For Dummies,* 2nd Edition (all published by Wiley). He lives in San Diego, California, with his wife, beautiful daughter, and two smelly and unruly dogs.

# Authors' Acknowledgments

Danny wants to thank his wife, Holly, and kids, for their infinite patience while he constantly tested new wireless technologies in the house, especially since it usually meant taking something that was (finally) working and replacing it with something that was newer but didn't work at all. At least it looked good! Pat, as always, thanks his wife, Christine, for providing her impeccable judgment when he asks, "Can I write this wisecrack and not offend half the people in the world?" and for her ability to restrain her desire to knock him over the head with a big frying pan when deadlines and late-night writing intrude on their domestic tranquility. He also wants to thank his daughter Annabel, who let him borrow her DSi, Wii, and other gizmos to play with on the network, and for generally being the best first grader ever.

Now that we're on our fourth edition, we have a large and historically significant (to us, at least) list of people to thank, including: Bill Bullock, at Witopia; Melody Chalaban and Jonathan Bettino at Belkin; Shira Frantzich from Sterling PR (for NETGEAR); David Henry at NETGEAR; Karl Stetson at Edelman (for the Wi-Fi Alliance); Mindy Whittington and Ana Corea at Red Consultancy (for Eye-Fi); Doug Hagan and Mehrshad Mansouri, formerly of NETGEAR; Dana Brzozkiewicz, at Lages & Associates, for ZyXEL; Trisha King, at NetPR, for SMC Networks; Fred Bargetzi, at Crestron; Shawn Gusz, at G-NET Canada (still waiting to try Auroras in our cars!); Karen Sohl, at Linksys; Keith Smith, at Siemon; Darek Connole and Michael Scott, at D-Link; Jeff Singer, at Crestron; Amy K Schiska-Lombard, at Sprint; Brad Shewmake, at Kyocera Wireless; James Cortese, at A&R Partners, for Roku; Bryan McLeod, at Intrigue Technologies (now part of Logitech); Stu Elefant, at Wireless Security Corporation (now part of McAfee); Craig Slawson, at CorAccess (good luck, too!); and others who helped get the content correct for our readers.

Our team at Wiley was awesome as always: Amy Fandrei, our "suit" on the corporate side of the house and our project editor Kim Darosett, who deserves a medal, a raise, and perhaps sainthood for putting up with us as we tried to write to deadlines and keep our day jobs at the same time. We'd also like to thank our technical editor, Dan DiNicolo, for helping us look smart. Finally, we always have to thank Melody Layne, who's moved on to a different and exciting job at Wiley, but who has always been our champion at Wiley.

## Publisher's Acknowledgments

We're proud of this book; please send us your comments at `http://dummies.custhelp.com`. For other comments, please contact our Customer Care Department within the U.S. at 877-762-2974, outside the U.S. at 317-572-3993, or fax 317-572-4002.

Some of the people who helped bring this book to market include the following:

*Acquisitions and Editorial*

**Project Editor:** Kim Darosett

**Acquisitions Editor:** Amy Fandrei

**Copy Editor:** Virginia Sanders

**Technical Editor:** Dan DiNicolo

**Editorial Manager:** Leah Cameron

**Editorial Assistant:** Amanda Graham

**Sr. Editorial Assistant:** Cherie Case

**Cartoons:** Rich Tennant
(`www.the5thwave.com`)

*Composition Services*

**Project Coordinator:** Kristie Rees

**Layout and Graphics:** Christin Swinford, Laura Westhuis

**Proofreader:** Sossity R. Smith

**Indexer:** Ty Koontz

**Publishing and Editorial for Technology Dummies**

    **Richard Swadley,** Vice President and Executive Group Publisher

    **Andy Cummings,** Vice President and Publisher

    **Mary Bednarek,** Executive Acquisitions Director

    **Mary C. Corder,** Editorial Director

**Publishing for Consumer Dummies**

    **Diane Graves Steele,** Vice President and Publisher

**Composition Services**

    **Debbie Stailey,** Director of Composition Services

# Contents at a Glance

*Introduction* ................................................................... *1*

*Part I: Wireless Networking Fundamentals* .................... *7*

Chapter 1: Introducing Wireless Home Networking.......................................................9
Chapter 2: From a to n and b-yond.................................................................................27
Chapter 3: Exploring Bluetooth and Other Wireless Networks .................................51

*Part II: Making Plans* ............................................... *67*

Chapter 4: Planning a Wireless Home Network ...........................................................69
Chapter 5: Choosing Wireless Home Networking Equipment....................................91

*Part III: Installing a Wireless Network* ...................... *107*

Chapter 6: Installing Wireless Access Points in Windows........................................109
Chapter 7: Setting Up a Wireless Windows Network .................................................125
Chapter 8: Setting Up a Wireless Mac Network..........................................................143
Chapter 9: Securing Your Home Network.....................................................................161

*Part IV: Using Your Wireless Network* ....................... *183*

Chapter 10: Putting Your Wireless Network to Work ................................................185
Chapter 11: Gaming Over Your Wireless Network.......................................................205
Chapter 12: Networking Your Entertainment Center .................................................225
Chapter 13: Extending Your Mobile Network...............................................................245
Chapter 14: Other Cool Things You Can Network.......................................................257
Chapter 15: Using a Bluetooth Network........................................................................273
Chapter 16: Going Wireless Away from Home .............................................................285

*Part V: The Part of Tens* ........................................... *297*

Chapter 17: Ten FAQs about Wireless Home Networks..............................................299
Chapter 18: Ten Ways to Troubleshoot Wireless LAN Performance........................309
Chapter 19: Ten Devices to Connect to Your Wireless Network in the Future......319
Chapter 20: Ten Sources for More Information ...........................................................339

*Index* ................................................................... *347*

# Table of Contents

*Introduction* ............................................................. 1
  About This Book ........................................................... 1
  System Requirements ....................................................... 2
  How This Book Is Organized ................................................ 2
    Part I: Wireless Networking Fundamentals ................................ 3
    Part II: Making Plans ................................................... 3
    Part III: Installing a Wireless Network ................................. 3
    Part IV: Using Your Wireless Network .................................... 3
    Part V: The Part of Tens ................................................ 4
  Icons Used in This Book ................................................... 4
  Where to Go from Here ..................................................... 5

*Part I: Wireless Networking Fundamentals* ..................... 7

**Chapter 1: Introducing Wireless Home Networking** ............... 9
  Nothing but Net(work): Why You Need One .................................. 10
    File sharing ........................................................... 10
    Printer and peripheral sharing ........................................ 11
    Internet connection sharing ........................................... 12
    Phone calling for free ................................................ 14
    Home arcades and wireless to go ....................................... 15
  Wired versus Wireless ................................................... 16
    Installing wired home networks ........................................ 16
    Installing wireless home networks ..................................... 17
  Choosing a Wireless Standard ............................................ 19
    Introducing the 802.11s: a, b, g, and n ............................... 19
    Comparing the standards ............................................... 21
  Planning Your Wireless Home Network ..................................... 22
  Choosing Wireless Networking Equipment .................................. 23
    Access point .......................................................... 23
    Network interface adapters ............................................ 24
    Wireless network interface adapters ................................... 25

**Chapter 2: From a to n and b-yond** ............................. 27
  Networking Buzzwords You Need to Know ................................... 28
    Workstations and servers .............................................. 28
    Network infrastructure ................................................ 30
    Network interface adapters ............................................ 33

Getting the (Access) Point ................................................................36
   Setting parameters to create your own personal network............37
   Comparing infrastructure mode and ad hoc mode........................39
Your Wireless Network's Power Station: The Antenna ...........................40
Exploring Industry Standards ..............................................................42
   Wi-Fi history: 802.11b and 802.11a................................................44
   The outgoing standard: 802.11g.....................................................45
   The next big thing: 802.11n............................................................46
Understanding Wi-Fi Certifications ........................................................48
   The Institute for Electrical and Electronics Engineers (IEEE)........49
   The Wi-Fi Alliance ..........................................................................49

**Chapter 3: Exploring Bluetooth and Other Wireless Networks......51**

Who or What Is Bluetooth? ....................................................................52
Comparing Wi-Fi and Bluetooth.............................................................53
Communicating with Bluetooth Devices: Piconets, Masters,
   and Slaves ..........................................................................................55
   Understanding Bluetooth connections ...........................................55
   Transmitting data via Bluetooth.....................................................56
   Securing data in a Bluetooth network.............................................58
Integrating Bluetooth into Your Wireless Network................................58
   Bluetoothing your mobile phone......................................................59
   Wirelessly printing and transferring data ......................................60
Extending Your Wireless Home Network with "No New Wires"
   Solutions ............................................................................................61
Controlling Your Home without Wires ....................................................64
   Understanding how home control networks work..........................64
   Exploring wireless networking standards: ZigBee and Z-Wave.....65

**Part II: Making Plans ..................................................67**

**Chapter 4: Planning a Wireless Home Network...................69**

Deciding What to Connect to the Network.............................................70
   Counting network devices ...............................................................70
   Deciding what devices to connect with wires and what
      to connect wirelessly...................................................................71
   Selecting a wireless technology ......................................................72
   Choosing an access point ................................................................73
   Deciding where to install the access point.....................................75
   Adding printers to the network .......................................................81
   Adding entertainment and more......................................................84
Connecting to the Internet .....................................................................85
Budgeting for Your Wireless Network .....................................................89
   Pricing access points.......................................................................89
   Pricing wireless network adapters ..................................................90
   Looking at a sample budget..............................................................90

**Chapter 5: Choosing Wireless Home Networking Equipment . . . . . . .91**
Choosing an Access Point ........................................................................... 92
Understanding Certification and Standards............................................... 93
Considering Compatibility and Form Factor............................................. 95
Looking for Bundled Functionality: Servers, Gateways, Routers,
    and Switches........................................................................................... 97
        DHCP servers........................................................................................ 97
        NAT and broadband routers ............................................................. 98
        Switches ............................................................................................... 99
        Print servers ...................................................................................... 100
Exploring Operational Features................................................................ 100
Knowing What Security Features You Need ............................................ 101
Examining Range and Coverage Issues.................................................... 102
Controlling and Managing Your Device.................................................... 103
        Web-based configuration .................................................................. 104
        Software programming....................................................................... 104
        Upgradeable firmware ...................................................................... 104
Taking Price into Account ......................................................................... 105
Checking Out Warranties........................................................................... 105
Finding Out about Customer and Technical Support ............................. 106

**Part III: Installing a Wireless Network . . . . . . . . . . . . . . . . . . . . 107**

**Chapter 6: Installing Wireless Access Points in Windows . . . . . . . .109**
Before Getting Started, Get Prepared ...................................................... 109
Setting Up the Access Point ...................................................................... 111
        Preparing to install a wireless AP.................................................... 111
        Installing the AP ................................................................................ 113
        Configuring AP parameters............................................................... 117
Changing the AP Configuration................................................................. 121

**Chapter 7: Setting Up a Wireless Windows Network. . . . . . . . . . . . .125**
Setting Up Wireless Network Interface Adapters ................................... 126
        Installing device drivers and client software ................................. 126
        PC Cards and mini-PCI cards............................................................ 129
        PCI and PCIx cards............................................................................. 131
        USB adapters ...................................................................................... 132
Connecting to a Wireless Network with Windows XP ............................ 133
Connecting to a Wireless Network with Windows Vista  ...................... 135
Connecting to a Wireless Network with Windows 7 .............................. 138
Tracking Your Network's Performance .................................................... 140

**Chapter 8: Setting Up a Wireless Mac Network . . . . . . . . . . . . . . . . .143**
Exploring Your AirPort Hardware Options ............................................. 144
        Getting to know the AirPort card...................................................... 144
        Apple AirPort Extreme–ready computers ....................................... 145
        "Come in, AirPort base station. Over."............................................. 146

Getting aboard the AirPort Express ................................................. 148
Backing up with Time Capsule ......................................................... 150
Using AirPort with OS X Macs ................................................................... 151
Configuring the AirPort base station on OS X ............................... 151
Upgrading AirPort base station firmware on OS X ........................ 156
Connecting another Mac to your AirPort network on OS X .......... 157
Adding a Non-Apple Computer to Your AirPort Network ...................... 158
Connecting to Non-Apple-Based Wireless Networks ............................. 159

**Chapter 9: Securing Your Home Network . . . . . . . . . . . . . . . . . . . . . . .161**
Assessing the Risks ...................................................................................... 162
General Internet security ................................................................. 162
Airlink security ................................................................................. 164
Getting into Encryption and Authentication ........................................... 165
Introducing Wired Equivalent Privacy (WEP) ............................... 167
Opting for a better way: WPA .......................................................... 170
Clamping Down on Your Wireless Home Network's Security ............... 171
Getting rid of the defaults ............................................................... 172
Enabling encryption ......................................................................... 173
Closing your network ....................................................................... 176
Taking the Easy Road ................................................................................... 178
Going for the Ultimate in Security ............................................................. 179

**Part IV: Using Your Wireless Network . . . . . . . . . . . . . . . . . . . . . . . 183**

**Chapter 10: Putting Your Wireless Network to Work . . . . . . . . . . . .185**
A Networking Review .................................................................................... 186
Getting to Know the Windows 7 Network and Sharing Center ............. 187
Sharing in Windows 7 — I Can Do That! .................................................... 190
Choosing what to share .................................................................... 191
Setting up a homegroup in Windows 7 ........................................... 192
Sharing specific libraries ................................................................. 194
Adding users ...................................................................................... 196
Accessing shared files ...................................................................... 197
Be Economical: Share Your Printer ........................................................... 197
Installing a printer in Windows XP ................................................. 198
Installing a printer in Vista and Windows 7 .................................. 199
Accessing your shared printers ....................................................... 200
Sharing Other Peripherals ........................................................................... 201
Sharing Files between Macs and Windows-Based PCs .......................... 201
Getting on a Windows network ........................................................ 202
Letting Windows users on your Mac network ............................... 202

**Chapter 11: Gaming Over Your Wireless Network . . . . . . . . . . . . . . .205**
PC Gaming over a Wireless Home Network ............................................. 206
Getting the right hardware .............................................................. 206
Examining networking requirements ............................................. 207

Getting Your Gaming Console on Your Wireless Home Network..........208
    Exploring the advantages to using a console over a PC ...............208
    Connecting your console to your network.....................................209
    Signing up for console online gaming services..............................212
Dealing with Router Configurations to Get a PC or Console Online .....216
    Getting an IP address .........................................................................217
    Getting through your router's firewall ...........................................219
Setting Up a Demilitarized Zone (DMZ) .....................................................222

**Chapter 12: Networking Your Entertainment Center................225**

Understanding How Wireless Networking Can Fit Into Your
    Entertainment System .......................................................................225
Wirelessly Enabling the Gear in Your Home Entertainment System ....226
    Understanding bandwidth requirements for audio and video ......227
    Exploring your equipment options..................................................228
Getting Media from Computers to Traditional (Non-Networked)
    A/V Equipment ...................................................................................231
Choosing Networked Entertainment Gear.................................................234
    Adding Wi-Fi to Ethernet A/V gear..................................................235
    Choosing equipment with built-in Wi-Fi.........................................236
Putting a Networked PC in Your Home Theater ........................................238
Wirelessly Connecting Inside Your Home Theater ..................................241
    Unwiring speakers ..............................................................................241
    Cutting the video cable ......................................................................242

**Chapter 13: Extending Your Mobile Network .....................245**

Building Your Own Hot Spots with 3G.......................................................246
    Exploring wireless WAN services ....................................................246
    Getting multiple devices online without buying multiple
        service plans...................................................................................248
Boosting Your Mobile Network at Home with a Femtocell...................252
    Exploring the pros and cons of femtocells.....................................253
    Setting up a femtocell........................................................................255

**Chapter 14: Other Cool Things You Can Network .................257**

"Look, Ma, I'm on TV" — Video Monitoring over Wireless LANs..........258
    Finding the right wireless network camera for you .......................258
    Setting up the camera .......................................................................261
Controlling Your Home over Your Wireless LAN......................................261
    Controlling your home-automation system with a touch
        panel ...............................................................................................262
    Doing your wireless control less expensively.................................264
Storing Your (Digital) Stuff on Your Wireless Network..........................265
    Exploring your server options ..........................................................266
    Comparing features when buying a server.....................................267
Having Your Very Own Wi-Fi Robot ..........................................................269
Wirelessly Connecting Your Digital Cameras ..........................................271

**Chapter 15: Using a Bluetooth Network. . . . . . . . . . . . . . . . . . . . . .273**

Discovering Bluetooth Basics .................................................................274
Taking a Look at Bluetooth Mobile Phones .............................................276
Exploring Other Bluetooth Devices..........................................................278
    Printers..................................................................................................279
    Audio systems.......................................................................................279
    Keyboards and meeses (that's plural for mouse!) ...........................280
    Bluetooth adapters ..............................................................................281
Communicating with Another Bluetooth Device: Pairing
    and Discovery........................................................................................282

**Chapter 16: Going Wireless Away from Home . . . . . . . . . . . . . . . . . .285**

Discovering Public Hot Spots....................................................................286
Exploring Different Types of Hot Spots....................................................288
    Freenets and open access points.......................................................288
    For-pay services ...................................................................................289
Tools for Finding Hot Spots......................................................................291
Staying Secure in a Hot Spot Environment..............................................293
    Using a VPN ...........................................................................................293
    Practicing safe browsing....................................................................294
Dealing with Hot Spots on Mobile Devices..............................................296

**Part V: The Part of Tens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297**

**Chapter 17: Ten FAQs about Wireless Home Networks . . . . . . . . . . .299**

Which Standard Is Right for Me? ..............................................................300
Are Dual-Band Routers Worth The Extra Money?...................................300
I Can Connect to the Internet with an Ethernet Cable But Not
    with My Wireless LAN. What Am I Doing Wrong?..............................302
How Do I Get My Video Games to Work on My Wireless LAN? .............303
My Videoconferencing Application Doesn't Work. What Do I Do? .......303
How Do I Secure My Network from Hackers? ..........................................304
What Is Firmware, and Why Might I Need to Upgrade It?........................305
Is NAT the Same as a Firewall? ................................................................306
How Can I Find Out My IP Address?.........................................................306
If Everything Stops Working, What Can I Do? .........................................307

**Chapter 18: Ten Ways to Troubleshoot Wireless
LAN Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .309**

Check the Obvious .....................................................................................310
Move the Access Point...............................................................................312
Move the Antenna ......................................................................................312
Change Channels ........................................................................................313

Check for Dual-Band Interference ..............................................313
Check for New Obstacles...........................................................314
Install Another Antenna.............................................................315
Add an Access Point....................................................................316
Add a Repeater or Bridge ..........................................................317
Check Your Cordless Phone Frequencies ................................318

**Chapter 19: Ten Devices to Connect to Your Wireless Network in the Future. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .319**

Your Bike .....................................................................................320
Your Car.......................................................................................321
Your Home Appliances ..............................................................323
Your Entertainment System .....................................................325
　Wi-Fi networking will be built into receivers, Blu-ray disc
　　players, and TVs......................................................................325
　Cables? Who needs them? ......................................................327
Your Musical Instruments .........................................................328
Your Pets .....................................................................................329
Your Robots .................................................................................331
Your Apparel................................................................................332
　Understanding the technology behind wearables........................333
　Wearing personal tracking devices ...................................333
　Going wireless with jewelry and accessories...................335
Everything in Your Home ...........................................................335
　Where to ZigBee and Z-Wave .............................................336
　Introducing Bluetooth 4.0 ...................................................337

**Chapter 20: Ten Sources for More Information. . . . . . . . . . . . . . . . . .339**

CNET.com ....................................................................................340
Amazon.com, Shopping.com, Pricegrabber.com, and More.................341
Wi-Fi Planet, Wifi-Forum, and More.........................................341
PC Magazine and PC World .......................................................342
Electronic House Magazine ......................................................343
Practically Networked................................................................343
ExtremeTech.com........................................................................344
Network World............................................................................344
Wikipedia ....................................................................................344
Other Cool Sites .........................................................................345
　Tech and wireless news sites............................................345
　Industry organizations .......................................................345
　Roaming services and Wi-Finder organizations.............345
　Manufacturers ......................................................................346

*Index* ..................................................................... *347*

much everything else you may want to know about your connection. If you're having problems with your connection, the View Status pop-up also has a Diagnose button that can help determine the cause of your connection problem.



**Figure 7-5:**
The Network and Sharing Center shows the new wireless network.

The Network and Sharing Center includes a helpful Signal Strength meter (which you can see from the View Status screen). We found in our tests that the Windows meter is not as fast to respond as some of the vendors' software that comes with your wireless network card. But if your vendor does not give you a signal meter, this one works fine to find weak coverage areas in your house.

# Connecting to a Wireless Network with Windows 7

The latest (and definitely, in our experience) greatest version of Windows is Windows 7. Like Windows Vista before it, Windows 7 makes connecting to wireless networks a snap. The built-in wireless networking configuration system is super slick, and we believe that there's no reason to ever use the software that might come with a network adapter when you're using Windows 7.

The big addition in Windows 7 is the *View Available Networks* feature. This feature lets you quickly find all of the available wireless networks in your location, wherever you may be — at home, in the office, near a wireless hot spot, and so on.

To use this feature to set up your network connection in Windows 7, follow these steps:

1. **Click the View Available Networks icon on the far right in the Windows taskbar.**

   Windows displays a list of available networks, as shown in Figure 7-6.



**Figure 7-6:** Click here to find your wireless network in Windows 7.

2. **Select the network you want to join by clicking its name (SSID) in the resulting list. If you plan to connect to this network regularly (for example, if this is your home network), select the Connect Automatically check box. Then click the Connect button.**

3. **If you're connecting to a secured (WEP or WPA) network, Windows prompts you to enter the password. Enter the WEP or WPA password in the Security Key box, as shown in Figure 7-7, and then click OK.**

**Figure 7-7:** Enter your security key (WPA or WEP passphrase) in this box.

Your computer connects to the network, and you're all set. If you selected the Connect Automatically option in Step 2, your computer will always connect to this network whenever it's within range.

**STAFF EXHIBIT 4**

Excerpts from Deposition Transcript of Dr. Jon B. Weissman

**COMMISSION INVESTIGATIVE STAFF'S INITIAL *MARKMAN* BRIEF**

Investigation No. 337-TA-1191



Deposition of:

**Dr. Jon B. Weissman**

*June 25, 2020*

In the Matter of:

**Certain Audio Players and Controllers**

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

Page 1

1          UNITED STATES INTERNATIONAL TRADE COMMISSION

2                          Washington, D.C.

3      - - - - - - - - - - - - - -x

4         In the Matter of:           :

5         CERTAIN AUDIO PLAYERS       :

6         AND CONTROLLERS,            :   Investigation No.

7         COMPONENTS THEREOF, AND     :   337-TA-1191

8         PRODUCTS CONTAINING THE     :

9         SAME.                       :

10     - - - - - - - - - - - - - -x

11

12

13                              - - -

14                    Thursday, June 25, 2020

15                              - - -

16

17

18     REMOTE ZOOM AUDIO/VIDEO deposition of JON B.

19     WEISSMAN, Ph.D., beginning at 9:03 a.m., before

20     Christina S. Hotsko, RPR, CRR, when were present on

21     behalf of the respective parties:

22

Page 2

```
 1      A P P E A R A N C E S
 2  On behalf of Complainant:
       BAS DE BLANK, ESQUIRE
 3     Orrick, Herrington & Sutcliffe, LLP
       1000 Marsh Road
 4     Menlo, California 94025-1015
       (650) 614-7343
 5     basdeblank@orrick.com
 6  J. DAN SMITH, ESQUIRE
    COLE B. RICHTER, ESQUIRE
 7     Lee Sullivan Shea & Smith, LLP
       656 W Randolph Street, Floor 5W
 8     Chicago, Illinois 60661
       (312) 754-9608
 9     smith@ls3ip.com
       richter@ls3ip.com
10
11  On behalf of Respondent:
       OGNJEN ZIVOJNOVIC, ESQUIRE
12     Quinn Emanuel Urquhart & Sullivan, LLP
       50 California Street, 22nd Floor
13     San Francisco, California
       (415) 875-6469
14     ogizivojnovic@quinnemanuel.com
15
    On behalf of the United States:
16     CORTNEY HOECHERL, ESQUIRE
       U.S. International Trade Commission
17     Office of Unfair Import Investigation
       500 E Street Southwest, Suite 401
18     Washington, D.C. 20436
       (202) 205-2000
19     cortney.hoecherl@usitc.gov
20
    Also Present:
21     Joshua Boria, Video Technician
       Suzie Gonzalez-Pender, Google
22     Shireen Bhatia, ITC Intern
```

Page 3

```
 1      C O N T E N T S
 2  EXAMINATION BY:                      PAGE
 3     Counsel for Respondent              07
 4     Counsel for ITC                    157
 5
 6  FURTHER EXAMINATION BY:              PAGE
 7     Counsel for Respondent             172
 8
 9
10  WEISSMAN DEPOSITION EXHIBITS:  *     PAGE
```

```
11  Exhibit 1    Declaration of Jon B. Weissman    12
12  Exhibit 2    Appendix F to Weissman            37
                 Declaration
13
    Exhibit 3    Rebuttal Declaration of Jon B.    53
14               Weissman Regarding Independent
                 Playback Device
15
    Exhibit 4    '949 Patent, Lambourne et al.     59
16
    Exhibit 5    Appendices A through C to         64
17               Weissman Rebuttal Declaration
                 Regarding Independent Playback
18               Devices
19  Exhibit 6    U.S. Patent Application           71
                 2002/0124097, Isely et al.
20
    Exhibit 7    U.S. Patent Application           81
21               2004/0131192, Metcalf
22
```

Page 4

```
 1  WEISSMAN DEPOSITION EXHIBITS:  *          PAGE
```

```
 2  Exhibit 8    Rebuttal Declaration of Jon B.    98
                 Weissman Regarding Security Key
 3
    Exhibit 9    '896 Patent, Millington et al.   105
 4
    Exhibit 10   Declaration of Matthew B.        112
 5               Shoemake, Ph.D.
 6  Exhibit 11   Exhibits A through G to Weissman 127
                 Rebuttal Declaration Regarding
 7               Security Key
 8  Exhibit 12   Wireless Home Networking for     158
                 Dummies, Fourth Edition
```

```
 9
10
11
12
13
14
15
16
17
18
19
20
21      *  (Exhibits attached to transcript.)
22
```

Page 5

```
 1      P R O C E E D I N G S
 2      VIDEO TECHNICIAN:  We are going on the
 3  record at 9:03 a.m. on June 25th of 2020.
 4      Please take a moment to mute your audio
 5  input, as your microphone is sensitive and can    12:03:26
 6  pick up whispering and background noises.
 7      Please turn off all cell phones or place
 8  them away from your computer, as they can
 9  interfere with the deposition audio.
10      Audio and video recording will continue       12:03:37
11  to take place unless all parties agree to go off
12  the record.
13      This is media unit 1 of the
14  video-recorded deposition of Dr. Jon B. Weissman
15  in the matter of Sonos, Inc., versus Google, LLC,  12:03:53
16  filed in the United States International Trade
17  Commission, investigation number 337-TA-1191.
18      This deposition is being held in
19  California via video conference.
20      My name is Joshua Boria from the firm         12:04:15
21  Veritext, and I am the videographer.  The court
22  reporter is Christina Hotsko from the firm
```

2 (Pages 2 - 5)

Page 154

1 population matches or exceeds the level of
2 ordinary skill in the field of the '896 patent?
3      A. Oh. Obviously, fraction is a vague term.
4 Can you quantify that?
5      Q. Sure. Would you agree that less than     17:34:06
6 30 -- let me start over.
7          Would you agree that less than 10 percent
8 of the U.S. population matches or exceeds the
9 level of ordinary skill in the field of the
10 '896 patent?                                    17:34:21
11          MR. DE BLANK: Same objection.
12          THE WITNESS: I would agree to that.
13 BY MR. ZIVOJNOVIC:
14      Q. Okay. So the average person in the
15 U.S. -- let me start over.                      17:34:31
16          Would you agree that the average person
17 in the U.S. is probably familiar with the
18 word "password"?
19      A. I would think so.
20      Q. Would you think that the average person  17:34:42
21 is familiar with the term "cipher"?
22          MR. DE BLANK: Same objection.

Page 155

1          THE WITNESS: So I should have asked this
2 before: So are we talking about today or are we
3 talking about 2004?
4 BY MR. ZIVOJNOVIC:
5      Q. Well, let's focus on the time frame.      17:35:06
6          In 2004, would you think the average
7 person would -- was familiar with the term
8 "cipher"?
9          MR. DE BLANK: Same objection.
10          THE WITNESS: It is more than likely they  17:35:20
11 are not familiar with the term "cipher."
12 BY MR. ZIVOJNOVIC:
13      Q. Now, what if we think about the year 2019
14 or 2020. Would the average person in this year be
15 familiar with the term "cipher"?                  17:35:35
16      A. They would be more likely to be familiar
17 than a person in 2004. But I can't -- I don't
18 know how to quantify that. And it may be in the
19 noise. There may not be much difference.
20      Q. Before this case was filed, have you ever  17:36:08
21 relied on Newton's Telecom Dictionary?
22      A. I'm sorry, which telecom dictionary?

Page 156

1      Q. Newton's Telecom Dictionary.
2      A. Sitting here, I can't recall one way or
3 the other.
4      Q. Are you familiar with Newton's Telecom
5 Dictionary outside the context of this case?     17:36:36
6      A. Like I said with respect to web pages,
7 I've done a number of legal cases. I look at a
8 lot of dictionaries. Sitting here today, I can't
9 recall one way or the other.
10          MR. ZIVOJNOVIC: I don't have any other    17:36:51
11 questions at this time.
12          MS. HOECHERL: Good afternoon,
13 Dr. Weissman. I have some additional questions
14 for you. I'm happy to start, but I also want to
15 offer you a break if you need before we begin.    17:37:16
16          THE WITNESS: How about a five-minute
17 bathroom break?
18          MS. HOECHERL: Sure. That would be
19 great.
20          VIDEO TECHNICIAN: Stand by.              17:37:21
21          We are going off the record. The time on
22 the video monitor is 2:37 p.m.

Page 157

1          (A recess is taken.)
2          VIDEO TECHNICIAN: We are back on the
3 record. The time on the video monitor is
4 2:44 p.m.
5          EXAMINATION BY COUNSEL FOR THE ITC        17:44:11
6 BY MS. HOECHERL:
7      Q. Good afternoon, Dr. Weissman. Can you
8 hear me?
9          VIDEO TECHNICIAN: I believe you are
10 muted, Doctor.                                    17:44:28
11          THE WITNESS: I can hear you.
12 BY MS. HOECHERL:
13      Q. Now I can hear you as well. I'd like to
14 continue our discussion about your declaration
15 regarding security key, which is Exhibit 8. And   17:44:41
16 we were discussing your opinion that a person of
17 ordinary skill in the art would understand
18 security key to include password or passphrase,
19 correct?
20      A. That's correct.                           17:44:52
21      Q. And in particular, we were discussing
22 some of the extrinsic evidence that you have cited

40 (Pages 154 - 157)

Page 158

1  that was entered as Exhibit 11, correct?

2      A.  We were.  Yes.

3          MS. HOECHERL:  Okay.  I'd like to mark as

4  Exhibit 12 a copy of the fourth edition of

5  Wireless Home Networking for Dummies.          17:45:12

6          (Weissman Deposition Exhibit 12 marked

7          for identification and attached to the

8          transcript.)

9  BY MS. HOECHERL:

10     Q.  Let me know when you have the upload.     17:45:24

11     A.  I've got it.

12     Q.  Technology is a little bit tricky to deal

13 with, so I'm glad.

14         If you could turn to page 138 of the

15 document, which I believe is PDF page 158.     17:45:40

16     A.  Okay.

17     Q.  And do you see midway through the

18 page there's a section header that says,

19 "Connecting to a Wireless Network with Windows 7"?

20     A.  Yes, I do.                             17:46:13

21     Q.  Okay.  If you could please turn to the

22 next page, which is page 139 of the document.

Page 159

1      A.  Yes.

2      Q.  Okay.  Do you see a step number 3 at the

3  middle of the page there?

4      A.  I do.

5      Q.  And do you see the second sentence that    17:46:36

6  says, "Enter the WEP or WPA password in the

7  security key box, as shown in figure 7-7, and then

8  click OK"?

9      A.  I do see that.

10     Q.  And then right below that there is a       17:46:51

11 figure 7.7, correct?

12     A.  Correct.

13     Q.  And the description to the left of

14 figure 7.7 says, "Enter your security key (WPA or

15 WEP passphrase) in this box."                  17:47:06

16         Do you see that?

17     A.  I do.

18     Q.  Is it your understanding that this

19 document equates a WEP password, WEP passphrase

20 and security key?                             17:47:25

21     A.  It appears to do so, although I don't

22 recall if I've seen this document in detail

Page 160

1  before.  But it would appear so.

2      Q.  This document was not cited in your

3  declaration, so you may not have seen it before.

4          But reading page 139, does it clearly

5  state that a WEP password and WEP passphrase are    17:47:52

6  types of security keys?

7      A.  Yes.  I mean, it's indicating that, yeah,

8  WPA passphrase or WEP passphrase are examples of

9  security key.

10     Q.  And do you agree this would support your     17:48:13

11 opinion that a person of ordinary skill in the art

12 would understand security key in the '896 patent

13 to include a password or passphrase?

14     A.  This is consistent with what I believe a

15 person of ordinary skill would understand the term    17:48:28

16 to mean.

17     Q.  Okay.  I believe you also testified that

18 a POSITA would have understood the definition of

19 security key in the '896 patent to be materially

20 the same from 2004 to today, correct?          17:48:39

21     A.  That's correct.

22     Q.  Now, I would like to shift to your

Page 161

1  opinions on the '949 patent.  So if you could find

2  Exhibits 3 and 4.

3          Please let me know when you have them.

4      A.  I have them now.

5      Q.  I'd like to begin by looking at the        17:49:52

6  '949 patent, which is Exhibit 4.  And if you could

7  turn to column 2, lines 12 to 17, please.

8      A.  Okay.

9      Q.  This portion of the background of the

10 invention is describing a need that existed in the    17:50:29

11 prior art, correct?

12         And at the top do you see the paragraph

13 that begins, "There is a need for dynamic control

14 of the audio players as a group.  With a minimum"

15 --                                            17:50:50

16     A.  Yeah -- no, I see that.  I see that.

17 It's in the background of the invention.  Yes.

18     Q.  Yes.  And it's describing a need for

19 dynamic control of audio players as a group,

20 correct?                                      17:51:00

21     A.  I do see that.  Yes.

22     Q.  And being able to readily group audio

41 (Pages 158 - 161)

Page 162

1 players with minimum manipulation, correct?

2    A. Yes.

3    Q. And a further need for user interfaces

4 that may be readily utilized to group and control

5 the audio players, correct?      17:51:19

6    A. I do see that. Yes.

7    Q. Would you agree that one of the ways the

8 present invention tries to solve this need is by

9 using independent playback devices that are

10 grouped? And let me provide a little more   17:51:40

11 example.

12       The independent playback devices can play

13 audio independently from one another, and they can

14 also play audio synchronously when they're

15 grouped, correct?      17:52:09

16    A. That's correct. Yes.

17    Q. And that ability would allow you to

18 dynamically group and ungroup playback devices,

19 correct?

20    A. Correct. And to your question about   17:52:16

21 dynamic control, I mean, in the background it

22 refers in the prior paragraph to specifically, you

Page 163

1 know, playing audio in a group.

2    Q. And it we look at the claim 1 of the

3 '949 patent, I believe -- I don't actually know if

4 Exhibit 4 has the re-exam language attached. If

5 not, you have the claim language listed in   17:52:52

6 paragraph 49 of your declaration.

7    A. Yes.

8    Q. So claim elements 1(a) and 1(b) are

9 directed to the grouping of independent playback

10 devices and their ability to play synchronized   17:53:24

11 playback when they're grouped, correct?

12    A. There's other aspects, other limitations,

13 but at a high level, it is referring to that

14 ability. Yes.

15    Q. Okay. Yeah, I didn't mean to exclude the   17:53:46

16 other aspects of those elements. But at least one

17 aspect of elements 1(a) and 1(b) address the

18 ability for the independent playback devices to be

19 grouped and to play synchronously when they're

20 grouped, correct?      17:54:07

21    A. I agree.

22    Q. Okay. And the capability of the

Page 164

1 independent playback devices to both play

2 multimedia separately from other players and to

3 play multimedia synchronously when grouped was

4 important in overcoming the prior art during

5 prosecution, correct?      17:54:36

6    A. My understanding is that was important to

7 draw a distinction with at least Metcalf.

8    Q. Okay. And I think paragraph 31 of your

9 declaration, which is Exhibit 3, talks about

10 Metcalf, correct?      17:54:53

11    A. It does talk about Metcalf in 31.

12    Q. And one of the things you note is that

13 the audio components of Metcalf are not able to

14 play audio independently and separately from one

15 another and also play the audio synchronously when   17:55:11

16 dynamically grouped together, correct?

17    A. I'm noting that that's one distinction

18 between Metcalf and the patent at issue.

19    Q. Now, if we look at the language of

20 claim 1 again -- sorry to make you jump back and   17:55:38

21 forth.

22       But claim 1 has two additional elements,

Page 165

1 correct?

2    A. Yeah. Limitations that I mark as (c) and

3 (d) on paragraph 49. Yeah.

4    Q. And claim element 1(c) essentially

5 requires that the independent playback device be   17:56:10

6 able to adjust its volume in response to a

7 player-specific input, correct?

8    A. That's what it says.

9    Q. And then claim element 1(d) requires that

10 the independent playback device be able to adjust   17:56:31

11 its volume in response to a group level input,

12 correct?

13    A. That's correct.

14    Q. And the independent playback device's

15 ability to adjust its volume in response to   17:56:46

16 individual and group-wise volume-control inputs

17 was important to distinguishing the prior art

18 during prosecution, correct?

19    A. Yes. It was important in the distinction

20 over Isely.      17:57:04

21    Q. Okay. Let's turn to paragraph 35 of your

22 declaration, which is Exhibit 3.

42 (Pages 162 - 165)

Page 166

1    A. Yes.

2    Q. And this begins the discussion of the

3  prosecution exchange that happened between Sonos

4  and the examiner regarding Isely, correct?

5    A. Yes.                          17:57:39

6    Q. And on August 20th, 2013, Sonos and the

7  examiner had a telephonic interview in which they

8  discussed Isely, correct?

9    A. That's what it says.

10    Q. Do you see where you quote that the    17:57:53

11  examiner's summary states that the participants,

12  quote, discussed support for the independent

13  operation of the claimed individual player and, in

14  parens, Sonos, closed paren, distinguished the

15  individual operation over the tethered or    17:58:08

16  interdependent operation of Isely?

17    A. I do.

18    Q. Do you have an understanding of what the

19  tethered or independent [sic] operation of Isely

20  was?                             17:58:22

21    A. It's not clear from the written record.

22  I can only speculate that it perhaps refers to the

Page 167

1  interdependent control of volume because that was

2  the basis upon which Isely was overcome, but I'm

3  not certain.

4    Q. Okay. The examiner did specifically

5  state that Isely controls volume in an    17:58:50

6  interdependent manner, correct?

7    A. Correct.

8    Q. Is there a -- do you have an

9  understanding of what the word "tethered" means in

10  the examiner's summary?            17:59:07

11    A. The examiner doesn't, you know,

12  explicitly say other than the basis for allowance

13  draws one to the conclusion that it is based on

14  volume being -- the inability for volume to be

15  independently controlled.          17:59:36

16    Q. Now, I think, as you discussed earlier,

17  Sonos' response was that Isely does not disclose

18  or suggest independent playback devices, correct?

19    A. That's what Sonos said. Yes.

20    Q. And then in paragraph 36 of your    17:59:59

21  declaration you discuss the examiner's issuance of

22  the notice of allowance, correct?

Page 168

1    A. Yes.

2    Q. And the examiner found that Isely, quote,

3  is enabling for an individually addressable

4  independent playback device, close quote, but

5  acknowledged that Isely does not teach the claimed    18:00:23

6  functionality of, quote, group-wise and individual

7  control of each of the group-wise addressable and

8  independently addressable playback devices, close

9  quote, correct?

10    A. That's what it says, yes.          18:00:35

11    Q. And part of the examiner's reasoning was

12  that Isely controls volume at -- in an independent

13  manner, correct?

14    A. Yes. That's required by the claims.

15    Q. I want to ask you a question. The    18:00:50

16  examiner refers to group-wise addressable and

17  independently addressable playback devices,

18  correct?

19    A. That's the term they use.

20    Q. Now, in the '949 patent, all of the    18:00:59

21  playback devices are independent playback devices,

22  correct? At least in claim 1, correct?

Page 169

1       It helps if you look at claim element

2  1(a). Do you see where it says, "and wherein each

3  player is an independent playback device"?

4    A. Yeah. In claim 1. Yes. Yes.

5    Q. So you would agree that the playback    18:01:38

6  devices of the disclosed invention are all

7  independent playback devices?

8    A. At least in claim 1, which is the claim I

9  focused on.

10    Q. Okay. So and in claim 1, the independent    18:01:49

11  playback devices have to be group-wise

12  addressable, correct? They have to respond to a

13  group-level input for volume control?

14    A. They do. I'm not certain about the

15  language "group-wise addressable." That was    18:02:09

16  language from the patent examination. But I would

17  agree it requires group-wise -- an individual

18  control of volume, and that's what the claims

19  require.

20    Q. Do you have any reason to believe that    18:02:22

21  the examiner was referring to playback devices

22  that wouldn't be covered by claim 1?

43 (Pages 166 - 169)

Page 170

1  A. Are you asking by using the
2  term "addressable" is --
3  Q. Yeah.
4  A. What are you asking --
5  Q. For the group-wise addressable and        18:02:49
6  independently addressable playback devices
7  referred to by the examiner, the examiner was
8  referring to playback devices of the disclosed
9  invention, correct?
10  A. That's correct. I mean, they're        18:03:01
11  referring to playback devices as required in
12  claim 1 --
13  Q. And --
14  A. So I have no reason to -- this is, I
15  mean, the basis for allowance and they must be --    18:03:10
16  they must be reading it on that.
17  Q. I apologize, I did not mean to cut you
18  off.
19      But again, as we discussed, all of the
20  playback devices in claim 1 are independent        18:03:24
21  playback devices, correct?
22  A. To meet claim 1, they have to be

Page 171

1  independent playback devices. That's the plain
2  claim language.
3  Q. So do you believe it would be a fair
4  reading, then, that the group-wise addressable and
5  independently addressable playback devices        18:03:41
6  referred to by the examiner are also independent
7  playback devices?
8  A. Yes, I do.
9  Q. I apologize, give me just one moment.
10  A. I'd like to clarify my previous answer,        18:04:39
11  just in case we crossed wires here. That -- I'm
12  not necessarily having an opinion whether Isely
13  discloses independent playback devices based on my
14  construction, but rather that the examiner, I
15  mean, had an opinion, I have no opinion, but it's        18:04:56
16  that it fails to meet the limitations that are
17  there.
18  Q. Understand. And I appreciate the
19  clarification.
20      MS. HOECHERL: Let's go ahead and take        18:05:20
21  just a five-minute break. I'm close to being
22  done, but I want to make sure that I have looked

Page 172

1  through all of the questions.
2      THE WITNESS: Okay.
3      VIDEO TECHNICIAN: Stand by.
4      We are going off the record. The time on
5  the video monitor is 3:05 p.m.        18:05:36
6      (A recess was taken.)
7      VIDEO TECHNICIAN: We are back on the
8  record. The time on the video monitor is
9  3:12 p.m.
10      MS. HOECHERL: Thank you, Dr. Weissman        18:12:54
11  for your time. I have no further questions.
12      THE WITNESS: Thank you.
13      MR. DE BLANK: I have no questions.
14  Thank you.
15      VIDEO TECHNICIAN: Are we concluded?        18:13:04
16      MR. ZIVOJNOVIC: I actually have a couple
17  of recross questions.
18  FURTHER EXAMINATION BY COUNSEL FOR RESPONDENTS
19  BY MR. ZIVOJNOVIC:
20  Q. If you could go to Exhibit 12. And I        18:13:11
21  could direction your attention specifically to
22  page 159 of the PDF.

Page 173

1      Please let me know when you're there.
2  A. I am there.
3  Q. Do you see at the top where it says, "To
4  use this feature to set up your network connection
5  in Windows 7"?        18:14:02
6  A. I see that.
7  Q. Windows 7 was released after Windows
8  Vista, correct?
9  A. You got me there. I don't remember the
10  exact ordering of releases.        18:14:16
11  Q. If you could go to page 6 of the PDF.
12      Do you see where this document has a
13  copyright date of 2011?
14  A. Yes, it does.
15  Q. Does this refresh your recollection of        18:14:57
16  whether Windows 7 came before or after Windows
17  Vista?
18  A. I don't recall the date of Windows Vista,
19  sitting here. Maybe we looked at that earlier and
20  I'm just not remembering.        18:15:22
21  Q. If you could go to Exhibit 11.
22  A. That's one that I can't --

44 (Pages 170 - 173)