Pages 1 - 132

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

| | | |
|---|---|---|
| GOOGLE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. C 20-06754 WHA** |
| | ) | |
| SONOS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| SONOS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. C 21-07559 WHA** |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

San Francisco, California
Wednesday, May 3, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

        ORRICK, HERRINGTON & SUTCLIFFE LLP
        The Orrick Building
        405 Howard Street
        San Francisco, California 94105
  BY:  **CLEMENT S. ROBERTS, ATTORNEY AT LAW**
       **ELIZABETH MOULTON, ATTORNEY AT LAW**

    **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, CRR, CSR No. 7445
        Official United States Reporter

**APPEARANCES**:  (CONTINUED)

For Plaintiff:

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    777 South Figueroa Street, Suite 3200
                    Los Angeles, California 90017
            BY:  **ALYSSA M. CARIDIS, ATTORNEY AT LAW**
                 **GEOFFREY MOSS, ATTORNEY AT LAW**


                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    51 West 52nd Street
                    New York, New York 10019
            BY:  **JOSEPH R. KOLKER, ATTORNEY AT LAW**

                    LEE SULLIVAN SHEA & SMITH LLP
                    656 West Randolph Street
                    Floor 5W
                    Chicago, Illinois 60661
            BY:  **SEAN M. SULLIVAN, ATTORNEY AT LAW**
                 **COLE B. RICHTER, ATTORNEY AT LAW**
                 **J. DAN SMITH, ATTORNEY AT LAW**


For Defendant:

                    QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                    50 California Street, 22nd Floor
                    San Francisco, California 94111
            BY:  **SEAN PAK, ATTORNEY AT LAW**
                 **MELISSA J. BAILY, ATTORNEY AT LAW**
                 **JAMES D. JUDAH, ATTORNEY AT LAW**
                 **IMAN LORDGOOEI, ATTORNEY AT LAW**
                 **LANA ROBINS, ATTORNEY AT LAW**
                 **JOCELYN MA, ATTORNEY AT LAW .**

                    QUINN, EMANUEL,URQUHART & SULLIVAN LLP
                    51 Madison Avenue, 22nd Floor
                    New York, New York 10010
            BY:  **JASON C. WILLIAMS, ATTORNEY AT LAW**

```
 1   Wednesday - May 3, 2023                              11:32 a.m.

 2                       P R O C E E D I N G S

 3                          ---o0o---

 4        THE CLERK:  Calling Civil Action 20-6754 related to

 5   Civil Action 21-7559, Sonos, Inc. vs. Google LLC.

 6        Counsel, please approach the podium and state your

 7   appearances for the record, beginning with counsel for the

 8   plaintiff.

 9        MR. SULLIVAN:  Good morning, Your Honor.  Sean

10   Sullivan from the law firm of Lee Sullivan Shea & Smith LLP on

11   behalf of the plaintiff, Sonos.

12        THE COURT:  Okay.  Welcome.

13        MR. PAK:  Good morning, Your Honor.  Sean Pak of Quinn

14   Emanuel representing Google.  And with me we have some team

15   members, if you'd like an introduction.

16        THE COURT:  There's so many.  Just the ones that are

17   going to speak today.

18        MR. PAK:  Yes, Your Honor.  So we have Iman Lordgooei,

19   James Judah, and Melissa Baily.  And with us is Patrick Weston

20   of Google as well.  Thank you.

21        THE COURT:  Welcome to all of you.

22      And anyone you want to introduce?

23        MR. SULLIVAN:  I do, Your Honor.  I have a few folks

24   I'd like to introduce.  We have Cole Richter, who's also from

25   the Lee Sullivan firm.  From -- we have Dan Smith as well, one
```

PROCEEDINGS

1   of my other partners in the back.

2       And then we have some members of the Orrick team here.  We

3   have Alyssa Caridis; we have Clem Roberts; we have Geoff Moss;

4   and we have Libby Moulton.

5           **THE COURT:**  Great.

6           **MR. SULLIVAN:**  Thank you, Your Honor.

7           **THE COURT:**  Welcome to all of you.

8       We're here for final pretrial conference.  And I think the

9   best way to start is to start with the motions in limine that

10  are directed against the plaintiff's case.  That will be the

11  first order of business, will be the plaintiff's case; so we

12  should deal with motions directed against it.

13      So who's going to argue the Motions 1 and 2 for Google?

14          **MS. BAILY:**  That's me, Your Honor.  Melissa Baily.

15          **THE COURT:**  Great.  So you get to come forward.

16      Who's going to argue against those motions?

17          **MR. SULLIVAN:**  That's going to be Clem Roberts,

18  Your Honor.

19          **THE COURT:**  Mr. Roberts, come forward, please.

20      All right.  I think I'm generally up to speed on these

21  motions.  And before I start asking questions, I'd like,

22  Ms. Baily, for you to summarize what your argument is on both 1

23  and on Number 2.

24          **MS. BAILY:**  Sure, Your Honor.

25      Your Honor, it sounds like you're up to speed to some

1   degree.

2       Our Motion in Limine Number 1 is seeking to exclude the

3   entirety of Sonos' damages expert's opinions on the basis that

4   the sole starting point for that analysis is the application

5   called If This Then That, or IFTTT.

6       Now, I did -- at our last hearing Your Honor said you like

7   cartoons.  I did bring a video.  I don't know if you're already

8   sort of familiar with what that app looks like.

9           **THE COURT:**  How long will it take to hear the video?

10          **MS. BAILY:**  Not very long at all.

11          **THE COURT:**  More than a minute?

12          **MS. BAILY:**  I don't believe so.

13          **THE COURT:**  All right.  Let's play the video.

14          **MS. BAILY:**  Okay.

15          **THE COURT:**  Is it going to come up on my screen?

16          **MS. BAILY:**  I believe so.

17          **THE COURT:**  Great.

18          **MS. BAILY:**  And it's just a graphic video.  So I can

19   keep talking as it's loaded so as not to waste time.

20          **THE COURT:**  All right.  You let me know whenever I

21   should turn around and look at the screen.

22          **MS. BAILY:**  Sure.

23          **THE COURT:**  Okay.  Keep going.

24          **MS. BAILY:**  So when you open up the IFTTT application,

25   the first thing you see is you have access to thousands of mini

1    software programs.  IFTTT calls them applets.

2         THE COURT:  My program is -- nothing's on my screen.

3      So I hope you all are better organized at trial because

4    it's got to be pronto, like one second on the screen.

5         MS. BAILY:  It might be switched to the defendant's --

6    I mean, sorry -- to the plaintiff side.

7         THE COURT:  Angie, help them switch if they need to

8    switch.

9         THE CLERK:  I'm switching to that table.

10        MS. BAILY:  This table over here.

11        THE CLERK:  It was on that table.

12        THE COURT:  Nothing is on my screen.

13        MS. BAILY:  While they work on that, Your Honor, would

14   you like me to continue?

15        THE COURT:  Yeah.  Go ahead.

16        MS. BAILY:  So when you open up this IFTTT app, the

17   first thing you see is all these thousands of little mini

18   software programs that you can --

19        THE COURT:  Like what?  Give me one example.

20        MS. BAILY:  Sure.  So there's one that logs how much

21   time you spend at specific locations in a spreadsheet.  So if

22   you want to figure out how much time you spend at home versus

23   the gym versus work, it will log that for you.

24      Another one sends you an e-mail if it's going to rain

25   tomorrow.  Another one keeps a running log of new restaurants

1  in your area.

2      And now there are even AI applets that will generate for

3  you an outline if you give it a subject or a topic, or a blog

4  post for you.

5      And so there's all these thousands of little applets or

6  mini software programs that are available through this

7  application.

8      **THE COURT:**  So if you have -- say it again --

9  If This Then That app, it gives you all those possibilities?

10      **MS. BAILY:**  Already programmed, yes.

11      **THE COURT:**  Okay.

12      **MS. BAILY:**  The other thing that it does is it gives

13  you the possibility to make your own.  So you can come up with

14  some new idea of what you want to do, and you can make your own

15  mini software program.

16      And the way it does that is using this If This Then That

17  statement.  And so you can identify a trigger, it's called in

18  the application.  So the trigger could be "The International

19  Space Station is over my house," for example.  And then you can

20  tell it what the action should be when that trigger occurs.  So

21  "Send me an e-mail," for example, "so that I know."

22      So we had an example in the video of how you kind of can

23  use If Then -- it's hard to say.

24      **THE COURT:**  Well, I want to understand.

25      How come it's not working Angie?

1      **THE CLERK:**  I have it clicked, Your Honor, to the

2  appropriate --

3                    (Discussion off the record.)

4      **THE COURT:**  Okay.  I guess we need to bring IT in.

5      I'm so discouraged by the IT system.  It never works when

6  I want it to.

7      Call IT and tell them that they should come up here and

8  fix it.

9      All right.  So we've got -- time is short, so keep going,

10  Ms. Baily.

11     **MS. BAILY:**  Sure.  So those are sort of two of the

12  many things you can do with the app.  You can pick a

13  mini-program that's already there, or you can create your own.

14  And that's IFTTT.

15     Now, the app was free --

16     **THE COURT:**  Well, of course, the things that it's

17  going to control have to be part of the smart system.  Like,

18  you can't say "If it's 7:00 a.m., cause my mechanical clock to

19  go off" because a mechanical clock is not a smart clock; it's

20  an old-fashioned clock.  Could it do that?

21     Could it do that?  I don't think so.  It has to be wired

22  in and be able to get a signal to do something.

23     **MS. BAILY:**  It has to be able to respond to the mini

24  software app, yes.  But it's not limited, for example, to the

25  home.  Right?  Spreadsheets, blog posts, social media, e-mail,

**PROCEEDINGS**

1  texts, Instagram, photos, calendar -- all of these electronic

2  things can be controlled either by an app that already exists,

3  a little mini-program in IFTTT, or you can create your own.

4      **THE COURT:**  All right.  So keep going.  What's wrong

5  with that?  So, using that as a starting point.

6      **MS. BAILY:**  What's wrong with that is that this case

7  is not about technology that allows you to write mini-programs

8  at all.  This case is about overlapping speaker groups that can

9  be saved for later invocation.  They are completely, completely

10  untethered.

11      And the only way that Mr. Malackowski does any

12  apportionment on the rate to try to get purportedly to the

13  alleged invention is to say:  Okay.  The IFTTT app is free.

14  You download it for free.  If you want additional capabilities

15  within the app, you can pay a subscription fee.

16      So Sonos doesn't identify how many people have ever paid

17  such a fee, but it's available.

18      So you download the app for free.  If you want additional

19  functionality, you can pay for it.

20      **THE COURT:**  Wouldn't Google know that by -- I asked

21  these questions.  I assumed that this was on your App Store.

22      **MS. BAILY:**  So -- yes.  So IFTTT, we can tell from the

23  App Store how many free downloads there have been on the Google

24  Play App Store.  And what we can tell is that it's around

25  5 million plus; between 5 million and 10 million free

PROCEEDINGS

 1   downloads.

 2       The information that we haven't been able to collect

 3   yet -- but I believe we should be able to and we can follow up

 4   with the Court -- is how many people -- or how many

 5   subscriptions have ever actually been purchased.

 6       **THE COURT:**  Well, don't you have the ability to know

 7   how much money you paid to the IFTTT developers?

 8       **MS. BAILY:**  We don't pay any money to the IFTTT

 9   developers.  The way that it works, Your Honor, in the Google

10   App Store is the IFTTT developer can sell IFTT on the

11   App Store.  And it sets its own price -- right? -- for the

12   subscription, for example.  A consumer might elect to buy it.

13   And IFTTT gets the price that it's charging.

14       **THE COURT:**  But who -- doesn't the money run through

15   the App Store?

16       **MS. BAILY:**  Well, my understanding is that the

17   developer receives the revenue.  And in certain instances,

18   Google charges 30 percent as, basically, a fee because,

19   you know, the app developer is using Google infrastructure,

20   like the billing system.

21       **THE COURT:**  Of course.  Don't you know from that

22   30 percent how much Google gets and how much the app developer

23   gets?

24       **MS. BAILY:**  So there's two issues.

25       One is, if the app developer doesn't sell at least a

 1   million dollars in revenue -- doesn't make at least a million

 2   dollars in revenue, then there is no charge by Google.  So

 3   Google would not receive any money.  So that's just Issue

 4   Number 1.

 5        And Issue Number 2 is, yes, Your Honor, it seems like

 6   Google should have this information, but we haven't been able

 7   to track it down yet.

 8        **THE COURT:**  Okay.  All right.  Continue on with your

 9   analysis.

10        **MS. BAILY:**  So at the start, there's a fundamental

11   problem because IFTTT is not about speakers.  It's not about

12   speaker grouping.  It's not about overlapping speakers.

13   It's --

14        **THE COURT:**  But let me --

15        **MS. BAILY:**  Sure.

16        **THE COURT:**  -- push back on that.

17        The other side is going to say:  Well, yes, it is because

18   the whole point of IFTTT is that you can write your own program

19   to turn the speakers on.  And so that would be a specialized

20   program to turn -- in the morning, turn on the kitchen, turn on

21   the bathroom, the ones you want on in the morning; and then a

22   separate app for the ones in the evening.  And so that it knows

23   when it's 7:00 a.m.; it knows when it's 7:00 p.m.

24        So it's not so far-fetched to say, well, you could use

25   this IFTTT to do the same thing that the speakers are going to

1  do under the patent.

2      So what do you say to that?

3      **MS. BAILY:**  So a few things.

4      First of all, Malackowski, in his deposition, conceded

5  that he's not aware of anyone ever doing that, except for the

6  Sonos lawyers in this case.  So there's no evidence that anyone

7  actually ever did it.  And there are thousands of those apps

8  that have been published.  It's not there.  Right?  It's not in

9  those thousands of apps that you can -- and there's no

10  evidence -- Mr. Malackowski is not aware of anyone who's ever

11  done it.  So that's number one.

12      Number two, the only apportionment related to this that

13  Mr. Malackowski does is say:  When you pay the subscription,

14  you get 20 applets, 20 mini-programs.  And he says:  Okay.  I'm

15  only going to take two.  I'm only going to charge for two.

16      The problem with that is those two applets still can do

17  anything -- right? -- anything that's connected.  Right?  The

18  whole point of IFTTT is the optionality.  Right?  The user gets

19  to think of all of these ideas and use it how they want.

20      And so something that gives you the ability to write two

21  mini-programs for anything you want is totally different from a

22  very specific speaker grouping technology.  Those are

23  fundamentally different things that Mr. Malackowski equates.

24      And the reason why you know that it's completely

25  untethered is because you could do the same thing in any patent

1    case that involves a patent with software and smart hardware.

2    There would be no difference.  That's how you know that it is

3    completely untethered:  two applets that can do anything you

4    want them to versus a very specific patent claim related to

5    overlapping groups of speakers that you can invoke later.

6        I mean, it's fundamentally different.  And you could use

7    the exact same analysis in any patent case that involves

8    software and smart hardware, any one.

9        THE COURT:  Is there any case law on this IFTTT, or is

10   this the first case to ever come up with this idea?

11       MS. BAILY:  We've never -- we have not identified a

12   case that deals with the IFTTT.

13       THE COURT:  Okay.  Keep going.

14       MS. BAILY:  So that's the first issue.  The first

15   issue is that all Mr. Malackowski does to get to the value of

16   the commercialized patented feature is say:  Two applets.  How

17   much does that cost?  That's it.

18       The next thing he does --

19       THE COURT:  This is if you pay the extra?

20       MS. BAILY:  This is if you pay the extra.  That's

21   right.  That's right.

22       The next thing -- and this is sort of Motion in Limine

23   Number 2.  So the next thing Mr. Malackowski does -- I'm told

24   the video is ready.

25       THE COURT:  Something is on my screen now.  Do you

1    want to take a moment to run your video and I'll try to pay

2    attention?

3             MS. BAILY:  Sure.  So this first --

4             THE COURT:  Now, the court reporter will only take

5    down what you say.  She's not going to take down anything on

6    the screen.

7             MS. BAILY:  So the intent of this first video is just

8    to show Your Honor -- and you don't need to read every one of

9    these -- that when you go into the IFTTT app, there's just all

10   of these mini-programs available.  Right?  So they're just

11   available.

12            THE COURT:  Stop and let me see one.

13            MS. BAILY:  Well, let's go to this -- whoop.  Go back

14   to the standstill slide that has the example.

15            THE COURT:  It's too small.  The print is so small I

16   can't read it.

17            MS. BAILY:  Well, this goes back to, Your Honor, like

18   the examples I was providing.  Right?

19        Send me an e-mail if it's going to rain tomorrow.

20        Log how much time I spend in different locations.

21        There's actually one where if you get a phone call, it

22   shows you the location of the person calling you on a map.

23        Right?  So there's just all these kinds of little software

24   programs in here.

25        Now, the next video we have shows a very basic creation if

1   you want to make your own.  So what you see here is, you go to

2   the Create page and you select a trigger.  And the trigger

3   we're going to select is, you know, to do something at the same

4   time every day.  So we're going to create that trigger.

5       And then after that, we're going to say:  Oh, what do you

6   want it to do when it's, you know, 9:00 a.m. every day?

7       Well, what I want it to do is remind me to feed my cat.

8   So how am I going to do that?  I'm going to say:  Give me a

9   notification.  It's going to send it through the IFTTT app.

10  And I'm going to write my message, and I'm going to have the

11  message say to remind me to feed my cat.

12      And then you can actually name your little applet, and if

13  you want, you can publish it so it becomes, you know, one of

14  these many applets that you can access if you download the

15  IFTTT app.

16      And so that goes back to, you know -- that's the end of

17  the video.  We can -- if Your Honor is done with it, we can

18  shut off the screen.

19          **THE COURT:**  Okay.  That's pretty close to what I had

20  imagined.

21      All right.  Keep going.

22          **MS. BAILY:**  So that goes back to the original issue

23  of, you know, IFTTT, two applets does not equal speaker groups

24  invoked later, saved and overlapping.

25      Additionally just on that point, Mr. Malackowski admitted

1  that even if you could use two applets to try to group

2  speakers, it doesn't practice the patents.  He admitted that.

3  So it's -- you can't even do it, even though you can do lots of

4  things with IFTTT.

5          THE COURT:  Why couldn't you do it?

6          MS. BAILY:  So --

7          THE COURT:  Why couldn't you do it to practice the

8  patents?

9          MS. BAILY:  Because part of what's required by the

10  patents is that -- sorry, Your Honor -- when the speakers

11  actually play back in a group, they play back in synchrony.  If

12  you use the IFTTT app to sort of jerry-rig it, the players

13  aren't -- the speakers aren't playing at the same time.  Right?

14  There's variation because the speakers aren't, you know,

15  communicating with anything central to actually start at

16  exactly the right second.  And so there's issues with,

17  actually, group playback in this way.

18      But from my perspective, the larger point is two applets

19  where you can do any one --

20          THE COURT:  Wait.  Wait.  I want to understand that

21  point.  So let's say that I'm trying to get the kitchen speaker

22  and the dining room speaker to play in the morning at 7:00 a.m.

23      You're saying that you can't set it up so that they will

24  be in sync?

25          MS. BAILY:  That's right, Your Honor.

1          THE COURT:  Is that true?

2          MR. ROBERTS:  Partially.

3          THE COURT:  Okay.  You'll get a chance to explain

4    later.

5      What do you think he means by "partially"?

6          MS. BAILY:  What I know -- I don't know.  I mean, I

7    can't sort of predict --

8          THE COURT:  So you're saying if I walk from the

9    kitchen to the dining room, I might hear the same word I just

10   heard in the kitchen?

11         MS. BAILY:  That's my understanding.

12     And at the heart of it, I think -- I'm not sure what

13   "partially" means.

14     But Mr. Malackowski said and Mr. Almeroth -- Dr. Almeroth

15   also, the technical expert who sort of jerry-rigged it

16   together, it doesn't practice the patents.

17     I mean, if it did, it would be its own problem because it

18   was available in the prior art; you could do it.  So from that

19   perspective too, it doesn't make any sense.

20     So --

21         THE COURT:  All right.  So keep going.

22         MS. BAILY:  So IFTTT -- sorry.  IFTTT as the sole sort

23   of fundamental basis in trying to value the invention doesn't

24   work.  So that's Issue Number 1.

25     The second issue is, once Mr. Malackowski uses IFTTT to

1  try to get at, you know, the value of the commercialized

2  version of the patented feature and that doesn't work, but once

3  he gets there, he says:  Okay.  When we're at the hypothetical

4  negotiating table, we have to divide up the value of that.

5  Right?  Like, what does Google contribute by taking --

6       You can go to the negotiating table slide.

7       Right.  So Google brings something to the table.  They

8  bring the commercialization of a product, their know-how with

9  respect to the products, the business risks of

10  commercialization, et cetera.

11       Sonos brings to the table a patent.  How are they going to

12  divide up sort of the value of the commercialized patented

13  feature?

14       And, again, what Mr. Malackowski does has nothing to do

15  with the patent or the feature.  And all he does is say:  Okay,

16  in the Google App Store, people can sell apps, all kinds of

17  apps -- social media apps, streaming apps, game apps, language

18  learning apps.  They're all there.  The app developers set

19  their prices.  Google doesn't have anything to do with that.

20  They sell their apps to consumers.  And at a certain point, app

21  developers start paying Google 30 percent to use Google's

22  infrastructure.  So let's apply that.  That's what he says.

23       Again, you could -- you could do that in any patent case.

24  It doesn't -- what does that have to do with Sonos coming to

25  the table with a patent on overlapping speakers that can be

 1    invoked later, or Google coming to the table with, you know,

 2    smart speaker technology that's going to implement that

 3    specific function?  It has nothing to do with the parties or

 4    the technology.  You could just apply that in any case.

 5         So both pieces, both pieces of the valuation that

 6    Mr. Malackowski does are completely untethered from the facts

 7    and circumstances of this case.

 8              **THE COURT:**  Okay.  Let's hear from the other side.

 9              **MR. ROBERTS:**  Thank you, Your Honor.

10         I'd like to start by talking about IFTT.  So it is true

11    that you can download the program for free, but that doesn't

12    allow you to create comparable technology with the program.

13         In order to create comparable technology with the program,

14    you would have to pay for a Pro subscription, because what the

15    Pro subscription allows to you do is to create multiple

16    multi-action applets.  Without paying for the Pro subscription,

17    you can't get that functionality.  That is an additional paid

18    functionality.

19         So when my friend here says:  Well, look at all the things

20    that IFTTT can do, sure.  But none of those are included in the

21    price.  The price is only for additional functionality that is

22    the multi-action applet.  So none of that free stuff you get

23    when you download it is included in our damages expert's

24    royalty rate because it's all excluded.  You pay -- you get

25    that for free, and then you pay for additional functionality.

1   And it's that additional functionality that provides the

2   comparable functionality.

3       Second, imagine, Your Honor, that you buy a tube of

4   superglue for a dollar.  You could do a lot of things with that

5   superglue, but you use it to fix a chair.  How much did you pay

6   to fix the chair?  I'd argue you paid a dollar.  Once you have

7   taken the glue and used it, the price you paid for the glue is

8   the amount you paid for that fixing that particular problem.

9       And that's kind of what you have with IFTTT.  So for the

10  Pro subscription, you get 20 multi-action applets, but you

11  could take two of them and use it to create these overlapping

12  speaker groups that would be saved and would play, that form a

13  comparable technology.

14      And what's the price that someone paid to do that?

15  Regardless of what they're going to do with the other 18 apps,

16  regardless of whether they could have used those two apps for

17  something else, the cost, the price in the marketplace for that

18  comparable technology is the price they paid for the

19  Pro proportional to, narrowed by 90 percent for the two apps

20  that were used, the amount of glue they used from the tube to

21  fix the chair.  That's the start of his analysis.

22      Next, I would say, Your Honor, that opposing counsel

23  criticized us and said, "Well, there's no evidence that anybody

24  uses IFTTT for this purpose."

25      I'm not sure why that would be relevant, but I would

**PROCEEDINGS**

1  address the Court to Trial Exhibit 8235, which is a post from

2  the Sonos Forums.  So this is Sonos' own website.  And this was

3  just before -- so it's after the priority date of the patent,

4  but just before Sonos released the embodying feature.

5       And what that post says, quite explicitly is:  Hey, I want

6  to create overlapping speaker groups.  Why can't they do that?

7       And someone says:  Oh, you can do that using IFTTT.

8       So right there in the Help post, where people go to look

9  for advice on how to use and configure Sonos' products,

10 immediately prior to the release of this feature within our own

11 feature set, there's a post from one of the community users

12 saying:  This is how you fix this problem.  This is how you

13 address it.

14      Now, opposing counsel said:  Well, once you create it,

15 Your Honor, it's not comparable because it doesn't practice the

16 patent.

17      We agree it doesn't practice the patent.  But "comparable"

18 does not require it to be the same.  And let me explain why I

19 said "partially."

20      So if you used IFTT to get these overlapping saved speaker

21 groups, they would start playing at the same time.  So you'd

22 press and you'd hear Jimmy Buffett in both your living room and

23 in your dining room.

24      But what happens is these devices have jitter and drift in

25 their timing mechanisms.  So over time, they get out of sync.

1    And there's no mechanism within IFTTT to keep them in

2    synchronicity.  So they would start at the same time, but they

3    wouldn't continue to play in synchronicity.

4        Now, what's the significance of this?  I think it means

5    that IFTT is not as good a solution as the one claimed in the

6    patent.  Doesn't mean it's not comparable.  And if anything, it

7    cuts in our favor because if people are willing to pay -- I

8    don't know -- a dollar to fix this problem using IFTTT,

9    wouldn't they be willing to pay more than a dollar to fix the

10   problem better?  Right?

11       If anything, IFTTT understates what people in the

12   marketplace are willing to pay to fix this problem or to

13   address this issue; and it understates it because it provides a

14   solution that is not as good as the solution in the patent,

15   specifically with respect to maintaining synchronicity over

16   time, to play in synchronicity.  So that's that.

17       Opposing counsel also said that all Malackowski does is he

18   apportions to the two of the 20 apps.  She said that's all he

19   does.

20       That's not true.  The other thing that he did, which

21   opposing counsel did not mention, which I think is important,

22   Your Honor, is he went and he looked at data, a survey done by

23   National Public Radio about the number of people who have more

24   than two smart speakers in their home.  So you have a smart

25   speaker, fine.  But if you have a smart speaker, what

1    percentage of those people have more than two?  Because those

2    are the people for whom they're really likely to get a benefit

3    from this technology.

4        And he apportioned -- in his apportionment analysis, he

5    also apportioned the percentage of smart speaker users who own

6    more than two speakers because that, in his view -- I think in

7    mine too -- really reflects the people who are most likely to

8    get value from this capability.

9        So that is completely contrary to what opposing counsel

10   says.  We start with revenue.  That revenue has nothing to do

11   with all the myriad apps that come in ITT.  It's only for the

12   additional functionality of Pro.

13       It is then apportioned down to the portion of the tube of

14   superglue that you need to fix or address this particular

15   problem.

16       It is then further apportioned to the percentage of users

17   who are likely to gain substantial benefit or the most benefit

18   from having this capability.

19       It's then apportioned for the cost of capital.

20       And then moving on to the second motion in limine, it's

21   apportioned by the revenue split.

22       Now, opposing counsel said:  Well, that revenue split

23   has -- it's totally unconnected to the facts of the case.

24   Except, Your Honor, it is actually the revenue split that

25   Google uses in all cases, not just for app developers, but in

1   other contexts.  There's a settlement with Apple that was

2   reported, it's discussed, where they also split the revenue

3   70/30 approximately.  I think it was like 33/67, but in that

4   same range.  And there's another example discussed in the

5   briefing as well.

6       But the point is that there is very consistent evidence

7   from Google that when you're thinking about revenue coming in

8   from a consumer, they divide it 70/30.  That's how it's been

9   divided, including for IFTTT.  Opposing counsel admitted:

10  That's how we divide the revenue up with developers like IFTTT.

11      So that 70/30 number is not like the *Uniloc* 25 percent

12  rule.  It's not pulled out of thin air like the Nash bargaining

13  solution.  It's derived specifically from what Google itself

14  splits revenue with other parties where they are bringing

15  technology to the case and Google is taking the risk with

16  respect to its infrastructure and its environment that it's

17  created.  It's not unconnected to the case.

18      With that, I think I've answered all of the points

19  opposing counsel made, but I'm happy to answer any questions

20  that the Court has.

21      **THE COURT:**  I do have a question, and I may need the

22  help of the lawyers to frame it in the right way.  But put

23  yourself in the position of the hypothetical negotiator.

24      And I don't remember the numbers anymore for -- you can

25  tell me.  What are the numbers that somebody pays for the

1   IFTTT?

2       **MR. ROBERTS:**  So that is actually complicated.  Let me

3   give you the answer.

4       There is a range that you can pay for the premium service

5   of IFTTT.  And the developer, at the time that he reached it,

6   allowed people to -- to pay what they thought was appropriate

7   within certain limits.

8       And the lowest price that he allowed people to pay was the

9   $1.99, and so that is the number that we used.  So we used the

10  $1.99 for the Pro subscription as the benchmark price, although

11  there are people who presumably pay the higher amounts, up to

12  9.99, for the IFTTT.

13      **THE COURT:**  That's 1.99 one-time payment?

14      **MR. ROBERTS:**  It is not.  It's a subscription payment

15  per month.

16      **THE COURT:**  Okay.  So let's use that number for

17  purposes of my question.

18      In the hypothetical negotiation, we are -- I'm asking,

19  presumably, the number -- this was my fourth question:  How

20  many uses does Sonos accuse of infringing the patents?

21      So let me just ask that question.  What is the number

22  there?

23      **MR. ROBERTS:**  Let me give you the answer.  Then I'm

24  going to give you the context.

25      The answer is between 94 and 169 million sales of

infringing products.

Now, Your Honor asked about uses.  These claims are system claims, and they're infringed when someone offers for sale or sells a system because the claim calls for either a speaker or a computer device with programming configured to perform certain steps.  They are not method claims.  So infringement is the act of selling or the act of providing.

If you're asking specifically "Well, how often do consumers use the accused feature?" the answer is we don't really know.

Google produced a spreadsheet that provides some usage data for one month in 2022.  It has got aggregated categories, and so it's not a hundred percent clear what that usage data shows.  But the best we can discern what that usage data shows is that somewhere between a half and 1 percent of users either configure groups in a given day or invoke groups in a given day.  So somewhere between a half a percent and a percent of the user base are doing one of those two activities per day.

What that would mean -- because they did not produce any information on unique users, so we have no idea whether it's the same 1 percent doing it every day or it's a different 1 percent doing it every day; and, obviously, that matters a great deal.

Because if it's a different 1 percent creating groups every day, over the course of a month, it's a third of their

1    user base.  Right?  And if it's the same 1 percent doing it

2    every day, then over the course of a month, it's only 1 percent

3    of their user base.

4         Now I will point out something, Your Honor, which is, you

5    would not expect a typical purchaser of a Google infringing

6    system, allegedly infringing system, to configure groups a lot.

7         I would ask, Your Honor, if you have a stereo system at

8    home, how many times you've configured it.  You configure it;

9    you save the configuration; and you move on.

10        So information about the number of times a user has

11   configured it -- I mean, I have the Sonos app and the Sonos

12   speakers at my home.  I've done that configuration one time.

13   It took me about 30 minutes to get it all set up, and I've

14   never done it again, because once I have the groups, they're

15   saved.

16        So then you might say:  Well, how often has a user then

17   actually used the feature to play music through a group?

18        But I would say, Your Honor, at this point, first of all,

19   we don't know because all we can know, again, is the data they

20   gave us about launch commands, which suggests between half a

21   percent and 1 percent per day in the given month that they

22   chose to give us.

23        But the patent is not about playing the music through the

24   groups.  The patent is about the capability.  And even if you

25   were going to treat the patent as a method claim, which you

1   should not, it would be about configuration, the last step, you

2   have to launch the group one time.

3        But nobody is claiming that the playing of music, whether

4   I choose to listen to music ten times a day or listen to music

5   two times a day, is where the value of the invention is.  And I

6   would give the Court an analogy.

7        You paid, Your Honor, real cash money for the airbag in

8   your car.  When you bought your car, you paid money, and some

9   of that money is allocable to the airbag in your car.  You've

10  never used it, hopefully.  Hopefully, you never will.  But the

11  value of the airbag, the amount that a user is willing to pay

12  for an airbag does not depend upon, it's not solely tied to,

13  it's not even specifically related to the number of times the

14  user uses the airbag.

15       **THE COURT:**  All right.  So to go back, you gave a

16  number that was around 100 million to 160 million.  What was

17  that again?

18       **MR. ROBERTS:**  Those are the number of units that have

19  been sold during the damages period.

20       **THE COURT:**  Units of what?

21       **MR. ROBERTS:**  Units of accused products.

22       So for the '855, that's the smart speakers; and for the

23  '966, that's the Android device with the Google Home app.

24       **MR. SULLIVAN:**  You know, Your Honor, this is something

25  you and I talked about at the last hearing, and you had some

1    questions about this for me.  And I apologize on interrupting

2    Clem.

3         Just so the numbers are clear and accurate, there's two

4    things.  We're asking Google to pay a royalty for every speaker

5    they sell.  We're asking Google to pay a royalty for every

6    controller that is made.

7         So there are roughly -- in the damages period, there was

8    roughly 94 million controllers made.  That's by putting the

9    Google Home app onto a phone or a tablet.  And there is about

10   14 million speakers that have been sold.

11        So that's our infringement, is basically --

12            THE COURT:  What's the 160 million then?

13            MR. ROBERTS:  Yes, Your Honor.

14        We initially did it analytically.  Our expert did it

15   analytically by looking for the controllers, at the total

16   number of controllers sold, and then looking at it from the

17   percentage of them that are Android.

18        Their expert came back and said that's wrong.  It's only

19   been 95 million.

20        We don't -- our expert submitted a supplemental report

21   criticizing their expert's reliance on the document, indicating

22   that the document was wrong, pointing out the fact that

23   Google's own App Store says that the application has been

24   downloaded more than 100 million times, and then adopted that

25   number for purposes of the damage report.

PROCEEDINGS

1    So we are using the 94.6 million.  But you asked me how

2    many times it's actually been.  It's between 94 and 169.

3        THE COURT:  Now, with respect to the IFTT, again, I

4    come back to my question:  How many times has that been

5    downloaded?

6        MR. ROBERTS:  So, again, we don't know.  What we can

7    tell you is that on the --

8        THE COURT:  Well, did they stonewall you, or did you

9    just fail to ask?

10        MR. ROBERTS:  We did not ask, Your Honor, because the

11    number of times that it has been downloaded is not relevant.

12        THE COURT:  Well, what if I think it is?

13        MR. ROBERTS:  Well, then you could explain to me,

14    Your Honor, why it's relevant.

15        THE COURT:  I'm going to come to my question.

16        MR. ROBERTS:  But I can give you the data that I do

17    have, Your Honor.

18        THE COURT:  All right.  Please.

19        MR. ROBERTS:  The data is that the Google Play Store

20    says that it's been downloaded more than 5 million times and

21    less than 10 million times for the current SKU number.  It's

22    not clear whether that means that it is -- additional SKU

23    numbers would be given different counts.  But safe to say

24    between 5 and 10 million times from the Google Play Store.

25        Google accounts for between 40 and 43 percent, the

**PROCEEDINGS**

 1  Android, relative to the Apple iOS operating system.  And so if

 2  you were, again, analytically assuming that the same proportion

 3  of Apple users do it as Google users and it was between 5 and

 4  10 million for Google, you'd end up 15 to 25 million, roughly.

 5       THE COURT:  Well, of the 5 million downloads, how many

 6  of those are for the free portion, and how many of those are

 7  for the premium portion?

 8       MR. ROBERTS:  A hundred percent of those 5 to

 9  10 million are free downloads.  We have no data as to how many

10  users have paid.

11       THE COURT:  Did you ask for that data?

12       MR. ROBERTS:  We did not ask for that.

13       THE COURT:  Do you know the answer?

14       MS. BAILY:  It was never asked for.  So we started

15  trying to find the answer this morning when we got your

16  supplemental request.

17       THE COURT:  All right.  Let me -- let's just assume

18  for the sake of argument that of the 5 million, 1 million pay

19  the premium service.

20       MR. ROBERTS:  Sure.

21       THE COURT:  I'm making that number up, just so you --

22  here's my question.  In a hypothetical negotiation, isn't it

23  one thing for Google to be negotiating with someone where there

24  is a million uses contemplated or downloads contemplated and

25  that that number affects the per unit charge versus

1    100 million -- let's say that -- 100 million where the stakes

2    go up or the possibilities go up by a hundred-fold and that

3    allows, arguably, Google to say to the other negotiator:  Hey,

4    look, you're going to get, through us, a tremendous opportunity

5    open to a market where there's a hundred million possible

6    sales; and so (a) we want a different 30 percent or (b) you

7    should charge a lot less.

8        Or maybe even the app developer would say to themselves:

9    Look, with this bigger market, that affects supply and demand.

10   There's a curve here.  And we should be selling this for a lot

11   less than $1.99.  We can sell it for 25 cents per quarter or

12   per month, and we'll make even more.

13       **MR. ROBERTS:**  It's a fair question.

14       **THE COURT:**  Wait, wait.

15       I could not find a single place where your expert

16   addressed that question.

17       **MR. ROBERTS:**  Thank you, Your Honor.

18       I would say it is, and here's how.  The way that is

19   addressed is by the expert pointing out that in all cases, they

20   split revenue 70/30.  So they split revenue 70/30 in all cases

21   in the App Store.  And not just in the App Store.

22       **THE COURT:**  How about the price part?  In other words,

23   instead of $1.99, the app developer might decide:  Hey, we can

24   make more money if we sell this for a quarter.

25       **MR. ROBERTS:**  The app developer, as opposing

 1   counsel said --

 2             **THE COURT:**  What?

 3             **MR. ROBERTS:**  The app developer has the freedom to set

 4   their own prices.  Google does not purport to restrict the

 5   prices that app developers charge.  They don't do it.

 6             **THE COURT:**  Well, that's the point.  Is this $1.99

 7   even comparable to what would happen in a real world?

 8        I'm going to say probably not.  I'm going to say probably

 9   not.  And that should have been controlled for here, and maybe

10   your study is no good.

11             **MR. ROBERTS:**  So here's why I think it was controlled

12   for, Your Honor.  So if we look at what -- again, the way this

13   is -- the way we have set up the analysis is the same way the

14   analysis was set up in *Apple vs. Motorola*, affirmed by the

15   Federal Circuit, and *i4i vs. Microsoft*.

16             **THE COURT:**  You're telling me that the IFTTT has been

17   approved by the Federal Circuit?

18             **MR. ROBERTS:**  No.  I'm saying the way --

19             **THE COURT:**  I don't think you are.

20             **MR. ROBERTS:**  I'm not.  I'm saying --

21             **THE COURT:**  Okay.  Then what you're telling me is

22   baloney.

23             **MR. ROBERTS:**  Excuse me, Your Honor.

24             **THE COURT:**  It's baloney.

25        All right.  Explain your point.

1        **MR. ROBERTS:**  Okay.  What the Federal Circuit has

2   approved in cases like *Apple vs. Motorola* and *i4i vs. Microsoft*

3   is starting with a product and then looking at what portion of

4   that price is comparable to the technological footprint of the

5   invention.

6        So in *Apple vs. Motorola*, the issue was wired versus

7   wireless mouses, and they started with the price of the mouse

8   overall and then excluded the price or the value of the

9   wireless feature in order to try to come to a royalty rate.

10       What we have done is start with the price of IFTT Pro, and

11   then exclude non-comparable technology in order to come to what

12   a consumer would pay for comparable technology.

13       There's nothing analytically wrong with that at all.  You

14   say:  Well, in the real world, how do we know?

15       Whether 1 million people have done it, Your Honor, or

16   5 million people have done it --

17       **THE COURT:**  It matters.  It does matter.  It matters

18   to me.

19       We're talking about a negotiation, not with the consumer

20   at the table, but between Google and the patent owner.

21       **MR. ROBERTS:**  Yes, Your Honor.

22       **THE COURT:**  All right.  No consumer is at that table.

23   But they have to anticipate.  They have a little supply curve,

24   demand curve, and they maximize their profit by setting a price

25   that instead of a million units, or whatever -- nobody can tell

1  me how many units.  It's 5 million free downloads.  It could be

2  10 -- it could only be 150, as far as we know, people who

3  actually paid for this service.

4      I'm amazed that Google doesn't know the answer to this.

5  And I'm amazed that no one has bothered to inquire into this

6  what the price would have been if you, instead of assuming a

7  tiny number of sales, you suddenly get it up to a hundred

8  million.

9          MR. ROBERTS:  So the place where that would come into

10  the analysis, Your Honor, is -- again, two-stage analysis.

11  What is a consumer going to pay for this function?  And then

12  how are we going to split the money?

13          THE COURT:  No, you're wrong.  It's what we are going

14  to charge for what -- in this case, it would be the patent

15  owner who has the app you're analogizing to.

16      What will be the price at 100 million units, not the price

17  that is down there -- let's say 120 units.  Just 120.  Maybe a

18  thousand units.  I have a feeling that almost nobody has ever

19  bought this app and paid extra for it, but if they had, it's

20  going to be less than 10,000.

21      That is nothing compared to 100 million.  The numbers will

22  change.  Not the 70/30 necessarily.  You may be right about

23  that.  But the price that would be paid to consumers for that.

24          MR. ROBERTS:  So I would argue two things, Your Honor.

25      The first is, as opposing counsel has acknowledged, app

1    developers within this ecosystem have the right to set their

2    prices wherever they want to.  It's not up to Google.  Google

3    doesn't use negotiating value -- or its negotiating leverage to

4    do that.  It's not part of how the negotiation occurs in the

5    App Store.

6        Number two, Your Honor, what the -- analytically, what the

7    expert was trying to do was come up with what the value is of a

8    comparable technology to then determine what price people would

9    pick.

10       And it is not unreasonable for the expert to say that in

11   the hypothetical negotiation, Sonos, as the supplier, would

12   choose to charge the value that consumers place on the feature.

13       They may argue differently.  They may say:  You know what,

14   Your Honor?  If they're going to sell so many of these things,

15   they'd charge less; they'd give the consumer a bargain; they'd

16   give the consumer a break.

17       That's an argument that they can present -- it's not in

18   their expert report -- but that they could hypothetically

19   present.

20           THE COURT:  All right.  Do you have any reply,

21   Ms. Baily?

22           MS. BAILY:  Sure, Your Honor.

23       Well, I mean, I think Your Honor understands that, of

24   course, the hypothetical negotiation would change based on

25   whether IFTTT is sold, you know, premium, some small number of

 1   times versus the hundred million.

 2       **THE COURT:** Well, that's what I think. But is it true

 3   that your expert doesn't bring that point up?

 4       **MS. BAILY:** I believe our expert does, in a variety of

 5   ways, bring that point up.

 6     In his damages report he has, I think, a few hundred pages

 7   attacking Mr. Malackowski's analysis for a variety of reasons.

 8   We didn't have space to brief them all.

 9       **THE COURT:** All right. What else would you like to

10   say?

11       **MS. BAILY:** You know, if there are other issues you

12   want to get to -- I mean, there were some things that my friend

13   said that we disagree with and that are wrong. I can just run

14   through a few of them.

15       **THE COURT:** Why isn't it true, the part about 30/70?

16   If you have done that in every single case, every single case,

17   he says, every single case, if that's -- why would you suddenly

18   do it differently in this case?

19       **MS. BAILY:** Well, that's not true.

20       **THE COURT:** Well, he says it's true.

21       **MS. BAILY:** Well, I'm very sorry.

22       **THE COURT:** He says it's true, and I believe him.

23   Give me an example where it's not true.

24       **MS. BAILY:** Sure.

25     There's a comparable license agreement in the record here.

**PROCEEDINGS**

1    Sonos agrees that the license agreement is technologically

2    comparable.  It actually relates to speaker grouping.  And what

3    did we pay?  We paid, I think, if you adjust for, you know,

4    timing and whatnot, $1.1 million for the patents that -- and

5    there was no -- right?  So it's not -- it's just, the App Store

6    has nothing to do with how we negotiate intellectual property

7    licenses, number one.  Number two -- so the App Store is not

8    comparable.

9         This public reporting on a settlement with Apple, not

10   comparable at all.

11            THE COURT:  Well, why isn't it comparable, the Apple?

12            MS. BAILY:  It's not intellectual -- I don't

13   believe -- I don't know too much about it.  It's not an

14   intellectual property license.  It relates to search.  It's

15   between Google and Apple.  It's an entirely different economic

16   and technological situation.

17            THE COURT:  But when you come to the App Store --

18            MS. BAILY:  Yes.

19            THE COURT:  -- is the 70/30 true in every case?

20            MS. BAILY:  Once a -- yes, once an app developer

21   reaches a million dollars in sales.

22            THE COURT:  What happens if they don't get to a

23   million dollars?

24            MS. BAILY:  It's free.

25            THE COURT:  What's free?

1          **MS. BAILY:**  Google gets nothing.

2       So an app developer can choose --

3          **THE COURT:**  So it's actually more than 30 percent.

4    I'm sorry.  It's more than 70 percent.  It's a hundred percent

5    up until a million, and then --

6          **MS. BAILY:**  Right.

7       So a couple of things here.  The Google App Store -- and I

8    apologize.  I just -- selling -- having -- basically, providing

9    a marketplace to app developers to sell what they create, to

10   me, is completely not comparable to intellectual property

11   licensing.  So I guess I'm just having a hard time with that.

12      When we license intellectual property, we license the

13   intellectual property, and we have a face-to-face negotiation

14   with the licensor, and we negotiate based on the value of the

15   technology.  And that's what the hypothetical negotiation

16   requires, and that's what Google does.

17      And in all of those cases, Google's strong preference and

18   all of the evidence is that we have, you know, a lump-sum

19   royalty.  It's not a 70/30 split.  When we license intellectual

20   property, we don't even do running royalties.

21         **THE COURT:**  Well, but here -- but the other side says:

22   Yes, we do do a hypothetical negotiation.  It is

23   *Georgia-Pacific* and all that.  But in doing that, here's the

24   way -- we keep in mind how it would have been done if it had

25   been done on the App Store.  And that -- just like you have --

**PROCEEDINGS**

1    you take into account non-infringing alternatives, they take

2    into account:  Hey, if we did this on the App Store, here's the

3    way it would work.

4        So why is there something about *Georgia-Pacific* that

5    prohibits IFTTT?

6            **MS. BAILY:**  Well, so there are a lot of issues.

7        So, first of all, in *Georgia-Pacific*, it's a bare

8    intellectual property license.  It's not about some developed

9    product.  That's actually a requirement.  Right?  There's a

10   willing licensor and a willing licensee, and all that's getting

11   negotiated over is the bare intellectual property license,

12   number one.

13       So that is completely different to situations where people

14   are selling products and fees are paid for services.  That is

15   something completely different than any negotiation for a bare

16   license, number one.

17       Number two, in the hypothetical negotiation in this case,

18   Google is the one creating a product.  It's Google who's

19   creating the product.  Right?

20       So in the App Store, you know, Google -- the app

21   developers are creating the products and selling them, and

22   Google gets a fee for providing infrastructure for that.

23   Right?  It's the same like any, you know, commissioned fee.

24       Here, Google is the one making the product.  So Google

25   should keep the 70 percent.  Right?  I mean, even if you were

**PROCEEDINGS**

1  going to apply it, it doesn't even make any sense.  They're

2  mixing and matching.

3      In the App Store, app developers are making products and

4  taking on all the risk of commercialization, all the risk of

5  marketing, all the risk of development.

6      That's what Google does in its negotiation with Sonos.

7  Google's making a product.  Google's selling the product.

8  Google's taking on all that risk that it's successful.  All

9  it's paying for is the bare patent license.

10     So I think for both of those reasons --

11         **THE COURT:**  All right.  Can I ask?  The accused

12  product here is in your -- what's it called?  The general

13  store?

14         **MS. BAILY:**  The Google Play App Store.

15         **THE COURT:**  Yeah, that.

16     One of the features that you get in there is the ability

17  to seek -- to put in tandem various speakers.  In other words,

18  that's the accused product here; right?  So, and I've already

19  said that that infringes the patent.

20         **MS. BAILY:**  So two things.

21     The Google Home app is the accused product.  The

22  Google Home app does many, many, many things.  It does not only

23  group speakers.

24         **THE COURT:**  Yeah, I understand.  It has many features.

25         **MS. BAILY:**  Right.  And so many people who have a

PROCEEDINGS

1    Google Home app do not use it for grouping.  They use it to

2    control their thermostat, for example.  So that's the first

3    thing.  So just because you have the Google Home app doesn't

4    mean you get any benefit to a speaker grouping invention.

5    That's number one.

6         THE COURT:  Well, but I thought you did.  I thought if

7    you had the Home app, you have the capability of tying your

8    speakers together.

9         MS. BAILY:  So the critical thing is you have the

10    capability of grouping Google speakers.

11         THE COURT:  Yeah.

12         MS. BAILY:  You do not have the capability of grouping

13    Amazon speakers or Sonos speakers or any other kind of

14    speakers.  This is nowhere accounted for by Mr. Malackowski.

15    Nowhere.  He just assumes that if you have three speakers and

16    the Home app, you can get the benefit of the invention.  It's

17    not true.

18         THE COURT:  Why wouldn't it be true?

19         MS. BAILY:  Because you can't use the Home app to

20    group any speakers other than Google speakers.

21         THE COURT:  Wait a minute.  I thought Mr. Roberts did

22    say that they made a -- what's the word? -- discount for that

23    very point.

24         MS. BAILY:  But it's not.  So this is the difference.

25    This is the delta.

PROCEEDINGS

1        What my friend said about what Mr. Malackowski did is, in

2   his base, he accounted for every household that has three or

3   more speakers.  They could be Amazon speakers.  They could be

4   Sonos speakers.  They can be all kinds of non-accused speakers

5   that cannot be controlled --

6        THE COURT:  Okay.  Let me focus on that.

7        So what was that percentage?  It was NPR?  Who did it?

8        MS. BAILY:  NPR.

9        THE COURT:  NPR's.  What number did NPR come up with?

10       MS. BAILY:  29 percent.

11       THE COURT:  So you're saying that's all households

12   with three or more speakers, but they could be Amazon speakers.

13       MS. BAILY:  That's right.

14       THE COURT:  All right.  And did the Malackowski study

15   further discount the 29 percent?

16       MS. BAILY:  No.

17       THE COURT:  Is that true?

18       MR. ROBERTS:  He did do further discounts.  He didn't

19   do further discounts on the number of speakers.

20       THE COURT:  Well, why wouldn't you try to figure out

21   how many were the infringing speakers?

22       MR. ROBERTS:  Thank you, Your Honor.

23       Again, it comes back to the nature of the claim.  This is

24   a capability claim.  You get value from the invention,

25   regardless of whether or not you deploy it.  Same thing.  This

1    is the airbag analogy I gave you earlier.

2        To be conservative, he reduced it by another 70 percent

3    because he said:  Look, I don't have data that I can find on

4    exactly what percentage of households have three or more Google

5    speakers; so I'm going to do the best I can with the available

6    data and reduce it for three or more households.

7        I would argue, even households that don't currently have

8    three or more Google speakers get benefit from it.  You buy it,

9    the controller with the Google Home app; you don't have three

10   or more speakers.  Next year, you go out and you buy Google

11   speakers, and the capability's in the device, and now you can

12   configure them.

13       Whether you own the three speakers now or you buy them in

14   the future is irrelevant.  It's an incredibly conservative

15   thing to do to say:  Look, I want to make sure that I'm

16   apportioning this down using every piece of data that I can

17   find that's publicly available that I can get about what

18   percentage of consumers have three or more speakers in order to

19   make sure that we're accounting for the consumers who are most

20   likely to get value and trying to exclude, on a reasonable

21   basis, consumers who are less likely to get value out of it.

22       **THE COURT:**  What do you say to that point, capability

23   versus actually doing it?

24       **MS. BAILY:**  So there's capability, but the -- in terms

25   of valuing the invention, the amount that it is used is

PROCEEDINGS

1    directly relevant.

2        So I agree, it's capable of.  But the thing that

3    Mr. Malackowski has to take into account and never does in

4    valuing the invention, an invention that is never used has to

5    have less value than an invention that is used all the time.

6        And there are multiple ways in which Mr. Malackowski

7    just -- Mr. Malackowski just ignored it.  So one way, for

8    example, is, you know, people have the Home app.  And the

9    royalty should be the same for everyone who has the Home app.

10    Okay.  Well, and then he took the -- he took that down and he

11    said 30 -- approximately 30 percent of households have three or

12    more speakers.

13        So he's already thinking about, well, you know, some

14    measure of use.  But that measure is not the right measure

15    because you can't control speakers that aren't Google speakers.

16    Not only that, Google did produce use metrics, and the use

17    metrics are critical to the value of the invention.

18        And what are Google's use metrics?  Less than 3 percent of

19    speakers -- not users, as my friend said -- Google speakers,

20    less than 3 percent are in a group at all.  Never mind an

21    overlapping group as required to get the benefit of the

22    invention.

23        This minimal amount of use of course is relevant and is

24    never accounted for in any way by Mr. Malackowski.

25        **MR. ROBERTS:**  It's 3 percent per day.  Is it the same

**PROCEEDINGS**

1  3 percent or a different 3 percent?  They have the data.  They

2  didn't give it to us.

3       **MS. BAILY:**  I mean, that's just incorrect.  It's not

4  users.  It's the speaker itself.

5       **THE COURT:**  Can I --

6       **MS. BAILY:**  Yes.

7       **THE COURT:**  I'm trying to understand your point,

8  Ms. Baily.  Don't say anything.  Let me see if I can

9  reconstruct it.

10      All right.  Let's start with the -- is it 29 percent or

11  30 percent?

12      **MS. BAILY:**  I believe it's 29 percent.

13      **THE COURT:**  29 percent have three speakers or more.

14  But that includes all of them, being Amazon -- what were those

15  other ones?

16      **MS. BAILY:**  Sonos.

17      **THE COURT:**  Sonos.

18      **MS. BAILY:**  And just to be clear, it can't group a

19  Google speaker with Sonos speakers.  Right?  It has to be

20  all Google speakers.

21      **THE COURT:**  So it's got to be all Google.

22      All right.  So you're saying that it's a much smaller

23  number.

24      Mr. Roberts comes back and says capability alone is

25  enough, to which you say -- just a minute.

**PROCEEDINGS**

1        Okay.  You make a distinction between the infringing base

2    capability versus what would happen at the negotiating table

3    for purposes of *Georgia-Pacific*.

4        And so let's assume, hypothetically, that almost nobody

5    ever used the Google system.  I know that's probably not true,

6    but let's assume that.  So let's say there are only four

7    instances in the history of the universe where anybody bothered

8    to use the Google system, even though there was a capability

9    through the smartphone to do so.

10        Your argument would be:  Yeah, that's true, we had the

11    capability; but at the negotiating table, since we hardly ever

12    used it, we would not have been willing to pay much because it

13    would have been easy to give up.

14        Is that your argument?

15             MS. BAILY:  That's exactly my argument.

16             THE COURT:  Now, my law clerk says this point was not

17    briefed.  Is that true?

18             MS. BAILY:  I -- it might not have been, but we

19    started talking about it --

20             THE COURT:  Does your expert --

21             MS. BAILY:  Our expert --

22             THE COURT:  Does your expert bring this up?

23             MS. BAILY:  Our expert brings this up.  And our

24    expert's analysis is actually based on, you know, in part,

25    removing the functionality because there was just evidence of

PROCEEDINGS

```
 1   such little use.

 2          THE COURT:  What do you say to this point,

 3   Mr. Roberts?

 4          MR. ROBERTS:  I have a lot of responses.  I will try

 5   to give you the most important ones.

 6        First of all, Your Honor, it is not true that the value of

 7   a capability is dependent upon the amount that it is used.  The

 8   value of your stereo speaker at home is not dependent upon the

 9   number of times that you use it.  The value of the parking

10   brake on your car does not go up and down whether or not you

11   change your habits and decide to always use your parking brake

12   when you park or not.

13        The value of a capability is not adjudicated by its use.

14   Airbags are the clearest example, but it goes on.  It's just

15   not the case that there is that title linkage between it.

16        To the Court's point, could there be some level of

17   de minimis use that's so small that nobody cared about it and

18   they would take it out of their products?  I suppose there

19   could be.  The number of lawyers on the other side, the amount

20   that they have spent on this case, how hard they're fighting

21   suggests that they care about this feature very much.  They

22   could take it out of their product.  They haven't done so.

23        So, and then the third piece, I would say, is --

24          THE COURT:  Now, neither side -- you could make that

25   argument to me.  Please don't --
```

PROCEEDINGS

1           **MR. ROBERTS:**  Of course.

2           **THE COURT:**  Don't try to -- I understand there's a lot

3    more involved than just this patent.  So don't make that

4    argument to the jury.

5           **MR. ROBERTS:**  I would not, Your Honor.

6       And then the final piece I would make, Your Honor -- two

7    final pieces.

8       The first, the 29 percent from the NPR survey applies

9    across all brands.  It was brand agnostic.  So it implies that

10   29 percent of Google households also have more than three

11   speakers.  Right?

12      Again, this isn't in the briefing, so just a little

13   careful; but, generally speaking, if you're going to be a Sonos

14   user, you're going to use Sonos.  If you're going to be a

15   Google user, you're going to use Google.  You're not going to

16   have -- I never heard of anybody having one Amazon speaker, one

17   Google speaker, and one Sonos speaker, and then being worried

18   about connecting them with groups.  That's just -- I mean, that

19   would be a very odd purchasing set of decisions; that you're

20   going to equip each room in your house with a different brand

21   in order to produce whole home audio, and you're going to use

22   different apps for different rooms in your house.  I mean, it's

23   just kind of implausible as a hypothetical.

24      And then, finally, Your Honor, with the data, again, the

25   data that they gave us shows usage per day with no indication

1  of whether the identities of the users between days or the

2  identity of the devices between Monday and Tuesday are the same

3  or different.

4      And if you want to talk about the significance of it, if

5  you said that 1 percent of devices were grouped per day, what

6  that would tell you, potentially, is that in a given month,

7  30 percent of devices were grouped, were played in a group,

8  which might imply that a hundred percent of the user base has

9  configured it as described in the steps of the patent --

10 right? -- that a hundred percent of the users are using it or

11 it might imply that only 1 percent.

12     The point is that the data that they gave us doesn't

13 answer this question one way or the other.

14     And this, we did ask for, and this was all they gave us.

15 So this is the one place I would say they can't turn around and

16 say, "Well, he didn't take this data into account," because the

17 data they gave us was useless for this purpose.

18     And Malackowski discussed it at length and why it was

19 useless and why it didn't help do it, and he used the best

20 available data that there was.

21     **THE COURT:**  Okay.  I've got to move on.

22     You need a break?

23     Okay.  We're going to take a break here, and when we come

24 back, there's two other motions by Google, and there are the

25 attacks on the damages expert the other way.  I may want to

1   start with the attacks on Dr. Bakewell first whenever we

2   return.

3       So I'm not making a ruling yet.  I'm going to think about

4   it.

5       Thank you.  We'll be back in 15 minutes.

6           THE CLERK:  Court is in recess.

7               (Recess taken at 12:44 p.m.)

8               (Proceedings resumed at 1:02 p.m.)

9           THE COURT:  Okay.  Back to work.  Please be seated.

10      Okay.  Let's turn to Dr. Bakewell.  Are there issues that

11  remain with respect to him?

12          MS. BAILY:  Your Honor, I'm sorry.  Before we start, I

13  made a misstatement in our last session; so I just wanted to

14  correct it.

15          THE COURT:  All right.  What did you -- go ahead.

16          MS. BAILY:  For some reason I said, in the Google

17  App Store discussion, that it was a 0 percent fee to Google up

18  to a million and then 30 percent.  I'm not sure how that got

19  into my head.

20      Just to correct the record, it's 15 percent up to a

21  million and then 30 percent.  I just wanted to correct that.

22          THE COURT:  It's how much?

23          MS. BAILY:  15 percent up to a million and then

24  30 percent.

25      I had said that Google doesn't charge any fee when app

PROCEEDINGS

```
 1   developers --
 2          THE COURT:  All right.  So the first million is at a
 3   reduced rate to who?
 4          MS. BAILY:  To the app developer.
 5          THE COURT:  All right.  And then after it hits a
 6   million, then they get more?
 7          MS. BAILY:  That's right.
 8          THE COURT:  Okay.  Thank you.
 9       All right.  Who's going to argue about Bakewell?
10          MS. CARIDIS:  Good afternoon, Your Honor.  Alyssa
11   Caridis on behalf of Sonos.
12          THE COURT:  Okay.  Thank you.
13       Now, my notes here say that parts of this is moot.  And so
14   which parts are still alive that I need to deal with?
15          MS. CARIDIS:  Sure, Your Honor.
16       So I think the only thing that, based on Sonos' --
17   sorry -- based on Google's representations in its opposition
18   that I think we should discuss prior to opening statements, is
19   whether Google should be permitted to talk about -- whether
20   Google or Mr. Bakewell should be permitted to talk about the
21   form or structure of any offers that Sonos made to Google prior
22   to the litigations between Sonos and Google that started in
23   2020.
24       So Mr. Bakewell makes references in his report to an offer
25   that Sonos made to Google prior to litigation.  We think that
```

1    is squarely covered under FRE 408.

2        Mr. Bakewell also said that he doesn't believe those

3    negotiations or those term sheets are relevant or are

4    comparable.

5        And so for both of those reasons, we think that the amount

6    and structure of any offer that Sonos made to Google prior to

7    litigation should not be put in front of the jury.

8            **MS. BAILY:**  This issue is not moot, however.

9            **THE COURT:**  Say it again.

10           **MS. BAILY:**  The issue's not moot, though.

11           **MS. CARIDIS:**  This is the one thing that I think we

12   still had a dispute on and that we should resolve today.

13   Everything else is either mooted by your representations or

14   they're so -- they're details of exhibits or arguments that we

15   can deal with as the trial progresses, depending on how --

16           **THE COURT:**  You're saying it's not moot?  It's the

17   only one that's not moot?

18           **MS. BAILY:**  I'm just -- I'm surprised.

19           **THE COURT:**  Are you saying that you thought it was

20   moot?

21           **MS. BAILY:**  No.  I know that issue's not moot.  I'm

22   surprised that there are other issues.

23           **THE COURT:**  Well, we'll come to those.

24       But with respect to the prior offers, what do you say to

25   Rule 408?

1    **MS. BAILY:**  Sure.  So it's a little bit a part of the

2    bigger issue.

3        If Sonos is going to bring in the whole licensing history

4    between Google and Sonos for purpose of willfulness, then the

5    term sheet that resulted -- the signed term sheet by Sonos that

6    resulted should come in as well.

7        And the only reason that Sonos says it's 408 is because

8    it's a lump sum, which is Google's preference.  And now that

9    agreement would demonstrate that it's Sonos' preference, or at

10   least they're willing to do a license for a lump-sum, number

11   one.

12       Number two, you know, they don't like the number.  I don't

13   know if I can say the number.

14       **MS. CARIDIS:**  I believe the number is confidential.

15       **MS. BAILY:**  To Sonos.  Google doesn't think it's

16   confidential.  So it's a small number.

17       **THE COURT:**  Well, if it goes in front of the jury,

18   it's not going to be confidential.  It's pointless if it

19   doesn't -- but was it a settlement negotiation or not?

20       **MS. BAILY:**  So there was a negotiation, a licensing

21   negotiation that ended up with a non-binding term sheet that

22   was signed by both parties that had a lump-sum payment for the

23   entirety of Sonos' patent portfolio, plus a license to fewer

24   than 20 Google patents, signed by both parties, non-binding.

25       The issue for us is, if Sonos is going to bring in all of

1    these licensing negotiations for willfulness, they can't bring

2    all that in and then say:  Oh, it can only be cherry-picked.

3    You know, Google, you can't bring in the pieces of the

4    licensing discussion that complete the picture.

5        So that's Issue Number 1.

6        **THE COURT:**  Tell me how it comes in for willfulness?

7    How's that going to work.

8        **MS. BAILY:**  Well, it's Sonos.

9        **THE COURT:**  Well, okay.

10       How is it going to be used for willfulness?

11       **MS. CARIDIS:**  So I think, generally speaking -- and if

12   you have more information, I can refer to my co-counsel -- the

13   fact that Sonos has provided Google, in the course of their

14   negotiations, with patent charts and assertions and knowledge

15   of Google's infringement of more than a hundred patents goes to

16   a willful blindness theory that shows Google's pattern of

17   knowing about Sonos' intellectual property, knowing about

18   Google's infringement of that intellectual property, and

19   disregarding it.

20       But none of that discussion has anything to do with the

21   form or structure of any offer.  And the form or structure is

22   what's important in considering whether it's admissible under

23   FRE 408, because what we expect Google's going to come up and

24   say is:  Sonos offered us X amount and a particular structure

25   that is in a communication covered by FRE 408; and, Jury, you

 1   should not allow -- you should not come back with a damages

 2   number bigger than that.

 3        And that, Your Honor, is directly against the principle of

 4   Federal Rule of Evidence 408 which says you cannot admit

 5   evidence to prove or disprove the validity or amount of a

 6   disputed claim.

 7        So they can't say --

 8             THE COURT:  Can't what?

 9             MS. CARIDIS:  -- "You offered them" -- "You offered

10   Google X amount of money; so you shouldn't ask for more than X

11   here."

12             THE COURT:  First, on the willfulness issue, it's okay

13   for you to put in evidence a notice of cease and desist letter.

14        You are not going to be allowed to put in hundreds of

15   patents.

16        And you can say that, if true, you brought to their

17   attention two years ago or three years ago this particular

18   patent and explained how it infringes.  That would be okay for

19   willfulness on this patent and -- these two patents and nothing

20   else.

21        You're not going to get off in some donnybrook about all

22   these other patents and all these other products.  No way.

23        Now, if they do that, I'm not sure why she isn't correct

24   about -- why would the dollar amounts prove a thing in terms of

25   Rule 408?

1          **MR. PAK:**  Your Honor, on this point, if I may respond.

2     This is Sean Pak of Quinn Emanuel.

3          **THE COURT:**  Yeah.

4          **MR. PAK:**  Because the other piece of that, Your Honor,

5     is the blindness piece.

6          **THE COURT:**  Is what?

7          **MR. PAK:**  Is the willful blindness piece.

8          So if they come in and they say, "As part of this 408 or

9     licensing negotiation, we gave notice to Google" -- I think

10    it's only limited now, based on Your Honor's order, to the

11    '966.  I believe Your Honor has already ruled that it's not

12    relevant for the '885, and willfulness is out for that case.

13         For the '966, if they come in and say, "As part of this

14    408 licensing negotiation, we gave Google notice with claim

15    charts," where is the -- and they say, "Based on that, there

16    was a known negotiated license.  Google didn't take a license

17    to our offer or did anything other than wait and continue to

18    use the technology until we filed a lawsuit."

19         **THE COURT:**  Was this part of an attempt to negotiate a

20    settlement?  I'm not sure.

21         **MR. PAK:**  I don't think so, Your Honor, because what

22    was happening was, there was a dispute between the parties

23    about the valuation of the technology.  There was no case that

24    was pending at the time.

25         So for us, I think the important point is then we should

1    be able to respond and say Google did not willfully turn a

2    blind eye to these -- to this notice that was given to us.

3         What we did is we engaged in good faith negotiation to

4    license the technology.  And Sonos itself put a dollar number

5    on what that looked like, and we agreed, although it was

6    non-binding.  We wrote and signed a term sheet together that

7    reflected our good faith willingness to license the technology

8    at fair market value, which was a negotiated value between the

9    parties, and then it was Sonos who walked away from that

10   non-binding term sheet.

11        So we think, Your Honor, it's highly prejudicial -- if

12   they don't want to talk about it at all, they don't want to run

13   a willfulness case, that's one thing.  But if they're going to

14   come in and tell the first chapter in the story, then,

15   Your Honor, I think it's only fair that we have an opportunity

16   to respond.

17        **THE COURT:**  Didn't you ever send a simple cease and

18   desist letter, like I say that you're supposed to do?

19        **MS. CARIDIS:**  So during the course of these

20   negotiations, we put Google on notice, if we're just talking

21   about --

22        **THE COURT:**  No, I don't like that argument because

23   then you get -- you open a whole can of worms with the

24   settlement negotiations.

25        You could have sent separately from that, non-settlement:

**PROCEEDINGS**

1  By the way, you infringe.  Here's how you infringe.  Signed,

2  General Counsel.

3      **MS. CARIDIS:**  So we did give them claim charts.  This

4  was not just a -- you know, a random discussion or a

5  non-specific discussion about, you know, generic IP.  We did

6  give them claim charts.

7      **THE COURT:**  But it was in these negotiations?

8      **MS. CARIDIS:**  But it was in the context of

9  negotiations.

10      **THE COURT:**  I think none of this should come into

11  evidence.  None of it from -- on willfulness, and none of it

12  over on your side.  That's my view.  End of story.

13      Now, if you have a cease and desist letter, that's okay;

14  you can use that.

15      But anything that deals with these negotiations, pointing

16  the finger at who walked away, there was a term sheet, that'll

17  take two days to try, and it doesn't prove very much.  So under

18  Rule 403, all of that is excluded.

19      **MS. CARIDIS:**  So, Your Honor, we don't think it will

20  take that long.

21      **THE COURT:**  It will.  Please.  I've made my ruling.  I

22  have made my ruling.  All of this is out, o-u-t --

23      **MR. PAK:**  Thank you, Your Honor.

24      **THE COURT:**  -- on both sides.

25      **MR. PAK:**  Thank you, Your Honor.

PROCEEDINGS

1        THE COURT:  All right.  What's the next motion having

2   to do with -- is there anything more to do with

3   Mr. Blakewell -- Bakewell?

4        MS. CARIDIS:  Not from Sonos' perspective.

5        THE COURT:  How about you?  You said you had more you

6   wanted to talk about, Ms. Baily.

7        MS. BAILY:  No, not if the motion --

8        THE COURT:  All right.  She's saying, based on your

9   representations that you have made, which I'm expecting you to

10  honor, that they feel that the motion is taken care of.

11     True?

12        MS. CARIDIS:  Correct.

13        THE COURT:  All right.  So, Ms. Baily, don't

14  transgress what you've said.

15        MS. BAILY:  Wait, wait, wait.  Sorry.  Let me just

16  make sure I understand.

17     Sonos, you're dropping the motion to exclude?

18        THE COURT:  They're not dropping anything.  They think

19  that you're -- what I think she's saying is, you made certain

20  representations about what you would and would not do, and

21  she's willing to accept that, but you've got to honor your

22  word.

23     Right?

24        MS. CARIDIS:  Correct.

25        THE COURT:  Is that --

1      **MS. BAILY:**  There are no representations about most of

2  the issues.  Maybe we can meet and confer while --

3      **THE COURT:**  Give us an example of something that

4  you -- in that category.

5      **MS. CARIDIS:**  So in respect to the very first argument

6  in our MIL, the cost of an NIA not being capped -- not being a

7  cap on damages, Google acknowledged that it would not argue

8  that, as a matter of law, the cost of an NIA was a cap on

9  damages.  That was a representation that Google made.

10      **THE COURT:**  Is that true?

11      **MS. BAILY:**  Yes.

12      **THE COURT:**  All right.  Is that -- are you going to

13  stand by that?

14      **MS. BAILY:**  Yes.

15      **THE COURT:**  Well, how close to that are you going to

16  get?

17      **MS. BAILY:**  Well, our expert, Mr. Bakewell, does

18  calculate the costs associated with non-infringing

19  alternatives.  He is not going to say, as a matter of law, that

20  it's a cap, but it's an appropriate measure of damages under

21  Federal Circuit.

22      **THE COURT:**  Well, it would be a factor.  It would not

23  be -- are you saying that it would be the measure of damages?

24      **MS. BAILY:**  It can be the measure of damages,

25  according to the Federal Circuit in *Apple vs. Motorola*.  A

PROCEEDINGS

1    party may use -- a party may estimate the value of the benefit

2    provided by the infringed features by -- (a) by comparing the

3    accused product to non-infringing alternatives.  That's what we

4    do.

5        He's not going to say that it's by law a cap.  But of

6    course it's a measure of damages, and it can be the measure of

7    damages.

8            THE COURT:  All right with you?

9            MS. CARIDIS:  Yes.

10           THE COURT:  Fine.  Okay.

11       All right.  So that's what you've said in your brief; so

12   you've got to stand by that.

13       And anything else that you want to -- okay.

14           MS. BAILY:  They've moved to exclude an analysis of a

15   patent agreement.

16       Are you dropping that motion to exclude the analysis of

17   the patent agreement?

18           MS. CARIDIS:  For Outland, yes.  For the purposes of a

19   MIL, yes.

20           MS. BAILY:  Okay.  Let me just make sure.

21       I think that covers the issues.

22           THE COURT:  Okay.  Now, we go to --

23           MR. ROBERTS:  Your Honor, before we move on, can I

24   make one point for the record, just because I want it to be on

25   the record.  I'm not challenging your ruling.  I understand

PROCEEDINGS

 1   your ruling.

 2        The point I wanted to make was just that Rule 408 allows

 3   evidence of settlement negotiations to be used for showing of

 4   knowledge or intent, but not for liability or the amount.

 5        Thank you.

 6        **THE COURT:**  Sticking by my ruling because it's also

 7   under Rule 403 and the risk of a donnybrook on a sideshow here.

 8        Okay.  I'm now going to -- I'm going back to -- I don't

 9   know.  Is this Schonfeld issue relevant to damages?

10        **MR. PAK:**  No, Your Honor, it's not.

11        **THE COURT:**  Okay.  Well, then let's go back to Google

12   Motion Number 3.

13        It looks like this is moot now; right?

14        **MR. JUDAH:**  Yeah.  Your Honor, James Judah for Google.

15   Yes, this one's moots.

16        **THE COURT:**  Explain in one sentence why it's moot.

17        **MR. JUDAH:**  I'm here to argue MIL 4; so I'll let

18   someone else explain in one sentence why it's moot.

19        **THE COURT:**  Somebody explain why it's moot, for the

20   record.

21        One, two, three, four -- seven, eight lawyers --

22        **MR. SMITH:**  Your Honor, I'm Dan Smith on behalf of

23   Sonos.  I can explain.

24        **THE COURT:**  Mr. Smith, go ahead.  Explain why that one

25   is moot, just for the record.

1      **MR. SMITH:**  My understanding of the MIL was that

2   Google was trying to preclude Sonos' experts from arguing that

3   their non-infringing alternatives still infringed other

4   unasserted Sonos patents.

5      And Sonos has agreed that it is not going to be offering

6   any opinions that the NIAs are not valid based on unasserted

7   Sonos patents.

8      But to be clear, Sonos still intends to argue that the

9   non-infringing alternatives proposed by Google infringe the

10  asserted patents, both the '885 and the '966.

11     **THE COURT:**  Thank you.  All right.  I understood that.

12  Okay.   Number 4, is there anything left to Number 4?

13     **MR. JUDAH:**  James Judah for Google.

14  Yes, there is, Your Honor.

15     **THE COURT:**  Please go ahead.  What's your -- start

16  with something that's still a live controversy.

17     **MR. JUDAH:**  Yes.  This is a MIL to exclude Sonos'

18  allegations of so-called anticompetitive conduct.

19  And if we go to Slide 2.

20  All right.  So it's clear what Sonos is trying to do

21  here --

22  Actually, could we go back to Slide 1?  Sorry about that.

23  It's clear what Sonos is trying to do here.  They're

24  trying to use their damages expert as a mouthpiece for attorney

25  argument.  It's extremely prejudicial.  It should be excluded

PROCEEDINGS

```
1    under 403 and 702.
2         If we could go to Slide 3.
3         So these expert opinions that Mr. Malackowski is trying to
4    offer, that Google has a cold-hearted, calculated strategy to
5    infringe patents or that Google is selling its hardware at a
6    loss in order to, quote, lock in consumers, you know, to
7    Google's -- so Google can make money in its billion-dollar
8    ecosystem, it's not based on documents from Google; it's based
9    on things like news articles and blog posts.
10        If you'd go to the next slide.
11        Focusing now on this loss leader or lock-in argument.
12        Next slide.
13        All right.  I mean, their expert, Mr. Malackowski, he
14   offers these prejudicial opinions; but then he doesn't make any
15   adjustments to his reasonable royalty quantification based on
16   them.
17        All right.  He does the same thing with this irrelevant
18   financial data, but we'll get to that in a second.
19            THE COURT:  Wait.  Wait, wait.
20        Is it true that a so-called expert is relying on news
21   articles to show that they're loss leaders and all that?
22            MR. RICHTER:  Yes.
23        Cole Richter on behalf of Sonos, Your Honor.  Good
24   afternoon.
25        In part, yes, that's correct.
```

1      **THE COURT:**  We're not going to do that.  We're not

2  going to do that.  That kind of inflammatory stuff is Mickey

3  Mouse.  No.  No newspaper stories, headlines like that.  That's

4  it.  Sorry.  We got -- time is too short.  Life is too short.

5  You can do a better job than that.  We're not going to make

6  that kind of -- newspaper articles.

7      Now, I'm not saying that anticompetitive conduct is not --

8  if there's some legitimate basis for that; but relying on

9  newspapers, for goodness sakes, to prove somebody's done

10  something wrong, that -- there's a thing called a hearsay rule,

11  and I'm not going to let an expert get around the hearsay rule

12  by regurgitating crap like that to the jury.

13      I'm ashamed to know that you would even try such a thing.

14  Please don't -- don't do that.

15      **MR. RICHTER:**  I think we understand Your Honor's

16  ruling.  I will just say an objection for the record is that --

17      **THE COURT:**  Go ahead and object.  Fine.  Object.  Go

18  to the Federal Circuit and say I deprived you from using

19  inflammatory headlines from unsworn newspapers.

20      **MR. RICHTER:**  I think I understand --

21      **THE COURT:**  I'm amazed that any self-respecting expert

22  would do that.

23      Has this guy ever testified before?  I mean, is he a

24  legitimate expert, or is he a hired gun, bought and paid for?

25      **MR. RICHTER:**  He's an economist from Ocean Tomo,

**PROCEEDINGS**

 1  Your Honor, yes.

 2      I wanted to address the hearsay aspect, if I could.

 3          **THE COURT:**  No, you're not going to -- I know they can

 4  rely on hearsay if it's reliable, but no expert's going to rely

 5  on news accounts.

 6          **MR. SULLIVAN:**  Your Honor --

 7          **THE COURT:**  No.  He's arguing.  You get to sit down.

 8      Go ahead, Counsel.

 9          **MR. RICHTER:**  Okay.  So I think I understand

10  Your Honor's ruling on the hearsay and on the news articles.

11      I will just point Your Honor to the fact that

12  Mr. Malackowski also relies on the financial data provided by

13  Google to explain that Google loses money on some of the

14  accused --

15          **THE COURT:**  That's okay.  That's okay if it's got a

16  legitimate basis there, but not news articles.

17          **MR. RICHTER:**  We understand, Your Honor.

18          **THE COURT:**  All right.  Do you have any problem --

19  it's okay for them to say Google loses money and is a loss

20  leader and all that.  What's wrong with that?

21          **MR. JUDAH:**  Well, Your Honor, two things.

22      One, I fully agree that when there's actually facts like

23  the actual financial data, that that's something that can be

24  introduced and relied on.  Right?  But the characterizations of

25  that, that there's therefore a strategy, which is based purely

1    on *ipse dixit* of the expert, is different.

2         **THE COURT:**  That's okay.  That's what experts are

3    bought and paid for.  You've got several of your own.  They'll

4    say things like that.  I think that's fine.

5         He can say, in his opinion, loss leader.  They're trying

6    to get their tentacles into the market.  Google's got its

7    tentacles into 42 different parts of the world economy.  Why

8    not this one too?

9         That's okay.  You're a big company.  You're one of the

10   gigantic companies.  And you do have tentacles everywhere.  So

11   please don't try to fool me into thinking it's a poor,

12   struggling company.

13        That's part of their case.  I'm going to let them make

14   that argument.  But I'm not going to let them use newspaper

15   headlines.  That's ridiculous.

16        Okay.  What else is left in your argument?

17        **MR. JUDAH:**  So, all right.  If we could go to Slide 7.

18        So there's this efficient infringement opinion that

19   Mr. Malackowski offers; that he opines that, oh, Google is

20   infringing Sonos' patents.

21        And so, first off, like the other one, he doesn't make any

22   adjustments to this.  He just wants to get the facade of

23   expertise.  "Oh, I'm an expert."  And, again, this is based

24   entirely on news articles and blog posts.

25        **THE COURT:**  That should not be allowed.  No newspaper

1    articles.

2         **MR. JUDAH:**  And -- okay.  So we can skip to Slide --

3         **THE COURT:**  So what's wrong with saying inefficient

4    or -- what is he saying?  That it's worthwhile to infringe?

5         **MR. JUDAH:**  Well, he's saying that Google has a

6    calculated business strategy to infringe Sonos' patents.  And

7    the way he phrases his opinion, he -- Sonos, in its own MIL

8    briefing in opposition, says, "Oh, yeah, this refers to the

9    hundred patents that we notified Google about," which I

10   understand is out.

11        But the jury is going to get confused into thinking that

12   efficient infringement of dozens of patents -- right? -- as

13   opposed to -- you know, he should not be offering --

14        **THE COURT:**  This is Malackowski?

15        **MR. JUDAH:**  Yeah.  He's a damages expert.  He

16   shouldn't be offering any opinions on infringement at all.

17        **THE COURT:**  Well, how does he know why somebody would

18   infringe if he's a damages person?

19        **MR. JUDAH:**  His opinion is based on the financial data

20   and the facts in the case, that Google is engaging in a

21   strategy where they take losses on their products in order to

22   achieve a lock-in effect of the ecosystems.  They can get a

23   number of speakers into the household, and then users become

24   more likely to purchase additional Google speakers as opposed

25   to Sonos speakers or any other customers.

1      And this --

2           THE COURT:  He's got documents that back that up, or

3      he's got internal Google documents that say that, or is that

4      just him opining?

5           MR. JUDAH:  Well, it's his opinion based on the

6      financial data and the fact that Google hasn't taken a license,

7      despite repeated attempts by Sonos to take a license --

8           THE COURT:  I think that's --

9           MR. JUDAH:  -- to its portfolio.

10          THE COURT:  That's a ridiculous argument.  That one is

11     out, o-u-t.  Don't make that argument.

12     All right.  What's your next one.

13          MR. JUDAH:  Your Honor, I would just point you, we

14     have a slide where we ask him:  Are there any Google documents

15     to support this opinion?

16     He said:  No, that wouldn't be --

17          THE COURT:  That's just wild speculation.  It's not --

18     and it's not very relevant to whether or not anyone infringed.

19     Go ahead.

20          MR. JUDAH:  Okay.  So then the final issue, if we go

21     to Slide 10, is the financial information about unaccused

22     products.

23     And so if we go to Slide 11.

24     Sonos agrees that a lot of this stuff, the Google Ads

25     revenue, search revenue, et cetera, is not relevant.  They say

PROCEEDINGS

 1    they're not going to introduce it.

 2        There's a dispute remaining about two products --

 3    right? -- YouTube Music and Google Play Music.

 4        Sonos -- sorry.  So Sonos says:  Well, these are accused

 5    products for the --

 6        **THE COURT:**  I read what was accused.  It's only

 7    accused if it's with the Home page and one of those things.

 8    Right?  I got it right here.  My law clerk showed it to me from

 9    Sonos' own mouth.

10        Where is that document?

11        Here it is.  I'm reading from -- what am I reading from?

12    Claim chart?

13        All right.  It's...

14        **MR. JUDAH:**  You might be looking at what's my next

15    slide.

16        **THE COURT:**  It's YouTube app, the Google Play Music

17    app.  I'm sorry.  I had it this morning, and now I can't --

18    she's got so many things underlined, I can't tell anymore.

19        Where's the part that you showed me?

20        **MR. JUDAH:**  Well, Your Honor, I'd direct you to Sonos'

21    infringement contentions, which say --

22        **THE COURT:**  That's what I'm looking at.  It said it

23    has to be the Home app plus something.

24        **MR. JUDAH:**  Pixel device plus the Home app.

25        If you look at their infringement contentions under Patent

**PROCEEDINGS**

1  Local Rule 3-1(b), they say exactly what's accused for the '996

2  and the '885.

3      For the '996, it's the Pixel, plus the Google Home app.

4  That is it.

5      **THE COURT:**  Here's what I was looking at.  I'm reading

6  now from the infringement contentions.

7      (As read):

8          "For purposes of this chart, any smartphone,

9      tablet, or computer device installed with a

10     Google Home app, either alone or together with one or

11     more of these other cast-enabled apps, will be

12     referred to as a cast-enabled computing device."

13     That's one thing.

14     Let's see.

15     **MR. JUDAH:**  That's the '885, right.

16     **THE COURT:**  It says '966 at the top.

17     All right.  Then another line says (as read):

18         "The Google Home app, either alone or together

19     with one or more of these other cast-enabled apps,

20     can be installed and run on any smartphone, tablet,

21     computer device that supports Android, iOS, Chrome

22     apps, or browser-based apps, including Google's own

23     Pixel smartphone, tablet, and computer devices."

24     And then there's a long quotation.

25     So to me, this was saying it's got to be Google Home app's

 1   is a *sine qua non*.  Right?  Right?

 2          **MR. JUDAH:**  That's correct.

 3          **THE COURT:**  Okay.  So it can't be just -- it can't

 4   just be a cast-enabled app.  It has to be Google Home app.

 5       So YouTube Music app alone is not enough to be an accused

 6   product.  Google Play Music app alone is not -- it has to be in

 7   tandem with Google Home app.  That's the way I read this.

 8          **MR. JUDAH:**  Well, Your Honor, let me take a step back.

 9       So I think you're looking at one of the Patent Rule 3-1(c)

10   charts, which is a different disclosure requirement.

11       If you look at 3-1(b) -- right? -- which is the

12   requirement to identify the accused instrumentalities, the

13   accused product -- right?

14          **THE COURT:**  That's what I think I am looking at.

15          **MR. JUDAH:**  I think you're looking at a chart under --

16   if you look at --

17          **THE COURT:**  Here, look at it.  You tell me what I'm

18   looking at.  I'm handing it to you.

19          **MR. JUDAH:**  Yes, Your Honor.  This is Exhibit C, and

20   if you look at the infringement contentions --

21          **THE COURT:**  Show counsel so he --

22          **MR. JUDAH:**  This is the disclosure under Patent Local

23   Rule 1(c) -- 3-1(c).

24          **THE COURT:**  Well, then maybe I'm misunderstanding your

25   point.  I thought I was supporting your point.  Evidently, I

**PROCEEDINGS**

1  don't understand your point.

2      **MR. JUDAH:**  Okay.  So you're supporting my point if

3  you agree that YouTube Music is not an accused product.  But

4  that's not clear.  But I think --

5      **THE COURT:**  YouTube Music alone is not, but YouTube

6  Music in conjunction with Home app is accused.

7      **MR. JUDAH:**  I disagree that in conjunction with the

8  Google Home app, it's an accused product.

9      And that's because if you look at their Patent Local

10 Rule 1(b) -- right?  And that's what I have on this slide,

11 Slide 12, is a requirement to disclose the accused

12 instrumentalities.

13     And Sonos identifies as the accused instrumentalities for

14 the '966 Pixel devices installed with the Google Home app, full

15 stop.  There's no reference to YouTube Music.  There's no

16 reference to Google Play Music.

17     **THE COURT:**  What was it, then, that I just looked at?

18     **MR. JUDAH:**  So you were looking at the disclosure

19 under Patent Local Rule 1-C, which is a separate requirement

20 where you're supposed to identify within the accused products

21 where you can find the limitations.  Right?  And that has

22 additional information -- right? -- which is going to include

23 things that are not the accused products themselves.

24     For example, that chart -- not the part you have,

25 necessarily, but another part of that chart references the

1    speakers -- right? -- because that's relevant to some of the

2    claims.  That has to be coordinated to interact with the

3    actual -- to group the speakers.  Those are the cast-enabled

4    media devices.

5         Those are not accused products for the '966.  Those are

6    accused products for the '885.  The fact that they're

7    referenced in the Patent Local Rule 1-C chart doesn't make them

8    accused products for the '966.

9         What's accused products for the '966 is what's identified

10   under Patent Local Rule 1-B.  And as you can plainly see --

11   well, yes.  I'll get to that other point in a second.

12        And if you go to the next slide.  Go to the next slide

13   after this.  No.  Sorry.  One back.  Yes, this.

14        Right.  So you can see -- right?  This is the *Oracle* case

15   you might remember where what matters is a Patent Local

16   Rule 3-1(b) disclosure.  And Sonos had not identified YouTube

17   Music or Google Play Music under Patent Local Rule 3-1(b), and

18   they can't now claim it -- say that -- accuse it of

19   infringement.

20        **THE COURT:**  Well, wait.  Somehow my law clerk and I

21   thought the document I've been looking at is the critical

22   document, but you seem to be saying no.  There's a different

23   critical document.

24        **MR. JUDAH:**  I would say that the cover pleading for

25   the infringement contentions is the critical one, and that

1   identifies 3-1(b) -- or Patent Local Rule 3-1(b).  And that's

2   one of the charts from 3-1(c).  So it's part of the

3   infringement contentions, but it's not the critical one for

4   this purpose.

5       But in any event, Your Honor, YouTube Music is not an

6   accused product.

7       But even taking a step back from that, Mr. Malackowski

8   does not make any adjustments to his reasonable royalty opinion

9   for the '966 or the '885 based on this YouTube Music revenue.

10  And the reason he doesn't do it is (a) it's not relevant; but

11  (b) he's only trying to get this in to skew the damages

12  horizon, to get in these big numbers to desensitize the jury.

13      And if we go to the next slide after this.  And one more.

14      Oh, I guess -- taking -- sorry.  Some other evidence too

15  that YouTube Music is not accused for the '966, Sonos' own

16  damages expert, you know, I asked him at his deposition --

17  right? -- '966 is Pixel phones -- right? -- these devices

18  installed with a Google Home app.

19      And he said:  Yes.  I state that explicitly in my report.

20      And he does.

21      And then if you go to the next --

22          THE COURT:  We're on exhibit -- we're on Motion

23  Number 4; right?  This is Google's Motion Number 4?

24          MR. JUDAH:  Yes.

25          THE COURT:  All right.  Say in a -- go back to

 1   square -- I've lost track of -- what is your main point?

 2        **MR. JUDAH:**  Our main point is that Mr. Malackowski

 3   should not be able to talk about revenue associated with the

 4   YouTube Music app because it's not an accused product and it's

 5   not relevant to the remaining patents in the case.

 6        It was accused, and it was part of his damages theory for

 7   the '033.  And Sonos didn't -- now they're trying to argue:

 8   Oh, well, this is an accused product for the -- for the '996.

 9        They started doing that -- right? -- not just in charts --

10   right? -- but, like, as a so-called accused product itself, a

11   3-1(b) accused product, only after the '033 patent was

12   invalidated, because now they can't skew the jury's damages

13   horizon with these massive numbers for the YouTube Music app.

14        And it's 403 and 702, should be excluded as unduly

15   prejudicial, even if it were an accused product, because it's

16   not part of his actual damages quantification.  So that's an

17   independent reason to exclude it but...

18        **THE COURT:**  Your turn.

19        **MR. RICHTER:**  Your Honor was reading from the correct

20   document.  The accused products are controller devices

21   installed with the Google Home app alone or in combination with

22   the YouTube Music app or the Google Play Music app.

23        That document, I believe, is a chart prepared by Sonos as

24   part of its infringement contentions that demonstrate and

25   illustrate how the accused products practice Sonos' claims.

**PROCEEDINGS**

1    I believe that chart was incorporated by reference into the

2    same document, the cover pleading that Mr. Judah referenced,

3    and therefore it is an accused product.

4        This is a -- this comes way too late in this case,

5    Your Honor.  If they had a problem with our characterization of

6    the accused products, they could have moved to strike.  They

7    could have moved to -- our technical expert, Dr. Almeroth

8    references this.  His report is replete with these references

9    to the accused products.  They made no motion to strike that

10   YouTube Music is somehow not accused.  It's been in all of our

11   contention charts and expert reports since before even the

12   direct control patents --

13           **THE COURT:**  Look --

14           **MR. RICHTER:**  -- were added to the case.

15           **THE COURT:**  -- I'm going to let them -- if they want

16   to bring up this number from sales of those two products, I'm

17   going to let them bring it up.

18       I don't -- I just -- this is -- this chart was attached to

19   Google's document.  Okay.  My law clerk is saying the chart

20   I've been referring to, the '966 claim chart, accused

21   instrumentalities, that was attached to your own motion.

22       All right.  Motion -- this part of your motion is denied.

23       All right.  Now, we go to Motion Number 2 from Sonos about

24   testimony of Schonfeld.  Is any of this now still alive and

25   well, needs to be addressed?

PROCEEDINGS

1          MR. SMITH:  Yes, Your Honor.

2          THE COURT:  Your name, please?

3          MR. SMITH:  This is Dan Smith again on behalf of

4  Sonos.

5          THE COURT:  Okay.  Go ahead.

6          MR. SMITH:  Yes.  So, Your Honor, I think this is

7  pretty simple.  So Rule 26 requires an expert report to have

8  all opinions, including the basis and reasons for those

9  opinions.  But Dr. Schonfeld's report has no analysis

10  whatsoever for the asserted claims of the '966 patent.

11          So, instead, what Dr. Schonfeld did -- right? -- is he

12  focused on the '885 patent.  And he actually did that, even

13  when the '885 patent was already out of the case with respect

14  to invalidity.  You had actually ruled that it was invalid.

15  Nevertheless, Dr. Schonfeld looked entirely at the claim

16  language of the '885 patent.  He did a claim-by-claim analysis

17  of Claim 1 of the '885 patent, already invalid.

18          Then he turned to the '966 patent.  And so he spends

19  hundreds of pages on the '885.  He gets to the '966, has a

20  few pages where all he does is cross-reference the '885

21  analysis.  So, again, he doesn't look at the claim language of

22  the '966 patent.

23          And why is that important?  Well, there are differences

24  between the scope of the '885 patent -- excuse me -- Asserted

25  Claim 1 of the '885 patent and the asserted claims of the

1    '966 patent.

2        And so -- and, in fact, Your Honor, in a separate issue

3    here, Google's also arguing, for purposes of infringement, that

4    there is a difference.  Yet for this MIL, Google's saying

5    there's no difference.  Claims are the same.  They should be

6    treated the same.  Analysis of the '885 applies to the '966.

7        But that's just not the case.

8        So in addition -- right? -- to not analyzing the claim

9    language, Dr. Schonfeld provides no explanation of his mapping.

10   Right?  So, for example, he gets to a limitation, and he'll

11   say:  Go see some other limitation in the '885 patent.  Right?

12   So he's looking at the '966.  He says:  Go look at this

13   limitation of the '885.  But he doesn't even explain why he's

14   mapping it that way.

15       And what's telling, Your Honor, is if you look at their

16   brief for this MIL, all of a sudden they've got all this

17   explanation in there that says:  Well, let me tell you why you

18   can map it.

19       They can't do that now.  That was Dr. Schonfeld's duty to

20   do, pursuant to Rule 26, in his expert report.  If they wanted

21   to do this mapping that they're trying to do in the MIL

22   briefing, he should have done it back then.  He didn't do it.

23   It's too late.  It's out.

24       So our opinion is that Dr. Schonfeld has no opinion with

25   any analysis related to validity of the '966 patent.

 1          **THE COURT:**  What do you say in response?

 2          **MR. PAK:**  Many things to say, Your Honor.  May I hand

 3   up the slides?

 4          **THE COURT:**  How many of those slides do you have?

 5          **MR. PAK:**  Just five or six.

 6          **THE COURT:**  All right.  Let me see them.  Hand them,

 7   please, to the clerk.

 8          **MR. PAK:**  Yes.

 9      Sorry.  I apologize.  I think I may have handed up the

10   wrong slides.  So let me...

11      I'll put them on the screen, Your Honor, and then we'll

12   hand them out.

13          **THE COURT:**  Go ahead.

14          **MR. PAK:**  Yes, Your Honor.

15      I think, first of all -- let's go to the next slide.

16      This is a motion in limine, Your Honor.  It's not a

17   summary judgment vehicle.  What they just said on the record is

18   they want to throw out our entire case on the invalidity of the

19   '966 patent on a motion in limine.  That is simply not the

20   vehicle for doing that.  If they wanted to move to strike, if

21   they wanted to move for summary judgment, they should have done

22   that many, many months ago.

23      Number two, if you go to the next slide, in this court,

24   ND Cal, as well as in numerous courts around the country, it is

25   well-recognized practice of experts to cross-reference evidence

PROCEEDINGS

 1    and analysis in other portions of their reports.  Absolutely

 2    standard procedure.

 3          This is quoting (as read):

 4              "By cross-referencing the other paragraphs, the

 5          report goes beyond an entirely conclusory expert

 6          opinion."

 7          That's the *Cyntec* case from ND Cal.

 8          (As read):

 9              "Accepting the 'expert's use of

10          cross-referencing' given scope of issues and because

11          of the 'heavy burden of persuasion on the party that

12          seeks to exclude or strike significant portions of

13          the opposing party's expert report.'"

14          This is from *Acceleration Bay*, Delaware.

15          You go to the next slide.

16          Dr. Almeroth, who is the only person that really matters

17    here, Your Honor, did Sonos' expert understand Dr. Schonfeld's

18    invalidity theories on the '966 patent?

19          Absolutely, because in his rebuttal report on the '966

20    patent validity issues, he says:  I know exactly what's going

21    on.

22          (As read):

23              "I have assumed for purposes of my discussion

24          below that Dr. Schonfeld is mapping the 'computing

25          device' of Asserted Claim 1 of the '966 Patent to a

**PROCEEDINGS**

 1      computer installed with SlimServer software . . . ."

 2          The computer -- if Your Honor recalls, the two claims at

 3      issue, the two claim sets, one talks about a computing device,

 4      the other talks about a network device.

 5          He knew exactly what was going on.

 6          Furthermore, on Slide 5, Your Honor, Dr. Almeroth actually

 7      uses the same technique of cross-referencing opinions across

 8      these two patents.  We see it here (as read):

 9              "For the same reasons, Google's 'speaker group'

10          functionality also satisfies the 'zone scene'

11          limitations" --

12          **THE COURT:**  Help me understand the procedural posture.

13      Why didn't your expert -- why did he do all this

14      cross-referencing?  Why didn't he just say it so that it'll be

15      in a plain paragraph with respect to '966?

16          **MR. PAK:**  He did, Your Honor.  So what he did is -- if

17      you remember, both experts, what they do is they describe the

18      systems.

19          So for the Sonos expert, his burden of persuasion or proof

20      was analyzing the Google system.  He does that in the context

21      of the '885 patent.

22          And for the '966 patent, he says:  Look at all the

23      evidence and all the analysis I did for the '885 patent.  For

24      the limitations that matter with respect to the '966, I'm

25      cross-referencing that.

1          Dr. Schonfeld did exactly the same thing when he's

2     analyzing the -- the prior art systems, including the

3     Sonos 2005, Squeezebox, and so on.  He says:  I'm going to

4     describe the system once, including all the details, from both

5     the perspective of the controller as well as the speakers that

6     are being controlled, once; and then I'm going to

7     cross-reference specifically back to the discussions that

8     matter.

9          And I will just note, Your Honor, the only thing that they

10    have complained about in their brief are two things.

11         One, they say the '966 patent uses the word "computing

12    device"; and because it's written from the perspective of the

13    computing device, Dr. Schonfeld's opinions on the '885 patent

14    can't possibly cover the '966 patent.

15         Problem with that is, in the context of the '885 patent, a

16    different word, "network device," is also used because the

17    speakers are obviously receiving these indications and commands

18    from a controller.  And instead of using the word "computing

19    device," he uses the word "network device."

20         Both experts understand that, clearly, that these are two

21    sides of the same system.  One, you can describe it from the

22    perspective of the speaker, or you can describe it from the

23    perspective of the controller.  So on that point, absolutely no

24    issue there.

25         The second point they say is storage.  The '966 patent has

1   this additional language about storing the zone scenes.

2       In the very sections that are cross-referenced in

3   Dr. Schonfeld's report on the '885, there's numerous

4   discussions about how the zone scenes in the prior art systems

5   are saved and stored.

6       And I'll just note, Your Honor, in the slides, if you go

7   to Slide 7, Your Honor and I had this discussion last time I

8   was before you on the summary judgment.  Party Mode.

9   Party Mode existed.  It was saved.  It allowed all the speakers

10  in the Sonos 2005 system to be grouped together.  That is

11  exactly what Dr. Schonfeld pointed to in the cross-referenced

12  section as one of the zone scenes that is present in the

13  Sonos 2005 system.

14      And specifically, he walked through, in the '885

15  discussion, exactly how that Party Mode zone scene is created,

16  providing indications to the speakers that they are now

17  belonging to the Party Mode and stored.

18      And so this is on -- the next slide.

19      Your Honor, this is Schonfeld opening report,

20  paragraph 343 (as read):

21          ". . . Mr. Lambourne testified that 'party mode'

22      was a 'zone scene.'"

23      Next slide (as read):

24          "As described above, however, groups that you

25      create and groups that the Sonos System creates, such

 1        as Party Mode, are saved."

 2        Saved.  So he has extensive discussion about how the

 3   accused or the identified groups, including zone scenes such as

 4   Party Mode, are saved and stored in -- and he does this for not

 5   only Sonos 2005.  He does it for Squeezebox.  He does it in all

 6   these other references.

 7        And then specifically on page 10 --

 8            THE COURT:  Why are you going into all this detail?

 9            MR. PAK:  Your Honor, because --

10            THE COURT:  Who cares if it's saved or not?  Is that

11   the issue?  I thought the issue was that he didn't do the

12   analysis for '996 and did cross-referencing.

13            MR. PAK:  Yeah.  So my point, Your Honor, is he did do

14   the analysis in the cross-referenced sections.

15        And cross-referencing, Your Honor, is permitted as an

16   expert tool to shorten the --

17            THE COURT:  Why isn't that right?

18            MR. SMITH:  So a couple of things I'd like to respond

19   to.

20        So first, Google's lead case, the *Cyntec* case, that

21   doesn't deal with the situation we have here.  It's not looking

22   at analyzing one patent with a first set of claim language and

23   then cross-referencing a second patent with a different set of

24   claim language.

25        There, I believe the case was just talking about the

1  doctrine of equivalence and the fact that he had a conclusory

2  statement in one portion of the report, and he referred back to

3  a different portion of the report with different language.

4  That's something totally different.  Right?

5        We're not talking about a situation here where

6  Dr. Schonfeld said in the '966 section:  Hey, I think it's

7  invalid.  Go look at this other section where I actually

8  analyze the '966 claim language.

9        That's not what he did.

10       Here he said:  Go look at this '885 patent which has

11  different language.

12       So that's the first point on the case --

13       **THE COURT:**  But on many of the points, they're so

14  parallel that it would be reasonable to -- there are some

15  differences in the claim language.  That's true.  But there are

16  a lot more things that are similar.  And why wouldn't it be

17  reasonable to cross-reference, even though they're different

18  patents, because it's the same concept?

19       **MR. SMITH:**  Well, I think, Your Honor, what they're

20  saying is:  You should go dig through our analysis of the '885

21  and figure out what applies to the '966.

22       But that's not -- they should have done that, pulled out

23  what they thought was relevant to the '966 and actually mapped

24  it to the claim language.

25       And what they're doing right now is they're trying to find

1  the best disclosure they have for some of the prior art, and

2  they're saying:  Look, Sonos had storage.  Look at this line

3  about storage.

4      But, again, they're not analyzing it in the context of the

5  specific claim language of the '966 patent.  And that claim

6  language is specific on causing storage.  For example, in

7  Claim 1, the controller has to cause storage.  And then in the

8  dependent claim, Claim 4, that storage has to be on a player,

9  and they needed to map that.

10     And we believe that that difference in claim language,

11  among other differences, are important to the issue of

12  validity, and we've made arguments about that.

13         **MR. PAK:**  Your Honor, let me -- because the last three

14  slides are critical on this.

15     Slide 11.  Counsel just represented to you that nobody in

16  this room knew where Dr. Schonfeld was discussing the storage

17  requirement of the '966 claim.

18     Absolutely false because, in Dr. Almeroth, Sonos' own

19  report, expert report, on page 5- -- paragraph 562, he's

20  analyzing exactly the language that counsel was talking about,

21  Section 1.6 which has the storage.

22     He says (as read):

23         "In my opinion, Sonos 2005 system prior art did

24      not meet this requirement."

25     Why is he saying that?  Because if you turn to the next

1    slide, he's referring back to Dr. Schonfeld's own discussion in

2    the cross-referenced material of the Party Mode.

3        He says the hard-coded All Zones-Party Mode option of

4    Sonos 2005 system that is relied upon by Dr. Schonfeld for '966

5    fails to meet these following requirements, including the

6    storage requirement.

7        So he knew exactly what the theory was.

8        And the next slide, Your Honor, not only that, he goes

9    into the details of Dr. Schonfeld's analysis, where he says for

10   the Party Mode, he cited to Mr. Lambourne's testimony.  For the

11   Party Mode, he identified these specific source code citations.

12       There was no confusion by Dr. Almeroth whatsoever.

13       **THE COURT:**  Is that the test, whether or not the

14   opposing expert was confused?

15       **MR. PAK:**  No, Your Honor, it is not the test.

16       But what I'm saying is the cross-referencing is a valid

17   tool, number one.

18       Number two --

19       **THE COURT:**  Okay.  Look, here's my ruling.  And I'm

20   going to defer a lot of the ruling.  But I will tell you how

21   I'm going to deal with this, just like I do in every trial.

22       If your expert is on the stand and you ask a question and

23   the other side steps up and says "That's not in the report" --

24   it'll come out of your time, by the way -- I will then say to

25   you in front of the jury:  Where is it in the report?

1        And I'll have it up here.

2        Then you will say:  Paragraph 102.

3        I'll turn to that.  I'll read it.  And I'll say:  Okay.

4    That's pretty close.  I'll let the question.

5        But let's say that I turn to page 102 or paragraph 102 and

6    it's some cross-reference.  Then I have to say to you:  No,

7    that's not good enough.  Explain to me why that

8    cross-reference -- where is that cross-reference?

9        So then you have to say:  Well, it's at paragraph 74.

10        So then we go back to paragraph 74.  Then I have to make a

11    decision.

12        Now, you have brought this on yourself by having a

13    convoluted expert report, and it's going to interrupt the flow

14    of your presentation and come out of your time.

15            **MR. PAK:**  Understood, Your Honor.

16            **THE COURT:**  Too bad, but that's the way it is.

17        But I will decide question by question whether or not

18    I think the report discloses the opinions that are being

19    offered.

20        Now, on the other hand, if you start asking --

21    interrupting just for the sake of interrupting, that's not good

22    either, and I'll have to find a way to deal with that.  So

23    please only make objections where you think in the end you're

24    going to win.

25            **MR. SMITH:**  So, Your Honor, I just need to --

PROCEEDINGS

```
 1            THE COURT:  No, I'm not going -- I've made my ruling.
 2    I'm not ruling for or against.  I'm denying your motion without
 3    prejudice to a question-by-question approach.
 4            MR. SMITH:  But to be clear -- right? -- there is no
 5    analysis of the '966.  So literally --
 6            THE COURT:  That's not true.
 7            MR. SMITH:  -- what we're going to do --
 8            THE COURT:  That's not true.  I just saw it on the
 9    screen.  I just saw it on the screen.
10            MR. SMITH:  That's not analysis of the '966.  That's
11    analysis of the '885 he's showing you.
12            THE COURT:  No, I saw the words "'966" on there.
13            MR. SMITH:  Maybe on his header.
14            THE COURT:  Does '966 appear in his report?
15            MR. PAK:  Yes, Your Honor, absolutely.
16            THE COURT:  Well, counsel is just telling me that it
17    does not even appear.
18            MR. PAK:  Absolutely.
19            THE COURT:  Wait, wait.  Are you telling me that
20    nowhere will we find '966?
21            MR. SMITH:  What you will find in the '966 is:
22    Element 1.1, go look at the '885.  Element 1.2, go look at the
23    '885.  Element 1.3, go look at the '885.
24        So what I'm telling you, Your Honor, is every question
25    they ask their expert, we're going to object and we're going to
```

 1   say, "That's not in the report."  And this is going to be a

 2   huge disruption.  I mean, it's on them.  They made the mistake

 3   of doing this.  And there's just no excuse for it.

 4        And we're going to sit here literally --

 5        THE COURT:  Normally, I would agree with you maybe,

 6   but this is convoluted because I made a mistake and ruled

 7   against him on -- I've forgotten.  I said it was invalid or --

 8   what did I do?  I can't remember.  I had to take it back.  And

 9   so I helped confuse things with my own rulings here.  So I'm

10   not going to hold that against Google.

11        I'm sorry.  It's denied without prejudice to

12   question-by-question.  That's it.  No more, please.  We've got

13   a trial to run here.  And you've made your argument.

14        Okay.  Is there anything else on Motion in Limine

15   Number 4?

16        Hearing nothing, we're going to go on.

17        Is there any other motion in limine that somebody wants to

18   bring up?  Otherwise, I'm going to deny them without prejudice

19   to a question-by-question.

20        MR. SMITH:  Thank you, Your Honor.

21        THE COURT:  Okay.  Are you coming forward on a motion

22   in limine?

23        MR. KOLKER:  Yes, Your Honor.

24        THE COURT:  Please go ahead.  What's your name?

25        MR. KOLKER:  Joseph Kolker from Orrick, Herrington &

PROCEEDINGS

 1   Sutcliffe on behalf of Sonos.  I'm here to discuss Sonos'

 2   Motion in Limine Number 3.

 3           THE COURT:  Number 3, invalidity based on lack of

 4   written description or enablement.

 5           MR. KOLKER:  Yes, Your Honor.

 6           THE COURT:  My notes here say this is now moot.

 7           MR. KOLKER:  Your Honor, I believe it is -- there were

 8   two parts of this motion.  I believe one is now moot.  I think

 9   we may be able to propose something that may moot the second

10   part as well.

11           THE COURT:  Go ahead.  Tell me what's left and why

12   it's still alive.

13           MR. KOLKER:  Thank you, Your Honor.

14       So what is still left in this motion, what is not

15   currently moot is Sonos challenges Google's attempts to compare

16   the specification of the asserted patents against the prior art

17   in order to carry its burden of showing that the prior art

18   enables the claimed invention.

19       Now, if we argue this, I can get into why we think that's

20   legally improper.  But what I want to propose is, in the

21   interest of further streamlining this case, if either Google is

22   willing to agree or if the Court will order that Google cannot

23   do that, cannot compare the specification, instead of the

24   claims, against the prior art, then Sonos is willing, under

25   those circumstances, to not argue to the jury that the

1    Sonos Forums or the 2005 system, which are the relevant prior

2    art here, combination is non-enabling, or to offer evidence

3    that is solely relevant to prove that argument.

4        And there's a slight detail that I would think would be

5    helpful to just clarify here, which is, we're not offering to

6    stipulate that the prior art is enabling, but we're saying that

7    we will not raise this argument to the jury.  We're not going

8    to try and appeal it.  It's just not going to be in the case.

9    And neither party will raise this.

10        **THE COURT:**  What does Google say?  And your name.

11    Start with your name.

12        **MR. LORDGOOEI:**  Your Honor, Iman Lordgooei on behalf

13    of Google.

14        I think that sounds acceptable.  The issue that we were

15    having before was that they're making the argument that certain

16    prior art is non-enabling, which is not even a legal

17    requirement under obviousness law.  And therefore, if they're

18    willing to agree not to make that argument, then I think the

19    MIL is moot.

20        **THE COURT:**  Then you two meet and confer after the

21    hearing, and put it in writing, and let me know what you agreed

22    on.

23        **MR. LORDGOOEI:**  Understood, Your Honor.  Thank you

24    very much.

25        **THE COURT:**  All right.  Okay.  Is there anything more

1    by way of motion in limines?

2        Bose.  Yes, my law clerk is pointing out, what's the

3    story -- is there anything left in controversy on Bose, the

4    Bose prior art?

5            **MR. LORDGOOEI:**  In terms of MIL Number 2, Your Honor?

6            **THE COURT:**  I think it's Number 2, yes.

7            **MR. LORDGOOEI:**  I'll hand it over to Mr. Pak.

8            **MR. SMITH:**  Yes, Your Honor.  This is Dan Smith again

9    on behalf of Sonos.

10        So with respect to the Bose issue, what we have is a

11   situation where Dr. Schonfeld has identified a number of

12   different Bose products.  And although it's not even clear, he

13   appears to be offering an opinion of obviousness based on a

14   combination of these different Bose products.  Yet in his

15   expert report, he provides no explanation as to why or how a

16   person of ordinary skill would actually combine those and

17   modify his primary reference to arrive at the invention.

18        And I think the case law is very clear.  Right?  You've

19   got to have more than just teachings from a bunch of different

20   products for purposes of obviousness.  The expert's got to tie

21   those together.

22        And the only thing they have in their expert report is

23   this statement that these different products -- I think they

24   call it in the same -- something about being in the same

25   endeavor.

**PROCEEDINGS**

1    And, again, the Federal Circuit's made it clear that a

2    statement like that, that these products or these references

3    are in the same field, is just not enough for purposes of

4    obviousness.

5    So we're trying to, again, exclude Dr. Schonfeld from

6    providing an opinion regarding obviousness of these different

7    Bose products.

8        **THE COURT:** What do you say, Mr. Pak?

9        **MR. PAK:** Sounds like a cross-examination point,

10   number one.

11   Number two is, of course, as an obviousness inquiry, he's

12   allowed to combine related technologies, related products,

13   related references.  They all come from the same company,

14   around the same time, all trying to make speakers easier to

15   control.  He has opinions on that.

16   If they think that's not sufficient as a matter of law,

17   they should have moved for summary judgment.

18       **THE COURT:** Well, but don't you have to show more than

19   just that?  Don't you have to show that there was a motivation

20   and a reasonable expectation of success?

21       **MR. PAK:** Absolutely, and he does that.

22       **THE COURT:** No.  Counsel said he doesn't do that.

23       **MR. PAK:** He absolutely does that, Your Honor.

24       **THE COURT:** Read to me where he does that.

25       **MR. PAK:** Yes.  So I'm taking us to -- apologize --

1    taking us to the discussion of Bose which starts on page 169 of

2    his expert report.  LifeStyle system -- this is, again --

3        (As read):

4            "The LifeStyle 50 system is analogous" -- this

5        is on page 181 -- "analogous to the '885 patent

6        because it is in the same field of endeavor,

7        'controlling or manipulating a plurality of

8        multimedia players in a multi-zone system.'"

9        (As read):

10           "For example, the LifeStyle 50 system, like the

11       '885 patent describes using different rooms or zones,

12       as well as grouping all zones in the house together,

13       for individual or group synchronous playback."

14       And let's turn to when he gets to the obviousness section.

15   This is on page 664.

16       Then starting on that, he starts to go through the Bose

17   LifeStyle system, which is the primary basis for the

18   obviousness opinions.  And he's combining the Bose

19   LifeStyle system, which he already talked about as being in the

20   relevant pertinent field, with other non-Bose systems, such as

21   the POSITA, Sonos Forums, Nourse, and Rajapakse.  And for each

22   of those, he provides the motivation to combine, and so we can

23   see that.

24           THE COURT:  Read to me what the motivational --

25           MR. PAK:  Yeah.  Sure, Your Honor.  Let me see if I

1    can find those.  I apologize.  It's a lengthy report.

2        So this is on page 548.

3            **THE COURT:**  Paragraph or --

4            **MR. PAK:**  Page 548, Your Honor, and these are

5    paragraphs 856 to 857 (as read):

6            "The capabilities and features of the Bose

7        LifeStyle are apparent from documents that Bose has

8        made available to the public . . . ."

9        In paragraph 857 (as read):

10            "I understand that Dr. Almeroth asserts that I

11        rely 'on disclosures in various materials related to

12        other Bose products . . . ."

13        And he lists them.

14        He says (as read):

15            "These products, however, are all Bose products

16        relating to playing audio on speakers and thus are

17        all part of the same endeavor.  For example, SA-2 and

18        SA-3 Amplifiers are both part of the 'LifeStyle'

19        family to which the Bose systems belongs."

20        So they're not just disparate products.  They're part of

21    the same family of products.

22        (As read):

23            "I also note, that other than his conclusory

24        opinion, Dr. Almeroth does not provide any evidence

25        that the above-mentioned products are incompatible."

1        Then moving to page 582, paragraph 880 (as read):

2            "Further, Dr. Almeroth states that SA-2 or SA-3

3        Amplifier products are not part of the Bose LifeStyle

4        50 system and thus suggests that his analysis should

5        stop there.  I addressed this above . . . ."

6        They're both part of the same product line -- same product

7   line -- and in same field of endeavor.

8        In 881, he says that (as read):

9            ". . . there is no evidence that the Bose

10       LifeStyle utilized the 'Bose link' communication

11       protocol . . . ."

12       That was a network protocol that was being used for this

13   family.

14       (As read):

15           "I disagree."  This is Dr. Schonfeld.  "The very

16       point of the communication protocol is to provide a

17       'conversation' between the network interfaces and the

18       speakers."

19       So he's addressing --

20           THE COURT:  Well, but if -- did Bose ever actually do

21   the invention?

22           MR. PAK:  Yes, Your Honor.  So Bose System --

23           THE COURT:  Wouldn't that be anticipation?

24           MR. PAK:  We have an anticipation argument on the

25   '966 patent, and then we also have the obviousness combinations

PROCEEDINGS

1  as well.

2          THE COURT:  Okay.  What do you say to that?

3          MR. SMITH:  So, Your Honor, a few things.

4      So, one, we're talking about a number of different Bose

5  products here.  Right?  So we have the Bose LifeStyle 50

6  system.  That's the primary Bose product or the primary

7  reference that the opinion's based on.  We have what's referred

8  to as these LifeStyle SA-2 and SA-3 Amplifier products.

9      While they share the LifeStyle name, Bose used the

10  LifeStyle name on a lot of different products.  Again, it's not

11  part of the same system.  So these, again, are still two

12  different products.

13      And then you have a system called the Bose FreeStyle

14  system.  That's a different Bose product.

15      And then you have this Bose communication protocol called

16  Bose link, which, again, is a different communication protocol

17  that's not used by the Bose LifeStyle 50 system.

18      So, again, you have these different systems that are not

19  part of the same system.  So Dr. Schonfeld needed to, you know,

20  make an obviousness argument to combine them.

21      And what you heard my co-counsel here say multiple times,

22  he kept pointing to the same "field of the endeavor" language.

23  But the Federal Circuit -- and I can point you to our brief

24  here -- has made it very clear that that's not sufficient.

25      And so, again, I didn't see anything in what Mr. Pak just

1    pointed to that talked anything about a reasonable expectation

2    of success, a motivation to combine, or anything.  All he has

3    is these different teachings --

4        **THE COURT:**  Well, if the jury were to hear all of

5    this, this is not like a murder case where you have a gory

6    body, blood everywhere, people in the jury box start vomiting

7    because they're so horrified.  This is a patent case in which

8    you'll be struggling to keep the jury awake.

9        What is the harm in letting them hear this?  And then if I

10   agree with you, I just strike it from the record.  I say to the

11   jury:  Did you hear what Google put up there?  All that stuff

12   about Bose, disregard it.  And they will.

13       And that's the answer to a lot of these questions, is I'll

14   decide it after the jury -- everybody hears it, because there's

15   absolutely zero prejudice to letting the jury hear any of this

16   because they will not be inflamed by any of this.  And I could

17   strike it after the fact, which is perfectly okay for a judge

18   to do.

19       But right now I'm a little -- I'm not certain that I

20   can -- I would feel comfortable throwing it out.  Once I hear

21   the evidence and hear the cross-examination, I may say:

22   You know, Sonos is absolutely right.  The scales have fallen

23   from my eyes.  I'm going to strike that testimony, and Google

24   will rue the day they ever wasted the jury's time with it.

25       **MR. SMITH:**  Yeah, Your Honor, I think at the end of

**PROCEEDINGS**

 1  the day, we just believe it's futile.  We believe they don't

 2  have a case for obviousness based on what's in there, and we

 3  have a lot of issues --

 4         **THE COURT:**  All right.  Look, you may be right, but

 5  it's just too much for me to absorb, prior to trial, on

 6  something that will not inflame the jury.  And therefore, I'm

 7  going to deny your motion without prejudice.  So that's the end

 8  of the Bose story.

 9      You can present it, but I may tell the jury -- please

10  don't come back to me later and say:  Judge, you allowed it in.

11  I'm allowing it, subject to being stricken for being -- should

12  never have been presented.

13      Okay.  I need to -- we're running out of time here today.

14  I'm not going to do any more motions in limine unless somebody

15  has one that's urgent.

16         **MR. RICHTER:**  I have one for Sonos, Your Honor,

17  I think can save a lot of time.  Sonos has moved in limine to

18  exclude references to prior asserted patents by Sonos and also

19  Google's own patent portfolio, including the size of its

20  portfolio.

21                (Official Reporter clarifies.)

22         **MR. RICHTER:**  Cole Richter on behalf of Sonos, ma'am.

23         **THE COURT:**  All right.  And what is your solution?

24         **MR. RICHTER:**  My solution is to exclude either party

25  from referencing any patents that were previously asserted but

1  no longer in this case and, also, exclude Google from

2  referencing Google's patents and the size of Google's patent

3  portfolio.

4          **THE COURT:**  Isn't that a good idea?

5          **MR. JUDAH:**  No, Your Honor.

6          **THE COURT:**  Why not?

7          **MR. JUDAH:**  So if we can go to Slide 4.

8      So, Your Honor, the evidence they want to rely on for

9  willfulness for the '966, now that you've correctly eliminated

10 this willful blindness theory, is this so-called courtesy copy

11 of the complaint.  Right?

12     Okay.  That -- and the question that the jury's going to

13 be asked to answer is, you know, did Google have a willful

14 intent to infringe under the totality of the circumstances --

15 right? -- or did they have a reasonable, good faith belief that

16 they did not infringe a valid patent at the time of the

17 challenged conduct?  Right?  This is when Google first got

18 notice of the '966.  Right?

19     They want to introduce this document into evidence.  And

20 so what they're trying to say is:  Okay.  Well, we're allowed

21 to introduce a document that references four patents that were

22 all withdrawn.  Either they withdrew the infringement

23 allegations for them, including for the '206, which is the

24 related patent, it's a zone scenes patent, they withdrew that

25 with prejudice, their infringement allegation for it.  Two

1    other patents you found to be invalid and/or non-infringed.

2    And then the fourth one in there, they withdrew it because it

3    was found to be -- it was deemed not enforceable in a letter.

4        But the point is, they want to tell an incomplete picture.

5    They want to open the -- I guess I would say it's not even

6    opening the door because we're not saying we want to walk in

7    and talk about other stuff.  It's the door itself.

8        They say:  Oh, no, we can talk about the door.  Google

9    can't talk about four-fifths of the door.

10        **THE COURT:**  Okay.  Are you trying to --

11        **MR. RICHTER:**  Sonos would be happy to redact the

12    listing of the unasserted patents.

13        **THE COURT:**  No.  You're trying a gimmick.  Sorry.

14    Motion denied.

15        Google's got -- look, if this is what you're going to use

16    for willfulness, this complaint, Google's got every right to

17    tell the jury:  Hey, one of these, they withdrew.  The other

18    one, the judge has already found was invalid.

19        So, yes, if this is your document on willfulness, too bad.

20        **MR. RICHTER:**  Our argument --

21        **THE COURT:**  Motion denied.

22        **MR. RICHTER:**  -- is that their --

23        **THE COURT:**  Motion denied.

24        **MR. RICHTER:**  Understood, Your Honor.

25        **THE COURT:**  Thank you.

1        **MR. RICHTER:**  There's other parts of that motion with

2    respect to Google's patents.  I'm sorry, Your Honor.

3        **THE COURT:**  All right.  Are you going to use any of

4    Google's patents?

5        **MR. JUDAH:**  Not specific patents, Your Honor.  But the

6    fact that Google has a patent portfolio, in a willfulness case,

7    that's relevant to the question of:  Does Google have the

8    intent to infringe someone else's patent?

9        We cite case law saying that that generally has been

10   deemed to be admissible, just to say:  At Google, we respect

11   patents.  We have a lot of our own patents.

12       **THE COURT:**  I don't know.  If it's one sentence like

13   that, that would not bother me; but if it gets beyond one

14   sentence, I would start to worry.

15       Motion denied.

16       **MR. JUDAH:**  Thank you, Your Honor.

17       **THE COURT:**  Okay.  We're done with the motions in

18   limine for now, except I'm going to make a ruling with respect

19   to the damages on Malackowski and the method of damages related

20   to IFTTT.

21       The answer is I'm not going to make a ruling right now.  I

22   feel that there are serious questions about this whole model.

23   I'm going to let you put it on, but I may tell the jury, after

24   I hear all the evidence, hear the cross-examination, to

25   disregard it and strike it from the record.

**PROCEEDINGS**

1        You can take the chance, if you wish, on the Sonos side.

2   It's a 50-50, very close call on whether this is a valid model

3   for damages.

4        But I think I would benefit from hearing the actual

5   testimony.  And there's absolutely no harm in telling the jury

6   to disregard it and giving them an instruction that no damage

7   award could be based on it whatsoever, if that's the way I come

8   out.

9        So you have to gamble if you want to use it.

10        That's going to be the ruling.

11        So on your side over there, you get to cross-examine, and

12   I get to listen to -- get the benefit of the cross-examination

13   and then decide whether or not the jury's going to hear it --

14   get to use it.  They will hear it.

15        So that's the answer to that one.

16        Okay.  Now, we have other issues in your paperwork.

17        By the way, I wish somebody would have -- the answers --

18   questions that I sent out the other day, yesterday, or this

19   morning, I wish that you would get me answers.  Google is the

20   one that probably can.  That would be very informative to the

21   poor judge struggling with this case.

22        All right.  We have here -- you had a bunch of other

23   disputes that -- derivation defense is out of the case; right?

24        **MR. PAK:**  Yes, Your Honor.

25        **THE COURT:**  Okay.  Affirmative defenses.  Now, listen,

1  there's not going to be any extra trial.  It's all your

2  14 hours.  Everything you want to say evidence-wise on those

3  affirmative defenses has to be put in during our trial.  You

4  will not get extra time later.  So please, the way you wrote

5  it, it made you sound like you were going to get a supplemental

6  trial on affirmative defenses.  No way.

7      Okay.  My law clerk is not happy about your proposed

8  schedule.  11:30 each night you submit a brief.  Well, do you

9  think she's going to be sitting here waiting for eight lawyers

10  over there and eight lawyers over here after you stand around

11  the watercooler and the coffee machine all day to -- no, she's

12  not going to do that.  So 7:30 is the latest you can make your

13  submissions if you want it to be read before the next morning.

14      I happen to like my own schedule that I've worked out, but

15  if you -- you submit to me tomorrow whatever you come up with

16  that's consistent with the 7:30 p.m. for her, and I might

17  modify my own system.  But until then, my system controls and

18  not your system.

19      Okay.  Remote testimony, is that still an issue or not?

20          **MR. PAK:**  No, Your Honor.

21          **THE COURT:**  Great.

22      Next, Schonfeld testimony re supplemental reply report.

23  Is that still an issue, or have I already ruled on that?

24          **MR. PAK:**  I don't think it's an issue, Your Honor.  We

25  tried to meet and confer on that, but they didn't engage with

1    us.

2        What happened, Your Honor, was after Your Honor changed

3    your decision on the validity of the '966, they put in an

4    opposition report on the validity issues.  Then, as has been

5    the case throughout the course of this case, we served a reply

6    expert report from Dr. Schonfeld.  They've had plenty of time

7    to analyze it.  We're ready to go to trial on that.

8            **THE COURT:**  Are you still objecting to this report?

9            **MR. SMITH:**  Yes, we are, Your Honor.

10       So let me just walk you through kind of what happened

11   here, and I think it will shed a lot of light on the issue

12   here.

13       So if you recall, Docket Number 542 was when you granted

14   Google's motion for reconsideration on the issue of validity

15   for the '885 patent.  And in that, you gave Sonos 14 days to

16   file on that supplemental expert report regarding validity of

17   the '885 patent.  So Sonos submitted that on March 21st of this

18   year, 2023.

19       And then on April 13th, the Court found no summary

20   judgment of invalidity of the '885 and '966 patents.  That was

21   Docket Number 566.  The MIL deadline for this case was also on

22   April 13th, 2023.

23       And then on April 14th, 2023, 23 days after Sonos filed

24   its supplemental report, which we only had 14 days to file, so

25   now 23 days later, after the MIL deadline, after the summary

**PROCEEDINGS**

1  judgment order, Google decides now to serve a supplemental

2  reply report.

3       And in that supplemental report, Google provides -- excuse

4  me -- Dr. Schonfeld provides a number of new opinions, some of

5  which Sonos believes are trying to address some of the issues

6  that Your Honor raised in the summary judgment order.

7       So now they're trying to add new opinions into the case to

8  address some of the issues that you noticed with their

9  obviousness case.  And we just believe that those opinions are

10  new and they should have been stricken because Google should

11  have and could have raised those in its earlier reports.

12  They're not addressing what Dr. Almeroth raised in his

13  supplemental report.

14       **THE COURT:**  Is that true?  You have -- Schonfeld, in

15  his most recent report, raises issues that are not responsive

16  to Almeroth?

17       **MR. LORDGOOEI:**  This is Iman Lordgooei again.

18       Your Honor, no, that's not true at all.  We've been trying

19  to figure out what the complaint is from the other side.  We

20  asked to meet and confer, as Mr. Pak indicated.  They blew us

21  off.  They didn't respond.

22       They sent us an e-mail that vaguely identifies -- I don't

23  even know if they identified specific paragraph numbers of

24  Dr. Schonfeld's report that they say are new.  And they didn't.

25       So we asked them:  What's new?  Radio silence.  Didn't

1  hear from them.  We didn't get a motion from them.  There's

2  absolutely no basis that we're aware of to allege that anything

3  in Dr. Schonfeld's supplemental reply is not responsive to

4  Dr. Almeroth.

5      And if they bring us a motion or any kind of indication of

6  what that is, I'm sure we'll be prepared to respond.

7      And the other thing I would note, Your Honor, is that we

8  served Dr. Schonfeld's report on April 14th, but we told them

9  six days after they served Dr. Almeroth's supplemental report

10  that we intended to file a reply -- or serve a reply report.

11  We asked them:  Do you have any objections?

12      They indicated:  Well, we need to see what it is.

13      Once they saw what it was on April 14th, they sent us an

14  objection four days later.

15      We offered to meet and confer.  Didn't hear a word from

16  them.  Didn't get any identification of any specific issues.

17  We didn't get any indication of what the purported prejudice

18  from the report is.

19      The only thing they indicated was:  Well, you served after

20  the motion in limine deadline.  Maybe we would have brought

21  another MIL.

22      Didn't identify what that MIL would have been.  So we have

23  no idea what the prejudice is.  We have no idea what alleged

24  new opinions they're pointing to that are not allegedly

25  responsive to Dr. Almeroth.

PROCEEDINGS

1      **THE COURT:**  How long is the reply report?

2      **MR. SMITH:**  Let me grab a copy.

3      **MR. LORDGOOEI:**  Your Honor, so their reply report is

4   52 pages, and our -- Dr. Schonfeld's reply report is 35 pages.

5   And there are demonstratives that are attached to each as

6   exhibits.

7      **THE COURT:**  What would be useful to me is this.  I

8   would like for Sonos to take the full 35 pages and highlight

9   everything in there which you think is a new opinion that

10   should have been included in the original opinion and is not

11   responsive to true rebuttal to the Sonos -- to Almeroth.

12      Do you know what I'm getting at?

13      **MR. SMITH:**  Yes.  That makes --

14      **THE COURT:**  Because a reply report is supposed to be

15   responsive to the opposition report and not include new

16   material that should have been included in the original

17   opinion.

18      So I don't think you've done that yet.  So you could do

19   that and let me have that.  Schonfeld's not going to testify

20   for a while.  So you can give me that on Friday at noon.

21   Today's Wednesday.

22      **MR. LORDGOOEI:**  Your Honor, if I may, would Google be

23   permitted to provide a response to that?

24      **THE COURT:**  Saturday at noon.

25      **MR. LORDGOOEI:**  Thank you, Your Honor.

PROCEEDINGS

1          THE COURT:  Now I'll go to Kowalski.

2          MR. SMITH:  Your Honor, just one question,

3    clarification on that.  So is it just the highlighted report,

4    or do you want any attachment with that, explaining --

5          THE COURT:  You can give me an attachment that

6    explains it if it's three or four pages.  What I'd like to --

7    what I'm trying to do is isolate things that clearly should

8    have been in the original report and not -- without

9    sandbagging.

10          MR. SMITH:  Okay.

11          THE COURT:  Sandbagging is when you save something for

12   reply and didn't give the other chance a side to oppose it.  I

13   don't like sandbagging.  It's unfair.  It's a gimmick.  And we

14   will not tolerate sandbagging.

15       But don't go overboard and try to throw the baby out with

16   the bath water.  Then I'll deny your whole motion.

17          MR. SMITH:  Understood, Your Honor.

18          THE COURT:  So you'd better be very careful on that.

19       All right.  And to me, it doesn't matter that I brought it

20   up for the first time.  It still may be new material.

21       All right.  Why are you standing up here?

22          MR. RICHTER:  I'm here -- Cole Richter for Sonos -- to

23   address Mr. Kowalski, Your Honor.

24          THE COURT:  Great.  Okay.  Now, the way I understand

25   this is you yourself listed Kowalski.

1          **MR. RICHTER:**  We listed him on our initial

2     disclosures, way back when, as a person who might have

3     information relevant to Sonos' claims; but Google, however, did

4     not list him as a person who would have --

5          **THE COURT:**  I get that.  But how can you claim

6     prejudice if you yourself noticed him?

7          **MR. RICHTER:**  Well, there's -- if we combine Sonos'

8     26(a)(1) initial disclosures with Google's, there's over a

9     hundred individuals, Your Honor, and we can't possibly depose

10    all of those individuals.

11         And I think the witness list deadline that Your Honor

12    ordered in Docket 547 should govern.  He was not on that

13    witness list.  We did not get a chance to depose him.  They

14    added him as a supplement on April 17th, 15 days after the

15    deadline.  We asked for a deposition.  Radio silence.  I then

16    objected, and still radio silence.  They haven't offered him

17    for a deposition.

18         **THE COURT:**  All right.  Is all that true?  I mean,

19    it's true that just because he was on their original, why --

20    who is Kowalski any?  And what do you want him to say?

21         **MS. BAILY:**  Kowalski is a Google person who is

22    knowledgeable about a comparable license.  He's on our

23    "may call" list because we weren't sure what was going to

24    happen with the damages experts in this case.  He's still a

25    "may call"; he's not a "will call."

1    And there was no radio silence.  We said if we decided to

2    call him, we'd be willing to consider a short deposition.

3        But not only was he on Sonos' initial disclosures, he was

4    relied on multiple times by Bakewell, cited in Bakewell's

5    report.

6        **THE COURT:**  In who?

7        **MS. BAILY:**  By our damages expert who had

8    conversations with him and relied on him in his damages report.

9        And I did neglect to supplement our initial disclosures,

10   but he was in the record, Sonos' initial disclosures.

11   Mr. Bakewell cited to him.  He's only a "may call," and we

12   did --

13       **THE COURT:**  Well, but "may calls," if you do call him,

14   then it matters.

15       Is he still with Google?

16       **MS. BAILY:**  I believe so, yes.

17       **THE COURT:**  All right.  Here's the answer.  You get a

18   one-day deposition of Mr. Kowalski any time between now and

19   Tuesday at noon.  So if they don't produce him, he will be

20   excluded.  End of story.

21       **MS. BAILY:**  Thank you, Your Honor.

22       **THE COURT:**  All right.  Now, we have -- let's turn

23   to -- is there any chance that I could talk you into having

24   back-to-back experts on the damages?  I want you to think about

25   it.  Don't say "yes" or "no" now.  And I'm not going to twist

 1   any arms.  But it might be a way for the jury to understand the

 2   case better.  So think about it.

 3        With respect to the way we're going to pick the jury,

 4   tomorrow --

 5        What time will they come in, the jury?  9 o'clock?

 6             **THE CLERK:**  The jury will be in at 9:00 a.m.

 7             **THE COURT:**  All right.  So I want all of you here

 8   at 8 o'clock, and we'll start with whatever issues are still

 9   lingering.

10        And then with the jury, here's the way we'll do that.

11        We need a one-page statement of the case so I can read it

12   to the jury.

13        We will call forward 14.  I will go through hardship

14   issues, and I'll probably excuse a number for hardship issues.

15   And eventually, we will get 14 passed for cause, or your cause

16   challenge overruled.

17        And then each side will get three peremptories.  And the

18   way I like for you to do it is you stand and thank.  So you

19   say:  We stand and thank Number 14, Mrs. Smith.  And so she

20   gets up and walks out.  And then the other side stands up,

21   says:  Well, we thank and excuse Number 2, Mr. Jones.  And

22   Mr. Jones gets up and walks out.

23        So we go through that, and then the last eight still in

24   the box will be the jury.

25        Is there any member of the press here today?  If you are,

 1  just raise your hand.  I want to say a comment that might be

 2  useful to you.

 3      Are you a member of the press?

 4          **UNIDENTIFIED MALE:**  I'm not a member of the press, but

 5  I --

 6          **THE COURT:**  I can't hear you.

 7          **UNIDENTIFIED MALE:**  I'm not a member of the press, but

 8  I report to the institutional investors.

 9          **THE COURT:**  Okay.  Well, I don't know if that's the

10  same.

11      I've just noticed this.  For the edification of all you

12  excellent lawyers, I've noticed this in these high-tech cases.

13  And I can't say which side it is, but one side or the other in

14  this case, as in all cases, will get rid of the jurors that

15  they can who could actually understand the technology; and the

16  other side will try to save them.

17      I don't know who that's going to be.  I don't know which

18  side it is that's afraid, but that is what I have seen in every

19  single high-tech case, is that one side or the other does not

20  want someone who can actually understand the technology.

21      It's okay.  You can do that.  That's the American way.

22  But it's interesting to me, and I like to see who is it going

23  to be that is afraid the jury might actually understand it.

24      And so keep that -- I don't know.  Maybe that'll help you

25  in your reports.

**PROCEEDINGS**

1    But I mention this in these high-tech cases because

2   I think it is -- it is an interesting phenomenon of the way

3   these high-tech cases are tried.

4    Okay.  And, by the way, it's perfectly okay.  There's

5   nothing wrong with excusing people who have more knowledge

6   about the -- that's fine.  Go for it.  It's just something that

7   the press usually misses.

8    Okay.  I got the neutral statement of the case right here.

9   That's good.

10    When we -- I'm a little worried that we will run out of

11   jurors because there's so many people who want to be excused on

12   account of hardship, and so I've asked for ten additional.

13    Did we do that, Angie?

14        **THE CLERK:**  Yes, Your Honor.

15        **THE COURT:**  I'm hoping that the ten additional ones --

16   here comes another message from the rear.  Hang on.

17                    (Pause in proceedings.)

18        **THE COURT:**  What was I saying, Angie?

19        **THE CLERK:**  We have --

20        **THE COURT:**  Oh, an additional ten.

21        **THE CLERK:**  Yes.

22        **THE COURT:**  I'm hoping that with an additional ten,

23   about whom we know nothing, we have no information at all,

24   that -- I will do the voir dire, except I'll give you all

25   about -- I don't know -- anywhere from 20 minutes to maybe a

 1   little more to do cleanup voir dire of the things that I miss,

 2   of the people who are in the box.  And so you could try to

 3   develop a cause challenge, if you wish.

 4       And then -- I think lawyer voir dire is important, but

 5   please use it for a proper purpose.  Please use it for a proper

 6   purpose and not an improper purpose.

 7       An improper purpose is when you try to find out how

 8   somebody's going to rule.  You know, you lay your case out in a

 9   summary form, and then you say:  Well, would you be willing to

10   grant damages based on that?  Or would you not be willing to --

11   and -- no, you can't do that.  You can't see how they're

12   predisposed.

13       You can ask for prejudice, opinions, life experiences.

14   All of those are fair game.

15       Okay.  I think we're getting close.

16       Counsel, is there any -- I'm going to have you here at

17   8:00 o'clock in the morning.  Is there anything you want to

18   know about today prior to tomorrow's -- that can't wait till

19   tomorrow at 8 o'clock?

20           **MR. PAK:**  Not on our end from Google, Your Honor.

21       **MS. MOULTON:**  Yes, Your Honor.

22       **THE COURT:**  Go ahead.

23       **MS. MOULTON:**  Elizabeth Moulton.

24       We do have some disputes on the neutral statement of the

25   case.  Do you want to handle those now or tomorrow?

PROCEEDINGS

 1          THE COURT:  What's the dispute?

 2          MS. MOULTON:  So the dispute that is unique to the

 3   voir dire statement is whether on page 2 of Docket 641, what's

 4   lines 4 through 6, whether you will include that.  Google does

 5   not want to include it because they don't want to say that they

 6   make and sell smart speakers.

 7          THE COURT:  That they what?

 8          MS. MOULTON:  Make and sell smart speakers.

 9          THE COURT:  Sonos makes and sells smart speakers?

10   Well, don't you do that?  Doesn't Sonos do exactly that?

11          MS. MOULTON:  Yes.  Sonos wants to include lines 4

12   through 6, and Google does not.

13          THE COURT:  Okay.  What's wrong with 4 through 6?

14          MR. PAK:  We're fine with it, Your Honor.

15          THE COURT:  All right.  I'm going to give the -- not

16   the footnote, but I'm going to give the Sonos version.

17          MS. MOULTON:  Thank you.

18          THE COURT:  All right.  Anything else that you need a

19   ruling on today before we meet again tomorrow at 8 o'clock?

20          MR. SMITH:  Your Honor, Dan Smith again on behalf of

21   Sonos.

22          THE COURT:  You need to move the mic up.

23          MR. SMITH:  Sorry about that.  Can you hear me now?

24          THE COURT:  It'll bend up.  See how it bends?

25          MR. SMITH:  Oh, there we go.

**PROCEEDINGS**

1       So it doesn't need to be decided today, but we do -- we

2   would like to have you hear it before trial starts on Monday,

3   and that's the issue that you had asked for supplemental

4   briefing on with respect to whether the '885 and '966 claims

5   rise and fall together.

6           **THE COURT:**  Well, I -- okay.  I'm glad you brought

7   that up.

8       You did not agree.  You gave me two different responses,

9   and you're not in agreement.

10          **MR. SMITH:**  That's correct, for the most part,

11  Your Honor.  However, I will say, with respect to infringement

12  for the prior design, so for the prior design of the

13  '966 patent, it appears that Google is only challenging one

14  element of that claim, which is the storage element.  And so at

15  a minimum, we think that Google should -- to streamline the

16  case, that they should stipulate to all of the other elements,

17  and we can just focus on that one element for '966.  Again --

18          **THE COURT:**  Why isn't that right?  Why isn't that

19  right?

20          **MR. PAK:**  Your Honor, it's not right because we have

21  to try our prior art case.  We have the burden of proof to go

22  through all of those elements and show that, in fact, they're

23  met.  We also have the redesign issues.  We have the damages

24  issues.  I don't see any savings, Your Honor, in terms of time.

25  We're going to have to talk about the full set of elements.

PROCEEDINGS

1          **THE COURT:**  Yes, but when it comes to infringement,

2    isn't it true that the storage is the only difference?

3          **MR. PAK:**  I'll have to go back and look, Your Honor.

4    There's also limitations that are present in the '885.  We just

5    haven't done that analysis in full.

6          **THE COURT:**  Well, but I have to send out a request

7    that you do the analysis and see if you could find a way to

8    streamline the case.

9          **MR. PAK:**  I will --

10         **THE COURT:**  You're coming up with some lame excuses.

11   Those are lame excuses.  Just because you can't get what you

12   want on invalidity, maybe it helps the jury understand the case

13   to say it all comes down to --

14         **MR. PAK:**  The storage limitation.

15         **MR. SMITH:**  Your Honor, I will say, if you look at

16   Google's brief --

17         **THE COURT:**  But I'm not going to force them to do

18   that.  I can't force them to do that.  I think it's a good

19   idea, but -- so, all right.

20      Go ahead.  What's your point?

21         **MR. SMITH:**  Two more points on that.

22      So one is, in the brief, Google did say specifically the

23   storage was the issue that's in dispute there, and so that's

24   the first point.

25      But I think another point I'd like to make on this storage

PROCEEDINGS

1  element which I think is a problem here is that, Your Honor,

2  with respect to the '885 infringement that you already ruled

3  summary judgment, prior design, you already ruled that Google's

4  products that are prior products are capable of using presaved,

5  presaved zone scenes.

6      And Google actually proposed -- you know, their

7  construction, if you go back to the briefing, go back to your

8  order, it's Docket --

9      **THE COURT:**  Whatever I said in summary judgment,

10  forget it.  I'm not going to be stuck with what I said in a

11  prior summary judgment order.

12      **MR. SMITH:**  That's understood, Your Honor.

13      **THE COURT:**  I don't understand why you're -- no, no,

14  don't do that to me.  There's so many orders in this case.

15  It's like the scriptures.  You can find something that will

16  support anybody.  Don't do that to me.

17      **MR. SMITH:**  All I'm raising here, Your Honor, is that

18  Google did not raise this storage issue.  So even though the

19  definition or the construction of zone scene required it to be

20  presaved, Google did not raise the storage requirement, which

21  to me -- right? -- if it's presaved, it's got to be stored.

22      **THE COURT:**  It's your burden of proof.

23      **MR. SMITH:**  Google never made that argument.

24      **THE COURT:**  It's your burden of proof.  Sorry.

25      Okay.  I wish you all would come up with an agreement that

PROCEEDINGS

1  would help streamline this case for the jury.  I'm just

2  requesting that you do it, but I'm not going to order it.

3       We're going to wind up with eight jurors, but we'll only

4  put 14 in the box at any given time.  The others will sit in

5  the back of the courtroom.

6            **MR. PAK:**  So, Your Honor, just a clarification on

7  that.

8       So when we're doing the separate lawyer voir dire, are we

9  only asking the questions to the 14?

10           **THE COURT:**  Yes, you only get to inquire of the 14.

11 You can do it individually, or you can do it as a group and ask

12 them to raise their hands.  That's fine.

13      You can say:  How many of you have ever done a patent?

14      One person will raise their hand.

15      And then:  How many of you feel that the big company has

16 screwed over you?

17      And all of them will raise their hand.

18                        (Laughter.)

19           **THE COURT:**  So you can then --

20           **MR. PAK:**  Some questions better not be asked.

21      And would there be a random shuffle from the list that we

22 got?

23           **THE COURT:**  You don't get to know the order.  I get to

24 know the order, I think, but you don't get to know the order

25 because it leads to gamesmanship.

1      Now, while we're on the subject, please do not refer in

2  the presence of the jury to anything that the Court has ruled

3  in the past, unless you get my blessings, including your

4  experts.

5      So there are legitimate times when that works.  Like if I

6  did a claim construction, then that counts and they can -- but

7  sometimes it's highly prejudicial if you say the judge has

8  already ruled something.

9      I am going to say to the jury that I have already found

10  that Google is an infringer and that you infringed the '9 --

11  what is it?  The '966? -- unless you prove that it's invalid,

12  in which case you're not an infringer.  So I will tell them

13  that.

14      But before you make a reference to something that I've

15  done before the jury, you should clear it with me first.

16      **MR. PAK:**  Your Honor, do we do that through a sidebar

17  request?

18      **THE COURT:**  Yeah, or out of the presence of the jury

19  when they're out on a break.

20      Now, oh, here's another thing.  There was a request that

21  you put a big screen up over here.

22      **MR. PAK:**  Yes, Your Honor.

23      **THE COURT:**  Is that moot, or do you still want to do

24  that?

25      **MR. PAK:**  I just noticed today that with the graphics

**PROCEEDINGS**

1   in here, that some of the slides are difficult to see on the

2   small screens.  So I think both parties would prefer, at our

3   cost, to have a bigger, nicer resolution screen.

4           **THE COURT:**  Can you take it down each day?

5           **MR. PAK:**  Yes, we can, Your Honor.

6           **THE COURT:**  And where would the projector be?

7           **MR. PAK:**  I think it would just be wired.  So I don't

8   think there's a projector.

9           **THE COURT:**  So it'll be like a gigantic screen?  How

10  big will it be?

11          **MR. PAK:**  I think when I did that with Judge Chesney,

12  it was probably about 70 inches or so.  So it's something --

13          **THE COURT:**  I think it's okay with me.  Let's give it

14  a try.  But you've got to take it -- because I have criminal --

15  I have other calendars in the afternoon, and I don't want it to

16  be in the way of the Marshals when we have the in-custodies

17  here.

18          **MR. MOSS:**  And for clarification, we can use it as

19  well?

20                  (Official Reporter clarifies.)

21          **MR. MOSS:**  Geoff Moss on behalf of Sonos.

22      We can use it as well?

23          **MR. PAK:**  Absolutely.  We'll work it out.  We'll work

24  out the logistics.  It'll be mutually shared by the parties.

25          **MR. MOSS:**  That's fine.

PROCEEDINGS

1          **THE COURT:**  I order that you work with Angie so we

2    know the system and we all are on the same page and it goes

3    like click, click, click with the jury and there's nothing like

4    we had earlier today, the machine didn't work.

5          She told me, by the way, it was the defense, that you were

6    at fault.

7          **MR. PAK:**  I take full blame.

8          **THE COURT:**  I'm forgiving you, but in the future, the

9    jury will get irritated.

10          **MR. PAK:**  Yes.

11          **THE COURT:**  So please, click, click, click.  It's like

12    a stage performance, and the jury is our audience.

13          **MR. PAK:**  Thank you, Your Honor.

14          **MR. ROBERTS:**  Will there be time on Friday,

15    Your Honor, where the technical people --

16          **THE COURT:**  Correcto.  Correcto.  That's an excellent

17    question.  And Angie will work that out.

18          **MR. PAK:**  Thank you, Your Honor.

19          **MR. MOSS:**  One more nuts-and-bolts question,

20    Your Honor.

21          Depo designations.  Will the parties be able to play video

22    excerpts for their depo designations?

23          **THE COURT:**  Yes, but let me tell you how this works.

24    In my guidelines, I explain to you how the depo designations

25    work; and I try -- and I will take these home.  I review them.

1    I say -- usually, I use "in" or "out."  Life for me has become

2    very simple.  "In" or "out."  That means -- "out" means I've

3    sustained at least one objection.  "In" means it comes in.

4        Then you have to put it together in the form that you're

5    going to present it to the jury.

6        If you do it the old-fashioned way, which is you read it,

7    then the court reporter will take it down.  But -- this is

8    something a lot of lawyers don't know -- if you're going to

9    show it by video, the court reporter doesn't take anything

10   down.  The court reporter counts the dots on the ceiling until

11   the video is over.  So what is your record for the Court of

12   Appeals or for the jury if they want a readback?  Well, that's

13   a problem.

14       So what you have to do is give Angie a CD that says

15   "Excerpts of Joe Jones' deposition played for jury."  And both

16   sides have to tell me that they agree that was it.  Then it

17   becomes a clerk's exhibit.  But it won't go into the jury room

18   because then it becomes a clerk's exhibit for the Court of

19   Appeals.  But it only -- we would not play it back unless they

20   requested a readback.

21       So that's the way that part works.

22           **MR. PAK:**  Thank you, Your Honor.

23           **MR. ROBERTS:**  Brief question, Your Honor.

24       Would the Court Clerk or Your Honor also like us to submit

25   hard copies of the portion that was read, that was played so

1   that it's on paper?

2         **THE COURT:**  No, you don't have to do that.  I mean, I

3   know how hard you're going to be working.  That's just an extra

4   step that I don't need.  I can listen to it at the same time as

5   the testimony.

6       And sometimes the lawyers put underneath there scrolling

7   text.  Now, then that gives you -- if he does that, then you've

8   got to read it to make sure they got it right.  Maybe he

9   confused "would" with "could."  Common error.  So you have to

10  make sure that you both agree on it.

11        **MR. MOSS:**  One last nut and bolt, Your Honor.

12      Juror notebooks.  The parties had agreed to give the

13  jurors notebooks.  I wanted to get your approval.

14        **THE COURT:**  Well, I'm not sure.  Show me the notebook.

15        **MR. MOSS:**  We don't have -- Sonos will provide a copy.

16  We can bring one with us tomorrow.  But I think it's Jury

17  Instruction Number 7, it will have paper to take notes, a copy

18  of both patents, claims --

19        **THE COURT:**  We give them a notepad.

20        **THE CLERK:**  Yes, we do.

21        **THE COURT:**  And I'll also always allow the patents to

22  be used.  But what else do you want to give them?

23        **MR. MOSS:**  It would also include your claim

24  constructions, stipulated facts, and photographs of the live

25  witnesses.

1          THE COURT:  Stipulated facts.  Are you sure?  The

2     stipulated facts, I normally require you to read it to the

3     jury.  That's how it gets into evidence.  I want to stick with

4     that.  I don't want to give them stipulated, because then the

5     stipulated facts turn out to have more weight than they

6     deserve.  So stipulated facts, I would not put in there.

7          Photographs of the witnesses?

8          MR. MOSS:  Yes, Your Honor.

9          THE COURT:  That's okay.  But don't play games with

10    the photographs.

11         MR. MOSS:  All those --

12         THE COURT:  I had a case where this actually occurred,

13    where I think they used Photoshop to make this woman, who was

14    perfectly pleasant as an HR person -- it was an employment

15    case -- and then they cranked up the contrast.  She looked like

16    the Wicked Witch of the East in the photograph.

17         MR. MOSS:  We will use whatever photographs --

18         THE COURT:  No gimmicks.  You cannot use -- you have

19    to have a fair picture.

20         MR. MOSS:  We will use whichever photos Google

21    provides for its witnesses.  No retouching.

22         THE COURT:  Well, and yours should not be -- should

23    not have the --

24         MR. MOSS:  No beauty filters, Your Honor.

25         THE COURT:  -- enhancements of any type, like the best

**PROCEEDINGS**

 1    lighting, the best makeup artist.

 2        No, none of that.  It's got to be -- but otherwise, be

 3    fair on the photos.  That's okay.

 4            **MR. MOSS:**  All right.  Thank you, Your Honor.

 5            **THE CLERK:**  Your Honor?

 6            **THE COURT:**  What?

 7            **THE CLERK:**  Can we confirm time assessed for each

 8    side?

 9            **THE COURT:**  Well, it's 14 hours of evidence.

10        Your opening statements are probably going to be

11    35 minutes.  I'm not going to rule on what the closing

12    statements are yet because I need to hear the evidence first.

13    The 35 minutes does not counts against your 14 hours.

14        I usually do use the video from the -- and not count it

15    against your time, the video that explains what a patent is and

16    the PTO, but I haven't done it in a while.  Does anyone still

17    have a copy of that thing?

18            **MR. PAK:**  We do, Your Honor.

19            **THE COURT:**  Would you bring that and play that?  Be

20    prepared to play that on Day One.

21            **MR. PAK:**  Yes, Your Honor.

22            **THE COURT:**  It would be -- you two confer whether it

23    should be before or after your opening statements.

24        What else?  Who's going to be your corporate

25    representative on both sides?  You each get one.  And you can't

 1   swap them out.  It's got to be one person.

 2          **MR. RICHTER:**  This is Cole Richter for Sonos.

 3       Sonos' corporate representative will be Alaina Kwasizur.

 4   She's general counsel for Sonos.

 5          **THE COURT:**  Is she here now?

 6          **MR. RICHTER:**  No, Your Honor, she's not here now.

 7          **THE COURT:**  Well, then all the other witnesses have to

 8   be excluded, unless you two want to stipulate to allowing

 9   experts, but I don't --

10       Okay.  Who is yours?

11          **MR. PAK:**  Your Honor, I think it's going to be Mr. Ken

12   MacKay.

13          **THE COURT:**  Is he here now?

14          **MR. PAK:**  He's not here today.

15          **THE COURT:**  All right.  Okay.  So you each get one

16   representative.  And all the other witnesses have to be

17   excluded until they're discharged.  Then they can stay, if they

18   wish.

19          **MR. PAK:**  Thank you, Your Honor.

20          **MR. RICHTER:**  Understood, Your Honor.

21          **MR. PAK:**  Your Honor, I assume that the mask policy

22   will be in effect.

23          **THE COURT:**  Everyone's got to wear a mask, unless you

24   have a speaking role.  Then you can take them off.  And I'll

25   probably wear a mask once I get into the listening mode.

PROCEEDINGS

1          Witnesses do not wear a mask.  Witnesses, it's important

2     that the jury see their demeanor.  That's part of it.

3               **MR. PAK:**  Thank you.

4          **THE COURT:**  Okay.  I'm going to let you go now.  Good

5     luck to both sides.  I'll see you 8 o'clock tomorrow morning.

6               **THE CLERK:**  Court is adjourned.

7                    (Proceedings adjourned at 2:50 p.m.)

8                         ---o0o---

9

10                   <u>**CERTIFICATE OF REPORTER**</u>

11          I certify that the foregoing is a correct transcript

12     from the record of proceedings in the above-entitled matter.

13

14     DATE:  Wednesday, May 3, 2023

15

16

17                         *Ana Dub*

18     _____

19          Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
            CSR No. 7445, Official United States Reporter
20

21

22

23

24

25