Volume 1

Pages 1 - 168

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

SONOS, INC.,                        )
                                    )
          Plaintiff and             )
Counter-Defendant,                  )
                                    )
   VS.                              )   **NO. C 20-06754 WHA**
                                    ) **Related Case No. C 21-07559 WHA**
GOOGLE LLC,                         )
                                    )
          Defendant and             )
Counter-Claimant.                   )
_____     )

San Francisco, California
Thursday, May 4, 2023

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiff/Counter-Defendant:
                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    The Orrick Building
                    405 Howard Street
                    San Francisco, California  94105
              BY:   **CLEMENT S. ROBERTS, ATTORNEY AT LAW**


                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    777 South Figueroa Street, Suite 3200
                    Los Angeles, California 90017
              BY:   **ALYSSA M. CARIDIS, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official U.S. Reporter

```
1   APPEARANCES:   (CONTINUED)

2   For Plaintiff/Counter-Defendant:
                        LEE SULLIVAN SHEA & SMITH LLP
3                       656 West Randolph Street
                        Floor 5W
4                       Chicago, Illinois 60661
                BY:   GEORGE LEE, ATTORNEY AT LAW
5                     SEAN M. SULLIVAN, ATTORNEY AT LAW
                      COLE B. RICHTER, ATTORNEY AT LAW
6

7   For Defendant/Counter-Claimant:
                        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
8                       50 California Street, 22nd Floor
                        San Francisco, California 94111
9               BY:   SEAN PAK, ATTORNEY AT LAW
                      MELISSA J. BAILY, ATTORNEY AT LAW
10                    JAMES D. JUDAH, ATTORNEY AT LAW
                      JOCELYN MA, ATTORNEY AT LAW
11

12

13  Also Present:       Kevin MacKay, Google
                        Toni Blake, Jury Consultant
14                      Jo Hillard, Jury Consultant
                        Laurel Purewal, Jury Consultant
15

16

17

18

19

20

21

22

23

24

25
```

**I N D E X**

Thursday, May 4, 2023 - Volume 1

|                 | **PAGE** | **VOL.** |
| --------------- | -------- | -------- |
| Jury Voir Dire  | 14       | 1        |

1  **Thursday - May 4, 2023**                              **7:56 a.m.**

2                    P R O C E E D I N G S

3                         ---o0o---

4   (Proceedings were heard out of the presence of the venire.)

5         **THE COURT:**  We don't need to call the case just yet.

6   All the lawyers are here on both sides.  The jury is not

7   present yet.

8       I'm handing you what I'm going to file as the final

9   pretrial order, and I want to give you each about an hour to

10  look and see if you think there's some grievous error.  This is

11  not an opportunity to nitpick.  This is not an opportunity to

12  reargue.  But if you think I've made an honest mistake

13  somewhere in here, you can bring it to my attention and maybe

14  I'll fix it.  Otherwise, this is what's going to be filed in

15  about an hour.

16      Okay.  With respect to your jury notebook, the patents are

17  okay.  Claim construction is not okay.  We're not going to give

18  them that.  That will be part of the jury instructions.

19      And I'm not sure -- and I need to vet this.  Even if you

20  two stipulated to it, I wouldn't necessarily give it.  And why

21  is that?  Because what if the jury asks a question -- what if I

22  don't agree with your claim construction and the jury asks a

23  question?  Then I realize:  Heck, I don't even agree with what

24  you stipulated to.  So then I have to answer the jury based on

25  something that I didn't agree with in the first place.  So the

**PROCEEDINGS**

1  claim construction, I'll do at the end in the jury

2  instructions.

3      Now, it looks to me like each side has got about four

4  witnesses.  Is that all you're going to be presenting?

5      **MR. PAK:**  Your Honor, there are two more witnesses

6  from Google that will definitely be called live.  We're going

7  to be adding them.  We still need to find --

8      **THE COURT:**  So this is just sort of like a

9  placeholder?  You're going to lard this notebook full of more

10  pictures?

11      **MR. PAK:**  No, Your Honor.  We'll prepare, actually --

12  we just wanted to submit this to Your Honor today just for

13  approval; but we will have two more pictures of Google

14  witnesses to be added to it.

15      **THE COURT:**  Well, I'm okay with giving them pictures.

16  That's all right.

17      **MR. PAK:**  Thank you, Your Honor.

18      **THE COURT:**  But the claim construction part I would

19  not put in.

20      Now, here's something that's not in here that should be in

21  here and it's very useful in every case, although I wouldn't

22  put it in a notebook.  I would have a single sheet of paper

23  that has a timeline, and you have to agree on it, a timeline

24  that has about seven or eight major points, like "Notice letter

25  given here."  Of course, in this case, you didn't give a notice

1  letter for strategic reasons; but in a normal patent case, you

2  would say "Cease and desist letter given here."  Then "Lawsuit

3  filed."

4       Anyway, whatever -- maybe you could do it in three; but

5  it's very useful for the jury to be able to see the timeline of

6  events, and then to put it up over there as well so they can

7  glance -- so when a witness says something like, "Well, on

8  March 14th of 2019, I was sitting at the Starbucks and saw

9  something important about this case."  And they could look at

10 the timeline, the jury can, and see exactly where that fits.

11      So I ask you to please try to stipulate to a timeline,

12 non-argumentative, of course.  It can't say something like

13 "Fraud begins here."

14                     (Laughter.)

15      **THE COURT:**  No.  That won't work.

16      Okay.  So with those, I'm okay with your notebook.

17      Now, be aware that this means this is extra work for the

18 jury.  You lawyers never think about the jury.  This is extra

19 work.  They have to keep this in their lap.  Instead of the

20 little steno pad that's easy to carry, you lawyers want them to

21 carry a steno pad and this heavy notebook.  I think it's a

22 mistake; but if you both want it, I'm going to let you try the

23 case that way.  I may tell them they can leave the notebook in

24 the jury room if they wish to do that.

25      Okay.  I've got a new statement of the case.  Is this it

**PROCEEDINGS**

 1   right here, the new one you submitted?  Great.

 2          **MR. ROBERTS:**  Your Honor?

 3          **THE COURT:**  Yes.

 4          **MR. ROBERTS:**  Would it be helpful -- would it

 5   alleviate your concerns if we put some note-taking paper in the

 6   back of the notebook --

 7          **THE COURT:**  No.

 8          **MR. ROBERTS:**  -- so they could --

 9          **THE COURT:**  No, no, because that's too big.  The

10   notepads are great for taking notes, and a notepad -- extra

11   notes in the back.

12      Now, I might ask them if they would, but that doesn't

13   leave very much room.  They may fill up the entire notepad

14   with -- I'd say no.  I'd say no.  The steno pads work great.

15      Okay.  Any other issues about jury -- let's first go to

16   jury selection.  Any issues about jury selection you want to

17   bring up today?

18          **MR. PAK:**  No, Your Honor, for Google.

19          **THE COURT:**  All right.

20          **MS. CARIDIS:**  No, for Sonos.

21          **THE COURT:**  Now, I'm going to -- it occurred to me

22   that -- I don't mean to favor one side or the other; but when I

23   explain to the jury in a typical case, right off the bat I say,

24   "Now, you can't go Google the names of these lawyers or Google

25   the name of this case."

PROCEEDINGS

1                              (Laughter.)

2          **THE COURT:**  And then it occurred to me, well, that's

3     one of the parties in the case.  But it's become a verb, and I

4     know I won't be able to stop myself.  I'll try to avoid saying

5     it that way, but it's part of the lexicon now.

6          But I have to tell them not to go online and do searches

7     for anything about this case.  Otherwise, they will be doing

8     it.  They may have already done it.

9          All right.  I will say that.

10         And what did I do -- where are their questions?  Here we

11    go.

12         All right.  I've got it here.

13         Now, I'm not going to ask all of your questions.  There's

14    too many.  But I'll ask the ones that I think are important.

15         Okay.  Anything else you want to bring up this morning?

16         **MR. PAK:**  No, Your Honor, for Google.

17         **MS. CARIDIS:**  Your Honor, when we're doing our own

18    voir dire, do you want us to be at the lecturn or should we --

19    where would you like us?

20         **THE COURT:**  I would do it -- I urge you to do it at

21    the lecturn and not be seated.  Just formality of being in

22    federal court.  This is not state court.  State court, a lot of

23    things are done from the table.  But we're here in open court.

24    I would urge you to -- you can flip that around.  Or if you

25    want to move the lecturn over to your place on the table and

**PROCEEDINGS**

1  set up the microphone so that you can stand, that's okay too.

2  That's fine.

3      But typically, the lawyers will -- they'll do it either

4  way.  They can -- but I would urge you to stand, not sit.

5          **MS. CARIDIS:**  Thank you.

6          **THE COURT:**  You've got your corporate representatives

7  here?  Do you want to introduce them so I can know who they

8  are?

9          **MR. PAK:**  They're not here just yet, Your Honor, but

10  they'll be here soon.  So I will make the introductions when

11  they're here.

12          **THE COURT:**  Okay.  Now, water is okay.  Coffee is not

13  okay.  Why is that?  Because I have to -- every time you stain,

14  I pay, myself, for the fix, the GSA to get the stains out.  And

15  we will eventually tell all the jurors so that they know.  They

16  can have it back in the jury room, but not out here.

17      Same thing for you members of the public:  No coffee

18  because I have to pay to clean it up.  You can have it out in

19  the hallway.  That's okay.

20          **MR. PAK:**  Your Honor, for the opening statements on

21  Monday, where would you like the lawyers to present the

22  statements from?  Is this okay?

23          **THE COURT:**  The same thing.  You use the -- you can

24  both -- you know, those lecterns don't belong to anybody.

25          **MR. PAK:**  Okay.

 1          **THE COURT:**  You can stand as close as you wish to the

 2    jury using a lecturn.  That's okay.  And you can deviate

 3    from -- you can move away from the lecturn to point to some

 4    diagram.  That would be okay, as long as you keep your voice up

 5    so the court reporter will hear you.  Otherwise, the court

 6    reporter is going to interrupt you, and your brilliant point

 7    might be muted.

 8                          (Laughter.)

 9          **THE COURT:**  So, but you can walk around.  You can do

10    your advocacy.

11       But, yeah, from the lecturn is the best place --

12          **MR. PAK:**  Thank you.

13          **THE COURT:**  -- to do your opening, closings, and

14    your -- now, and, again, I want to emphasize, just because the

15    plaintiffs are over here, doesn't mean you can't use it.  When

16    you're examining a witness, I recommend you stand here --

17          **MR. PAK:**  Yes.

18          **THE COURT:**  -- because it's closer to the witness.

19       And you don't have to use this.  In fact, I don't know why

20    they put two in here.  But it works good for law and motion,

21    but for trials, one lecturn, the one closest to the jury, is

22    the one both sides should use.

23          **MR. PAK:**  Thank you, Your Honor.

24          **THE COURT:**  Anything else?

25       We have the world's greatest court reporter, world's

1  greatest courtroom deputy.

2      Okay.  Tell us how we're doing on our -- we don't have --

3  oh, did I ask you about the video?  Didn't you say you had the

4  video from the FJC on the --

5          **MR. PAK:**  Yes, sir.

6          **THE COURT:**  All right.  We don't need it today, but we

7  will need it Monday first thing.

8          **MR. PAK:**  Yes, Your Honor.  We'll have it ready.

9          **THE COURT:**  And I'll play that before you do your

10  openings.

11          **MR. PAK:**  Thank you.  We'll have everything set up.

12          **THE COURT:**  I do say -- I want you to know that I say

13  this in every trial as part of the preliminary instructions.  I

14  say that what the lawyers say in court is never evidence unless

15  it's a stipulation.  I repeat that so many times because that's

16  the easiest way for the --

17      The other thing in that connection, you should never make

18  preliminary comments.  Here's a good example.  You're asking a

19  witness a question and you say something like, "Well, in this

20  case, I've looked at all the documents, and Google never

21  presented a single document in discovery."  That's totally

22  improper.  You cannot testify before the jury.  If you want to

23  make that point, call a legal assistant to the stand to

24  testify, but you cannot make speeches like that.

25      Same thing.  You can't say, "Sonos didn't do it."  You

1    must ask questions.

2              **MR. PAK:**  Understood.

3              **THE COURT:**  You cannot make speeches.

4       So I make it very clear that nothing you ever say is

5    evidence unless it's -- and I tell them when it is evidence; or

6    if you're reading in a deposition, I say, "Yes, even though

7    Mr. Pak is a lawyer and nothing he says is evidence, when he's

8    actually just reading the words, that is evidence."

9              Remember, you've got to read your stipulations to the jury

10   to put it into evidence.

11             So be careful.  One of my pet peeves is lawyers trying to

12   insinuate information into the jury room through comments.  So

13   you have to be very careful that you -- if you're going to even

14   try that, make sure you're on solid ground.

15        Okay.  If there's nothing more, I'll step off the bench

16   and work on something else and let you read the final pretrial

17   order that I have drafted.  And you can comment on it later on.

18   Okay?

19             Thank you.

20             **MR. PAK:**  Thank you, Your Honor.

21             **THE CLERK:**  Court is in recess.

22                       (Recess taken at 8:09 a.m.)

23                       (Proceedings resumed at 9:02 a.m.)

24        (Proceedings were heard out of the presence of the venire.)

25             **THE CLERK:**  Please remain seated.  Please come to

PROCEEDINGS

 1   order.

 2          THE COURT:  All right.  Be seated.

 3      We're about to bring the panel in.

 4      Yes?

 5          MR. PAK:  Everything was great on the pretrial order

 6   from our perspective.

 7          THE COURT:  What?

 8          MR. PAK:  Everything looks fine on the pretrial order.

 9          THE COURT:  Your side, the same?

10          MR. RICHTER:  Yes, Your Honor.

11          THE COURT:  Okay.  I'll sign it and get it out.

12      Do you have your witness list ready?  I'm going to have

13   each of you read to the jury who you're going to bring in as

14   witnesses because we need to know if they know any of them.  So

15   even if they're a maybe, "may call," you need to read them out

16   loud.

17      All right.  Are we all set and ready to bring in the jury?

18          THE CLERK:  I'm going to get them.

19          THE COURT:  I'm going to have you introduce everyone,

20   and we'll call the case officially once the jury gets into the

21   back of the courtroom.

22      All of you people who are in the back now, visitors,

23   you're most welcome, but please, no fraternization of any sort

24   with the jury.  Okay?

25          All right.

```
 1              (The jury venire enters the courtroom.)

 2          (Proceedings heard in the presence of the venire.)

 3                        JURY VOIR DIRE

 4         THE COURT:  Okay.  Be seated everyone.

 5         THE CLERK:  Your Honor, shall I swear them in?

 6         THE COURT:  Have you taken the roll?  Do you need to

 7   take the roll?  You can swear them in and take the roll,

 8   please.

 9         THE CLERK:  Will the prospective jurors please rise

10   and raise your right hand?

11       (The venire was duly sworn for voir dire examination.)

12         THE CLERK:  Thank you.  Please be seated.

13   The jury administrator has taken the roll.

14         THE COURT:  All right.  So we have the exact?

15         THE CLERK:  We do.

16         THE COURT:  Okay.  All right.  Then we don't need to

17   do that.

18       Welcome to the U.S. District Court, ladies and gentlemen.

19   I'm the judge in this case, and I am very pleased to see you

20   all here.  And we are here today to pick a jury of eight people

21   to decide this case.

22       So to make it official, I'm going to ask the clerk to call

23   the case and have the lawyers please make their appearances.

24         THE CLERK:  Court is now in session.  The Honorable

25   William Alsup is presiding.
```

1        Calling Civil Action 20-6754, Sonos, Inc. vs. Google LLC

2    and related cases.

3        Counsel, please approach the podium and state your

4    appearances for the record, beginning with counsel for

5    plaintiff.

6        **MS. CARIDIS:**  Good morning.  Alyssa Caridis on behalf

7    of Sonos.  With me I have Cole Richter, George Lee, Sean

8    Sullivan, Clem Roberts, and Toni Blake.

9        **THE COURT:**  Welcome to all of you.

10       **MR. PAK:**  Good morning, Your Honor.  Sean Pak of Quinn

11   Emanuel representing Google, and with me is Melissa Baily,

12   James Judah, Jocelyn Ma.

13       Thank you, Your Honor.  And we have our corporate

14   representative Ken MacKay.

15       **THE COURT:**  Okay.  Welcome to all of you.

16       I need to give you -- I hate to even give a jury direct

17   orders, but this is very important.  And I have to order you,

18   and I do order you, not to go onto the Internet and look up

19   anything having to do with this case or with any of the lawyers

20   in the case and/or any of the witnesses in the case.

21       And as the case proceeds, if you're on the jury, you

22   should not look up some term that may be having to do with the

23   law or look up something that you want to get information about

24   because it pertains to the case.  No, you cannot do that.

25       Now, why is it that you can't do that?  Every case in our

1   U.S. District Court, in fact in state court too, is supposed to

2   be decided on the evidence here at trial and on the

3   instructions of law that I give you, and it would be totally

4   wrong for somehow something you learned on the Internet to be a

5   factor.

6       It's like a laboratory experiment.  You do the experiment,

7   you take notes, it's all controlled, and then you -- either the

8   experiment turns the litmus paper red or turns it -- what's the

9   other color? -- blue.  It doesn't -- or pink or blue.  You

10  don't get to -- you don't get to get additional information.

11      So you must not do that.  You must not try to check the

12  Internet for information about anything having to do with this

13  case or any of the lawyers, or whatever, or any of the terms.

14  Please, help me out on that.

15      The burden is on these lawyers to do that, to educate you

16  about the case; and if you don't understand the case well

17  enough at the end and you're on the jury, the party with the

18  burden of proof loses.  It's that simple.  You've got to be

19  persuaded.  If you can't understand it and you're not

20  persuaded, the party with the burden of proof loses.  So make

21  these lawyers do their job.  You don't go get to supplement it

22  with stuff on the Internet.

23      So to return to my main point, we're going to pick a jury

24  today.  We'll be here most of the day.  Sometimes we're done by

25  about 2 o'clock, but it could be as late as 4:00.  And I'll

1  move it along, but we want to pick a jury that will be fair to

2  both sides and has -- all right.

3       Let me tell you what the case is about.  I know you're

4  dying to know.

5       By the way, we have excellent lawyers in this case.  If

6  you're selected, you will get to see these excellent lawyers

7  perform in the courtroom.  That's a bonus.  Sometimes you don't

8  get excellent lawyers like this in the case.  We have excellent

9  lawyers.  Sometimes I may disagree with them.  That's okay.

10 That's their job.  But you will have the benefit of really the

11 top tier of lawyers in America will be in this case.

12      All right.  I'm going to read to you a statement that they

13 have given me.  I've read it before.  It tells you what the

14 case is about.

15      Now, why am I doing this?  Well, it could be that you have

16 some personal background in exactly this kind of scenario, and

17 we would want to know that before selecting you for the jury so

18 we could inquire of you whether it would be a point of

19 prejudice to you.

20      This is a patent infringement case.  Let me repeat that

21 one because you may not have heard it.  This is a patent

22 infringement case.  Now, some of you may not know what a patent

23 is.  I'll stop for a second.

24      Patents are issued by the federal government through the

25 Patent and Trademark Office near Washington, D.C., and they --

1  the Patent Office studies an application and then either grants

2  it or denies it.

3      And there are two patents involved in this case that were

4  issued by the Patent and Trademark Office to Sonos, who is

5  the -- S-o-n-o-s.

6      This is a patent infringement case.  The plaintiff, the

7  entity that has brought this case, is Sonos, Inc., S-o-n-o-s.

8  The defendant is Google LLC.  So we have two big companies

9  here.  We've got Sonos that makes speakers, and we've got

10  Google that also makes speakers but does a lot of other things

11  too.  Sonos makes and sells smart speakers.

12      Now, I've learned a few things in this case.  I come from

13  the generation where my speakers are not smart.  They -- I

14  wouldn't -- I didn't even know what a smart speaker was till

15  this case, but you probably are way ahead of me and understand

16  what a smart speaker is.

17      So Sonos makes and sells smart speakers.  That's Sonos on

18  this side of the room.

19      Smart speakers are speakers that can be wirelessly

20  networked together.  I'll restate that.  Wirelessly networked

21  together.

22      Google makes and sells smart speakers and other devices

23  that can play and control music or video and be wirelessly

24  networked together.  It kind of sounds the same, doesn't it?

25      Sonos asserts two patents in this case.  I'm just going to

1  say '885.  It's 10,848,885 and 10,469,996.  So you can see the

2  Patent Office has been busy with tens of millions of patents.

3      We refer to the patents by their last three digits of the

4  patent number.  So we will call these '885 and '966.  You don't

5  have to remember that right now.  This will -- we will hear

6  these a lot of times, and you will get to understand what these

7  patents refer to.

8      The '885 and the '966 relate to how a user can create a

9  group of speakers and play back music on one of those groups.

10 Okay.  That's what it relates to.  But as you will find out,

11 there are very specific features that have to be in it that

12 cover the patent.  It's not just grouping any speakers together

13 that is covered by the patent.  It's more specific than that.

14     I have already determined that prior versions of Google's

15 products infringe the '885 patent, and Sonos is now seeking

16 damages for that infringement.

17     So me, the judge, in prior proceedings before today, have

18 already determined that prior versions of Google's products

19 infringed the '885 patent, and Sonos is now seeking damages for

20 that infringement.  That's where the jury comes in, to figure

21 out the damages if the patents are valid.

22     Sonos is also seeking a finding that the newer versions of

23 Google's products still infringe the '885 patent and damages

24 for -- and seeks damages for that infringement.

25     Sonos also alleges that Google infringes the '966 patent.

1    Now, I have not made any determination on the '966.  Sonos

2    is -- so the jury will have to decide that one.

3        Sonos is seeking damages for that alleged infringement and

4    a finding that Google's infringement on the '966 patent was

5    willful.  Willful.  Now, that's a -- you'll hear all about

6    that, but that's a -- you can understand willful, meaning

7    deliberate, et cetera.  There's more to it than just

8    deliberate, but it -- willful.

9        Now, on the Google side -- this is what Sonos is arguing.

10       On the Google side, Google denies that it infringed the

11   '966 and denies that the alleged infringement was or is

12   willful.  Google also denies that the newer versions of its

13   products still infringe the '885 patent.  Google also contends

14   that both the '885 and the '966 patents are invalid.

15       Now, let me -- just because the PTO, the Patent and

16   Trademark Office, has issued these patents does not mean that

17   they're valid.  They are presumed to be valid, but in our

18   system, it's up to the jury to decide if they are valid because

19   sometimes the PTO issues a patent that turns out to be invalid

20   for various reasons that we'll get into.  On the other hand,

21   sometimes a jury decides that they are valid.  But they are

22   presumed valid until the burden of proof is carried, and the

23   burden of proof would be on Google to show that they were

24   invalid.

25       So Google denies that Sonos is entitled to any damages.

1       To be clear, the claims and defenses just described merely

2   summarize the parties' arguments.  The parties themselves will

3   explain their positions at trial, and the evidence presented

4   will provide the facts.

5       So that's what the case is going to be about.  And so the

6   jury is going to learn a lot about speakers, about how to group

7   these speakers together and some of the business of both

8   companies in this new economy that we have.  So it'll be an

9   interesting case, and you will have very excellent lawyers

10  performing, and so you, in a sense, are very lucky.

11      On the other hand, this is going to take -- let me tell

12  you how much time it's going to take.  It's going to -- both

13  sides have got time limits that I have already told them what

14  they are; and assuming they use up all of their time, the case

15  could be over -- well, let me just say, we will pick the jury

16  today and start on Monday with the opening statements and the

17  evidence.

18      And then we will go through -- each day the jury has to be

19  here at 7:45 in the morning.  We will start with the evidence

20  no later than 8:00 a.m., and we will adjourn -- the jury will

21  adjourn at 1:00 p.m.  No lunch break, but we'll have

22  convenience breaks during the day, but no lunch break, and then

23  at 1 o'clock you can go home and beat the traffic problems.

24  The juries like this system.  It does mean you've got to get up

25  early, but it also means you get to leave early.

 1          You have to be here the entire time.  You can't look at

 2   somebody else's notes if you're late.  Everybody has to hear

 3   the same evidence.

 4          So Monday, Tuesday, Wednesday, Thursday, Friday of next

 5   week.  So we'll have five days there.  And then we're -- and

 6   then we go -- we're going to skip Monday.  Why?  Because of

 7   Mother's Day.  Mother's Day.  We want you to be able to

 8   celebrate Mother's Day, and so we're going to take that Monday

 9   off.  So you'd have a Saturday, Sunday, and Monday off and then

10   return on that Tuesday the following week, and then go Tuesday,

11   Wednesday, Thursday, Friday.

12          Now, there's a chance, in my judgment, the case will be

13   over by then, that you would have reached a verdict, but it's

14   hard to know.  Maybe not.  So I would say we need to make sure

15   you're available for the following Monday, Tuesday, Wednesday,

16   but it won't go past Wednesday.  I can't say never, but I'm

17   almost certain it will not go past that Wednesday.

18          So that's how many days you would need to be here to

19   decide this case.  So it could be over that second Friday, but

20   it might go through the following Wednesday.  Okay?

21          Now, today what we will do is to get started.  I'm going

22   to get -- fill in -- call forward 14 of you here.  And it's

23   best for you just to see how it unfolds rather than me try to

24   explain it in detail.

25          But in a short sentence, we will call a lot of you

1  forward, 14 of you, and ask you some questions.  And what we're

2  trying to get at is basically whether or not you would be fair

3  and impartial to both sides and pay attention and decide the

4  case according to the law as I give it to you.

5      And then some of you I'll have to excuse, and then others

6  of you will be called forward.  I think we have enough here to

7  finish it out today.  So some of you I will excuse; some of you

8  I will not.  I have to go by the rules.

9      And when we wind up -- we will wind up with a procedure

10  that goes from 14 down to 8.  And then we have a jury, and the

11  rest of you get to go home.  Okay?

12      Good.  Now, are you ready to begin?

13      I'm going to ask the clerk to call forward the 14 of you.

14  This is a random selection.

15      Please go ahead, Angie.

16      **THE CLERK:**  The first one to come forward, Frances

17  Lynn Kwong.  Please sit in Seat Number 1.

18      **THE COURT:**  How do you spell that?

19      **THE CLERK:**  K-w-o-n-g.

20      **THE COURT:**  Okay.

21  Good morning.  Please take Seat Number 1.

22      **THE CLERK:**  Next is Andrea Louise Bosworth.

23      **THE COURT:**  Bosworth.

24      **THE CLERK:**  Please sit in Seat Number 2.

25  Next, Emma Carin Samelson-Jones, Seat Number 3.

 1          Next, Edward Hayes, Seat 4.

 2          Next, Timothy Michael Simonson, Seat 5.

 3          Next is Reid Knabe, K-n-a-b-e.

 4              THE COURT:  How do you say your name?

 5              PROSPECTIVE JUROR KNABE:  Knabe.

 6              THE COURT:  Knabe?

 7              PROSPECTIVE JUROR KNABE:  Yeah.

 8              THE COURT:  All right.  Thank you.

 9              THE CLERK:  Next, Paul Brian Westberg.  Please sit in

10   Seat Number 7.

11          Next, Carolyn Cameron.  Please sit in Seat Number 8.

12          Next, Meenakshi Vellayapan.  Please sit in Seat Number 9.

13          Next, Jennifer Friedland.  Please sit in Seat Number 10.

14          Next, Kristen Marie Austin, Seat 11.

15          Next, Eric Ivory-Chambers, Seat 12.

16          Next, Tilde Ann Thurium, Seat 13.

17              THE COURT:  Sorry.  Who is in 12?

18              THE CLERK:  Eric --

19              THE COURT:  What's your name?

20              PROSPECTIVE JUROR IVORY-CHAMBERS:  Eric

21   Ivory-Chambers.

22              THE COURT:  I didn't hear him.

23              THE CLERK:  Ivory-Chambers.

24              THE COURT:  Chambers.  Okay.

25              THE CLERK:  I-v-o-r-y, dash, Chambers.

1          **THE COURT:**  Ivory-Chambers.  All right.  I see it.

2     Okay.  And Number 13 is who?

3          **THE CLERK:**  Is Tilde Ann Thurium.  That's

4     T-h-u-r-i-u-m.

5          **THE COURT:**  Okay.

6          **THE CLERK:**  And finally, Number 14 is Jonathan Elliot

7     Christopher.

8          **THE COURT:**  All right.  Welcome to the jury box.

9     Now, I want all the rest of you out there in the gallery

10    to please pay attention to the questions that get asked because

11    when your turn comes, I may just ask you "Did you hear all the

12    questions and would you have raised your hand to anything?"

13    It'll go faster then; so please pay attention.

14    And, again, let me say that all of you are wearing masks

15    and that's good.  If you have a speaking role -- and the

16    lawyers will have a speaking role, the witnesses will have a

17    speaking role, and right now I have a speaking role -- then you

18    don't have to wear a mask so we can hear you better; but -- and

19    eventually, when I am just listening, I will wear a mask;

20    and -- but right now, I'm in a speaking mode so I have taken it

21    off so the court reporter and all of you can hear me better.

22    We're still being slightly cautious on account of the

23    recent pandemic, even though the emergency is over.

24    Okay.  Let's see.  What is the best way to be most

25    efficient?

```
 1          I think it's going to be that we can -- Ms. Kwong, can you
 2     see that chart?
 3          PROSPECTIVE JUROR KWONG:  Yes.
 4          THE COURT:  Can you take the microphone and give us
 5     the biographical information there?  And then I'll have some
 6     follow-up questions maybe.
 7          Go ahead, please.
 8          PROSPECTIVE JUROR KWONG:  Okay.  My name is Frances
 9     Kwong.  I live in San Francisco.
10          Education, I went to UC Berkeley.  I have a B.A. in
11     architecture.
12          I'm an architect, and my employer is Leddy Maytum Stacy
13     Architects.  We work in San Francisco.
14          THE COURT:  Repeat the name of the employer.
15          PROSPECTIVE JUROR KWONG:  Leddy Maytum Stacy
16     Architects.
17          THE COURT:  Thank you.
18          PROSPECTIVE JUROR KWONG:  Organizations, just like
19     memberships or --
20          THE COURT:  Well, you know, like if you're a member of
21     the union or the Joggers Association of East Bay.  I don't
22     know.
23                         (Laughter.)
24          THE COURT:  Tell us what you -- anything like that.
25          PROSPECTIVE JUROR KWONG:  Yeah.  I serve on the board
```

```
 1   of a non-profit.  I'm the treasurer.  The non-profit's Friends

 2   of Roots.

 3              THE COURT:  Say it again.  What's the name of it?

 4              PROSPECTIVE JUROR KWONG:  Friends of Roots.  It's like

 5   Friends of the Public Library except it's Friends of Roots,

 6   which is a program that we do with Journey of America.

 7              THE COURT:  Roots, like r-o-o-t-s?

 8              PROSPECTIVE JUROR KWONG:  Yeah.  Uh-huh, like family

 9   history, genealogy.

10              THE COURT:  Oh, I see.  Okay.

11              PROSPECTIVE JUROR KWONG:  Yeah.

12              THE COURT:  All right.

13              PROSPECTIVE JUROR KWONG:  With hobbies, I do ceramics.

14   I have a community garden.  I do bike rides around the City.

15       Marital status, I'm not married.  So I don't have a spouse

16   or partner.

17       Occupation I shared.

18       I don't have children.

19       And I have not served on a jury before, and I've never

20   been in the military or law enforcement or a party or witness

21   in the court.

22              THE COURT:  Okay.  You said it, but I missed it.  What

23   city do you live in?

24              PROSPECTIVE JUROR KWONG:  San Francisco.  Like, two

25   blocks that way (indicating).
```

1      **THE COURT:**  Two blocks away?  That's great.

2          Now, if selected, would you be a fair and impartial juror?

3      **PROSPECTIVE JUROR KWONG:**  I think so.

4      **THE COURT:**  Okay.  Do you have any hardship issue you

5  wish to raise?

6      **PROSPECTIVE JUROR KWONG:**  No.

7      **THE COURT:**  Okay.  Now, what I'm going to -- I'm going

8  to use you as a point of asking a different question.

9          We need to know if any of you 14 know any of the potential

10 witnesses in the case.  So I'm going to get the lawyers to read

11 off who they will be, the witnesses.

12         And why am I doing that?  It's so -- what if it was your

13 next-door neighbor and you hated them, or you loved them,

14 either way?  It would be possibly a point of bias.  It happens.

15 Every now and then, it happens.  So we need to be careful.

16         On the plaintiff side, Sonos side, please read off the

17 witnesses.

18     **MS. CARIDIS:**  Kevin Almeroth.

19     **THE COURT:**  You can take your mask off since you're

20 speaking.

21     **MS. CARIDIS:**  Thank you.

22     **THE COURT:**  All right.

23     **MS. CARIDIS:**  Kevin Almeroth, Robert Lambourne, Nick

24 Millington, James Malackowski, Alaina Kwasizur, Christopher

25 Butts, and Tomer Shekel.

```
 1            THE COURT:  Okay.  Now, remind the jury your name.

 2            MS. CARIDIS:  Sorry.  My name is Alyssa Caridis.

 3            THE COURT:  All right.  Thank you.

 4       Mr. Pak.

 5            MR. PAK:  Yes, Your Honor.

 6       My name is Sean Pak, and I represent Google.  And on our

 7   side, we will have Mr. Ken MacKay, Justin Pedro, Tavis

 8   MacLellan, Chris Chan, Tim Kowalski, Michael Maigret,

 9   Debajit Ghosh, Umesh Patil, Vincent Mo, Christopher Bakewell,

10   and Dan Schonfeld.

11            THE COURT:  All right.  Raise your hand if you know

12   any of those people.

13                        (No response.)

14            THE COURT:  Great.

15       Raise your hand if you know any of these lawyers or

16   assistants or people at the counsel -- in the counsel -- in the

17   well of the courtroom.

18                      (A hand is raised.)

19            THE COURT:  Okay.  You do know somebody.  Let's get

20   the microphone down to the end there.

21            PROSPECTIVE JUROR WESTBERG:  Could I please have the

22   Google attorneys' names reread?

23            THE COURT:  Yes.  In fact, we'll start with the Google

24   side, since that's what you asked, and then we'll go back to

25   the plaintiff side as well.
```

1    **PROSPECTIVE JUROR WESTBERG:**  Thank you, Your Honor.

2    **THE COURT:**  Google, please identify all -- and anyone

3    who's not here today who might be here later.

4    **MR. PAK:**  Yes, Your Honor.

5    So my name is Sean Pak, Melissa Baily, James Judah,

6    Jocelyn Ma.  We may also have Iman Lordgooei as well as Lindsay

7    Cooper.

8    **THE COURT:**  And who are the other three at counsel

9    table?

10    **MR. PAK:**  We have other folks that are assisting us

11    today.  They're not lawyers, Your Honor.

12    **THE COURT:**  All right.  And how about your corporate

13    representative?

14    **MR. PAK:**  Yes.  Our corporate representative is

15    Mr. Ken MacKay from Google.

16    **THE COURT:**  All right.  Do you know any of those

17    people?

18    **PROSPECTIVE JUROR WESTBERG:**  (Shakes head.)

19    **THE COURT:**  No?

20    Okay.  Let's do the same thing on the plaintiff side.

21    **MS. CARIDIS:**  Good morning.  So, again, my name is

22    Alyssa Caridis.  This is Cole Richter, George Lee, Sean

23    Sullivan, Clem Roberts; and not with us today but is also --

24    but are also representing Sonos include Libby Moulton, Geoff

25    Moss, Joey Kolker, Dan Smith, Rory Shea, and David Grosby.

 1          **THE COURT:**  Okay.  Raise your hand if you know any of

 2   those people.

 3                      (No response.)

 4          **THE COURT:**  Raise your hand if you know me or any of

 5   my court staff here.

 6                      (No response.)

 7          **THE COURT:**  Raise your hand if you know anyone else

 8   that's in the potential jury pool.  That happens too, believe

 9   it or not.  Maybe two or three times a year it happens.

10                      (No response.)

11          **THE COURT:**  Okay.  Great.  No one raised.

12      Now, those in the back of the room, you don't have to

13   raise your hand yet, but remember those questions, please.

14      All right.  So, Ms. Kwong, thank you for letting me use

15   you as the occasion to ask that question.

16      We'll go now to Ms. Bosworth.  Your turn.

17          **PROSPECTIVE JUROR BOSWORTH:**  My name's Andrea

18   Bosworth.  I live in Santa Rosa.

19      Some college.

20      Job, so I'm an IHSS worker, I am a self-employed

21   bookkeeper, and I am a tax preparer.  Landmark Worldwide.

22      Shooting pool, playing Ping-Pong, basic sports.

23      Divorced.  No spouse or partner.  A son, 32.  He's a

24   painter.

25      I have served on a jury, and we did reach a verdict.

 1          No military or law enforcement, and not a party or witness

 2     in court.

 3               THE COURT:  Okay.  Any hardship issue?

 4               PROSPECTIVE JUROR BOSWORTH:  Yep.

 5               THE COURT:  What would that be?

 6               PROSPECTIVE JUROR BOSWORTH:  I'm not making money

 7     right now; and my self-employment, the IHSS, being an in-home

 8     support service for my brother, that's two and a half weeks

 9     possibly that I'm not taking care of him.

10               THE COURT:  Those are two different things.  First

11     let's start with your brother.  Give us that -- I just don't

12     understand it yet.  What is the hardship with your brother?

13               PROSPECTIVE JUROR BOSWORTH:  Well, I go.  I take care

14     of him.  I clean his house.  I prepare his meals.  And there's

15     nobody else to take care of him while I'd be serving on a jury.

16               THE COURT:  I see.  Where does he live?

17               PROSPECTIVE JUROR BOSWORTH:  Sonoma.  City of Sonoma.

18               THE COURT:  And you live in Santa Rosa?

19               PROSPECTIVE JUROR BOSWORTH:  (Nods head.)

20               THE COURT:  So you go over there every day and do

21     this?

22               PROSPECTIVE JUROR BOSWORTH:  I do 6 -- I do 12 hours a

23     week.  So 6 hours on one day and 6 hours on the weekend.

24               THE COURT:  Who does it in between?

25               PROSPECTIVE JUROR BOSWORTH:  Nobody.  I set him all up

 1  for the week or for those in-between days that I'm not there.

 2      THE COURT:  Well, you know, we would be in session

 3  till 1 o'clock.  Would you be able to do that after court?

 4      PROSPECTIVE JUROR BOSWORTH:  Let's see.  Leave

 5  at 1 o'clock.  I'd get home probably by 2:00, 2:30, and I'd be

 6  working there until 9 o'clock at night if I did that.

 7      THE COURT:  Let's consider the -- now, go to the other

 8  issue you raised about work.  Explain that to me.

 9      PROSPECTIVE JUROR BOSWORTH:  So I'm self-employed.

10  That wouldn't be an issue getting off at 1 o'clock.  I could do

11  that.

12      But I also am a tax preparer.  I assist setting -- doing

13  taxes.  And since we're on an extension till October, we have a

14  lot of files that we still have to prepare.  But that wouldn't

15  be that big of an issue.  It's not taking care of my brother,

16  that's the biggest issue.

17      THE COURT:  When you served on a jury in the past, was

18  your brother an issue then?

19      PROSPECTIVE JUROR BOSWORTH:  No.  I was -- I worked at

20  Kaiser, so it wasn't an issue.  I'm taking care of my brother

21  since 2018.

22      THE COURT:  Well, let me think about that.

23      If you were selected, would you be fair and impartial to

24  both sides?

25      PROSPECTIVE JUROR BOSWORTH:  Yep.

 1              **THE COURT:**  Okay.  We'll come back, Ms. Bosworth.

 2      Samelson-Jones, your turn.  Please go ahead.

 3              **PROSPECTIVE JUROR SAMELSON-JONES:**  My name's Emma

 4      Samelson-Jones.  I live in San Francisco.

 5          I have a doctorate from UCSF in medicine.  I work at UCSF

 6      as a physician.

 7          I enjoy hiking, biking.

 8          I'm married.  My husband is a digital artist who works for

 9      a small production company.  I have a one-year-old.  He does

10      not have a job.

11                              (Laughter.)

12              **PROSPECTIVE JUROR SAMELSON-JONES:**  I've been in jury

13      selection before, but I have not been on a jury.

14          No military or law enforcement.

15          And I don't know if this is a party in court.  I did have

16      a disorderly driving charge in my early 20s that was -- went

17      down from a misdemeanor to a ticket that I showed up in court

18      for.

19              **THE COURT:**  Fine.

20          If you were selected, would you be fair and impartial?

21              **PROSPECTIVE JUROR SAMELSON-JONES:**  I don't know.  I'm

22      pretty -- I feel like there's no person in a side here, and I'm

23      just sort of irritated about having to be here for a case

24      between smart speakers, honestly.

25              **THE COURT:**  Between what?

1          **PROSPECTIVE JUROR SAMELSON-JONES:**  About smart

2    speakers.  I do have Sonos speakers at home.  I like them.  I

3    use a lot of Google products.  But I have a lot of things to

4    do.  I'm already an overwhelmed new mom.  And so I don't know

5    that that's biased, but it's unhappy about being here.

6          **THE COURT:**  So do you have a hardship issue?

7          **PROSPECTIVE JUROR SAMELSON-JONES:**  The only hardship

8    is trying to rearrange all my patients because nobody covers

9    them, but it's not a financial hardship issue.

10         **THE COURT:**  I'm going to let the -- we can't just

11   excuse everybody if they've got a Sonos speaker or use a Google

12   phone.  Then I'd never get a jury, would I?

13         So, but I -- and later on, I'm going to let the lawyers

14   ask questions, and maybe they will have some questions for you

15   about your Sonos speakers.

16         Now, me, I wouldn't know a Sonos speaker from -- if it hit

17   me in the head.  I would not.  My speakers are 35 years old,

18   and they still work great.  But I'm in the ancient Stone Age,

19   and you young people know all about this stuff.  That's great.

20         But we can't excuse everybody just because they've got a

21   Sonos speaker because it wouldn't -- I'm going to let them ask

22   you follow-up questions on that.

23         Okay.  We'll go now to Mr. Hayes.

24         **PROSPECTIVE JUROR HAYES:**  My name is Edward Hayes.  I

25   live in Castro Valley.  I have three applied associates degrees

1  in various educations from aviation, computers, and cars.

2      I've been employed at Sares Regis since 2004.  I'm the IT

3  facilities manager.

4      I don't really have any clubs or organizations.

5      Hobbies would be billiards, motorcycles, gardening, and

6  music is the most important thing.

7      I'm married for a year.

8          **THE COURT:**  Did you say "music"?

9          **PROSPECTIVE JUROR HAYES:**  Say again?

10         **THE COURT:**  Did you say "music"?

11         **PROSPECTIVE JUROR HAYES:**  Yes.

12         **THE COURT:**  Like you're a musician?

13         **PROSPECTIVE JUROR HAYES:**  No.  Listening to music.

14         **THE COURT:**  Listening.  So you probably have speakers.

15         **PROSPECTIVE JUROR HAYES:**  Yes.  I am familiar with

16  speakers.

17         **THE COURT:**  Okay.  All right.  Go ahead.

18         **PROSPECTIVE JUROR HAYES:**  I'm married.  I met my

19  second wife seven years ago, got married last year.  I have

20  three children, two sons who are 18 and 17 and a daughter who's

21  13.

22      I have served on the jury, I think, twice.  I don't

23  remember what the first one was about.  The second one, I do

24  know what it was about and it was civil.

25      I have no military or law enforcement.

1    Ever a party or witness in a court?  No, I don't think so

2  on 12.

3         THE COURT:  Well, would you be fair and impartial?

4         PROSPECTIVE JUROR HAYES:  I believe I would, but I

5  have prior commitments, which I would like to bring up, that I

6  have invested -- well, my wife and I bought tickets to

7  Cruel World, and the expense was about $2,000.

8         THE COURT:  I'm sorry?  To where?

9         PROSPECTIVE JUROR HAYES:  Cruel World.  It's a concert

10  in Pasadena.  It's a bunch of '80s bands are coming together,

11  and --

12         THE COURT:  When is that going to be?

13         PROSPECTIVE JUROR HAYES:  May 19th.  And I have, if

14  you'd like to look at it --

15         THE COURT:  Wait a sec.  Wait a minute.

16         PROSPECTIVE JUROR HAYES:  And the tickets are

17  non-refundable.  They're VIP.

18         THE COURT:  Okay.  Wait, wait.

19    May 19th is a Friday; right?  So you would not -- you

20  would not want to be here on that Friday?

21         PROSPECTIVE JUROR HAYES:  Right.  Exactly.  And I took

22  time off of work so that I could go to the concert too.

23         THE COURT:  You have already paid for those tickets

24  and it's personal, not business?

25         PROSPECTIVE JUROR HAYES:  Right.

 1              THE COURT:  Okay.  That's an automatic out.  You win.

 2    This is your lucky day.  I'm going to excuse you because if

 3    you've already prepaid for those tickets -- you say you have?

 4              PROSPECTIVE JUROR HAYES:  Yes.  They're --

 5              THE COURT:  I believe you.  It's under oath.  You get

 6    excused.

 7              PROSPECTIVE JUROR HAYES:  Okay.

 8              THE COURT:  Nobody's going to make you sit through a

 9    trial and cancel your personal vacation.

10        Now, business is different.

11              PROSPECTIVE JUROR HAYES:  Right.

12              THE COURT:  Business, they -- no.  But personal and

13    you've already paid for it, no, you -- I'm going to let you go.

14        Any objection?

15              PROSPECTIVE JUROR HAYES:  All right.

16              MR. PAK:  None, Your Honor, for Google.

17              MS. CARIDIS:  No, Your Honor.

18              THE COURT:  Great.

19        Okay.  Mr. Hayes, enjoy that concert.

20              PROSPECTIVE JUROR HAYES:  Thank you.

21              THE COURT:  And you think on that day about all the

22    other jurors here whenever you're rocking out with the -- those

23    people.  Have a good time.  You're free to go.

24              PROSPECTIVE JUROR HAYES:  Thank you.

25                  (Prospective Juror Edward Hayes excused.)

```
1            THE COURT:  Let's replace Mr. Hayes.

2            THE CLERK:  Kimberlyanne Lejano Bioco.

3            THE COURT:  Spell that for me.

4            THE CLERK:  B-i-o-c-o.

5       Please sit in Seat Number 4.

6            THE COURT:  Welcome.  We'll just start right away with

7  you, and I'll give you the microphone.

8       By the way, Angie goes way beyond the call of duty.  In

9  between uses of the microphone, she -- what do you do?  You

10 have some kind of --

11           THE CLERK:  I do.

12           THE COURT:  -- antiseptic thing up here.

13           THE CLERK:  Yes.

14           THE COURT:  So, anyway, you're not going to get

15 somebody else's germs.

16      Please go ahead.  Can you see the chart?

17           PROSPECTIVE JUROR BIOCO:  Yes.

18           THE COURT:  Give us the biographical information,

19 please.

20           PROSPECTIVE JUROR BIOCO:  My name is Kimberlyanne

21 Bioco, and I live in San Mateo.

22      And for now, my education is I'm trying to do CNA class

23 and trying to go back to nursing school.

24           THE COURT:  Are you in class now?

25           PROSPECTIVE JUROR BIOCO:  No, but I'm planning around
```

```
 1   this month or June.  I just haven't checked on the schedule yet

 2   about my CNA class.

 3            THE COURT:  Well, are you going to miss any classes if

 4   you serve on the jury?

 5            PROSPECTIVE JUROR BIOCO:  Yes, because I tried to sign

 6   up for classes for next week.

 7            THE COURT:  Next week?

 8            PROSPECTIVE JUROR BIOCO:  Yes.

 9            THE COURT:  You tried or you did?

10            PROSPECTIVE JUROR BIOCO:  I have to try first and

11   check my schedule for work because I have two jobs.  Like, I

12   work in the morning and I also work in the p.m.

13            THE COURT:  Well, see, it's not -- you're not telling

14   me enough to let you off.  If you -- if a student tells me they

15   will definitely miss the ABC class of physics, or whatever, if

16   they have to serve on the jury, then that's an automatic

17   excuse.

18        But you're just telling me maybe.  That's not good enough.

19        Okay.  Continue with your biographical information.

20            PROSPECTIVE JUROR BIOCO:  I work at a facility, and my

21   employer is BNLE Incorporation.

22        And no organization or clubs.

23        My hobbies is, like, hiking and attending concerts.

24        Marshal...

25        No husband and no kids.
```

1    And I haven't attended yet on a jury, juror before.

2    And I'm not a military and -- and --

3         THE COURT:  Have you ever been a party or a witness in

4    court?

5         PROSPECTIVE JUROR BIOCO:  No.

6         THE COURT:  All right.  Have you ever been in law

7    enforcement?

8         PROSPECTIVE JUROR BIOCO:  No.

9         THE COURT:  Okay.  Do you have a hardship issue?

10        PROSPECTIVE JUROR BIOCO:  No.

11        THE COURT:  Would it be a hardship for you to serve on

12   this jury?

13        PROSPECTIVE JUROR BIOCO:  Yes.

14        THE COURT:  What would be the hardship?

15        PROSPECTIVE JUROR BIOCO:  Because I have work.  Like,

16   I start work at 6:00 a.m., and I got my other job I start at

17   3:30 until 12:00 midnight.  So if I'm going to be -- like,

18   going to be serving for the whole week, I have to, like, work

19   and pay my bills.

20        THE COURT:  Will you have difficulty paying your bills

21   if you are on the jury?

22        PROSPECTIVE JUROR BIOCO:  Yes.

23        THE COURT:  Are you a member of the union?

24        PROSPECTIVE JUROR BIOCO:  No.

25        THE COURT:  All right.  I'm going to excuse Ms. Bioco

1    on account of hardship unless I hear an objection.

2         **MR. PAK:**  No objection, Your Honor.

3         **MS. CARIDIS:**  No objection.

4         **THE COURT:**  All right.  You're free to go.  Thank you.

5         **PROSPECTIVE JUROR BIOCO:**  Thank you.

6    (Prospective Juror Kimberlyanne Lejano Bioco excused.)

7         **THE COURT:**  Let's replace Ms. Bioco.

8         **THE CLERK:**  Kim Allan Yeager.

9         **THE COURT:**  Please come forward, Mr. Yeager.

10        **THE CLERK:**  You may remove your mask.

11        **PROSPECTIVE JUROR YEAGER:**  What's that?

12        **THE CLERK:**  You may remove your mask.

13        **THE COURT:**  Mr. Yeager, welcome.  Please give us the

14   biographical info.

15        **PROSPECTIVE JUROR YEAGER:**  Okay.  My name is Kim

16   Yeager.  I live in Martinez.  My education is high school, one

17   year of college.

18        Most recent job is I was an auto mechanic.  I worked on

19   computers in cars.  I've been retired for six years.

20        Organizations, the only thing we -- my husband and I both

21   collect music.  We have 6,000 songs, and we listen to them on

22   Friday nights.  Hobbies, that's -- maybe that's a hobby.

23        Let's see, that covers that.

24        No children.

25        Prior service, jury service, I have had one prior jury

1   service.  It was a criminal service.  It was mostly a

2   misdemeanor, and we came to a conclusion on it.

3        No military or law enforcement.

4        I guess that's it.

5            THE COURT:  All right.  Have you ever been a party or

6   witness in court?

7            PROSPECTIVE JUROR YEAGER:  Oh, no.

8            THE COURT:  Okay.  If you're selected, would you be

9   fair and impartial?

10           PROSPECTIVE JUROR YEAGER:  Yes.

11           THE COURT:  And do you have any hardship issue to

12  raise?  In other words, if serve -- would serving on the jury

13  be a hardship such that you wish to be excused?

14           PROSPECTIVE JUROR YEAGER:  I have no hardship.  I do

15  not remember things for a long time, so my memory's a little

16  forgetful.  I don't know if that matters.

17           THE COURT:  Well, can you take notes and will that

18  help you?

19           PROSPECTIVE JUROR YEAGER:  Yeah, it probably would.

20           THE COURT:  Okay.  Well, then welcome to the club.

21           PROSPECTIVE JUROR YEAGER:  Okay.

22           THE COURT:  All right.  I have the same problem, but I

23  take notes and I manage to get by.

24        So all right.  Thank you.

25        Let's go now to Mr. Simonson.

1        **PROSPECTIVE JUROR SIMONSON:**  My name's Timothy

2   Simonson.  I live in Sonoma.  I'm a college graduate.

3        I'm currently employed by Intralinks, it's a software

4   company, a technology company, as a customer success -- or I

5   manage --

6        **THE COURT:**  I didn't hear the name of the company.

7        **PROSPECTIVE JUROR SIMONSON:**  Oh.  It's Intralinks.

8   It's --

9        **THE COURT:**  Okay.  What do you do for them?

10       **PROSPECTIVE JUROR SIMONSON:**  I manage a customer

11  success team of professionals.

12       **THE COURT:**  Okay.

13       **PROSPECTIVE JUROR SIMONSON:**  No real clubs or

14  organizations.

15       Hobbies, just kind of yardwork, walking my dogs, spending

16  time with my family.

17       I'm married.  My wife is an executive assistant for Sonoma

18  Valley Hospital Foundation.  I have two children.  They're

19  students, 16 in high school and 19 in college.

20       I've not served on a jury previously, no military or law

21  enforcement experience, and haven't been a party or a witness

22  in court.

23       **THE COURT:**  Great.  Would you be fair and impartial?

24       **PROSPECTIVE JUROR SIMONSON:**  I believe I would be.

25  I think I should say that I had maybe some prior awareness of

1  the case, not from any advance research but just from reading

2  in news.  I do look at stories about Sonos and upcoming product

3  releases, just for informational, because I'm a customer.

4          **THE COURT:**  What do you mean, you're a customer?

5          **PROSPECTIVE JUROR SIMONSON:**  I'm a loyal customer.  I

6  mean, I buy their products and I look for upcoming releases, so

7  I do a news search on the company.

8          **THE COURT:**  Okay.  Now, can you -- that doesn't

9  disqualify you unless you tell me that you're so loyal to Sonos

10  that it'll be a factor in your -- you can't put it aside.  In

11  other words, you've got to be able to put to one side any bias

12  that you might have and decide the case fair and square.

13          **PROSPECTIVE JUROR SIMONSON:**  I can listen to both

14  sides and make an objective decision.

15          **THE COURT:**  And put aside any bias; true?

16          **PROSPECTIVE JUROR SIMONSON:**  True.

17          **THE COURT:**  All right.  Do you have any hardship issue

18  to raise?

19          **PROSPECTIVE JUROR SIMONSON:**  No hardship.  I do have a

20  business trip scheduled for May 21st through the 25th.  It's

21  just at the tail end of the potential dates.

22          **THE COURT:**  Well, you might have to be here; and if

23  so, business trips don't -- we would never get a jury if we let

24  business trips interfere.  Your employer will find somebody to

25  send in your place.

1          **PROSPECTIVE JUROR SIMONSON:**  I understand.

2          **THE COURT:**  So that's not a good -- any other hardship

3    issue?

4          **PROSPECTIVE JUROR SIMONSON:**  None.

5          **THE COURT:**  Thank you.

6       Okay.  Now, we go to Knabe.

7          **PROSPECTIVE JUROR KNABE:**  My name's Reid Knabe.  I

8    live in San Francisco.  I have a bachelor's degree and a J.D.

9       I'm currently employed as an attorney at Morrison &

10   Foerster here in S. F.

11      Organizations, clubs, I suppose California Bar

12   Association.

13      Hobbies.  What do I do?  Skiing a lot recently.  I think

14   that counts.

15      I'm unmarried.  I have a live-in partner.  She works in

16   tech at a startup doing finance, corp. dev, things of that

17   nature.  No children.

18      No prior jury service.  No military, law enforcement.

19   Never a party or witness.

20         **THE COURT:**  Okay.  What kind of lawyer are you?

21         **PROSPECTIVE JUROR KNABE:**  Intellectual property.

22         **THE COURT:**  Well --

23         **PROSPECTIVE JUROR KNABE:**  So I focus more on the

24   transactional side, but we do patent settlements, patent

25   licenses, things of that nature.

 1          THE COURT:  All right.  Have you ever done any work

 2   for either of these two companies?

 3          PROSPECTIVE JUROR KNABE:  I will have to run

 4   conflicts.

 5          THE COURT:  What?

 6          PROSPECTIVE JUROR KNABE:  I'll have to run conflicts

 7   at the firm.  I'm not sure if we've come across them as a

 8   counterpart or anything.

 9          THE COURT:  Well, I'm asking whether you personally

10   have.

11          PROSPECTIVE JUROR KNABE:  No, not that I'm aware of.

12          THE COURT:  Well, I suspect, but I don't know, that

13   your firm at some point in the past has represented one side or

14   the other here in something else, not this case; but that --

15   I'm not -- I don't think that's going to -- see, we don't apply

16   the attorney attribution rules here.  You're a juror here.

17      Now, can you put aside your knowledge of intellectual

18   property and decide this case based on the instructions of law

19   that I will give you later?

20          PROSPECTIVE JUROR KNABE:  To be frank, I think I'll

21   struggle to do that.

22          THE COURT:  You would?

23          PROSPECTIVE JUROR KNABE:  I -- I think -- I think

24   it'll be challenging.

25          THE COURT:  That's okay.  That's not enough.

 1          **PROSPECTIVE JUROR KNABE:**  No.  I realize.

 2          **THE COURT:**  I believe you, as a good lawyer, can meet

 3    the challenge.  So you tell -- it won't do any good to say

 4    it'll be hard because good lawyers do hard things all the time.

 5    If you tell me, no, you know too much and you would not be able

 6    to follow the instructions of law, even though it's your duty

 7    to do so and you would violate your duty, then I have to let

 8    you go.

 9          **PROSPECTIVE JUROR KNABE:**  I don't want to tell you

10    that I'll violate my duty, but the facts of this case are very,

11    very close to what I do on a daily basis, and so I do not think

12    I'll truly be able to be impartial.

13          **THE COURT:**  All right.  Can I excuse Mr. Knabe?  Yes

14    or no?

15          **MS. CARIDIS:**  Yes, for Sonos.

16          **MR. PAK:**  Your Honor, we would like to ask some more

17    questions of Mr. Knabe.

18          **THE COURT:**  No.  This -- he's too biased.

19          **MR. PAK:**  I understand.

20          **THE COURT:**  He's got too much personal baggage.  We're

21    not going to waste the rest of the jury's time.  Sorry.

22          **MR. PAK:**  Thank you, Your Honor.

23          **THE COURT:**  Motion denied.

24       Mr. Knabe, you're excused.

25          **PROSPECTIVE JUROR KNABE:**  Thank you, Your Honor.

```
 1              (Prospective Juror Reid Knabe excused.)

 2          THE COURT:  Let's replace Mr. Knabe.

 3          THE CLERK:  Sosale Shankara Sastry, S-a-s-t-r-y.

 4          THE COURT:  Give me -- spell that for me.

 5          THE CLERK:  S-a-s-t-r-y.

 6          THE COURT:  Sastry.  Okay.

 7      All right.  Mr. Sastry, you see how slow this is going.

 8  I'm looking for a ray of hope here.  Come on.  Your turn.  Go

 9  down and give us the biographical info.

10          PROSPECTIVE JUROR SASTRY:  Shankara Sastry, Sosale

11  Shankara Sastry.  I live in Orinda.  I have a doctorate.

12      And I'm a professor of electrical engineering and computer

13  sciences at Berkeley.

14          THE COURT:  Sorry.  Say that again.  You're a

15  professor of what?

16          PROSPECTIVE JUROR SASTRY:  Electrical engineering and

17  computer science at Berkeley.

18          THE COURT:  Okay.  So you could solder two wires

19  together.

20                          (Laughter.)

21          PROSPECTIVE JUROR SASTRY:  We used to.

22          THE COURT:  Yeah.  Okay.

23          PROSPECTIVE JUROR SASTRY:  Let's see.  You know, the

24  professional organizations, National Academy and American

25  Academy of Arts and Sciences.
```

1      Hobbies, not too many now.  It's work pretty much.

2      Marital status, married.  Two children.  My wife is also a

3  professor at Berkeley.

4          **THE COURT:**  What does she teach?

5          **PROSPECTIVE JUROR SASTRY:**  Sorry?

6          **THE COURT:**  What does she teach?

7          **PROSPECTIVE JUROR SASTRY:**  Also electrical engineering

8  and computer sciences.

9          **THE COURT:**  You must have exciting discussions at the

10  dinner table.

11          **PROSPECTIVE JUROR SASTRY:**  Yeah.  She's my chairperson

12  actually, so...

13          **THE COURT:**  Okay.

14          **PROSPECTIVE JUROR SASTRY:**  Two children, 15 and 9.

15      No prior jury duty.

16      So I've not been part of the military, but I've been

17  deputed to be a civilian at DARPA, Defense Advanced Research

18  Project Agency, '99 to 2001.  You know, that is -- it did have

19  a military ranking, equivalent military ranking.

20          **THE COURT:**  DARPA, you said?

21          **PROSPECTIVE JUROR SASTRY:**  Yeah.

22          **THE COURT:**  D-A-R-P-A?

23          **PROSPECTIVE JUROR SASTRY:**  Right.

24          **THE COURT:**  Okay.

25          **PROSPECTIVE JUROR SASTRY:**  Ever been a party or

1  witness in court?  No.

2      THE COURT:  Okay.  Would you be fair and impartial in

3  this case?

4      PROSPECTIVE JUROR SASTRY:  I think so.

5      THE COURT:  And do you have any hardship issue?

6      PROSPECTIVE JUROR SASTRY:  I do.  It's -- you know,

7  it's the final exam season.  I actually have finals today and

8  tomorrow.  And then I have to get grades and all of that turned

9  in before the end of the term, and that's next week.  That's

10  the week of finals.  It's a class of graduating seniors.

11      And also, I have a trip to Philadelphia with some of

12  these -- with the Department of Defense and others at -- on the

13  19th of May.  So those are --

14      THE COURT:  Well, that's a business trip.

15      PROSPECTIVE JUROR SASTRY:  On the 19th of May, yes.

16      THE COURT:  Well, that doesn't -- the United States

17  military will -- they would have to get by without you.

18      PROSPECTIVE JUROR SASTRY:  It involves also --

19      THE COURT:  How come you can't do those tests after we

20  let you go at 1 o'clock each day?  You could work on the -- how

21  many students do you have to grade their papers?

22      PROSPECTIVE JUROR SASTRY:  They're -- it's the final

23  projects that they have to present to me, and they have to --

24  also, I already rescheduled the ones from today.  So 64.

25      THE COURT:  64?

 1          PROSPECTIVE JUROR SASTRY:  Yeah.

 2          THE COURT:  And you have to grade those between now

 3   and when?

 4          PROSPECTIVE JUROR SASTRY:  Next Friday.

 5          THE COURT:  Have you already got them scheduled?

 6          PROSPECTIVE JUROR SASTRY:  I had them scheduled for

 7   today and tomorrow.  And today's, of course, have to be

 8   rescheduled.

 9          THE COURT:  Well, when are you going to do the ones

10   for today?

11          PROSPECTIVE JUROR SASTRY:  I haven't yet rescheduled

12   them, but I'll have to reschedule.

13          THE COURT:  Is this in stone?  Why can't you be late

14   in giving these grades?

15          PROSPECTIVE JUROR SASTRY:  You know, they're

16   graduating seniors; so they need to know -- they need to know

17   their grades to graduate.

18          THE COURT:  Let me think about it.

19       All right.  We'll come back to that.

20       Let's go to Mr. Westberg.

21          PROSPECTIVE JUROR WESTBERG:  My name is Paul Westberg.

22   I'm a resident of San Mateo, California.  I have an

23   undergraduate degree in applied mathematics and a business

24   degree from UC Berkeley.

25       I'm currently chief business officer of a small startup

1   with funding measured in weeks as opposed to months or years,

2   and am leading all business parts of our organization.

3        Outside of that, I have affiliations with the alumni

4   efforts at UC Berkeley and UC San Diego, as well as volunteer

5   my time for my two daughters, who are both high school

6   students.

7        Not a lot of time for hobbies, given two teenage

8   daughters.  So most of my activities revolve around those

9   family activities.

10       I am married to my wife Kelly.  She is a full-time

11   educator in the K through 6th glades for kids with special

12   needs.  My children are both daughters, one a freshman and one

13   a senior in high school.

14       I've been through the jury selection process but never

15   been selected to actually serve.

16       I have not actively served in the military, and I have not

17   been an actual party or the actual witness in a court

18   proceeding.

19           **THE COURT:**  All right.  If selected, would you be fair

20   and impartial?

21           **PROSPECTIVE JUROR WESTBERG:**  The one thing I'd like to

22   raise, Your Honor, is in my -- the reason I asked the question

23   earlier was that in my older daughter's friend group and as a

24   member of her sports teams is a senior member of Google legal

25   counsel; and so that's why I wanted to make sure that, given

1   the mask and things, that I didn't recognize anybody.

2           THE COURT:  All right.  Well, what is the name of the

3   person that you know from Google?

4           PROSPECTIVE JUROR WESTBERG:  Brian Mayorkin.  His son

5   is Teddy and is a senior at Hillsdale High School.

6           THE COURT:  Okay.  Thank you for that information, but

7   can you put that to one side and be fair and impartial to both

8   sides here?

9           PROSPECTIVE JUROR WESTBERG:  I think that that,

10  combined with the fact that I routinely work and negotiate

11  settlements and avoid patent litigation on behalf of my

12  company, I think like the previous gentleman who's a lawyer who

13  spends his full time doing so, I would try my very best; but

14  given those two facts, it will be quite challenging for me,

15  quite candidly, Your Honor.

16          THE COURT:  Are you just saying that, or is that

17  really true?  Here you are, a professional person.  Can't you

18  put to one side the fact that you know somebody from Google and

19  what you do for a living and decide this case fair and square

20  for both sides?

21          PROSPECTIVE JUROR WESTBERG:  Yes, I understand the

22  gravity of this, Your Honor, and I wouldn't be saying this and

23  bringing it to your attention if I did not feel that it would

24  be a significant challenge to my ability to perform this as

25  opposed to another jury.

 1        **THE COURT:**  All right.  Do you have any hardship

 2    issue?

 3        **PROSPECTIVE JUROR WESTBERG:**  Notwithstanding your

 4    comments, as I mentioned, my payroll for my 12 employees is

 5    measured in weeks, Your Honor, and I currently have flights out

 6    to New York next week to try to finish negotiations to save the

 7    fate of the company.  And so I have a copy of that, as well as

 8    on the app on my phone, if you wish me to --

 9        **THE COURT:**  Well, that's a business thing.  Your

10    company --

11        **PROSPECTIVE JUROR WESTBERG:**  I understand.

12        **THE COURT:**  -- can send somebody else, and so I --

13    that's not a good reason.

14        All right.  Thank you.

15        We'll go to -- let's start with the gentleman behind you.

16    We'll go to Mr. Christopher and go in reverse order.

17        I will consider what you've said and take it up with the

18    lawyers at the next break.

19        **PROSPECTIVE JUROR WESTBERG:**  Thank you, Your Honor.

20        **PROSPECTIVE JUROR CHRISTOPHER:**  My name is Jonathan

21    Elliot Christopher.  I stay in Richmond, California.  I have

22    education, high school.

23        I work for UPS.  Local 70.  Oakland Hub.

24        My hobbies, family, fishing, sports.

25        I'm not married.  I have a girlfriend.  Her occupation is

1  she's a gymnast.  No children.

2      No prior service on -- for jury.

3      I can't see the other one.

4          **THE COURT:**  Have you ever been in the military or law

5  enforcement?

6          **PROSPECTIVE JUROR CHRISTOPHER:**  No military or law

7  enforcement.

8          **THE COURT:**  Ever been a party or witness in court?

9          **PROSPECTIVE JUROR CHRISTOPHER:**  No.

10         **THE COURT:**  Do you have any hardship issue?

11         **PROSPECTIVE JUROR CHRISTOPHER:**  No hardship issues.

12         **THE COURT:**  Do you -- would you be fair and impartial

13  to both sides?

14         **PROSPECTIVE JUROR CHRISTOPHER:**  I could say I'd be

15  fair and impartial, but I have, like, prior history of felonies

16  myself when I was, like -- just, years ago.

17         **THE COURT:**  You had what?

18         **PROSPECTIVE JUROR CHRISTOPHER:**  Felony convictions.

19         **THE COURT:**  You had a felony conviction?

20         **PROSPECTIVE JUROR CHRISTOPHER:**  Yeah.  A few of them

21  on my record.

22         **THE COURT:**  Well, how did you even get here?  You're

23  not supposed to serve on a jury if you've got a felony

24  conviction.

25         **PROSPECTIVE JUROR CHRISTOPHER:**  I'm not sure.  They

 1  just kept sending me this in the mail.  So I guess I had to

 2  show up.  I put that down on paper and I filled it out, every

 3  e-mail they send me, so I'm not really sure in particular.

 4          THE COURT:  What was the most recent felony?

 5          PROSPECTIVE JUROR CHRISTOPHER:  Seven years ago.

 6          THE COURT:  What was it for?

 7          PROSPECTIVE JUROR CHRISTOPHER:  For burglary.

 8          THE COURT:  All right.  I'm going to -- I think I have

 9  to excuse Mr. Christopher.  Any objection?

10          MR. PAK:  No objection, Your Honor.

11          MS. CARIDIS:  No, Your Honor.

12          THE COURT:  Mr. Christopher, thank you for letting us

13  know about your felony convictions.  So, good luck.

14     (Prospective Juror Jonathan Elliot Christopher excused.)

15          THE COURT:  Let's replace Mr. Christopher.

16          THE CLERK:  Next is Rei Yun Chen Brockett, B, as in

17  "boy," r-o-c-k-e-t-t.

18          THE COURT:  Spell it for me again.

19          THE CLERK:  B, as in "boy," r-o-c-k-e-t-t.

20          THE COURT:  Brockett?  I'm just -- is it Brockett?

21          PROSPECTIVE JUROR BROCKETT:  Brockett, yes.

22          THE COURT:  Okay.  You get to go next, please.

23          PROSPECTIVE JUROR BROCKETT:  Okay.  My name's Rei

24  Brockett.  I live in Menlo Park.  I went to Harvard.  I have a

25  Ph.D. from UCLA in electrical engineering.

1     I am a product manager at a company called Illumeo.  We do

2  network security.

3     Organizations, clubs, alumni associations, Girl Scouts.

4     Let's see.  Hobbies, cooking, home improvement.

5     Marital status, I'm married.  My husband is a consultant

6  in high tech.  I have three children: 18, 20, 22.  One of them

7  is in high school, two of them in college.

8     Let's see.  I've been an alternate on a DUI case.

9     Have I ever been -- not in the military or in law

10  enforcement and --

11         THE COURT:  Party or witness in court?

12         PROSPECTIVE JUROR BROCKETT:  -- never been a party or

13  witness.

14         THE COURT:  Great.  Any hardship issue?

15         PROSPECTIVE JUROR BROCKETT:  I do have plane tickets

16  on the 22nd of May to see my son graduate from college.

17         THE COURT:  Well, when is the graduation?

18         PROSPECTIVE JUROR BROCKETT:  Graduation is the

19  Thursday, and then there's a Letterman's dinner on the

20  Wednesday, and there are the faculty invitations on Tuesday.

21  And the plane tickets are non-refundable.

22         THE COURT:  Say -- okay.  Wait a minute.  I didn't --

23  your voice trailed off.

24         PROSPECTIVE JUROR BROCKETT:  Sorry.  The plane

25  ticket's for Monday.  There are events Tuesday, Wednesday,

1    Thursday, and I'm coming back Thursday.

2            THE COURT:  That's your only hardship issue?

3            PROSPECTIVE JUROR BROCKETT:  That is my only hardship

4    issue.

5            THE COURT:  Well, I could order these lawyers to have

6    the case done before that.  That way, you could serve.  If I

7    did that, could you serve?  Are you biased?  Would you have any

8    other hardship issue?

9            PROSPECTIVE JUROR BROCKETT:  No other hardship issues.

10   I'd be fair and impartial.

11           THE COURT:  All right.  I'll come back to you as well.

12   Thank you.

13       All right.  Let's go next down the line to Thurium.  I'm

14   sorry if I've mispronounced your name.

15           PROSPECTIVE JUROR THURIUM:  That's okay.

16       My name is Tilde Thurium.  I live in San Francisco.  I

17   have a bachelor degree in gender studies.

18       Most recently I was employed as a software engineering

19   manager at Twilio.

20       I'm a member of the Democratic Socialists of America.

21       My hobbies are power lifting and making art.

22       I'm --

23           THE COURT:  What kind of lifting?

24           PROSPECTIVE JUROR THURIUM:  Power lifting.

25           THE COURT:  What is that?

 1          **PROSPECTIVE JUROR THURIUM:**  It's a sport where you

 2    compete in the squat, the bench press, and the deadlift to see

 3    who can lift the most weight relative to your body size.

 4               (Official Reporter clarifies.)

 5          **PROSPECTIVE JUROR THURIUM:**  Squat, the bench, and the

 6    deadlift.

 7          Yeah.  Well, no, no, no.  Like, not over your head.

 8    That's weightlifting.  That's different.

 9          **THE COURT:**  Okay.  So you're on the bench and lifting

10    it above your chest.  That's great.  Okay.

11          **PROSPECTIVE JUROR THURIUM:**  I am married.  My wife is

12    a software engineer.  No kids.

13          No prior jury service.  No military or law enforcement.

14          I was in court.  When I was 14, I got caught smoking

15    marijuana and got a ticket.

16          **THE COURT:**  Oh, no.

17          **PROSPECTIVE JUROR THURIUM:**  Yeah.  That was my only

18    time.  I suspect that's not relevant here.

19          **THE COURT:**  But it was not a felony?  It was --

20          **PROSPECTIVE JUROR THURIUM:**  Misdemeanor, yeah.

21          **THE COURT:**  Misdemeanor.  Okay.  Great.

22          Is that it?  Would you be fair and impartial to both

23    sides?

24          **PROSPECTIVE JUROR THURIUM:**  Yeah, I think so.

25          **THE COURT:**  Would you have any hardship issue?

1        **PROSPECTIVE JUROR THURIUM:**  I also have plane tickets

2   to actually go to a power lifting competition on the 18th.

3   When will this finish?

4        **THE COURT:**  Well, see, that's the problem.  There are

5   imponderables in life and in litigation and trials, and I

6   can't -- I think it's going to be done by May 19th, but I need

7   to have two or three days afterwards in the following week

8   to -- just in case.  So that's the best I can answer.

9        **PROSPECTIVE JUROR THURIUM:**  Okay.  Thanks.

10       **THE COURT:**  Do you -- when is your contest?

11       **PROSPECTIVE JUROR THURIUM:**  On the 19th, but I'm

12   not -- I'm not competing.  I'm just going to go, like, coach

13   and cheer on my friend, so...

14       **THE COURT:**  So you could be here instead?

15       **PROSPECTIVE JUROR THURIUM:**  I mean, it's my -- it kind

16   of sucks, but it's my civic duty so, you know...

17       **THE COURT:**  Well, I salute you.  Thank you for that

18   good attitude.

19       All right.  So I'm taking that to mean that if you were

20   selected, you would skip the 19th and be -- I mean, you'd be

21   here on the 19th?

22       **PROSPECTIVE JUROR THURIUM:**  Yeah.

23       **THE COURT:**  All right.  Okay.

24       All right.  So I'm going to have more questions later, but

25   I'm getting the basic biographical right now.

 1      So I'm going to go now to Chambers.  Your turn,

 2  Mr. Chambers.

 3          PROSPECTIVE JUROR IVORY-CHAMBERS:  Hi.  My name is

 4  Eric Ivory-Chambers.  I live in San Rafael.  B.A. from Emerest

 5  College.  Just got a certificate of business insurance --

 6  business excellence from Haas School of Business at Berkeley.

 7      Currently -- currently employed at Salesforce as a

 8  principal writer.  Previously worked as a contractor for

 9  Google.

10          THE COURT:  Wait.  Tell us about that part.

11          PROSPECTIVE JUROR IVORY-CHAMBERS:  Just prior to

12  joining Salesforce, I was working for a year as a writer for

13  Google augmented reality.

14          THE COURT:  A writer of what?

15          PROSPECTIVE JUROR IVORY-CHAMBERS:  Writer -- writer of

16  content for the Google Android augmented reality technology.

17          THE COURT:  You mean you would explain to the public

18  how something works?  That kind of a writer?  Or do you mean --

19          PROSPECTIVE JUROR IVORY-CHAMBERS:  It was writing for

20  partners at Google and helping them -- helping them understand

21  how to implement a certain software library in Google Android

22  hardware.

23          THE COURT:  Got it.

24      Okay.  Please continue.

25          PROSPECTIVE JUROR IVORY-CHAMBERS:  So organizations,

1    I've been involved in community theater, singing.

2        Hobbies, hiking and, ironically, home audio listening.  So

3    we'll get to that later.

4        But marital status, I'm married to my wife for 25 years.

5    She is a marriage and family therapist in private practice.  I

6    have one son who is 21.  He works in the entertainment industry

7    in L.A. currently with music videos.

8        No prior jury service.  No law enforcement or military

9    background.

10       My only experience in court was 17 when I had a traffic

11   violation.  So that was enough for me.

12           **THE COURT:**  Okay.  You sound like you have some bias

13   point you want to bring up.

14           **PROSPECTIVE JUROR IVORY-CHAMBERS:**  Well, our family,

15   we're early adopters for Sonos technology, and my son absconded

16   with all of it except for the soundbar.

17       And I spend a lot of time -- I have two dear friends who

18   have -- I live vicariously through them.  They have a budget

19   for -- one is a seven-figure home audio system.  And I have on

20   my phone an invite to go with the two of them to a home -- to

21   an audio summit or some sort of a conference that happens once

22   a year.

23       So also, Sonos had a sort of affable agreement with

24   Salesforce employees, and so you could get Sonos equipment at a

25   discount, employee discount, so there's some relationship there

1  as well.

2      So it's kind of -- it's definitely maybe bringing a lot of

3  foreknowledge about the technology into -- into this.

4      **THE COURT:**  So did you say you have a sound system

5  that cost seven figures?

6      **PROSPECTIVE JUROR IVORY-CHAMBERS:**  No, no.  A good

7  friend of mine.  No.  I -- I've been looking to --

8      **THE COURT:**  That's a million dollars.

9      **PROSPECTIVE JUROR IVORY-CHAMBERS:**  1.4, is what I've

10 heard, so...

11     **THE COURT:**  Don't you think that's ridiculous?

12                     (Laughter.)

13     **THE COURT:**  That with all the problems we've got in

14 our world, somebody would spend that kind of money on a speaker

15 system?

16     **PROSPECTIVE JUROR IVORY-CHAMBERS:**  It's not my money,

17 so...

18     **THE COURT:**  Well --

19     **PROSPECTIVE JUROR IVORY-CHAMBERS:**  Anyway, so --

20     **THE COURT:**  All right.  So you like Sonos equipment

21 and you used to work for Google?

22     **PROSPECTIVE JUROR IVORY-CHAMBERS:**  Right.

23     **THE COURT:**  So maybe you know too much.

24     **PROSPECTIVE JUROR IVORY-CHAMBERS:**  Possibly.  I don't

25 know.

1              **THE COURT:**  I am not certain yet.

2         All right.  Do you have any hardship issue?

3              **PROSPECTIVE JUROR IVORY-CHAMBERS:**  I mean, the only

4    concern is -- is job performance.  Since I work at Salesforce

5    and tech layoffs seem to be a weekly issue, and I think

6    there's -- you know, so any --

7              **THE COURT:**  If they hold you serving on the jury

8    against you, I will bring Mr. Salesforce in here, and he will

9    or she will regret the day that they interfered with your

10   federal jury service.  So you do not have to worry about that.

11             **PROSPECTIVE JUROR IVORY-CHAMBERS:**  I don't think he

12   lives too far away from here, so...

13             **THE COURT:**  That's good.  That's good.

14        All right.  Anything else you want to bring up?

15             **PROSPECTIVE JUROR IVORY-CHAMBERS:**  The only other

16   thing is I have a very dear friend who often serves as an

17   expert witness in patent and IP cases, and he was a pioneer in

18   the digital audio industry.  So that's why he was there.  So

19   when you were reading the witness list, I was listening to see

20   whether his name would be brought up.

21             **THE COURT:**  What was your friend's name?

22             **PROSPECTIVE JUROR IVORY-CHAMBERS:**  His name is Gareth

23   Loy.

24             **THE COURT:**  All right.  Lawyers, does he have anything

25   to do with this case?

1          **MR. PAK:**  No, Your Honor.

2          **MS. CARIDIS:**  No, Your Honor.

3          **THE COURT:**  Okay.  How do you think he might fit in?

4    You just want to check to see if he is in the background

5    somehow?

6          **PROSPECTIVE JUROR IVORY-CHAMBERS:**  No.  He would

7    have -- he could have probably served on either side of the

8    case.

9          **THE COURT:**  Well, do you think it matters?  They say

10   he has nothing to do with the case.

11         **PROSPECTIVE JUROR IVORY-CHAMBERS:**  No.

12         **THE COURT:**  Okay.  But you were good to bring it up.

13   Thank you.

14      All right.  Anything else you want to bring up?

15         **PROSPECTIVE JUROR IVORY-CHAMBERS:**  No.  Thank you.

16         **THE COURT:**  Okay.  Now we'll go to Austin.

17         **PROSPECTIVE JUROR AUSTIN:**  Hi.  My name is Kristin

18   Austin.  I live in San Ramon.  I have a B.A. in communications

19   from UCSD.

20      I'm the director of revenue integrity at Sutter Health.

21      The only organization I can think of is my daughter and I

22   are part of National Charity League, which is a mother-daughter

23   philanthropy leadership organization.

24      I don't have a lot of time for hobbies, but I do like to

25   walk my dog and occasionally read.

1      I'm married.  My husband's a lawyer.  He's a med mal

2   defense lawyer.  We have three children.  Our oldest is 21.

3   She's a student at DVC, and she's blind.  So we'll come back to

4   that in a minute.  I also have two eighth graders.

5      I have never served on a jury before or been in the

6   military or law enforcement.  I was a plaintiff in a case, a

7   med mal case, related to my daughter's eye issues, but that's

8   the only time I was a party or a witness in court.

9          THE COURT:  Okay.  And the hardship issue is?

10         PROSPECTIVE JUROR AUSTIN:  So, well, the first thing

11  may not matter.  I have a very bad toothache that can be fixed

12  tomorrow morning if I can get to Walnut Creek by 3 o'clock

13  today and see the dentist, but you said we're not here

14  tomorrow; right?

15         THE COURT:  Correct.  We will not be here tomorrow.

16         PROSPECTIVE JUROR AUSTIN:  So my daughter's 21.  She

17  is a student at DVC.  She's completely blind, and she has

18  severe social anxiety.  I am the way she gets to and from

19  school.  My husband has -- we looked at the calendar.  He has

20  obligations in other courts next week and then he is in Atlanta

21  for my nephew's graduation the week after.

22      And then the last conflict is that on the 22nd and 23rd, I

23  am scheduled to be deposed in a case for my job as the PMK,

24  so...

25         THE COURT:  Well, the deposition, if you're serving on

1  the jury, that -- we'll make sure that doesn't -- that gets

2  postponed.

3      But go back to the travel part.  Are you going out of town

4  or --

5          PROSPECTIVE JUROR AUSTIN:  I'm not going.  He is.  But

6  my daughter, she's missing school today because she can't get

7  there.  So she has two more weeks of school.  It just happens

8  to coincide with this, and I don't know how -- I don't know how

9  we'll get her there.

10         THE COURT:  And your husband can't do it?

11         PROSPECTIVE JUROR AUSTIN:  Can't do it next week.

12 He's got -- we looked at the times.  He's in court during the

13 times that she's supposed to be there, and then he's gone to

14 Atlanta the following week.

15         THE COURT:  All right.  I'm going to excuse you on

16 account of hardship, Ms. Austin.  It's your daughter.  None of

17 those other things, just your daughter.

18         PROSPECTIVE JUROR AUSTIN:  Thank you.

19         THE COURT:  Any objection?

20         MR. PAK:  No objection, Your Honor.

21         MS. CARIDIS:  No, Your Honor.

22         THE COURT:  All right.  Your daughter, she's lucky to

23 have such a good mom.

24         PROSPECTIVE JUROR AUSTIN:  I'm lucky to have her too.

25         THE COURT:  Thank you.  Thank you for taking good care

 1  of her --

 2            PROSPECTIVE JUROR AUSTIN:  Thank you.

 3        THE COURT:  -- and I bet she'll be a great success in

 4  life.

 5            PROSPECTIVE JUROR AUSTIN:  I hope so.

 6        (Prospective Juror Kristin Marie Austin excused.)

 7            THE COURT:  All right.  Let's replace Ms. Austin.

 8            THE CLERK:  Tony Cerezo Abarca.  Last name

 9  C-e-r-e-z-o.

10            THE COURT:  Spell it again, slowly.

11            THE CLERK:  C-e-r-e-z-o.

12            THE COURT:  Okay.  Welcome.  Tell us how you say your

13  name.

14     We're going to -- somebody needs to use the restroom over

15  there.  Can you wait for one more person?  And then we'll use

16  the -- we'll take a break.

17     All right.

18            PROSPECTIVE JUROR CEREZO ABARCA:  My name is Tony

19  Cerezo Abarca.  I live in Santa Rosa.  Highest education is

20  high school.

21     I just started working for Benedetti's Tire Express and

22  Oil Services.

23     I'm not in any organizations.

24     Hobbies, playing soccer, listening to music, working out.

25     I'm not married.  I don't have any children.

1    I have not served on a jury before, never in military or

2    law enforcement, and I have a sealed juvenile record.

3         THE COURT:  Any felonies?  I assume not.

4         PROSPECTIVE JUROR CEREZO ABARCA:  I don't remember

5    what it was.  I'd have to ask my -- I'd have to send a message

6    to my attorney.

7         THE COURT:  How old are you now?

8         PROSPECTIVE JUROR CEREZO-ABARCA:  I am 18.

9         THE COURT:  18?  Do you have any hardship issue?

10        PROSPECTIVE JUROR CEREZO-ABARCA:  No.  Just besides

11   that I just started working at this new job on Friday.

12   I would -- I will -- I would be willing to serve here as

13   long as, you know, I don't run the risk of losing my job.

14        THE COURT:  Well, they cannot discriminate against you

15   on account of jury service.  That's the best I can tell you.

16   So that's not a good enough reason.

17   Do you have -- will you be fair and impartial if selected

18   to serve?

19        PROSPECTIVE JUROR CEREZO-ABARCA:  Yes, I will.

20        THE COURT:  All right.  Thank you.

21   Now we're going to take a break because somebody needs to

22   use the restroom.

23   Before we do that, I need to tell you not to go on the

24   phone and try to research anything about this case or about any

25   of the lawyers.  It would be improper to do that.

1    And then we'll come back here and resume.  It's 10:30 now.

2  We're doing okay.  We're doing okay.  And I want everyone to

3  come back here in 15 minutes.

4    Please do not talk among yourselves about the case or with

5  anyone else.

6    Okay.  See you in 15 minutes.  Thank you.

7        **THE CLERK:**  Court is in recess.

8    All rise for the jury.

9   (Proceedings were heard out of the presence of the venire.)

10        **THE COURT:**  Okay.  Be seated.

11    Are there any other potential jurors present?  Are you a

12  potential juror?

13        **UNIDENTIFIED PROSPECTIVE JUROR:**  Yes.

14        **THE COURT:**  Do you mind stepping out so that I can

15  talk privately with the lawyers?

16    How about you two in the back?  Are you jurors?

17        **UNIDENTIFIED SPEAKER:**  No, Your Honor.

18        **MR. PAK:**  They're with Google.

19        **THE COURT:**  All right.  Okay.

20    Well, let's start with Ms. Bosworth, Number 2, who has a

21  brother she cares for.  I'm inclined to let her go on account

22  of hardship, but I want to hear what you have to say.

23        **MR. PAK:**  We agree, Your Honor.

24        **MS. CARIDIS:**  We're fine with letting her go,

25  Your Honor.

 1          **THE COURT:**  All right.  So we will excuse her.

 2      Then Samelson-Jones, the physician who has a one-year-old

 3  son.  I'm not inclined to excuse her, but I -- what are your

 4  views?

 5          **MR. PAK:**  I do think it is a hardship for her.  We'd

 6  be inclined to excuse her.

 7          **MS. CARIDIS:**  Your Honor, we think that we should be

 8  able to ask her some more questions to vet out whether the

 9  hardship is real or not.

10          **THE COURT:**  All right.  I'm going to pass it for now.

11      Then the electrical engineering prof from UC Berkeley

12  who's got the seniors waiting to know if they're going to

13  graduate.  What does Sonos say?

14          **MS. CARIDIS:**  Your Honor, I'd like to be able to

15  explore his hardships more as well.

16          **THE COURT:**  Well, it's pretty serious.  He's telling

17  us he's got 64 people who are going to not graduate.

18          **MS. CARIDIS:**  We can let him go then.

19          **MR. PAK:**  That's fine with us, Your Honor.

20          **THE COURT:**  All right.  We'll let him go.

21      How about Westberg, who may be biased?  He's the guy who's

22  a business guy who -- Number 7, who --

23          **MS. CARIDIS:**  We're okay with letting him go as well

24  based on his connections.

25          **MR. PAK:**  We're fine with letting him go as well,

1  Your Honor.

2      **THE COURT:**  Brockett.  Now, her, she's an electrical

3  engineer.  She would be an excellent juror, but she has a

4  problem on May 22nd, which leads me to wonder if we can --

5  instead of going on May 22nd, if we need to, we -- I think she

6  said she would be back -- did she say she'd be back on the 25th

7  or traveling on the 25th?

8      **MS. CARIDIS:**  I think she said she was traveling on

9  whatever that Friday is.

10     **THE COURT:**  No.

11     **MR. PAK:**  Thursday.

12     **MS. CARIDIS:**  Because the graduation was on Thursday.

13     **THE COURT:**  Well --

14     **MR. PAK:**  I heard that she was traveling back on

15  Thursday.

16     **THE COURT:**  All right.  So we could come back on

17  Friday, the 26th, and then, if need be, on the 30th and 31st

18  instead.

19     **MR. PAK:**  Yeah, we would be fine with that,

20  Your Honor.

21     **THE COURT:**  Can you do that schedule?

22     **MS. CARIDIS:**  Yes, Your Honor.

23     **THE COURT:**  Okay.  I may propose that to her.

24     All right.  Then we come to Chambers, who used to work for

25  Google and loves Sonos equipment.

1        **MR. PAK:**  Your Honor, I just -- I just think there is

2   just too much information there and potential bias either way.

3        **THE COURT:**  What do you think?

4        **MS. CARIDIS:**  Your Honor, again, I'd like a chance to

5   explore it.  He did work previously with Google; so I'd like to

6   understand whether he truly thinks that he would be able to be

7   impartial, whether he thinks he can put aside --

8        **THE COURT:**  He loves your equipment.  He's biased in

9   your favor.  He's a big-time --

10       **MS. CARIDIS:**  Your Honor, I'm sure that most of this

11  panel has used Google services, you know, plenty of times, and

12  so I'm not sure that just based on the fact that he happens to

13  like our services is enough.

14       **MR. PAK:**  Your Honor, I think it goes beyond just

15  casual use.  I think he stated on the record that he loves

16  their stuff and that he's -- he and his friends organize

17  parties and he's --

18       **THE COURT:**  Well, but we'll see.  All right.  I'm

19  going to give you a chance to ask questions on it.

20       How about -- I circled, but now can't understand why,

21  Cerezo.  What was the reason I circled that?

22       **MS. CARIDIS:**  So he just started a new job on Friday;

23  but other than that, as long as --

24       **THE COURT:**  Okay.  I'm not going to excuse him then

25  unless -- I don't know why I circled it.

1            **MR. ROBERTS:**  Your Honor, you might have circled it

2   because he has a juvenile record that he said was sealed and he

3   didn't know whether it contained a felony.

4            **THE COURT:**  Well, can a juvenile even be convicted of

5   a felony?  I don't know the answer to that actually.

6        I don't have a good enough reason to excuse him yet unless

7   it was stipulated to.  If it was stipulated, I'd let him go,

8   but I'm not going to do it on my own.

9            **MR. PAK:**  We'd like to keep him for now, Your Honor,

10  pending questions.

11           **THE COURT:**  Okay.  All right.

12       Okay.  So to come back, we excused Bosworth -- what did

13  I -- Sastry, he's the guy who is -- we're going to excuse.

14           **MS. CARIDIS:**  Yes, Your Honor.

15           **THE COURT:**  We excused Westberg.

16       Possibly save Brockett with additional rearranging those

17  days.

18       And then you ask more questions of --

19           **MR. PAK:**  Ivory-Chambers.

20           **THE COURT:**  Yeah, Chambers and Samelson-Jones.

21       Well, I may -- I may get you -- before we get into the

22  more general questions, I may let you ask your follow-up

23  questions of those two before we get into -- this is going

24  slow.  This is going slow.  We've got a long way to go.

25           **MS. CARIDIS:**  We can let Samelson-Jones go, the doctor

 1   who had the one-year-old at home.

 2           THE COURT:  Well, Mr. Pak, I can't remember your

 3   position.

 4           MR. PAK:  Your Honor, that's fine with us.

 5           THE COURT:  Let her go?

 6           MR. PAK:  Yes.

 7           THE COURT:  Okay.  So she will go.

 8       All right.  So there we are.  We'll take about -- let's

 9   take a ten-minute break ourselves and come back.

10           MR. PAK:  Thank you, Your Honor.

11           MR. ROBERTS:  Your Honor, could I ask for one short

12   thing?

13           THE COURT:  Yeah.

14           MR. ROBERTS:  Which is, when the jury comes back,

15   would you tell them that the reason we're not being friendly in

16   the hallways is because we're not allowed to talk to them?

17           THE COURT:  Sure.  If I forget, remind me.

18           MR. ROBERTS:  Thank you.

19           THE COURT:  Thank you.

20           THE CLERK:  Court is in recess.

21                   (Recess taken at 10:39 a.m.)

22               (Proceedings resumed at 10:48 a.m.)

23       (Proceedings were heard in the presence of the venire.)

24           THE COURT:  Okay.  Thank you.  Be seated.

25       The lawyers, when they see you in the hallway, if they

1    do -- or maybe even in the elevator, they will at most smile

2    and say "Good morning."  They're not going to engage in any

3    smalltalk with you.  The reason for that is out of respect for

4    your position, and they don't want you to in any way think

5    they're trying to ingratiate themselves with smalltalk about

6    the Warriors, for example, or, you know, music.

7         No.  They respect what -- your job, and they don't want to

8    make you even think for a second that they're trying to

9    ingratiate themselves.

10        Angie, would you do this?  I want to get your advice on

11   when the best time to break for lunch would be so that the

12   jurors get to the lunchroom on the second floor prior to any

13   rush so that we can not waste time with people standing in line

14   to get a hamburger.

15             **THE CLERK:**  11:45 would be a good time, Your Honor.

16             **THE COURT:**  Okay.  That's probably when we're going to

17   break, at 11:45 then.

18        All right.  Well, we made some progress.  The lawyers --

19   are you sick over there?  Do you need -- are you okay?

20        All right.  Because we've got cough drops here if you need

21   them.

22        All right.  Bosworth.

23             **PROSPECTIVE JUROR BOSWORTH:**  Yes.

24             **THE COURT:**  We're going to excuse you on account of

25   your need to assist with your brother.  So you may stand up and

1   go with our thanks.

2        (Prospective Juror Andrea Louise Bosworth excused.)

3        THE COURT:  Samelson-Jones, the doctor, do you still

4   want off?

5        PROSPECTIVE JUROR SAMELSON-JONES:  Yes.

6        THE COURT:  Okay.  You're excused.

7        PROSPECTIVE JUROR SAMELSON-JONES:  Thank you.

8   Appreciate it.

9        (Prospective Juror Emma Carin Samelson-Jones excused.)

10       THE COURT:  Sastry.  Now, is it really true you have

11   no way to avoid this problem with the seniors?

12       PROSPECTIVE JUROR SASTRY:  I really don't, Your Honor.

13       THE COURT:  What?

14       PROSPECTIVE JUROR SASTRY:  I'm sorry.  I really don't,

15   Your Honor.

16       THE COURT:  Okay.  You're excused.

17       (Prospective Juror Sosale Shankara Sastry excused.)

18       THE COURT:  Westberg, where are you?

19   We think you're too biased and would be unable to be fair.

20   So you're excused.

21       PROSPECTIVE JUROR WESTBERG:  Thank you, Your Honor.

22       (Prospective Juror Paul Brian Westberg excused.)

23       THE COURT:  The rest of you, we've got -- I've got a

24   question now.

25   Ms. Brockett, our electrical engineer, we're trying to

1  figure out -- the lawyers and I have consulted.  We can work

2  around your schedule and do the resumption of the trial; but

3  this may -- before I go to all that trouble, I want to make

4  sure that I understand the dates that you would be -- you'd be

5  away for -- I think it was your son's graduation.

6          **PROSPECTIVE JUROR BROCKETT:**  Right.  I would be away

7  from May 22nd through the 26th.

8          **THE COURT:**  Well, you said earlier that you would be

9  traveling on the 25th.

10         **PROSPECTIVE JUROR BROCKETT:**  No.  Traveling on the

11  22nd, which is a Monday.

12         **THE COURT:**  Uh-huh.  And then what day do you travel

13  back, though?

14         **PROSPECTIVE JUROR BROCKETT:**  The night of the 26th.

15         **THE COURT:**  Oh, I thought you said the --

16         **PROSPECTIVE JUROR BROCKETT:**  No.  Sorry.  You're

17  right.  The 25th.

18         **THE COURT:**  All right.  So could you be in court on

19  the 26th?

20         **PROSPECTIVE JUROR BROCKETT:**  Yes.

21         **THE COURT:**  So we could do it -- we could -- if we had

22  to, we could postpone -- if the trial goes that long, to the

23  26th -- and then I think the next Monday is Memorial Day;

24  right?

25         **PROSPECTIVE JUROR BROCKETT:**  Right.

1          THE COURT:  So that we would have to be the twenty- --
2    sorry -- the 30th and 31st.  Would that work for you?
3          PROSPECTIVE JUROR BROCKETT:  That would.  I just have
4    to clarify.  On the Friday, we would be done by, like,
5    4:00 p.m.?  My --
6          THE COURT:  Friday, the 26th?
7          PROSPECTIVE JUROR BROCKETT:  Yes.
8          THE COURT:  Or Friday, the 19th?
9          PROSPECTIVE JUROR BROCKETT:  Friday, the 26th.
10         THE COURT:  Well, if that's what -- by 4:00 p.m.?
11         PROSPECTIVE JUROR BROCKETT:  My daughter graduates
12   from high school on the Friday.
13         THE COURT:  Friday, the 26th?
14         PROSPECTIVE JUROR BROCKETT:  Yes.
15         THE COURT:  Okay.  Yeah, we'd be done in time for you
16   to see her graduate.
17         PROSPECTIVE JUROR BROCKETT:  Okay.  Great.
18         THE COURT:  All right.  But I thought she was
19   graduating anyway.  Who is it that you're going to see?
20         PROSPECTIVE JUROR BROCKETT:  I have a college senior
21   and a high school senior.  It was the year from hell this year.
22                         (Laughter.)
23         THE COURT:  Okay.  So the college senior is where?
24         PROSPECTIVE JUROR BROCKETT:  At Harvard.
25         THE COURT:  Harvard.

```
 1          PROSPECTIVE JUROR BROCKETT:  I'm much, much poorer
 2    than I was four years ago.
 3                        (Laughter.)
 4          THE COURT:  Well, so this is a lot of happy graduation
 5    days coming up for you; right?
 6          PROSPECTIVE JUROR BROCKETT:  Yes.
 7          THE COURT:  I know you're a proud mom.  But would
 8    those days work for you?
 9          PROSPECTIVE JUROR BROCKETT:  Those will.
10          THE COURT:  All right.  Now, let me ask everybody else
11    because I -- is that -- would that work for you, that we
12    would -- if we go that long, we would take off that third week
13    entirely except for Friday, the 26th, and then come back on the
14    26th and then on Tuesday, the 30th, and the 31st.
15        First, all in the front row, you're okay with that?
16          PROSPECTIVE JUROR KWONG:  Can I check the calendar?
17          THE COURT:  Please, yes, go ahead, check your
18    calendars.
19                        (Pause in proceedings.)
20          PROSPECTIVE JUROR VELLAYAPAN:  I have a flight on
21    Friday, the 26th, for the long weekend.
22          THE COURT:  Is that a personal thing?
23          PROSPECTIVE JUROR VELLAYAPAN:  It's a personal thing.
24    It's a family friend reception.
25          THE COURT:  What time of day is the flight?
```

 1          **PROSPECTIVE JUROR VELLAYAPAN:**  It's in the evening.  I

 2    have to check the exact time.

 3          **THE COURT:**  Well, if it's in the evening, maybe you

 4    could still be here during the day, or at least part of the

 5    day.

 6       Okay.  Whenever we come -- I'll come to you in a moment.

 7       All right.  The clerk will now call four replacements in

 8    the order in which I excused them, Number 2 first.

 9          **THE CLERK:**  Amy Chuck, C-h-u-c-k, please sit in Seat

10    Number 2.

11       Samuel Woods, W-o-o-d-s, please sit in Seat Number 3.

12       Raymond James Michalski --

13          **THE COURT:**  Michalski?

14          **THE CLERK:**  -- Number 6.

15       M-i-c-h-a-l-s-k-i.

16          **THE COURT:**  Okay.

17          **THE CLERK:**  And Mechele Pruitt, Seat Number 7.

18          **THE COURT:**  Pruitt?

19          **THE CLERK:**  P, as in "Paul," r-u-i-t-t.

20          **THE COURT:**  Okay.  Thank you.

21       Who has the microphone over there?

22       All right.  We've been waiting a long time -- you've been

23    waiting a long time, and your name is Friedland; right?

24          **PROSPECTIVE JUROR FRIEDLAND:**  Mm-hmm.

25          **THE COURT:**  Okay.  You can take off your mask so we

 1   can hear you better.

 2        Please give us the biographical information.

 3        **PROSPECTIVE JUROR FRIEDLAND:**  I'm Jennifer Friedland.

 4   I live in San Francisco.  I am a college graduate.

 5        I most recently worked in real estate development;

 6   however, I am currently a stay-at-home mom.

 7        I do -- I'm involved in a lot of volunteer organizations,

 8   Service Corps.  I'm on the board of Reading Partners Bay Area,

 9   which is a non-profit helping kids read.

10        I -- hobbies, I play tennis, other sports.

11        I am married.  My husband does work at Apple as a software

12   engineer.  I have two kids.  They are 12 and 10.  So they're in

13   school.

14        I have not served in jury service before.  I've not been

15   in the military or law enforcement.  And I've never been a

16   party or witness in court, although a long time ago I did work

17   as a legal assistant doing corporate litigation and would be in

18   trials as a legal assistant.

19        **THE COURT:**  In trial?

20        **PROSPECTIVE JUROR FRIEDLAND:**  As in, like, I assisted

21   attorneys who were litigating.

22        **THE COURT:**  Okay.  What law firms are those?

23        **PROSPECTIVE JUROR FRIEDLAND:**  It was at Shearman &

24   Sterling in New York.

25        **THE COURT:**  Okay.  Did you assist in any case with

 1   Sonos or with Google?

 2           **PROSPECTIVE JUROR FRIEDLAND:**  No.

 3           **THE COURT:**  All right.  So you were a legal assistant

 4   and decided not to go to law school?

 5           **PROSPECTIVE JUROR FRIEDLAND:**  Yeah.  That was a big

 6   decision-maker, yeah.  That was a big "no" for me.

 7           **THE COURT:**  Instead, you decided to get into what line

 8   of work?

 9           **PROSPECTIVE JUROR FRIEDLAND:**  Real estate development.

10   Also -- yeah.  Yeah.

11           **THE COURT:**  Real estate development.  Does that mean

12   building condos?  What does that mean?

13           **PROSPECTIVE JUROR FRIEDLAND:**  I did residential and

14   commercial buildings.

15           **THE COURT:**  Okay.  Do you have any hardship issue?

16           **PROSPECTIVE JUROR FRIEDLAND:**  I am a stay-at-home mom,

17   so I am responsible for getting my children to school at

18   8:30 in the morning.  I'm the only one who can do it.  My

19   husband does work in Cupertino, so he takes an early commute

20   bus so that is --

21           **THE COURT:**  Now, let me push back on that a little

22   bit.

23           **PROSPECTIVE JUROR FRIEDLAND:**  Sure.

24           **THE COURT:**  How come Apple -- doesn't he work for

25   Apple?

1          **PROSPECTIVE JUROR FRIEDLAND:** He does work for Apple.

2          **THE COURT:** Can't they cut him a little slack so he

3     could watch the kids while you do your civic duty?

4          **PROSPECTIVE JUROR FRIEDLAND:** He -- I mean, he's

5     looked at his calendar for the next couple of weeks.  It's

6     difficult.  That's --

7          **THE COURT:** It's easy --

8          **PROSPECTIVE JUROR FRIEDLAND:** You know, it's possible.

9     It's --

10         **THE COURT:** My calendar is pretty difficult for the

11    next couple of weeks too.

12         **PROSPECTIVE JUROR FRIEDLAND:** Yeah.

13         **THE COURT:** But I'm still here.  So I feel like maybe

14    he should look harder at his calendar.

15         **PROSPECTIVE JUROR FRIEDLAND:** Yeah.  So, I mean,

16    that's --

17         **THE COURT:** Is that it?

18         **PROSPECTIVE JUROR FRIEDLAND:** That would be the

19    hardship, sure.

20         **THE COURT:** Would you be fair and impartial?

21         **PROSPECTIVE JUROR FRIEDLAND:** I believe so.

22         **THE COURT:** I'm going to say you can do this and get

23    your husband to help with those two children.

24         **PROSPECTIVE JUROR FRIEDLAND:** Okay.

25         **THE COURT:** Thank you.

1          Okay.  Please pass the microphone to your neighbor.

2          **PROSPECTIVE JUROR VELLAYAPAN:**  My name is Meenakshi

3    Vellayapan.  I live in Fremont.  I have a master's degree in

4    speech language pathology.

5          I'm employed as a speech therapist in a school district.

6    I'm part of the teacher's union.

7          Hobbies, I guess walking.

8          And I'm married.  My spouse is an engineer in supply chain

9    planning.  Two children, 24, she's a teacher; 21, he works at a

10   Fintech start-up.

11         And I've been in the jury selection process but not

12   selected.

13         Not been in the military or law enforcement, and have

14   never been a witness or party in court.

15         **THE COURT:**  All right.  I need to ask you.  I want to

16   pronounce your name correctly.  How do you pronounce your name?

17         **PROSPECTIVE JUROR VELLAYAPAN:**  Meenakshi.  Meena for

18   short.

19         **THE COURT:**  No, no.  Your last name.

20         **PROSPECTIVE JUROR VELLAYAPAN:**  Oh.  Vellayapan.

21         **THE COURT:**  Vellayapan?

22         **PROSPECTIVE JUROR VELLAYAPAN:**  Correct.

23         **THE COURT:**  Vellayapan.

24         All right.  And your husband, for whom does he work?

25         **PROSPECTIVE JUROR VELLAYAPAN:**  Sorry.  He moves around

 1    a lot.  Just give me a second.

 2           THE COURT:  Has he ever worked for these two

 3    companies?

 4           PROSPECTIVE JUROR VELLAYAPAN:  No, no, no.  He's in

 5    supply chain planning.  He works in the food industry.

 6           THE COURT:  All right.  It's okay.  As long as it's

 7    not these two companies, I'm fine.

 8        And he is a software engineer?

 9           PROSPECTIVE JUROR VELLAYAPAN:  No.  My husband is a

10    mechanical engineer.

11           THE COURT:  Oh, oh.  Supply chain engineer.

12           PROSPECTIVE JUROR VELLAYAPAN:  Yeah.

13           THE COURT:  Yeah, you said that.

14        All right.  Any hardship issue?

15           PROSPECTIVE JUROR VELLAYAPAN:  Only that I'm at the

16    school and there's nobody there to replace me, so the students

17    don't get therapy.

18        I don't know any of the lawyers or any of the witnesses,

19    but my brother-in-law does work for Google.

20           THE COURT:  Brother-in-law?

21           PROSPECTIVE JUROR VELLAYAPAN:  Mm-hmm.

22           THE COURT:  What does he do there?

23           PROSPECTIVE JUROR VELLAYAPAN:  Software engineer.

24    I think he's a VP.  I'm not a hundred percent sure.

25           THE COURT:  What's his name?

```
 1            PROSPECTIVE JUROR VELLAYAPAN:  Chidambaram Krishnan.

 2            THE COURT:  Spell that slowly.

 3            PROSPECTIVE JUROR VELLAYAPAN:  Last name

 4   K-r-i-s-h-n-a-n.

 5            THE COURT:  Does he have anything to do with this

 6   case?

 7            MR. PAK:  No, Your Honor.

 8            THE COURT:  Can you put that to one side and be fair

 9   and impartial to both sides here?

10            PROSPECTIVE JUROR VELLAYAPAN:  I believe so.

11            THE COURT:  All right.  Thank you.

12        All right.  Now, I think it's not enough of a hardship

13   issue for me to excuse you on account of the children at

14   school.  So if you're selected, I think you'd be an excellent

15   juror.

16        All right.  Ms. Cameron, your turn.

17            PROSPECTIVE JUROR CAMERON:  Hello.  My name is Carolyn

18   Cameron.  I live in Fairfax.  I have a bachelor's in art.

19        I work for a company called Dark Garden Corsetry.  I'm a

20   designer --

21            THE COURT:  Can you speak closer to the mic?

22            PROSPECTIVE JUROR CAMERON:  Sorry.

23        I'm a designer and seamstress there.

24        Hobbies, no.  I work all the time.  I work in my studio

25   most of the time.
```

1      I am not married, though I live with my partner.  He's a

2  carpenter.  I don't have children.

3      I have not done jury service.  I have not been in the

4  military.  And I've not been a party or a witness in court.

5          **THE COURT:**  Great.

6      Any hardship issue you have?

7          **PROSPECTIVE JUROR CAMERON:**  Well, ideally, it's not --

8  like, financially, it's not ideal.  But you probably should

9  know that I'm neurodivergent.  I have ADD pretty bad.  So I'm

10 not sure how well I will follow everything from day to day.

11         **THE COURT:**  You have ADD?

12         **PROSPECTIVE JUROR CAMERON:**  Mm-hmm.

13         **THE COURT:**  So what is that?  Attention deficit

14 disorder?

15         **PROSPECTIVE JUROR CAMERON:**  Yes.

16         **THE COURT:**  So you think you'd have a hard time

17 following the testimony?

18         **PROSPECTIVE JUROR CAMERON:**  Yes.

19         **THE COURT:**  Or remembering it or paying attention?

20         **PROSPECTIVE JUROR CAMERON:**  All of that.

21         **THE COURT:**  Okay.  But you work for a living; right?

22         **PROSPECTIVE JUROR CAMERON:**  I have my life very

23 organized around being able to deal with the way my brain

24 works.

25         **THE COURT:**  All right.  So you function in the real

 1   world?

 2              **PROSPECTIVE JUROR CAMERON:**  Yes.

 3         **THE COURT:**  That'll do for us.

 4      Okay.  What else?  What other hardship issue?

 5              **PROSPECTIVE JUROR CAMERON:**  I do have a trip on the

 6   19th.

 7         **THE COURT:**  What?

 8              **PROSPECTIVE JUROR CAMERON:**  I have a trip on the 19th.

 9         **THE COURT:**  19th?

10              **PROSPECTIVE JUROR CAMERON:**  Yes.

11         **THE COURT:**  Okay.  Now, that is -- is that for

12   business or for personal or what?

13              **PROSPECTIVE JUROR CAMERON:**  My best friend is getting

14   her doctorate; so I need to be there.

15         **THE COURT:**  Have you already paid for the tickets?

16              **PROSPECTIVE JUROR CAMERON:**  Yeah.  I have tickets and

17   all that stuff.

18         **THE COURT:**  You've already paid for them?

19              **PROSPECTIVE JUROR CAMERON:**  Yeah.

20         **THE COURT:**  You paid for them?

21              **PROSPECTIVE JUROR CAMERON:**  Yes.  Because it said that

22   we had to be -- pay attention -- or be free for the first two

23   weeks.

24         **THE COURT:**  I didn't -- I can't hear what you say.

25   Speak closer to the microphone.

1    **PROSPECTIVE JUROR CAMERON:**  I thought that we only had

2  to be available for the first two weeks of May.

3    **THE COURT:**  Well, the 19th is in the first two weeks.

4  It's the last day of the two weeks.

5    **PROSPECTIVE JUROR CAMERON:**  Oh, okay.  Well --

6    **THE COURT:**  Could you -- I mean, if you've already

7  paid for the tickets --

8    **PROSPECTIVE JUROR CAMERON:**  It's in the evening.

9    **THE COURT:**  Where is it?  Is it --

10    **PROSPECTIVE JUROR CAMERON:**  It's just to L.A.

11    **THE COURT:**  L.A.?

12  Could you leave in the afternoon to go down there and

13  come --

14    **PROSPECTIVE JUROR CAMERON:**  Yeah.

15    **THE COURT:**  All right.  So you could be here for at

16  least most of the 19th; right?

17    **PROSPECTIVE JUROR CAMERON:**  Yes.

18    **THE COURT:**  All right.

19  Okay.  So that -- and then could you be here on the 26th

20  and the 30th and the 31st?

21    **PROSPECTIVE JUROR CAMERON:**  I believe so, yes.

22    **THE COURT:**  All right.  Would you be fair and

23  impartial to both sides?

24    **PROSPECTIVE JUROR CAMERON:**  I assume I will be.

25    **THE COURT:**  I mean, do you --

 1          **PROSPECTIVE JUROR CAMERON:**  Yeah.  I mean, I don't

 2     know anything about any of the computer stuff, so...

 3          **THE COURT:**  Okay.  Great.  Okay.  Thank you.

 4       Now, please pass the microphone to Chuck.

 5       Mrs. Chuck, am I saying it right?

 6          **PROSPECTIVE JUROR CHUCK:**  Yes.

 7          **THE COURT:**  All right.  Please, your turn.

 8          **PROSPECTIVE JUROR CHUCK:**  Hello.  My name is Amy

 9     Chuck.  I live in San Carlos.  I have an associate's.

10       I'm a stay-at-home mom.  I used to work at Parking and

11     Traffic in the Disabled Placard Unit and also at the City Tow

12     desk.  I volunteer at my daughter's school as a docent for arts

13     and action and at the library and at lunchtime.

14       I'm married.  My husband works for Sherwood in finances.

15     They sell off assets and pay creditors.  I have one daughter.

16     She's 7.

17       I have not been picked -- I've been seated here before,

18     but not picked.

19       I haven't not been in law enforcement, but I do know some

20     people in the Sheriff's Department and D.A. and P.D.

21       I think that's about it.

22          **THE COURT:**  Okay.  Have you ever been a party or

23     witness in court?

24          **PROSPECTIVE JUROR CHUCK:**  When I was on a job one

25     time, I did have a cyclist hit me, and I think we did do a day

 1   in court, but it was -- I was working for the City at the time,

 2   so it was all handled through them.

 3          THE COURT:  Do you have any issue concerning hardship?

 4          PROSPECTIVE JUROR CHUCK:  Just getting -- my husband

 5   has no problem dropping her off to school.  Just if we get off

 6   at 1:00 every day, I don't think it should be a problem.  It

 7   takes me about an hour to get home, and she gets -- most of the

 8   days she gets off of school at 2:30.

 9          THE COURT:  We will be done by 1:00 each day.  Once

10   the jury begins to deliberate, if they wish, I will let them

11   stay as late as they want.

12       But you'd be on the jury.  You could say, "No, I've got to

13   leave at 1 o'clock."  So it would be up to you.  Or maybe that

14   day your husband could cover for you.

15       But, no, we will be done each day at 1 o'clock if that's

16   what you need.

17          PROSPECTIVE JUROR CHUCK:  Yes.  I mean, there's only

18   one day she gets off earlier, but I can probably have that

19   covered.

20          THE COURT:  You'd have it covered?

21          PROSPECTIVE JUROR CHUCK:  Probably.

22          THE COURT:  That's your husband?

23          PROSPECTIVE JUROR CHUCK:  I guess if he has to.

24          THE COURT:  Yeah.  He can pitch in a little bit.

25   Thank you.

1          All right.  Do you think you'd be fair and impartial?

2               PROSPECTIVE JUROR CHUCK:  I'll do my best.

3               THE COURT:  All right.  But do you know of any reason

4     why --

5               PROSPECTIVE JUROR CHUCK:  No.

6               THE COURT:  -- that comes to mind?

7          All right.  That's great.  Thank you.

8          Let's go to -- is it Wolf?

9               PROSPECTIVE JUROR WOODS:  Woods.

10              THE COURT:  All right.  I'm sorry.  Woods.

11         Go ahead, Mr. Woods.

12              PROSPECTIVE JUROR WOODS:  Okay.  My name is Samuel

13    Woods.  I live in San Francisco.  I have a bachelor's in

14    business administration from the University of Tennessee.

15         I currently work for a company called Legarza Sports where

16    I'm a youth coach.

17         No organizations.

18         Hobbies, sports, TV, board games.

19         I'm single.  No kids.

20         No prior jury service.  No military or law enforcement.

21    Never a party or witness in court.

22              THE COURT:  Any issue of hardship?

23              PROSPECTIVE JUROR WOODS:  The only thing would be I

24    have an appointment to get my car fixed on the 19th.  I know

25    that pushing something like that back would push it back, like,

1  two or three months.  But it's still able to be driven.  So

2  that's the only thing.

3           THE COURT:  It's what?

4           PROSPECTIVE JUROR WOODS:  I can still drive my car,

5  so...

6           THE COURT:  I'm not following you.  You have an

7  appointment to get it fixed on the 19th?

8           PROSPECTIVE JUROR WOODS:  Yeah.  It needs to be

9  serviced.  The check engine light's been on for months, and

10  I've had it scheduled for months.  So it just so happened that

11  I got jury service at the same time that I've had it scheduled,

12  but that's the only thing.

13           THE COURT:  Well, can somebody attend to that for you?

14           PROSPECTIVE JUROR WOODS:  No.  It's -- the dealership

15  I have to take it to is in San Jose, and it's an all-day thing.

16           THE COURT:  I don't know if that's a good enough

17  reason.  How come you can't change that?

18           PROSPECTIVE JUROR WOODS:  Well, I can change it.  It's

19  just that the way that it works, you have to schedule months

20  and months in advance.  Like, I called about a month ago to

21  check with a couple other places to see if I could get it done

22  sooner, and they said that the nearest opening was in July.  So

23  that was in, like, mid-March that I made those calls.  So if I

24  had to reschedule now, there's no telling when I could get it

25  fixed.

1    THE COURT:  Would you be fair and impartial?

2    PROSPECTIVE JUROR WOODS:  Yes.

3    THE COURT:  The 19th we probably will be in session.

4    PROSPECTIVE JUROR WOODS:  Mm-hmm.

5    THE COURT:  So you'd have to figure out a way to deal

6  with your car.

7    PROSPECTIVE JUROR WOODS:  Okay.

8    THE COURT:  I'm going to leave you eligible to serve

9  because you strike me as a resourceful guy who will figure out

10  a way to deal with your car.

11    PROSPECTIVE JUROR WOODS:  It's hard to get a car to

12  San Jose if I'm not driving it.

13    THE COURT:  Well, that's where the resourcefulness

14  comes in.

15    All right.  Mr. Woods, I thank you.

16    All right.  Now we go to Michalski.

17    PROSPECTIVE JUROR MICHALSKI:  Good morning.  My name's

18  Ray Michalski.  I live in Rohnert Park.  I have a B.S. in

19  electrical engineering.

20    Right now I'm working for Costco.

21    No clubs or organizations.

22    Hobbies, mountain biking and restoring antique stereo

23  speakers.

24    Married.  My wife is a payroll coordinator at Santa Rosa

25  Junior College.  Two children.  My daughter's 40, housewife;

1    and my son, 38, is an oncology nurse.

2         I was turned down on two prior juries, and in one criminal

3    case, I did sit on the jury.

4         No military, and I was never a witness in court.

5              **THE COURT:**  What do you mean you were turned down?

6              **PROSPECTIVE JUROR MICHALSKI:**  I wasn't selected.

7              **THE COURT:**  Okay.  But did somebody shriek at you and

8    say you were biased or something like that, or do you --

9              **PROSPECTIVE JUROR MICHALSKI:**  No.

10             **THE COURT:**  -- just mean you didn't get selected?

11             **PROSPECTIVE JUROR MICHALSKI:**  I just didn't get

12   selected.

13             **THE COURT:**  Okay.  Now, are you an electrical engineer

14   for Costco?

15             **PROSPECTIVE JUROR MICHALSKI:**  No.

16             **THE COURT:**  So you're retired?

17             **PROSPECTIVE JUROR MICHALSKI:**  Retired from that, yes.

18             **THE COURT:**  And in your active career, what did you do

19   for -- as an electrical engineer?

20             **PROSPECTIVE JUROR MICHALSKI:**  I worked for Bunker Ramo

21   and Olivetti North America on hardware on computer systems.

22             **THE COURT:**  Okay.  So you could solder two wires

23   together too?

24             **PROSPECTIVE JUROR MICHALSKI:**  Pretty much.

25             **THE COURT:**  All right.  And then you say you repair

 1  antique speakers?

 2          PROSPECTIVE JUROR MICHALSKI:  Yes, sir.

 3          THE COURT:  Describe that for us.  What do you do?

 4          PROSPECTIVE JUROR MICHALSKI:  Refinish the cases.  If

 5  the surrounds on the cones need to be repaired, I replace them

 6  or source some new parts.  Things such as that.

 7          THE COURT:  So these are not the smart speakers?

 8          PROSPECTIVE JUROR MICHALSKI:  No.

 9          THE COURT:  These are ancient speakers like I have?

10          PROSPECTIVE JUROR MICHALSKI:  Like you have, yeah, and

11  my 50-year-old pair.

12          THE COURT:  Okay.  There are not many people who do

13  what you do there, you know.  I've looked into this, and it's

14  hard to find somebody who will repair old speakers.

15          PROSPECTIVE JUROR MICHALSKI:  There's a really

16  reputable shop in San Rafael.

17          THE COURT:  Oh, is there?

18          PROSPECTIVE JUROR MICHALSKI:  Yeah.

19          THE COURT:  Okay.  Well, given your familiarity with

20  speakers, do you think -- have you got any inside knowledge

21  about what the issue is in this case?

22          PROSPECTIVE JUROR MICHALSKI:  No, sir.  I do not even

23  have a smart speaker in my home.

24          THE COURT:  Okay.

25          PROSPECTIVE JUROR MICHALSKI:  I'm afraid it would be

1  smarter than I am.

2       **THE COURT:**  Do you believe you'd be fair and impartial

3  to both sides?

4       **PROSPECTIVE JUROR MICHALSKI:**  I would do my best.

5       **THE COURT:**  All right.  And are you -- any hardship

6  issue you want to raise?

7       **PROSPECTIVE JUROR MICHALSKI:**  I'm assisting a neighbor

8  taking care of her husband, who's terminally ill, and he's been

9  my best friend for 25 years, but we could work around that.

10      **THE COURT:**  I'm sorry to hear that, but thank you for

11  being willing to serve.

12      Okay.  Now, we go to Pruitt.

13      **PROSPECTIVE JUROR PRUITT:**  Hi.  My name is Mechele

14  Pruitt.  I am a resident of San Francisco.  I have a degree in

15  education.

16      I am presently employed by Felton Institute, which is an

17  agency that serves families.

18      I don't belong to any organizations.

19      I enjoy cycling and camping and gardening.

20      I am not married.  I have a partner who has a background

21  in education.  I have a daughter who's 25.  She's a chef.

22      I have had prior jury service.  It was a civil case.  We

23  did reach a verdict.

24      No military or law enforcement background, and I was just

25  a party in a small claims court.

1          THE COURT:  Okay.  Any hardship issue?

2          PROSPECTIVE JUROR PRUITT:  No.

3          THE COURT:  Do you have -- do you think you'd be fair

4     to both sides?

5          PROSPECTIVE JUROR PRUITT:  Yes.

6          THE COURT:  Great.  Great.

7       Okay.  Now, have I -- all 14 of you, have I covered just

8     the biographical information?  I think I have.

9       Okay.  So those of you in the rear, though, some of you

10    still will come forward yet based on prior experience, so

11    please bear with me.

12       Oh, I want all of you to think about what I will call the

13    Brockett alternative calendar, which is in order to accommodate

14    Ms. Brockett, we would -- if we don't reach a verdict by the

15    19th, which is -- should be done but things get in the way of

16    that, then we would -- we would skip almost an entire week and

17    come back on Friday, the 26th, have one day, then the

18    weekend -- the long weekend for Memorial Day, and then come

19    back on Tuesday, the 30th, and the 31st.  So I'm certain we

20    will be done by that point.

21       Raise your hand if there is -- that would present a

22    hardship for you, the alternative schedule.

23       Now, it goes without saying that we would start on Monday,

24    the 8th, and go all week, next Monday, the 8th, go all week.

25    And then we would take the Monday after Mother's Day off,

1  that's the 15th, and then go 16 through 19.  The 19th is a

2  Friday.

3       Then by that Friday is when I think we'll have a verdict,

4  but I don't know.

5       And then we skip to the 25th and then the 30th and the

6  31st.

7       So raise your hand if you think there's a hardship issue

8  in there that I need to consider.

9            PROSPECTIVE JUROR VELLAYAPAN:  I just wanted to

10  confirm, on the 26th we would be done by, like, 3:00 or

11  4:00 p.m.?

12           THE COURT:  Yes.  Yes.  We would accommodate you, 3:00

13  or 4:00 p.m.

14           PROSPECTIVE JUROR VELLAYAPAN:  Thank you.

15           THE COURT:  All right.

16       Okay.  I see no hands.  Okay.  Great.

17       So that will be our alternative schedule if -- our

18  schedule.

19       All right.  Any of you ever had any -- ever applied for a

20  patent?

21                    (A hand is raised.)

22           THE COURT:  Okay.  Ms. Brockett.  All right.  Let's

23  hear about your patent.  Tell us about your applying for a

24  patent and whether you got one.

25           PROSPECTIVE JUROR BROCKETT:  I applied for several.  I

1  do have one.  It's for a multiplexing video over a video

2  delivery system.

3          THE COURT:  Okay.  What year was it granted?

4          PROSPECTIVE JUROR BROCKETT:  Oh --

5          THE COURT:  Roughly.

6          PROSPECTIVE JUROR BROCKETT:  About seven, eight years

7  ago.

8          THE COURT:  Okay.  And were you the sole inventor?

9          PROSPECTIVE JUROR BROCKETT:  No.

10         THE COURT:  One of many?

11         PROSPECTIVE JUROR BROCKETT:  One of four.

12         THE COURT:  Okay.  Has it ever been in litigation?

13         PROSPECTIVE JUROR BROCKETT:  No.

14         THE COURT:  And who is the current owner of that?

15         PROSPECTIVE JUROR BROCKETT:  The current owner is

16  CommScope.

17         THE COURT:  That's who you work for?

18         PROSPECTIVE JUROR BROCKETT:  No.

19         THE COURT:  Okay.

20      All right.  And it's multiplexing what?

21         PROSPECTIVE JUROR BROCKETT:  Video content.

22         THE COURT:  All right.  Okay.

23      So, okay.  So you have a patent.

24      Anybody else?

25                      (No response.)

```
 1              THE COURT:  Okay.  Nobody.

 2         All right.  Have any of you ever had a good idea that was

 3    stolen by somebody else?

 4                        (No response.)

 5              THE COURT:  Nobody yet.  Okay.  Good.

 6         Has your patent, Ms. Brockett, been in litigation of

 7    any --

 8              PROSPECTIVE JUROR BROCKETT:  (Shakes head.)

 9              THE COURT:  She says "no."

10         Okay.  Any of you own stocks or bonds in Sonos or Google?

11                        (Hands raised.)

12              THE COURT:  Okay.  Wait.  Over here, Ms. --

13              PROSPECTIVE JUROR KWONG:  Kwong.

14              THE COURT:  Kwong.

15         Okay.  Let's see what you -- you own stock in Google or

16    what?  You need to take your mask off.

17              PROSPECTIVE JUROR KWONG:  In Alphabet.

18              THE COURT:  Alphabet?

19              PROSPECTIVE JUROR KWONG:  Yeah.

20              THE COURT:  You own stock in it?

21              PROSPECTIVE JUROR KWONG:  Like one or two shares.

22              THE COURT:  One or two shares.

23         Why don't you sell them this afternoon and eliminate this

24    problem for me?

25         All right.  So you have stock -- common stock in Alphabet?
```

1        **PROSPECTIVE JUROR KWONG:**  Yes, I think so.  I can

2   double-check if it's important.

3        **THE COURT:**  It could be important.  I think you should

4   check it.

5        Anyone else?

6                          (Hands raised.)

7        **THE COURT:**  Ms. Brockett.

8        **PROSPECTIVE JUROR BROCKETT:**  I have to check with my

9   husband, but I'm pretty sure he owns Alphabet.  I'm not sure

10  about Sonos.

11       **THE COURT:**  You think your husband has stock in

12  Alphabet?

13       **PROSPECTIVE JUROR BROCKETT:**  Yep.

14       **THE COURT:**  How certain are you?  80 percent?

15       **PROSPECTIVE JUROR BROCKETT:**  The portfolio is pretty

16  big.  So I just glanced over it for taxes, but I -- I can text

17  him and see.

18       **THE COURT:**  All right.  Would this -- I think you

19  should.  But let me ask you.  Would this in any way affect your

20  ability to be fair and impartial?

21       **PROSPECTIVE JUROR BROCKETT:**  No.

22       **THE COURT:**  How about you, Ms. Kwong?

23       **PROSPECTIVE JUROR KWONG:**  No.

24       **THE COURT:**  Would you be fair?  Would you be willing

25  to rule against Google, even though you own stock in Alphabet?

```
 1              PROSPECTIVE JUROR KWONG:  Yes.

 2         THE COURT:  All right.  Let's go over here to

 3   Ms. Vellayapan.

 4              PROSPECTIVE JUROR VELLAYAPAN:  The same.  We might

 5   have stock in Google, but I'd have to check with my husband.

 6         THE COURT:  Well, that's not good enough.  I mean, you

 7   need to check and...

 8       Okay.  Ms. Friedland, did you raise your hand?

 9              PROSPECTIVE JUROR FRIEDLAND:  Exactly the same.  We

10   own a lot of stock.  I'm sure we probably have Alphabet in

11   there, but I'm not a hundred percent sure.

12         THE COURT:  Well, I can't excuse you just because on a

13   "maybe."

14       Raise your hand if you have Sonos smart speakers.  Raise

15   them high enough that everybody can...

16                        (Hands raised.)

17         THE COURT:  Okay.  One, two, three, four.

18       All right.  Okay.  Thank you.

19                     (Pause in proceedings.)

20         THE COURT:  Oh, something I've got to know here.  One

21   juror said that you knew somebody -- maybe know another juror.

22   Who is that?

23              PROSPECTIVE JUROR BROCKETT:  Shankar and my

24   father-in-law were friends and colleagues, but he's been

25   excused, so we're okay.
```

1           THE COURT:  Okay.  Well, as long as -- it still would

2      have been okay as long as you would not form an alliance in the

3      jury deliberations.  And then -- I'm sure it would have worked

4      out.

5           Have any of you ever negotiated a patent -- I'm sorry --

6      negotiated a license to a patent?

7           THE COURT:  No hands go up.  All right.

8                          (A hand is raised.)

9           THE COURT:  Okay.  Ms. Brockett needs to have the mic.

10          PROSPECTIVE JUROR BROCKETT:  I was on a team that did

11     diligence for the negotiation.

12          THE COURT:  Okay.  Thank you.

13          Any of you ever been -- no, I'm not going to ask that.

14          All right.  I need to -- I want the lawyers to look and

15     see whether or not ownership of any stock in one of these

16     companies is a mandatory excusing or is it just a discretionary

17     thing?

18          MR. PAK:  Yes, Your Honor, we'll look into that now.

19          THE COURT:  I need to know soon.

20          How about over there?  Do you know?

21          MS. CARIDIS:  I believe it's a mandatory, because you

22     have a financial interest in the action, but we will

23     double-check on that.

24          THE COURT:  Double-check and see.  We've wasted a lot

25     of time if...

**JURY VOIR DIRE**

```
 1      I want you to check with your spouses to see if you -- if

 2  you, in fact, do own it.

 3          PROSPECTIVE JUROR VELLAYAPAN:  You want us to check

 4  now?

 5          THE COURT:  Yes.  Here's what we're going to do.

 6      What time is the best time to go down for lunch?

 7          THE CLERK:  Between 11:30 and 11:45.

 8          THE COURT:  We're going to go right now.  It's 11:30.

 9  So we're going to take a break.

10      Don't talk about the case with each other.  Check on your

11  stock ownership.  Check both Sonos, Google, and Alphabet.

12      Now, I'm not saying that Alphabet equals Google, but let's

13  check anyway.

14      Is there a parent company for Sonos?

15          MS. CARIDIS:  No, Your Honor.

16          THE COURT:  All right.  Is it a publicly held company?

17          MS. CARIDIS:  Yes, Your Honor.

18          THE COURT:  All right.  So check on that.

19      Go down and get you some lunch on the second floor.  It's

20  a great federal facility.

21                          (Laughter.)

22          THE COURT:  It's not one of these fancy things that

23  the -- it's good old federal cuisine.  You will enjoy it.

24      So you have a good break.  We'll see you here in -- let's

25  just say 40 minutes.  Try for 40 minutes.
```

1      All right.

2           **THE CLERK:**  All rise for the jury.

3      (Proceedings were heard out of the presence of the venire.)

4           **THE COURT:**  Okay.  Please close the door and be

5      seated.

6      I need to know the answer of whether or not it's

7      absolutely jurisdictional or not.

8           **MS. CARIDIS:**  We're looking it up to get you an answer

9      as quickly as possible, Your Honor.

10          **THE COURT:**  All right.  We're going to take a break

11     then.

12          **THE CLERK:**  Court is in recess.

13              (Luncheon recess was taken at 11:29 a.m.)

14     <u>**AFTERNOON SESSION**</u>                            <u>**12:05 p.m.**</u>

15     (Proceedings were heard out of the presence of the venire.)

16          **THE COURT:**  Let's hear what you have by way of answers

17     on whether or not -- what difference does it make if somebody

18     owns stock in one of the companies?

19     Mr. Pak, you first.

20          **MR. PAK:**  Yes, Your Honor.

21     So it seems like there's some circuit authority that's

22     somewhat split.  One, I think, the Fourth Circuit says there's

23     no per se category for cause based on this.  However, there's

24     Seventh Circuit authority and possibly Federal Circuit

25     authority that seems to suggest that.

1    There are -- I will note that there are a large number of

2    cases where stock ownership has been the basis for cause

3    strikes.

4    And so I'm not sure we have a definitive answer whether

5    it's a per se, but the overwhelming case law suggests that it's

6    a proper basis to remove jurors.

7    　　　　THE COURT:  What if we don't know?  They just said

8    maybe.

9    　　　　MR. PAK:  Yeah.  That's -- then we don't know.  So I

10   don't think we can strike for cause on that basis.

11   　　　　MR. RICHTER:  Your Honor, this is Cole Richter for

12   Sonos.

13   We're seeing Federal Circuit law and a number of other law

14   in other circuits, such as the Third, that says it's reversible

15   error to refuse to excuse a juror who owns even a tiny

16   financial interest in a party to the case.

17   　　　　THE COURT:  Read to me the Federal Circuit authority.

18   　　　　MR. RICHTER:  Your Honor, this is *Caterpillar, Inc.*

19   *vs. Sturman Industries* and the cite is 387 F.3d 1358.  And the

20   relevant portion says (as read):

21   　　　"We conclude that the district court should have

22   　　　dismissed Juror Number 3 for implied bias.  Juror

23   　　　Number 3 had a financial interest in this case

24   　　　because her husband worked for Caterpillar at the

25   　　　time of the trial."

1        As noted in *Polichemi*, which is a Fourth Circuit case,

2   Your Honor -- I apologize -- a Seventh Circuit case (as read):

3            "Even a tiny financial interest is enough to

4        warrant dismissal, and it is legally irrelevant

5        whether this financial interest arose due to his

6        employment in management or under a union contract.

7        We, therefore, disagree with the district court's

8        reasoning during the jury selection process whereby

9        it either retained or dismissed potential jurors

10       based on, respectively, employment under a union

11       contract or, alternatively, in management.  In either

12       case, there's a financial interest in the outcome of

13       the case.

14           "In addition, we find no distinction in the law

15       between the financial interest of an at-will

16       management employee and the interest of an employee

17       under a union contract nor do we advocate creating

18       one."

19       **MR. PAK:**  We agree with the assessment of the case

20   law.

21       **THE COURT:**  All right.  So -- but we still don't have

22   a record yet that anybody owns stock.

23       **MR. PAK:**  Right, Your Honor.

24       **MS. CARIDIS:**  Your Honor, I don't think that's

25   entirely true.  I think Juror Number 1 -- Juror Number 1,

1    Ms. Kwong, said she definitely did own Alphabet stock.

2           **THE OFFICIAL REPORTER:**  I can't hear you.

3           **MS. CARIDIS:**  I apologize.

4      Juror Number 1, Ms. Kwong, said she definitely did own

5    Alphabet stock; and I believe that we're waiting for three

6    jurors -- 9, 10, and 14 -- as to --

7           **THE COURT:**  Well, if Kwong said that, does Alphabet

8    own Google?  Or is Alphabet now the -- I don't know the

9    relationship.

10           **MR. PAK:**  Yes, Alphabet is the parent company of

11   Google.

12           **THE COURT:**  Do you lawyers see, why do you -- are you

13   making the jury go through this?  Do you understand the burden

14   it is on them to settle your case that you lawyers can't

15   settle?  It's a shame.

16      Bring in the jury and let's continue.

17      (Proceedings were heard in the presence of the venire.)

18           **THE COURT:**  Okay.  Be seated.

19      I hope you had a good lunch.

20      Ms. Kwong -- now I don't have my -- where did Angie go?

21   There she is.

22      You need to give Ms. Kwong the microphone.

23      But my question to you is going to be:  Do you know for

24   sure whether or not you own any stock in Google or Alphabet?

25           **PROSPECTIVE JUROR KWONG:**  Yes, I do.

1          **THE COURT:**  Well, I have mismanaged things.  I have to

2   excuse you.  So I have no choice in the matter.  I have goofed

3   up.  I could have asked that question a long time ago and saved

4   you and some others some time, and it's my fault, and I'm very

5   apologetic.  But you take off and...

6       Any objection lawyers?

7          **MR. PAK:**  No, Your Honor.

8          **MS. CARIDIS:**  No.

9       (Prospective Juror Frances Lynn Kwong excused.)

10         **THE COURT:**  All right.  Who else raised their hand

11  that maybe they own some stock?

12      Okay.  Let's go to Number 9.

13         **PROSPECTIVE JUROR VELLAYAPAN:**  Yes, we do.  I checked.

14         **THE COURT:**  You have stock in which company?

15         **PROSPECTIVE JUROR VELLAYAPAN:**  Google.

16         **THE COURT:**  You mean Alphabet?

17         **PROSPECTIVE JUROR VELLAYAPAN:**  Yeah.

18         **THE COURT:**  Any objection to excusing her?

19         **MS. CARIDIS:**  No, Your Honor.

20         **MR. PAK:**  No, Your Honor.

21         **THE COURT:**  Take off.  You're excused.

22      (Prospective Juror Meenakshi Vellayapan excused.)

23         **THE COURT:**  Next.  Ms. Friedland, did you find out for

24  sure?

25         **PROSPECTIVE JUROR FRIEDLAND:**  We do.

```
 1            THE COURT:  You do what?

 2            PROSPECTIVE JUROR FRIEDLAND:  Sorry.  We do own Google

 3   stock.

 4            THE COURT:  You're excused.

 5            (Prospective Juror Jennifer Friedland excused.)

 6            THE COURT:  Anyone else?

 7            PROSPECTIVE JUROR THURIUM:  My partner owns Google

 8   stock.

 9            THE COURT:  Are you married?

10            PROSPECTIVE JUROR THURIUM:  No.  Well, it's

11   complicated.  I have a wife and a partner.

12            THE COURT:  Well, I'm going technically by the law

13   here.

14            PROSPECTIVE JUROR THURIUM:  Okay.

15            THE COURT:  Is your wife somebody who owns stock?

16            PROSPECTIVE JUROR THURIUM:  No.

17            THE COURT:  Who does?

18            PROSPECTIVE JUROR THURIUM:  My partner.

19            THE COURT:  Are you legally married?

20            PROSPECTIVE JUROR THURIUM:  Not to that person, no,

21   so...

22            THE COURT:  I can't excuse you yet.  They may ask you

23   more questions about it, but thank you for asking.

24       How about you?  Do you personally own any stock?

25            PROSPECTIVE JUROR THURIUM:  No.
```

1          **THE COURT:**  Great.

2          **PROSPECTIVE JUROR BROCKETT:**  Sadly, we used to, but we

3     don't anymore.

4          **THE COURT:**  You used to, but you don't anymore.  Okay.

5     Thank you, Ms. Brockett.

6          Now, we will replace Number 1.

7          And let me ask you back there, just raise your hand if you

8     think -- this is not binding -- if you own stock in Google or

9     Sonos.  So one, two, three, four -- about more than half the

10    people remaining own -- think they do.

11         Okay.  I want you to make sure because when the moment

12    comes, you've got to say it under oath.

13         **UNIDENTIFIED PROSPECTIVE JUROR:**  I --

14         **THE COURT:**  What?  Wait till you're called forward.  I

15    can't -- we can't hear you yet.

16         Okay.  Number 1.  Let's replace Number 1.

17         **THE CLERK:**  Number 1, Seat Number 1, Nasira Johnson.

18         **THE COURT:**  All right.  Ms. Johnson, come forward.

19         Now, Ms. Johnson, just tell me, do you own stock in --

20         **PROSPECTIVE JUROR JOHNSON:**  No.

21         **THE COURT:**  Great.  Okay.  Have a seat in Number 1.

22         And before we go -- let's go through Ms. Johnson over the

23    microphone.  How are you today?

24         **PROSPECTIVE JUROR JOHNSON:**  Good.  How are you?

25         **THE COURT:**  I'm making one mistake after the other,

 1   but I'm okay.  Thank you.

 2        Please --

 3             PROSPECTIVE JUROR JOHNSON:  It's not a problem.

 4        THE COURT:  Please give us the biographical info.

 5             PROSPECTIVE JUROR JOHNSON:  Okay.  My name is Nasira

 6   Johnson.  I live in San Francisco.  I have a B.A. in marine

 7   bio.

 8        My most recent job is aquatics coordinator at the YMCA.

 9        I don't -- I'm not a part of any organizations I can think

10   of.

11        Hobbies, general things, traveling, music festivals,

12   skating, swimming.

13             THE COURT:  Do you repair speakers in your spare time?

14             PROSPECTIVE JUROR JOHNSON:  I wish I did.

15             THE COURT:  Okay.

16             PROSPECTIVE JUROR JOHNSON:  Marital status, single.

17   No children.

18        No prior jury service.  No military or law service.  No

19   time in court.

20             THE COURT:  Can you think of any reason why you would

21   be biased in this case?

22             PROSPECTIVE JUROR JOHNSON:  No.

23             THE COURT:  Do you have any hardship issue?

24             PROSPECTIVE JUROR JOHNSON:  I do not.

25             THE COURT:  Okay.  You are great.

1      **PROSPECTIVE JUROR JOHNSON:**  I was trying to think of

2  something the whole time.  I got nothing.

3      **THE COURT:**  No.  You are great.

4                          (Laughter.)

5      **THE COURT:**  All right.  I salute you.

6      Okay.  Let's replace Number --

7      **THE CLERK:**  Number 9.

8      **THE COURT:**  Number 9.

9      **THE CLERK:**  Theresa Cox.

10     **THE COURT:**  Cox, C-o-x?

11     **THE CLERK:**  C-o-x, correct.

12     **THE COURT:**  All right.  As you come forward, Ms. Cox,

13  how are you today?

14     **PROSPECTIVE JUROR COX:**  I'm fine.  Thank you.

15     **THE COURT:**  Do you own stock in any of these

16  companies?

17     **PROSPECTIVE JUROR COX:**  Yes.  Google.

18     **THE COURT:**  You do?

19     **PROSPECTIVE JUROR COX:**  Yes.

20     **THE COURT:**  Okay.  Wait.  Wait.

21     Before you even get there, you have to say it under oath,

22  but let me ask you officially.

23     Do you own, Ms. Cox, any stock in Google, Alphabet, or

24  Sonos?

25     **PROSPECTIVE JUROR COX:**  Alphabet.

1          THE COURT:  You're excused.

2          PROSPECTIVE JUROR COX:  Thank you.

3          THE COURT:  You don't even have to take the time to

4    sit down.  We can't make exceptions, okay, I guess.

5          (Prospective Juror Theresa Virginia Cox excused.)

6          THE COURT:  Next let's replace Ms. Cox.

7          THE CLERK:  Margaret Weir, W-e-i-r.

8          THE COURT:  Welcome.

9      Ms. Weir, do you own any stock?

10         PROSPECTIVE JUROR WEIR:  Alphabet.

11         THE COURT:  You do?

12         PROSPECTIVE JUROR WEIR:  I do.

13         THE COURT:  I'm going to ask you the official

14   question.

15      Do you own any stock in any of these parties?

16         PROSPECTIVE JUROR WEIR:  I do.  Alphabet.

17         THE COURT:  Then you're excused.

18         (Prospective Juror Margaret Vivien Lee Weir excused.)

19         THE COURT:  Let's replace Ms. Weir.

20         THE CLERK:  Sejal Popat, P-o-p-a-t.

21         THE COURT:  Okay.  Welcome.

22      Do you own any stock?

23         PROSPECTIVE JUROR POPAT:  (Shakes head.)

24         THE COURT:  Oh, great.  Okay.  Have a seat in

25   Number 9.  Welcome to the box.  And we'll give you the

1    microphone and ask you to give us the biographical information.

2         PROSPECTIVE JUROR POPAT:  I'm Sejal.  I live in

3    Los Altos.

4         THE COURT:  I can't hear you very well.  Speak more

5    into the mic.

6         PROSPECTIVE JUROR POPAT:  Oh, sorry.

7         I'm Sejal.  I live in Los Altos, and I have a master's

8    degree.

9         My employer is Snorkel.

10         THE COURT:  Is who?

11         PROSPECTIVE JUROR POPAT:  Snorkel AI.  It's a startup.

12         THE COURT:  What kind of degree do you have?

13         PROSPECTIVE JUROR POPAT:  Information systems.

14         THE COURT:  Okay.

15         PROSPECTIVE JUROR POPAT:  And no organizations.

16         Our hobbies are painting, hiking, reading.

17         Unmarried.  I don't have children.

18         And haven't served on a jury before, I haven't served in

19    the military or law enforcement, and I haven't been a party or

20    a witness to a court.

21         THE COURT:  Great.

22         Do you have any reason that you think you might be biased

23    one way or the other?

24         PROSPECTIVE JUROR POPAT:  Nope.

25         THE COURT:  All right.  Do you have any hardship

1  issue?

2          **PROSPECTIVE JUROR POPAT:**  No.

3          **THE COURT:**  Thank you.

4      Okay.  Let's replace Number 10.

5          **THE CLERK:**  Larry Seidman.  That's S-e-i-d-m-a-n.

6          **THE COURT:**  All right.  Are you going to be one of

7  these stock owners?  You do?

8      Okay.  Just stand there and let me ask it and say it under

9  oath.

10     Mr. Seidman, how do you say your name?

11         **PROSPECTIVE JUROR SEIDMAN:**  Seidman.

12         **THE COURT:**  Okay.  Do you own any stock in any of

13  these companies?

14         **PROSPECTIVE JUROR SEIDMAN:**  Yes.

15         **THE COURT:**  Which one?

16         **PROSPECTIVE JUROR SEIDMAN:**  Alphabet.

17         **THE COURT:**  Alphabet?

18     All right.  Then you're excused.

19         **PROSPECTIVE JUROR SEIDMAN:**  Thank you.

20          (Prospective Juror Larry Seidman excused.)

21         **THE CLERK:**  Elaine Cheung, C-h-e-u-n-g.

22         **THE COURT:**  Do you own any stock?

23         **PROSPECTIVE JUROR CHEUNG:**  I do.

24         **THE COURT:**  Okay.  Just stand right there.

25     Give us your name.

1          **PROSPECTIVE JUROR CHEUNG:**  My name's Elaine Cheung.

2          **THE COURT:**  Which stock do you own?

3          **PROSPECTIVE JUROR CHEUNG:**  Alphabet.

4          **THE COURT:**  You're excused.

5          **PROSPECTIVE JUROR CHEUNG:**  Thank you.

6          (Prospective Juror Elaine Lerjia Cheung excused.)

7          **THE COURT:**  Next.

8          **THE CLERK:**  Adam Hinh, H-i-n-h.

9          **THE COURT:**  Welcome.

10     Any stock in these companies?

11         **PROSPECTIVE JUROR HINH:**  Not currently, no.

12         **THE COURT:**  Not currently.  That's fine.

13     Okay.  So have a seat in the jury box.  And can you see

14 the chart there okay?  And give us the biographical info.

15         **PROSPECTIVE JUROR HINH:**  My name is Adam Hinh.  I'm a

16 city -- I'm a resident of San Francisco.  Bachelor degree in

17 economics at UC Berkeley.

18     Current employer is Wells Fargo Bank, and I am a mortgage

19 consultant.

20     No clubs or organizations.

21     Hobbies, gardening, family, and sports.

22     I am married with two kids.  My wife also works for

23 Wells Fargo.  My kids are 13 and 18.

24     I've never been as a juror.

25     I did have prior misdemeanor convictions 25 years ago, and

1    that's been discharged.

2        I am currently in a civil lawsuit.  I'm an administrator

3    of an estate that's being sued by the deceased siblings.

4        I've never been in the military or law enforcement.

5        And that's about it.

6            THE COURT:  Okay.  Any reason why you would be biased

7    in this case?

8            PROSPECTIVE JUROR HINH:  I don't see no reason.

9            THE COURT:  All right.  Do you have any hardship issue

10   you wish to raise?

11           PROSPECTIVE JUROR HINH:  Yes, I do.

12           THE COURT:  What's that?

13           PROSPECTIVE JUROR HINH:  My job is commission based,

14   and if I am out for the next two weeks, then I cannot make

15   sales.

16           THE COURT:  You cannot what?

17           PROSPECTIVE JUROR HINH:  I cannot make sales and get

18   compensated.

19           THE COURT:  I see.  Well, have you ever served on a

20   jury?

21           PROSPECTIVE JUROR HINH:  No, I have not.

22           THE COURT:  Well, when would you be able to serve if

23   you -- aren't you always going to have this problem?

24           PROSPECTIVE JUROR HINH:  Unless I change my

25   occupation.

1        **THE COURT:**  How much of a hardship would it be?

2        **PROSPECTIVE JUROR HINH:**  My commission is a hundred

3    percent of my comp.

4        **THE COURT:**  Well, but you'd be able to work in the

5    afternoons after you get done here; right?

6        **PROSPECTIVE JUROR HINH:**  I would miss calls in the

7    morning and be able to in the afternoon, yes.

8        **THE COURT:**  Raise your hand back there if you own

9    stock.  How many of you are left as jurors?  Just raise your

10   hand first if you're still eligible as a juror.

11                    (Hands raised.)

12       **THE COURT:**  We've just got one person left?  Two?

13     And how many of you own stock in the company?  Anybody?

14                    (A hand is raised.)

15       **THE COURT:**  One.  So we've just got one person left.

16       **MR. PAK:**  There are two jurors, potential jurors.

17       **THE COURT:**  Two left but -- three left.

18       **MR. PAK:**  Three left.

19       **THE COURT:**  Does your wife work?

20       **PROSPECTIVE JUROR HINH:**  Yes, she does.

21       **THE COURT:**  Are you going to be foreclosed on if you

22   serve as a juror?

23       **PROSPECTIVE JUROR HINH:**  I don't think so, but I could

24   lose my job if I don't sell.

25       **THE COURT:**  No.  If Wells Fargo, which is a big-time

1  customer of the U.S. District Court, were to try to punish you

2  for serving on a jury, they would have to answer to me.  They

3  will not do that.  You're not going to lose your job on account

4  of jury service, and I'll call up whoever it is that's in

5  charge there and tell them that myself.

6      Any other hardship issue?

7          **PROSPECTIVE JUROR HINH:**  No.

8      **THE COURT:**  I can't let you go without -- for hardship

9  unless it's a better record than that.  You may have millions

10  of dollars in the bank or $100,000 in the bank and be able to

11  finance your way through jury service, which we expect

12  everybody to do once in a while.

13      So I need a better record if you're going to be excused.

14  So explain to me why it would be a hardship just because you're

15  not able to get out there and make commissions for two weeks,

16  why it would be hard on you and what the hardship is.

17          **PROSPECTIVE JUROR HINH:**  Basically, I would just lose

18  loss of income.

19          **THE COURT:**  Okay.  That's it?

20          **PROSPECTIVE JUROR HINH:**  That's it.

21      **THE COURT:**  All right.  Motion denied.

22      That's not a good enough reason.  You have to say

23  something like "They're going to foreclose on my car.

24  Foreclose on my house.  I won't be able to buy groceries.  I

25  won't be able to buy medicine."  Now, if you say that to me,

 1   okay, I would let you go, but you're not saying that.  So

 2   it's -- it's not quite good enough.

 3          PROSPECTIVE JUROR HINH:  But I am a party to a lawsuit

 4   currently.

 5          THE COURT:  The thing about the estate?

 6          PROSPECTIVE JUROR HINH:  That's correct.

 7          THE COURT:  Okay.  Well, why is that a hardship?

 8          PROSPECTIVE JUROR HINH:  That's not a hardship.

 9          THE COURT:  Well, being -- okay.  You are -- that's

10   not a ground, though, for you to -- it's not a bias in this

11   case, I don't think.  Why -- would that cause you to be biased

12   in this case?

13          PROSPECTIVE JUROR HINH:  It would not be.

14          THE COURT:  All right.  I'm going to let the lawyers

15   ask more questions.

16      Do you have any preplanned vacation?

17          PROSPECTIVE JUROR HINH:  I do in June.

18          THE COURT:  All right.  In June.  All right.  We'll be

19   done by June.

20      All right.  I've run out of questions.

21      I'm going to let the lawyers ask questions at this point,

22   of the panel; and then you can -- each side gets, I don't know,

23   approximately 20 minutes.

24      Introduce yourself again, please, to the jury.

25          MS. CARIDIS:  Good afternoon.  My name is Alyssa

1    Caridis.  I work at the law firm of Orrick, Herrington &

2    Sutcliffe, and today I'm very honored to be here representing

3    Sonos.

4         Before I begin, I just want to thank you for your service

5    as jurors here.  This case is very important to Sonos, and we

6    really --

7              THE COURT:  No, you don't get to make speeches like

8    that.

9              MS. CARIDIS:  I appreciate your --

10             THE COURT:  It's important to both sides.

11             MS. CARIDIS:  Absolutely.

12             THE COURT:  Just because it's important to one side

13   doesn't -- that is ingratiating yourself.  Just thank the jury

14   and move on.

15             MS. CARIDIS:  Absolutely.

16        We've asked a lot of questions about you this morning.  So

17   with the Court's permission, I'd just like to reintroduce my

18   team.

19             THE COURT:  Please.

20             MS. CARIDIS:  We have Mr. Cole Richter, Mr. George

21   Lee, Mr. Sean Sullivan, and Mr. Clem Roberts, and Ms. Toni

22   Blake is here assisting us as well.

23        Again, my name is Alyssa; and even though I'm standing

24   here as a lawyer, I'm actually an engineer by training.

25        And as you may have gathered so far, this is case is about

1   technology.  And you don't have to have a technology degree to

2   be a juror in this case, but I do want to get a sense and ask

3   whether anyone is worried about being able to understand

4   testimony about technology and computers in this case.

5        Can you raise your hand if you have that worry?

6                    (Hands raised.)

7        **MS. CARIDIS:**  Yes, Ms. Cameron.  Can you tell me

8   about -- can you tell me about your concern here?

9        **PROSPECTIVE JUROR CAMERON:**  I don't know anything

10  about computers or how they work.  Like, I'm -- I mean, I can

11  use my phone, but I don't -- I mean, my laptop is basically a

12  TV.

13       **MS. CARIDIS:**  Sure.  So what's going to happen in this

14  case is both sides will have folks come up and try to explain

15  and simplify the technology concepts so that everybody here can

16  understand it.

17       So I guess what I'm trying to figure out from you is, is

18  that something that you're open to, or does the fact that we're

19  going to be dealing with technology create any concern about

20  your ability to sit and fairly evaluate the evidence?

21       **PROSPECTIVE JUROR CAMERON:**  I mean, besides, like,

22  it's, like, an anxiety trigger, but...

23       **MS. CARIDIS:**  Okay.

24       **PROSPECTIVE JUROR CAMERON:**  I don't know if I'd follow

25  it, honestly.

1       **MS. CARIDIS:** You're concerned about just following

2 the technical discussion?

3       **PROSPECTIVE JUROR CAMERON:** Yes.

4       **MS. CARIDIS:** Okay. Thank you.

5    Ms. Chuck, I believe you raised your hand as well.

6       **THE COURT:** You need to take your mask off. Take off

7 your mask, please. Thank you.

8       **PROSPECTIVE JUROR CHUCK:** I believe myself to be

9 technology challenged. I couldn't even turn on my AirDrop

10 yesterday to collect a video. And if the Internet goes out and

11 my husband's out of town, I just use my data on my phone. So I

12 am a little bit worried in that department of being able to

13 absorb all the technology terminology and stuff.

14       **MS. CARIDIS:** But if we have -- if both sides, you

15 know, put on a witness that tries to explain to you the

16 technology here, do you have concerns about being able to

17 evaluate that testimony fairly?

18       **PROSPECTIVE JUROR CHUCK:** All I can say is I'll try

19 and do my best.

20       **MS. CARIDIS:** Okay. Thank you.

21    I think I missed one more hand. Did somebody else raise a

22 hand about being concerned with technology or no?

23                     (No response.)

24       **MS. CARIDIS:** Wonderful.

25    Now, could you please -- and this might be everybody.

1  Could you please raise your hand if you have any experience

2  with Google products in your everyday life?

3                    (Hands raised.)

4        **MS. CARIDIS:**  Okay.

5        **THE COURT:**  Raise it up high so they can make a list.

6     For the record, it's almost everybody except two people --

7  three people in the jury box.

8     Okay.  Thank you.

9        **MS. CARIDIS:**  Ms. Johnson, what Google products or

10 services do you use?

11       **PROSPECTIVE JUROR JOHNSON:**  My phone is a Google

12 Pixel.  So every day, every part of it, I'm using Google.

13       **MS. CARIDIS:**  Do you use any other products or

14 services from Google besides the Pixel?

15       **PROSPECTIVE JUROR JOHNSON:**  No, nothing that I can

16 think of immediately.

17       **MS. CARIDIS:**  Do you have any strong feelings one way

18 or the other about Google based on your experience with their

19 products?

20       **PROSPECTIVE JUROR JOHNSON:**  No.

21       **MS. CARIDIS:**  Can you please pass the microphone to

22 Ms. Chuck?

23       **PROSPECTIVE JUROR CHUCK:**  I have a Google Hub.  And I

24 have this thing in my kids room.  I used to have one that I

25 said "Hey, Google" to, but now it's "Hey, Alexa."  I don't know

 1   if that's a Google product also.

 2       MS. CARIDIS:  And did you set those products up

 3   yourself, or did you have somebody help you set those up?

 4       PROSPECTIVE JUROR CHUCK:  I set up the one in my kid's

 5   room that I do -- that tells stories.  It's Amazon Kids or

 6   something like that.

 7       MS. CARIDIS:  And do you have any strong feelings

 8   about Google one way or the other based on your experience with

 9   their products?

10       PROSPECTIVE JUROR CHUCK:  I like their search engine.

11   No.  I mean, technology is all the same.  It's just useful to

12   me when I know how to use it.

13       MS. CARIDIS:  Let's move over to Mr. Woods.

14     What Google products do you use, sir?

15       PROSPECTIVE JUROR WOODS:  We have a Google Home and

16   Google Nest devices.

17       MS. CARIDIS:  And what do -- what do you do with those

18   Google Home and Google Nest devices?

19       PROSPECTIVE JUROR WOODS:  Mostly just either, like,

20   play video on the site somewhere or use it to control the

21   thermostat.

22       MS. CARIDIS:  Did you set those devices up yourself?

23       PROSPECTIVE JUROR WOODS:  Me and my roommate did it,

24   yeah.

25       MS. CARIDIS:  And do you have any strong feelings one

 1  way or the other about Google based on your experience with

 2  their products?

 3          **PROSPECTIVE JUROR WOODS:**  I mean, I like Google, but

 4  nothing stronger than that.

 5          **MS. CARIDIS:**  Do you believe that you can sit here and

 6  judge the evidence fairly, despite your like for Google?

 7          **PROSPECTIVE JUROR WOODS:**  Yes.

 8          **MS. CARIDIS:**  Thank you.

 9      Mr. Yeager, I think you said you might use some Google

10  services once in a while.  Is that right?

11          **PROSPECTIVE JUROR YEAGER:**  Yes.  I only use it for a

12  search engine.  That's the only Google product I use.

13          **MS. CARIDIS:**  Okay.

14          **PROSPECTIVE JUROR YEAGER:**  I use Chrome sometimes.

15          **MS. CARIDIS:**  And do you feel that you can sit here

16  and fairly evaluate the evidence, despite your experience with

17  Google products?

18          **PROSPECTIVE JUROR YEAGER:**  Yes.

19          **MS. CARIDIS:**  Wonderful.

20      Mr. Simonson, what products or services do you use?

21          **PROSPECTIVE JUROR SIMONSON:**  Software.  So the Chrome

22  browser, Google Maps, and I own a Google smart speaker but it's

23  not plugged in.

24          **THE COURT:**  A little closer to the mic.  I can't hear

25  you.

1        **PROSPECTIVE JUROR SIMONSON:**  Okay.  I use the Google

2   browser, Google Maps.  I have a Google smart speaker, but it's

3   not plugged in.

4        **MS. CARIDIS:**  And do you have any strong feelings

5   about Google in this case based on your experiences with their

6   products?

7        **PROSPECTIVE JUROR SIMONSON:**  No.

8        **MS. CARIDIS:**  Thank you.

9      Mr. Michalski, do you have any Google products?

10       **PROSPECTIVE JUROR MICHALSKI:**  Just Google search

11  engine and Maps occasionally.

12       **MS. CARIDIS:**  Sure.  But no actual hardware devices?

13       **PROSPECTIVE JUROR MICHALSKI:**  No.

14       **MS. CARIDIS:**  Thank you.

15     Ms. Pruitt, how about you?

16       **PROSPECTIVE JUROR PRUITT:**  I mainly use the search

17  engine and the Google suite.  No hard products.

18       **MS. CARIDIS:**  Okay.  And do you have any strong

19  feelings about Google based on your -- based on your history

20  with their products or services?

21       **PROSPECTIVE JUROR PRUITT:**  No.

22       **MS. CARIDIS:**  Ms. Brockett?

23       **PROSPECTIVE JUROR BROCKETT:**  I use Sheets and the

24  Google Docs, and we have a Nest.

25       **MS. CARIDIS:**  And did you set that Nest up yourself?

1          **PROSPECTIVE JUROR BROCKETT:**  Yes.

2          **MS. CARIDIS:**  And do you -- and what's your experience

3     been like with that Nest?

4          **PROSPECTIVE JUROR BROCKETT:**  Well, we like Nest, but

5     we're replacing them because we have concerns about Google's

6     privacy policies.

7          **MS. CARIDIS:**  Despite those concerns, do you feel that

8     you can sit here and fairly evaluate the evidence in this case?

9          **PROSPECTIVE JUROR BROCKETT:**  Yes.

10         **MS. CARIDIS:**  Thank you.

11       Ms. Thurium.

12         **PROSPECTIVE JUROR THURIUM:**  I have an Android phone

13    and I have a -- I use Chromecast to play music to my speakers.

14         **MS. CARIDIS:**  And what kind of speakers do you play

15    music to using your Chromecast?

16         **PROSPECTIVE JUROR THURIUM:**  A soundbar.

17         **MS. CARIDIS:**  A Sonos soundbar or something else?

18         **PROSPECTIVE JUROR THURIUM:**  Oh, God.  I don't know,

19    actually.  I don't think it's Sonos.

20         **MS. CARIDIS:**  Okay.  And do your experiences -- has

21    your experiences with those Google products, would that impact

22    your ability to judge and evaluate the evidence fairly in this

23    case?

24         **PROSPECTIVE JUROR THURIUM:**  No.

25         **MS. CARIDIS:**  Thank you.

1        Mr. Ivory-Chambers.

2            **PROSPECTIVE JUROR IVORY-CHAMBERS:**  Yeah, I use Google

3    Docs, you know, Sheets, all the software, presentation

4    software, in my work, you know, frequently during the day.

5        Hardware-wise, we have the -- I used to have an Android

6    phone, but I prefer the Apple.

7        And we have -- I don't know the name of the product, but

8    it's a Wi-Fi setup where you distribute the little pods

9    everywhere, and I set that up with my son.

10           **MS. CARIDIS:**  And have your experiences with those

11   Google products, would that impact your ability to evaluate the

12   evidence fairly in this case?

13           **PROSPECTIVE JUROR IVORY-CHAMBERS:**  No.  I have

14   concerns about, like, the data and ethical use.  They had a

15   recent departure of their ethical data person.  So there's

16   those issues.  But, you know, as well as my experience working

17   at Google, generally really, really positive.

18           **MS. CARIDIS:**  And, again, despite the privacy concerns

19   that you may have, any reason that that would impact your

20   ability to sit as a juror in this case?

21           **PROSPECTIVE JUROR IVORY-CHAMBERS:**  I don't think so.

22   I'd do my best.

23           **MS. CARIDIS:**  Thank you.

24       Mr. Cerezo Abaraya?  Was I close?

25           **PROSPECTIVE JUROR CEREZO ABARCA:**  It's Cerezo Abarca.

1          MS. CARIDIS:  Sorry.  I can't read my own handwriting.

2    I apologize.

3          PROSPECTIVE JUROR CEREZO ABARCA:  It's okay.

4       I don't use any Google hardware or any of the software, so

5    I don't have any.

6          MS. CARIDIS:  Do you use any Sonos products?

7          PROSPECTIVE JUROR CEREZO ABARCA:  Yes, I do.

8          MS. CARIDIS:  What Sonos products do you use?

9          PROSPECTIVE JUROR CEREZO ABARCA:  It's a Sonos

10   speaker.  It's set up in the living room.

11         MS. CARIDIS:  Did you set that up yourself?

12         PROSPECTIVE JUROR CEREZO ABARCA:  Yes.

13         MS. CARIDIS:  And does the fact that you have a Sonos

14   speaker, would that impact your ability to sit fairly and judge

15   the evidence in this case?

16         PROSPECTIVE JUROR CEREZO ABARCA:  I don't think so.

17         MS. CARIDIS:  Thank you.

18      Mr. Hinh.

19         PROSPECTIVE JUROR HINH:  I interact a lot with Google

20   software during the day for my employment as well as the

21   Chromes and Google search engine.

22      At home for products, I have a Google speaker as well as a

23   Google Nest for many years.

24         MS. CARIDIS:  And did you set those -- that Nest and

25   that speaker up?

1      **PROSPECTIVE JUROR HINH:**  I did set those up myself.

2      **MS. CARIDIS:**  And does your -- does your history with

3   Google products and Google services, do you believe that that

4   would impact your ability to evaluate this case?

5      **PROSPECTIVE JUROR HINH:**  I don't have any negative

6   feelings towards Google.

7      **MS. CARIDIS:**  Thank you.

8      Ms. Popat.

9      **PROSPECTIVE JUROR POPAT:**  I use the software, but not

10  the hardware, from Google.

11     **MS. CARIDIS:**  Okay.  And any reason why you couldn't

12  sit and judge the evidence fairly in this case?

13     **PROSPECTIVE JUROR POPAT:**  I don't think so.

14     **MS. CARIDIS:**  And, Ms. Cameron, you said that you

15  didn't use any Google products; correct?

16     **PROSPECTIVE JUROR CAMERON:**  My work does for, like --

17  I think we use Google Sheets --

18     **MS. CARIDIS:**  Okay.

19     **PROSPECTIVE JUROR CAMERON:**  -- but they print those

20  out for me.

21     So I'm not really working with the hard- -- the software.

22     **MS. CARIDIS:**  Okay.  Thank you.

23     Is there anyone here who would think in your own mind that

24  Google has a slight advantage over Sonos before you hear any

25  evidence in this case because of your impressions of the

1  companies in this case as you sit here today?

2                        (A hand is raised.)

3          **MS. CARIDIS:**  Mr. Hinh, tell me more about that,

4  please.

5          **PROSPECTIVE JUROR HINH:**  I've done a lot of loans over

6  the years for many of Google's employees, and so that's how I

7  get my compensations.

8          **MS. CARIDIS:**  And so do you believe that that history

9  would impact your ability to sit here and evaluate the evidence

10  fairly in this case?

11          **PROSPECTIVE JUROR HINH:**  I have no prejudgments right

12  now without hearing the evidence.

13          **THE COURT:**  I can't -- I did not hear your answer.

14  Say your answer again.

15          **PROSPECTIVE JUROR HINH:**  I don't have any prejudgment

16  without hearing the evidence presented.

17          **THE COURT:**  Well, she's asking a somewhat different

18  question.

19      These friendships that you have with Google people, will

20  that influence you any way in this case?

21          **PROSPECTIVE JUROR HINH:**  As I said earlier, I have --

22  I do not have any negative impressions of Google.

23          **THE COURT:**  Do you have any positive impressions that

24  would influence you based on those friendships?

25          **PROSPECTIVE JUROR HINH:**  Yes.  I have Google employees

1  that are my friends.

2          **THE COURT:**  But that would -- can you set that to one

3  side and decide this case on the merits?

4          **PROSPECTIVE JUROR HINH:**  I can't say in advance one

5  way or the other.

6          **THE COURT:**  All right.  Keep asking questions.

7          **MS. CARIDIS:**  Can I have a question or two for

8  Mr. Ivory-Chambers?

9      I believe you said that you currently own one Sonos

10  soundbar.  Is that right?

11          **PROSPECTIVE JUROR IVORY-CHAMBERS:**  Yes.

12          **MS. CARIDIS:**  And do you think that your experience --

13  and your experience with -- sorry.

14      Do you think your experience with Sonos products would

15  lead you to be biased in this case one way or the other to

16  evaluate the evidence fairly?

17          **PROSPECTIVE JUROR IVORY-CHAMBERS:**  No.

18          **MS. CARIDIS:**  Thank you.

19          **PROSPECTIVE JUROR IVORY-CHAMBERS:**  Could I answer your

20  previous question, though?

21          **MS. CARIDIS:**  Sure.

22          **PROSPECTIVE JUROR IVORY-CHAMBERS:**  I think if I had to

23  compare Google and Sonos in the marketplace, in terms of

24  Google's ability to synergistically integrate technology across

25  lots of products and across many industries and having a

1   ubiquitous brand name, that that would give an advantage.

2        MS. CARIDIS:  Would that give an advantage in the

3   marketplace, or are you talking about in your own head about

4   preconceived notions about the parties in this case?

5        PROSPECTIVE JUROR IVORY-CHAMBERS:  That would be my

6   assessment independent of this -- this proceeding here.

7        MS. CARIDIS:  Okay.  And you could set that aside and

8   judge the evidence that's presented to you in this courtroom

9   fairly without account for any bias that you may have?

10       PROSPECTIVE JUROR IVORY-CHAMBERS:  I'd do my best,

11  yeah.

12       MS. CARIDIS:  Mr. Simonson, I believe that you

13  mentioned many hours ago that you had potentially heard about a

14  dispute between these parties in the press.  Is that true?

15       PROSPECTIVE JUROR SIMONSON:  Yes.

16       MS. CARIDIS:  And are you able to kind of put those

17  aside and just -- and just hear the evidence as it's presented

18  to you in this courtroom, putting aside anything that you may

19  have read in the press prior to this?

20       PROSPECTIVE JUROR SIMONSON:  Yes, I can.

21       MS. CARIDIS:  Thank you.

22     Ms. Thurium, can you briefly describe the relationship

23  that you have with your partner who owns the Google?

24       PROSPECTIVE JUROR THURIUM:  Oh, yeah.  We're -- we're

25  lovers.  They live here in San Francisco.  And my wife lives

 1  in -- splits her time between New York and Florida.  I'm

 2  polyamorous with consent with all parties involved, so...

 3      MS. CARIDIS:  And do you share any financial

 4  arrangements with your partner?

 5      PROSPECTIVE JUROR THURIUM:  Not -- not yet.  We're,

 6  like, talking about moving in together, and they have about a

 7  hundred K worth of Google stock that we're, like, you know,

 8  maybe going to try to buy a house with at some point, so...

 9      MS. CARIDIS:  Okay.  Thank you.

10      THE COURT:  I'm sorry.  You said that she -- you have

11  a hundred K?

12      PROSPECTIVE JUROR THURIUM:  No.  My partner.

13      THE COURT:  Your partner.  Okay.

14      MS. CARIDIS:  Ms. Brockett, I believe you said that

15  you have at least one patent; is that right?

16      PROSPECTIVE JUROR BROCKETT:  Yes.

17      MS. CARIDIS:  Were you at all involved in the process

18  of obtaining that patent?

19      PROSPECTIVE JUROR BROCKETT:  Yes.

20      MS. CARIDIS:  Could you talk to me about that a little

21  bit?

22      PROSPECTIVE JUROR BROCKETT:  Oh, my goodness.  So you

23  write up the -- you write it up.  You take it to your lawyer.

24  The lawyer tells you how it's appropriate or not appropriate or

25  what needs to be added.  And then it goes into the system, and

 1    they come back after some period of time with -- or with

 2    clari- -- they ask you for clarifications and you rewrite

 3    things.

 4         And so I think all told, the patent was granted about six

 5    or seven years after it was filed.

 6         MS. CARIDIS:  Thank you.

 7         And that was connected with your employment at the time;

 8    is that correct?

 9         PROSPECTIVE JUROR BROCKETT:  Right.

10         MS. CARIDIS:  Okay.

11         PROSPECTIVE JUROR BROCKETT:  So in that time, the

12    company got acquired and moved on, so that we retained enough

13    people to finish up the patent.

14         MS. CARIDIS:  Got it.  Thank you.

15         So everybody's answered a ton of specific questions today,

16    and, again, thank you for your time.

17         I just want to conclude by asking:  Is there anything that

18    any of you can think of that we haven't talked about today and

19    you think that one side or the other side should know about it

20    before we go and make the decisions on who's going to sit in

21    this jury?

22                        (A hand is raised.)

23         MS. CARIDIS:  Yes?

24         PROSPECTIVE JUROR CHUCK:  Earlier when you asked me

25    about Google and Sonos products, I didn't realize the Nest was

1    a Google product.  So we have the Nest thermostat and the Nest

2    camera, which are very handy; and we also have Sonos speakers,

3    soundbar, and like a -- one that sits in the art room.

4         MS. CARIDIS:  Got it.

5         That actually reminds me of one more question.  Can we get

6    a raise of hands?  I know that some people have talked about

7    Sonos and some people have talked about Google speakers, but

8    who here has a smart speaker in their home?

9         PROSPECTIVE JUROR CHUCK:  Like the Google Hub?

10        MS. CARIDIS:  That would include a Google Hub,

11   I think, yeah.

12                      (Hands raised.)

13        THE COURT:  Could you also ask how many have at least

14   three smart speakers of the same type in their home?

15                      (Hands raised.)

16        THE COURT:  One, two, three, four.  Okay.

17        All right.  Thank you.

18        MS. CARIDIS:  I have no further questions at this

19   time, Your Honor.

20        THE COURT:  All right.  Mr. Pak, you have 20 minutes

21   as well.

22        MR. PAK:  Thank you, Your Honor.

23        Good afternoon, everyone.  My name is Sean Pak.  I

24   represent Google.

25        And I know everybody shared a lot of information about

1    themselves; so I'll try to keep this very brief.

2        I did want, by show of hands, if everybody could raise

3    their hand to the following question for us.  And the question

4    is:  Does anyone have strong feelings, positive or negative,

5    about technology companies generally?

6                        (A hand is raised.)

7            THE COURT:  One hand goes up.

8            PROSPECTIVE JUROR IVORY-CHAMBERS:  Generally positive,

9    since that's been my bread and butter for 30 years.

10           MR. PAK:  And you mentioned that you had previously

11   worked for Google.

12           PROSPECTIVE JUROR IVORY-CHAMBERS:  Yes.

13           MR. PAK:  Do you have any strong feelings today,

14   positive or negative, about Google?

15           PROSPECTIVE JUROR IVORY-CHAMBERS:  Positive.  I had a

16   really great experience working at Google.

17           MR. PAK:  Thank you.

18       Now, you also mentioned, Mr. Ivory-Chambers, that you do

19   follow Sonos quite a bit.  Can you tell us a little bit more

20   about that?

21           PROSPECTIVE JUROR IVORY-CHAMBERS:  Well, I followed

22   Sonos, at least the initial wave, and then my son took the

23   equipment because he wanted it.  So I have one piece left, and

24   I've been waiting to buy, you know, another smart speaker and

25   probably at a price point above the Sonos product line.  So I

 1    haven't replaced -- replaced that yet.

 2         MR. PAK:  Do you currently own any smart speakers

 3    today besides the soundbar?

 4         PROSPECTIVE JUROR IVORY-CHAMBERS:  Just -- no.  I

 5    mean...

 6         MR. PAK:  And I also noted that you liked music quite

 7    a bit, and can you tell us a little bit about your love for

 8    music?

 9         PROSPECTIVE JUROR IVORY-CHAMBERS:  Well, I'll make

10    this quick.  I've done a lot of music and music performing.  So

11    for me, when I got the Sonos, initially that was more

12    background music; and I found that the more I work in music, I

13    have a hard time tuning out background music.  So I have sort

14    of gone binary from either I'm listening to music or I'm not.

15         So if I'm listening to music, I've been spoiled by

16    listening to really, you know, high-end sound audio quality,

17    and so -- so I don't know if that answers your question.

18         MR. PAK:  No, that's very helpful.

19         So with respect to the high-end speaker equipment that you

20    use to listen to music today, what kind of equipment are you

21    using?

22         PROSPECTIVE JUROR IVORY-CHAMBERS:  Well, my friends

23    have all the names for it, but they're all -- you know, they're

24    all, you know, very specifically researched components.  I set

25    up a pair of speakers the other day for a friend.  They're

 1   smart speakers.  I don't know the French company.  The product

 2   is Pearl.  They look like two eyeballs -- sort of eyeballs and

 3   R2D2 combo.

 4       And, you know, I'm just amazed at how really great

 5   quality, sound quality, is showing up in much cheaper products.

 6           MR. PAK:  Thank you.

 7       So going back to everybody, by show of hands, can

 8   everybody raise their hand if -- besides the things that you

 9   have mentioned, if you know of someone who else works for

10   technology companies that you have not mentioned today?

11       Besides yourself or partners or husbands and wives that

12   you've mentioned, do you have anyone in your close circle who

13   works for technology companies?  If so, could you raise your

14   hands for us?

15                       (Hands raised.)

16           MR. PAK:  Okay.  Great.

17       Yeah, and I'm going to just take it one at a time.

18   Thank you very much.

19       So, Ms. Chuck, can you tell us the individuals that you

20   have in mind?

21           PROSPECTIVE JUROR CHUCK:  I have a friend that works

22   for Google Mag Pile.

23           MR. PAK:  What does he do?

24           PROSPECTIVE JUROR CHUCK:  I'm not sure.  I thought he

25   was still at Facebook.

 1          **MR. PAK:**  Okay.  Do you talk to your friend about his

 2   work at Google often?

 3          **PROSPECTIVE JUROR CHUCK:**  No.

 4          **MR. PAK:**  Do you know whether he's an engineer?

 5          **PROSPECTIVE JUROR CHUCK:**  No.

 6          **MR. PAK:**  Okay.  Thank you.

 7      Ms. Poppet, am I saying that correctly?

 8          **PROSPECTIVE JUROR POPAT:**  Yeah.  It's Popat.

 9          **MR. PAK:**  Popat?  Okay.  Thank you.

10      Ms. Popat, can you tell us about people in your close

11   circle that you have not mentioned before who works in

12   technology companies?

13          **PROSPECTIVE JUROR POPAT:**  Just any technology company?

14          **MR. PAK:**  Yes.

15          **PROSPECTIVE JUROR POPAT:**  Yeah.  My boyfriend works at

16   Apple as a software engineer.  My uncle works at Google in

17   machine learning.  And I have a lot of friends that work at

18   different tech startups and other technology companies.

19          **MR. PAK:**  And I know you have some friends and

20   colleagues and family members who work in other technology

21   companies, but would you be able to set aside those

22   relationships and consider the merits of this case based on the

23   evidence fairly?

24          **PROSPECTIVE JUROR POPAT:**  Yeah, I think so.

25          **MR. PAK:**  Thank you.

1      And I believe, Mr. Hinh, you raised your hand as well.

2          **PROSPECTIVE JUROR HINH:**  That's correct.

3          **MR. PAK:**  Thank you.

4      And can you tell us again, outside of the people that

5  you've mentioned, who are some of the people that are in your

6  close circle that work for technology companies?

7          **PROSPECTIVE JUROR HINH:**  My brother works for a tech

8  company in Silicon Valley.

9          **MR. PAK:**  Okay.  And what is the name of his company?

10         **PROSPECTIVE JUROR HINH:**  Texas Instruments.

11         **MR. PAK:**  Texas Instruments?

12         **PROSPECTIVE JUROR HINH:**  Electrical engineer.

13         **MR. PAK:**  He's an electrical engineer.

14     Okay.  I want to go back to Mr. Michalski.

15     Am I saying that correctly?

16         **PROSPECTIVE JUROR MICHALSKI:**  Close enough.

17         **MR. PAK:**  Okay.  Sorry about that.

18     So I believe you mentioned that before your current job

19  with Costco today, that you worked for a company called

20  Bunker Ramo.  Is that correct?

21         **PROSPECTIVE JUROR MICHALSKI:**  Yes.  Yes.

22         **MR. PAK:**  Can you tell us a little bit about that

23  company?

24         **PROSPECTIVE JUROR MICHALSKI:**  They wrote software and

25  manufactured hardware for the banking and insurance industries.

1          MR. PAK:  And for how long were you employed by

2    Bunker Ramo?

3          PROSPECTIVE JUROR MICHALSKI:  A little over 20 years.

4          MR. PAK:  20 years?

5          PROSPECTIVE JUROR MICHALSKI:  Yeah.

6          MR. PAK:  And what was your role within Bunker Ramo?

7          PROSPECTIVE JUROR MICHALSKI:  I did hardware repair

8    and software upgrades.  You know, some of our customers were,

9    like, Bank of America, Exchange Bank, Westamerica Bank.  At one

10   time they controlled about 90 percent of the banking industry.

11         MR. PAK:  Wow.  So when you were working for this

12   company Bunker Ramo, did you actually write software?

13         PROSPECTIVE JUROR MICHALSKI:  No, I did not.

14         MR. PAK:  So tell me a little bit about the work that

15   you were doing when you were upgrading software as an engineer.

16         PROSPECTIVE JUROR MICHALSKI:  It was just mostly

17   downloading new software updates to the networks.  Most of the

18   time was spent actually just doing repair on the mini

19   mainframes.

20         MR. PAK:  And during your long career, have you had

21   the opportunity to actually review and write source code for

22   computer systems?

23         PROSPECTIVE JUROR MICHALSKI:  No.

24         MR. PAK:  And right now for Costco, what is your role

25   for the company?

1    **PROSPECTIVE JUROR MICHALSKI:**  I was the gas

2   supervisor, and now I just oversee the maintenance department.

3    **MR. PAK:**  Thank you.  Thank you.

4        Mr. Simonson, I think you mentioned previously that you

5   are -- also have been somebody that's been monitoring Sonos and

6   think highly of the company.  Is that correct?

7    **PROSPECTIVE JUROR SIMONSON:**  Yeah.  I look for news

8   stories about them for new products.

9    **MR. PAK:**  Right.  Now, based on what you've heard, is

10  there a particular reason why you would not feel comfortable

11  serving as a juror today in a dispute between Sonos and Google?

12    **PROSPECTIVE JUROR SIMONSON:**  No.

13    **MR. PAK:**  And I think you may have mentioned that you

14  own some Sonos products.  Is that correct?

15    **PROSPECTIVE JUROR SIMONSON:**  That's correct.

16    **MR. PAK:**  And can you tell us a little bit more about

17  the products you actually own?

18    **PROSPECTIVE JUROR SIMONSON:**  I have two Play 1

19  speakers, two 1SL and a Sonos Beam soundbar.

20    **MR. PAK:**  And how do you control those different Sonos

21  speakers?

22    **PROSPECTIVE JUROR SIMONSON:**  With my phone, the Sonos

23  app.

24    **MR. PAK:**  Sonos app.  Okay.

25        And how would you characterize your working knowledge of

 1    how the Sonos systems work together?

 2        PROSPECTIVE JUROR SIMONSON:  A knowledgeable customer,

 3    but not a power user or expert.

 4        MR. PAK:  Okay.  And do you have any experience, sir,

 5    in understanding computer systems or software particularly?

 6        PROSPECTIVE JUROR SIMONSON:  Not from an engineer use.

 7    Just from a user standpoint.  You know, user interface training

 8    type of thing.

 9        MR. PAK:  Okay.  Thank you very much.

10        Ms. Brockett, I have a few questions for you.  You

11    mentioned that you are an inventor on a patent in your prior

12    discussions.

13        Despite being an inventor on a patent, if the evidence in

14    this case were to convince you that the particular patents in

15    this case are invalid because of what had happened before Sonos

16    filed the patents, would you have any problems coming to a

17    decision that the patents are invalid?

18        PROSPECTIVE JUROR BROCKETT:  No.  I mean, my own

19    experience is that I've seen -- I'm in tech, so all my friends

20    are in tech.  Right?  And we've seen cases in which patents are

21    granted that we think should not have been granted.

22        We also have seen patents that by the time they've been

23    through the mill, we're not sure that it's actually what was

24    originally filed.

25        And we also -- I also -- when I talked earlier about being

1    part of a licensing agreement, it was because someone --

2    another company sued my company for infringement, and we didn't

3    think we were infringing but we didn't have the finances to

4    fight it.

5        **MR. PAK:**  I understand that.

6        So with respect to the licensing experience that you have

7    and based on the experience that you have generally in this

8    field, do you think that you would be biased in some way that

9    you could not reach a fair and objective decision on the issues

10   in this case?

11       **PROSPECTIVE JUROR BROCKETT:**  I don't think I'd be

12   biased.  I'd have strong opinions, but not biased.

13       **MR. PAK:**  Thank you.  We would appreciate those strong

14   witness.

15       So with that, Your Honor, I think -- let me just check

16   quickly with my team to see if I may be done.

17                    (Pause in proceedings.)

18       **MR. PAK:**  Thank you.  I'm going to cede my time

19   I think.

20       Thank you very much for your patience.

21       **THE COURT:**  All right.  Thank you, Counsel.

22       Because we had some changes in the seating, let me make

23   sure we all understand the timetable.

24       Next week we would start here, all of you that are

25   selected, we will select 8 of you from the 14, and you would be

1  here all week next week through Friday.  Then you'd come back

2  on the following Tuesday, because there's Mother's Day in there

3  and I want to give you that day off.  So you'd get Monday off.

4  You'd come back on Tuesday and go the rest of that week through

5  the 19th.

6        And there's a couple of people, if I recall right, who

7  have an afternoon problem, and we would accommodate you.

8        Now, then it gets a little bit more complicated because of

9  the Brockett protocol that we have.  That would get us all the

10  way -- we would take off Monday through Thursday but come back

11  on Friday, the 25th, if we needed to.  And that's at least

12  50-50.

13        And then, if we needed to come back yet again, it would be

14  the 30th and the 31st, which is a Tuesday and Wednesday.  And

15  it would have to be over by then.  We would not go in past

16  that.

17        I think it's 50-50, but I think it will be over by the

18  19th, but I can't promise you that.  I think there's enough of

19  a chance that you have to be available.

20        So that's the time frame.  7:45 to 1 o'clock each day

21  except when you're deliberating.  If everyone on the jury wants

22  to stay late, I'll stay till midnight.  Sometimes juries say,

23  "We can reach a verdict today.  Let's stay till midnight."  So

24  we all get our doughnuts and we sit around with our coffee and

25  we wait till midnight, which -- because your druthers come

1    first.

2        So that's the schedule, and I want to give everyone one

3    last chance to say, "Oh, wait a minute.  I just thought of

4    something.  I'm" -- you know, so I want to give you one chance.

5        Yes, sir?  You raised your hand again.  Let's give you the

6    microphone.

7        You're Mr. Yeager?

8            **PROSPECTIVE JUROR YEAGER:**  Yes.

9            **THE COURT:**  Is that right, Mr. Yeager?

10           **PROSPECTIVE JUROR YEAGER:**  Are you going to write down

11   the days that we're coming and hand it out to, us or are we

12   supposed to write it down ourselves?

13           **THE COURT:**  I'll write -- I don't -- I can't do it

14   this very minute --

15           **PROSPECTIVE JUROR YEAGER:**  Uh-huh.

16           **THE COURT:**  -- and I probably won't be able to do it

17   before you leave, but Angie will do it.

18       By Monday, she'll have all that down for you.

19           **PROSPECTIVE JUROR YEAGER:**  Okay.  Great.

20           **THE COURT:**  Here's another thing.  If any of you feel

21   that you have to drive too far to be -- you know, it's too long

22   a drive, we have money from the United States Treasury to pay

23   for you if you live a certain distance away -- and I don't

24   remember what it is anymore -- so you can stay in a hotel

25   overnight here.  Sometimes a juror wants that, and we try to

1    accommodate.  So I forgot to mention that, but that's

2    available.

3        Okay.  Anyone else who wants -- on the timetable itself,

4    has heartburn over it?

5        Okay.  Ms. Johnson, you raised your hand.

6            **PROSPECTIVE JUROR JOHNSON:**  Yes.

7            **THE COURT:**  Let's give the microphone to Ms. Johnson.

8            **PROSPECTIVE JUROR JOHNSON:**  It's very, like,

9    consequential, but with the timetable that we have right now, I

10   am available until the 19th because that's what I planned to

11   set aside; but after that, if we have to come back, I also

12   would be one of those people that I believe I would be gone the

13   22nd and most of the 23rd.  I fly in on the 23rd from a weekend

14   trip.

15           **THE COURT:**  I'm sorry.  You'd be gone on the 22nd and

16   23rd?

17           **PROSPECTIVE JUROR JOHNSON:**  Yes.

18           **THE COURT:**  Well, that's okay because of the Brockett

19   protocol.

20           **PROSPECTIVE JUROR JOHNSON:**  Yeah.  I'm hoping --

21           **THE COURT:**  You'd be cool on that because we won't be

22   in session.

23           **PROSPECTIVE JUROR JOHNSON:**  And then you said the 25th

24   or the 26th is when we come back; right?

25           **THE COURT:**  26th is when we would resume.

1     **PROSPECTIVE JUROR JOHNSON:**  And then possibly may go

2  into the 31st; correct?

3     **THE COURT:**  30th and 31st, but not the Monday because

4  that's Memorial Day.

5     **PROSPECTIVE JUROR JOHNSON:**  Okay.  That's my other

6  thing that I have to mention.  On the 31st, I'm flying out in

7  the morning at 11:00.  I know.

8     **THE COURT:**  Where are you flying to?

9     **PROSPECTIVE JUROR JOHNSON:**  New Orleans.

10    **THE COURT:**  Well, that's a good reason.

11    **PROSPECTIVE JUROR JOHNSON:**  I hope so.

12    **THE COURT:**  I'm going to take a chance and say this

13  case will be over by then.

14    **PROSPECTIVE JUROR JOHNSON:**  I'm pretty sure it will

15  too.  It's just I would feel bad if I said nothing.

16    **THE COURT:**  If it's not, then the lawyers will have to

17  deal with me.

18    **PROSPECTIVE JUROR JOHNSON:**  Okay.  All right.

19    **THE COURT:**  And they don't want to do that.

20    **PROSPECTIVE JUROR JOHNSON:**  And I'm sure they don't

21  want --

22    **THE COURT:**  You're going to be fine.

23    **PROSPECTIVE JUROR JOHNSON:**  Okay.

24    **THE COURT:**  All right.  Anyone else want to raise an

25  issue?

1    Okay.  I have one last thing I want to bring up with you.

2    I just want to summarize because some of you've never served on

3    a jury.

4    Raise your hand if you have served on a jury.  I want to

5    just see how many we got.

6                    (Hands raised.)

7    **THE COURT:**  Okay.  That's a fair number who've served,

8    but most of you have not, and I want to explain to you what it

9    is that the jury does.

10    Sometimes I think people out there in the universe think

11    that the judge is going to give you a secret sign and tell you

12    how to rule.  No, I do not.  I will make rulings during the

13    course of the trial.  I'm just ruling on individual issues, but

14    the ultimate issues are for you to decide.

15    And the way you do it is this:  I'm going to tell you what

16    the parties with the burden of proof have to prove in order to

17    win on that issue.  Some issues Sonos has got the burden of

18    proof and some issues Google has got the burden of proof, and

19    I'm just going to list them for you.

20    I'll say they've got to prove A and B and C, all three, by

21    a preponderance of the evidence or clear and convincing,

22    whatever it happens to be, A, B and C; and if they prove it,

23    then they win on that issue.  If they don't prove -- if they

24    prove just A and B, that's not enough.  They've got to prove A,

25    B, and C.

 1          So I will tell you what those elements of proof are.  And

 2     then your job is to decide:  Okay.  Let's look at the evidence

 3     that was presented here in this trial.  Not something on the

 4     Internet, not something that somebody told you in the hallway,

 5     but the actual evidence.  Not something that the lawyers even

 6     said, because what the lawyers say is never evidence.  It's

 7     what the witnesses say under oath and subject to

 8     cross-examination -- not lawyer talk -- witness talk under oath

 9     and subject to cross-examination, plus the documents or

10     pictures.

11          That, you then line it up and say:  Did they prove A?  Did

12     they prove B?  Did they prove C?

13          And it's like a laboratory experiment.  Just, you

14     engineers would know this.  A lab -- you check and see.  You've

15     got your lab notebook.  You see if it works or not.  A, B, and

16     C, has it been proven?

17          And if the answer is yes, then they win on that issue.  If

18     the answer is they didn't prove but two out of the three, the

19     answer is no, they lose on that issue.

20          And I will tell you what those elements of proof are at

21     the end.  I'm not going to tell you now.  It's premature to

22     tell you all that now, but I will tell you that at the end.

23          So you see what the jury does.  You are the thing that

24     makes -- our court system, because of the juries, most

25     Americans say that they have more trust in the federal courts

1  than any other institution except maybe the military, and

2  that's because of good people like you who come in here and

3  make the sacrifice to do this job.

4      Your job, the job of deciding a case A, B and C, has it

5  been proven?  You listen carefully.  You do the best you can.

6      Now, if there's somebody there who thinks -- I'm going to

7  give you a chance to raise your hand.  And, of course, you have

8  to do that fairly and impartially.  You have to be fair to both

9  sides and decide it on the merits and not decide it based on

10  politics.  Never on politics.  Based on -- based on fairness

11  and the merits.

12      Now, if you think you can't do that for some reason, I

13  want you to raise your hand and give us one last chance to

14  inquire about it.

15                      (No response.)

16      **THE COURT:**  Okay.  Nobody's raising their hand.

17      Is there anything else you think you should tell us?  We

18  can't ask every possible question.  Like, let's say -- I don't

19  know.  Let's say that one of these companies or the other once

20  gave a scholarship to the next-door neighbor, and that is a

21  wonderful thing, and it's going to influence you in this case.

22  Anything like that, let us know.  Raise your hand so we can ask

23  you about it.

24                      (No response.)

25      **THE COURT:**  Okay.  No one's raising their hand.

 1        Okay.  I'm coming to the end here.

 2        Are there -- can we pass the panel for cause?

 3            MS. CARIDIS:  Your Honor, I believe we have one cause

 4    motion that we would like to bring to you.

 5            THE COURT:  All right.  I need to ask you to step out

 6    in the hall, and you step out in the hall for not very long,

 7    15 minutes maximum, and then we'll resume when you come back.

 8        And all the other members of the potential panel have to

 9    step out too.

10            THE CLERK:  All rise for the jury.

11     (Proceedings were heard out of the presence of the venire.)

12            THE COURT:  All right.  Be seated, and let's hear your

13    motion.

14            MS. CARIDIS:  Your Honor, Ms. Thurium, Juror

15    Number 13 --

16            THE COURT:  Yeah.

17            MS. CARIDIS:  -- indicated that she is in an intimate

18    relationship with a person who owns $100,000 of Alphabet stock

19    and that they are talking about purchasing a house together.

20        We believe that that is a sufficient financial interest in

21    a party to this case to strike her for cause.

22            THE COURT:  What do you say, Mr. Pak?

23            MR. PAK:  Your Honor, it's not a legal marriage, and

24    it sounds like it's speculative planning.  We don't believe

25    there is adequate cause for a cause strike.

 1          **THE COURT:**  Sorry.  What was that noise?

 2          **THE CLERK:**  The microphone.

 3          **THE COURT:**  Oh.

 4      She's not married to this person.

 5          **MS. CARIDIS:**  Your Honor, we don't believe that

 6  marriage is a requirement.  It is a close intimate

 7  relationship.  They are talking about purchasing a house

 8  together and moving in together.  Marriage is not a requirement

 9  under any of the statutes or case law that we saw.

10          **THE COURT:**  I'm denying the motion.  It's not -- she

11  is not the owner.  It's somebody that she's intimate with.

12  That's not good enough.  She has otherwise made it very clear

13  she could be fair and impartial to both sides.  Motion denied.

14          **MS. CARIDIS:**  Thank you, Your Honor.

15          **THE COURT:**  All right.  Anyone -- any motions on your

16  side, on the Google side?

17          **MR. PAK:**  No, Your Honor.  Thank you.

18          **THE COURT:**  All right.  Let's go over how it will

19  work.  Plaintiff gets to go first.  You stand and thank whoever

20  you want to thank, and they walk out.  You stand and thank.  It

21  goes back and forth until we're down to eight people, and then

22  we will swear those eight people in as our jury.

23          **MR. PAK:**  Yes, Your Honor.  And my understanding is,

24  Your Honor, just for clarification, is that the first six will

25  be the actual jurors and the remaining two are alternate

1    jurors.  Is that --

2        **THE COURT:**  No, no, no.  In federal court in a civil

3    case, everyone is on the jury.  We don't have alternatives on

4    civil anymore.  That went out.  On criminal, we still do; but

5    on civil, everyone is on the jury.  So all eight will serve in

6    the jury room if they're still there.

7        **MR. PAK:**  Thank you.

8        **THE COURT:**  Okay.  Now, I'll give you a few minutes.

9    You might want to talk to your team to see who it is that you

10   want to strike.

11       Okay.  I'll be back in about eight minutes.

12       **THE CLERK:**  Court is in recess.

13                   (Recess taken at 1:11 p.m.)

14              (Proceedings resumed at 1:20 p.m.)

15    (Proceedings were heard out of the presence of the venire.)

16       **THE COURT:**  My law clerk pointed out something I

17   didn't realize, and we made a -- paragraph 3 of the final

18   pretrial order says we were going to have alternate jurors.

19   That was a mistake, a clerical error.  We don't have alternates

20   on the civil side.  So it's going to be eight.  Okay?  And I'll

21   do an amended order.

22       All right.  Anything else today before we bring the jury

23   in?

24       **MR. ROBERTS:**  Your Honor, may I make a brief record on

25   something?

1          **THE COURT:**  Sure.

2          **MR. ROBERTS:**  Thank you.

3      This relates to Your Honor's ruling on Juror Number 13.

4  And I just wanted to point out, because I didn't think it was

5  clear from the record, that when she talked about her financial

6  interest, she said, "Not yet.  We're, like, talking about

7  moving in together, and they have about a hundred K worth of

8  Google stock that we're like, you know, maybe going to try to

9  buy a house with at some point."

10     So our concern was that the financial interest is direct

11 because it has to do with stock that she is planning to buy a

12 house with.  So the value of that stock has personal importance

13 to her.

14     But I do respect the Court's ruling.  I just wanted to

15 make that clear.

16         **THE COURT:**  No.  You're larding the record.

17         **MR. ROBERTS:**  I am putting in --

18         **THE COURT:**  You're larding the record.

19     All right.  Let me ask the other side.  Here's what I

20 propose to do:  Strike Number 13 and we're just going to have

21 seven.  We're not going to have eight.  We're going to move on.

22 We'll have seven.

23     Do you care, Mr. Pak?

24         **MR. PAK:**  Yes, Your Honor.

25         **THE COURT:**  Do you want to jeopardize -- do you want

1  to jeopardize a verdict in your favor, if you get that far, on

2  account of this issue?  You're crazy if you do.

3          **MR. PAK:**  Defer to Your Honor.

4          **THE COURT:**  What?

5          **MR. PAK:**  Your Honor, if Your Honor is inclined to

6  excuse her, then that's fine with us.

7          **THE COURT:**  All right.  We're going to go down to

8  seven.  We're not going to have eight.  We're going to strike

9  her and move on.

10         **MR. PAK:**  Thank you, Your Honor.

11         **THE COURT:**  I think this is some gimmickry going on,

12 but I'm -- fine.  You made your record.

13     Go ahead.  Let's bring everybody back in, please.

14     (Proceedings were heard in the presence of the venire.)

15         **THE COURT:**  Welcome back.  Be seated.

16     Ms. Thurium, I want to make sure that I understand the

17 facts right.

18     I think you said toward the end -- we need to give her the

19 microphone -- that you and your partner have talked about

20 buying a house together with $100,000 worth of her Google

21 stock.

22         **PROSPECTIVE JUROR THURIUM:**  Yeah.  Exactly.  Yeah.

23         **THE COURT:**  We have to excuse you.

24         **PROSPECTIVE JUROR THURIUM:**  Thank you, Your Honor.

25         (Prospective Juror Tilde Ann Thurium excused.)

 1          **THE COURT:**  All right.  Now, with excusing

 2   Ms. Thurium, I'm going to change it a little bit.  Instead of

 3   eight jurors, we're going to have seven.  Each side gets to

 4   knock off three of the 13, and that means we can't lose a

 5   single one of you of the seven.

 6       The panel has been passed for cause; correct?

 7          **MR. PAK:**  Correct.

 8          **MS. CARIDIS:**  Correct, Your Honor.

 9          **MR. PAK:**  Yes, Your Honor.

10          **THE COURT:**  All right.  At this time, plaintiff may

11   make -- the challenge rests with plaintiff.

12          **MS. CARIDIS:**  Thank you, Your Honor.

13       At this time, we would thank and excuse Juror Number 9,

14   Ms. Popat.

15          **THE COURT:**  Okay.  You're free to go, Ms. Popat.

16   Thank you for your willingness to serve.

17          (Prospective Juror Sejal Kaushik Popat excused.)

18          **THE COURT:**  All right.  At this time the challenge

19   lies with the defense.

20          **MR. PAK:**  Thank you.

21       Mr. Simonson, we'd like to thank you for your service.

22   You may be excused.

23          **THE COURT:**  Mr. Simonson.  Okay.  Good luck, sir.

24          (Prospective Juror Timothy Michael Simonson excused.)

25          **THE COURT:**  All right.  Now, the challenge lies with

1   plaintiff.

2       **MS. CARIDIS:**  We would like to thank and excuse

3   Mr. Hinh.

4       **THE COURT:**  All right.  You're free to go, sir.

5           (Prospective Juror Adam Hinh excused.)

6       **THE COURT:**  Now the challenge lies with the defense.

7       **MR. PAK:**  Mr. Michalski, we'd like to thank you for

8   your service, and we'd like to excuse you at this time.

9       **THE COURT:**  Okay.  Thank you, sir.

10      Don't shrug your shoulders.  Hey, listen, you would have

11  been a great juror.  All of you would have been a great juror.

12  I think all of you would have been terrific.  And they got to

13  knock somebody off, so you're the lucky guy.  Okay?

14      (Prospective Juror Raymond James Michalski excused.)

15      **THE COURT:**  Okay.  Now, the last challenge for the

16  plaintiff.

17      **MS. CARIDIS:**  We'd like to thank and excuse

18  Mr. Yeager.

19      **THE COURT:**  Where's Yeager?  Okay.  Yeager.

20      All right.  And thank you, Mr. Yeager.  You too.

21      (Prospective Juror Kim Allan Yeager excused.)

22      **THE COURT:**  All right.  Google, do you have any other

23  challenges?  If you were to pass, then we would have eight.

24      **MR. PAK:**  Mr. Ivory-Chambers, we'd like to thank you

25  for your service.  You may be excused.

**JURY VOIR DIRE**

```
 1        THE COURT:  Okay.  Mr. Chambers, thank you.  You go
 2  have a great day.
 3        (Prospective Juror Eric Ivory-Chambers excused.)
 4        THE COURT:  All right.  Welcome to the U.S. District
 5  Court, and you are the jury.  Please stand and raise your right
 6  hand.  The clerk will now swear you in.
 7        (The jurors were duly sworn to try this case.)
 8            (Jurors answer in the affirmative.)
 9        THE COURT:  You've got to say "yes."
10            (Jurors answer in the affirmative.)
11        THE COURT:  Okay.
12        THE CLERK:  Thank you.
13        THE COURT:  Thank you.  Have a seat.  You're going to
14  be on your way home in just a minute.
15     Okay.  We're almost done for today.  Angie's going to take
16  you back here to your new home away from home, which is the
17  jury room, where she will give you a badge and give you
18  credentials and help you with some of the mechanical stuff, and
19  then she's going to send you on home.
20     Do not talk to anyone about this case, even among each
21  other about the case.  It'll be your duty to do that later on
22  at the time of deliberations.
23     No Internet research.  Please, do not go on the Internet
24  and try to learn anything about the issues in this case.  That
25  would be wrong.  You're supposed to decide the case based on
```

**PROCEEDINGS**

1  the evidence here in the courtroom, not something that somebody

2  found on the Internet that might be completely off base.  So

3  you've got to do it the right way.  We're going to decide the

4  case on the merits.

5      And you need to be back here at 7:45 Monday morning.

6  Please leave enough time.  Here's what happens:  If one of you

7  is late, then we all sit here in the courtroom waiting.  The

8  jury is -- the rest of the jury is sitting in the jury room

9  waiting until you finally arrive if you're late, and then we

10  have to make that time up somehow.  It may mean that we have to

11  go into an additional day, which we don't want to do.

12      In my experience, the jurors have been very good for

13  23 years of me doing this.  Rarely do we get a situation where

14  somebody is late.  It's fine to be early.

15      Angie, how early will the federal doughnuts and the

16  federal coffee be in there?

17          **THE CLERK:**  7 o'clock, Your Honor.

18          **THE COURT:**  7 o'clock.  So if you want to get here at

19  7:00 a.m., read the newspaper, that's the way.  The coffee will

20  be there.  The doughnuts will be there.  The nice comfy chair

21  will be there.

22      So 7:00 a.m.  But you don't have to be here at 7:00 a.m.

23  You can -- you know, what did I say?  7:45.  7:45, you've got

24  to be here, at 7:45.  And then we'll start at 8:00.

25      Now, if the lawyers want to talk to me and make motions,

1    too bad.  At 7:59 I say, "End of story.  Put your witness on

2    the stand.  We're going forward."  I will not let them drag the

3    case out with motions in limine.

4        So you will -- I'm going to respect your time and the

5    burden that you are -- and the sacrifice that you're making for

6    your country to come in here and decide this case.  So you come

7    first.  You come first.

8        So be -- but you've got to help me out and be on time.

9        Are you crying over there?  Huh?

10           **JUROR CAMERON:**  The thought of doing this for --

11           **THE COURT:**  I can't hear you.

12           **JUROR CAMERON:**  I'm sorry.  The thought of doing this

13   for the next two weeks solid is very overwhelming for me.

14           **THE COURT:**  I just cannot hear what she's saying.

15       What?

16           **JUROR CAMERON:**  I said the thought of doing this for

17   the next two weeks solid is very overwhelming for me.

18           **THE COURT:**  Well, I tried to prepare you for this and

19   told you exactly this.  So you're in.  It's like the U.S. Army.

20   You have been drafted.  You're in for the duration.  There's no

21   going back on it now.

22       Help me out here.  Be on time.  Pay attention.

23       Anything else?  Any other admonitions before I send the

24   jury back into the jury room?

25                        (No response.)

**PROCEEDINGS**

1        **THE COURT:**  Okay.  Angie, please take our jury to the

2   jury room.

3        I'll see you back here at 7:45 on Monday morning.  Have a

4   great weekend.

5        (Proceedings were heard out of the presence of the jury.)

6        **THE COURT:**  All the other jurors back there -- I mean

7   potential jurors, you're free to go now.  Thank you for your

8   willingness to serve.  I think it's three -- it's just three

9   left; right?  Yeah, three.  One, two, three.  Yeah.

10       Okay.  Thank you.  Take off.

11       Okay.  Any other business by the lawyers before we break

12   for the day?

13       **MR. PAK:**  No, Your Honor.

14       **MS. CARIDIS:**  No, Your Honor.

15       **THE COURT:**  Okay.  Be ready to go on Monday morning,

16   and good luck to both sides.

17       **MR. PAK:**  Thank you.

18       **MR. RICHTER:**  Thank you.

19           (Proceedings adjourned at 1:32 p.m.)

20                   ---o0o---

21

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Thursday, May 4, 2023


_____

Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter